# 20-1796

## United States Court of Appeals for the Second Circuit

**JAMES GARLICK,**

PETITIONER-APPELLEE,

-AGAINST-

**WILLIAM LEE,**
**SUPERINTENDENT OF EASTERN CORRECTIONAL FACILITY**

RESPONDENT-APPELLANT.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

## APPENDIX

NANCY D. KILLIAN
PETER D. CODDINGTON
JOSHUA P. WEISS
ROBERT C. MCIVER
ASSISTANT DISTRICT ATTORNEYS
OF COUNSEL

DARCEL D. CLARK
DISTRICT ATTORNEY
BRONX COUNTY
ATTORNEY FOR RESPONDENT
BRONX, NEW YORK 10451
(718) 838-6229

# TABLE OF CONTENTS

Docket entries ........................................................................................ A-01 – 08

Transcript of oral argument before Hon. Sarah L. Cave .............................. A-09 – 47

State's post-oral argument submission........................................................... A-48 – 50

Magistrate's Report & Recommendation ....................................................... A-51 – 114

State's objections to Report & Recommendation ......................................... A-115 – 120

Petitioner's objections to Report & Recommendation ................................. A-121 – 141

State's opposition to petitioner's objections ................................................ A-142 – 154

Decision and order granting habeas petition .............................................. A-155 – 169

Notice of Appeal ....................................................................................... A-170

Letter advising of State's intent to re-try petitioner.................................. A-171 – 172

Decision and order of the Appellate Division, First Department affirming
petitioner's conviction................................................................................ A-173 -– 175

Order by Hon. Sheila Abdus-Salaam denying leave to appeal to the New York State
Court of Appeals ...................................................................................... A-176

Petition for Writ of Certiorari ................................................................... A-177 – 215

State's opposition to Certiorari .................................................................. A-216 – 256

Petitioner's Certiorari reply ....................................................................... A-257 – 272

Autopsy report and records ....................................................................... A-273 – 293

CLOSED,APPEAL,HABEAS,CASREF,ECF

# U.S. District Court
# Southern District of New York (Foley Square)
# CIVIL DOCKET FOR CASE #: 1:18-cv-11038-CM-SLC

Garlick v. Miller

Assigned to: Judge Colleen McMahon

Referred to: Magistrate Judge Sarah L Cave

Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 11/27/2018

Date Terminated: 06/03/2020

Jury Demand: None

Nature of Suit: 530 Habeas Corpus (General)

Jurisdiction: Federal Question

## Petitioner

**James Garlick**      represented by    **Katharine Rachel Skolnick**
Center for Appellate Litigation
120 Wall Street
New York, NY 10005
(212) 577-2523 x501
Fax: (212)-577-2535
Email: kskolnick@cfal.org
*TERMINATED: 04/04/2019*
*LEAD ATTORNEY*

**Matthew Bova**
Center for Appellate Litigation
120 Wall Street
New York, NY 10005
212-577-2523
Email: mbova@cfal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

## Defendant

**Superintendent Christopher L Miller**     represented by    **Jordan K. Hummel**
*Great Meadow Correctional Facility*

Westchester County Office of the District
Attorney
111 Dr. Martin Luther King Jr. Blvd.
White Plains, NY 10601
914-995-8112
Email: jhummel@westchesterda.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Phillip Weiss**

Bronx District Attorney's Office
198 East 161st Street
Bronx, NY 10451
(718)-838-6229
Email: weissjo@bronxda.nyc
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Christopher McIver**
Bronx District Attorney's Office
198 E. 161st Street
Bronx, NY 10451
718-838-6144
Email: mciverr@bronxda.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/27/2018 | 1 | **FILING ERROR - DEFICIENT PLEADING - PDF ERROR -** PETITION FOR WRIT OF HABEAS CORPUS pursuant to 28 U.S.C. 2254. Document filed by James D. Garlick. (Skolnick, Katharine) Modified on 11/28/2018 (pc). (Entered: 11/27/2018) |
| 11/27/2018 | 2 | REQUEST TO PROCEED IN FORMA PAUPERIS. Document filed by James D. Garlick. (Skolnick, Katharine) (Entered: 11/27/2018) |
| 11/27/2018 | 3 | CIVIL COVER SHEET filed. (Skolnick, Katharine) (Entered: 11/27/2018) |
| 11/27/2018 | 4 | FIRST MEMORANDUM OF LAW in Support re: 1 Petition for Writ of Habeas Corpus . Document filed by James D. Garlick. (Skolnick, Katharine) (Entered: 11/27/2018) |
| 11/28/2018 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Katharine Rachel Skolnick to RE-FILE Document No. 1 Petition for Writ of Habeas Corpus. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the pleading is not correct; Remove the filing instructions as the first page of the Petition. Re-file the pleading using the event type Petition for Writ of Habeas Corpus found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. If the deficiency/deficiencies are not corrected within five (5) days per Amended Standing Order 15-mc-00131 this case will be administratively closed. Initial Pleading due by 12/3/2018. (pc)** (Entered: 11/28/2018) |
| 11/28/2018 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Katharine Rachel Skolnick. The party information for the following party/parties has been modified: Superintendent Christopher L Miller, James D. Garlick. The information for the party/parties has been modified for the following reason/reasons: party name contained a typographical error; party text was omitted;. (pc)** (Entered: 11/28/2018) |
| 11/28/2018 | 5 | PETITION FOR WRIT OF HABEAS CORPUS pursuant to 28 U.S.C. 2254. Document filed |

| | | |
|---|---|---|
| | | by James Garlick.(Skolnick, Katharine) (Entered: 11/28/2018) |
| 11/29/2018 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Colleen McMahon. Please download and review the Individual Practices of the assigned District Judge, located at http://nysd.uscourts.gov/judges/District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (pc) (Entered: 11/29/2018) |
| 11/29/2018 | | Magistrate Judge Henry B. Pitman is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: http://nysd.uscourts.gov/forms.php. (pc) (Entered: 11/29/2018) |
| 11/29/2018 | | Case Designated ECF. (pc) (Entered: 11/29/2018) |
| 11/29/2018 | 6 | ORDER REFERRING CASE TO MAGISTRATE JUDGE: Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Habeas Corpus. Referred to Magistrate Judge Henry B. Pitman. SO ORDERED. (Signed by Judge Colleen McMahon on 11/29/2018) (jca) (Entered: 11/29/2018) |
| 11/30/2018 | 7 | ORDER: The Clerk of the Court will serve a copy of this Order and underlying petition, by certified mail, return receipt requested, upon the Attorney General of the State of New York and the District Attorney of Bronx County and will also transmit a copy of this Order to counsel for petitioner. Respondent is directed to serve and file an answer or motion herein no later than January 31, 2019. Responding papers shall include such information as is necessary for this Court to determine whether petitioner has exhausted his state remedies. Transcripts of all relevant proceedings, the briefs submitted on appeal, and the record in any state post-conviction proceedings shall also be submitted. Christopher L Miller answer due 1/31/2019. (Signed by Magistrate Judge Henry B. Pitman on 11/30/2018) Copies Transmitted By Chambers. Copies Mailed By Chambers. (ne) Transmission to Docket Assistant Clerk for processing. (Entered: 11/30/2018) |
| 12/03/2018 | | Mailed a copy of 7 Order to Answer, Set Deadlines, to Katharine Rachel Skolnick Center for Appellate Litigation 120 Wall Street New York, NY 10005 ; 7 Order to Answer, Set Deadlines, 1 Petition for Writ of Habeas Corpus to Attorney General State of NY 120 Broadway NY, NY 10007; DA Bronx County 198 E. 161st Bronx, NY 10451 by Certified Mail # 7017 3040 0000 1025 4175; 7017 3040 0000 1025 8296 with Return Receipt Requested. (aea) (Entered: 12/03/2018) |
| 12/05/2018 | 8 | MEMO ENDORSEMENT on 2 REQUEST TO PROCEED IN FORMA PAUPERIS. Document filed by James D. Garlick. ENDORSEMENT: APPLICATION GRANTED. SO ORDERED. (Signed by Magistrate Judge Henry B. Pitman on 12/5/2018) (ne) (Entered: 12/07/2018) |
| 12/10/2018 | 9 | NOTICE OF APPEARANCE by Jordan K. Hummel on behalf of Christopher L Miller. (Hummel, Jordan) (Entered: 12/10/2018) |
| 01/17/2019 | 10 | ENDORSED LETTER addressed to Magistrate Judge Henry B. Pitman from Jordan K. Hummel dated 1/16/2019 re: Respondent requests that our time to answer the petition be extended 60 days, until April 1, 2019. ENDORSEMENT: APPLICATION GRANTED. SO ORDERED. Christopher L Miller answer due 4/1/2019. (Signed by Magistrate Judge Henry B. Pitman on 1/17/2019) (ne) (Entered: 01/17/2019) |

| 04/01/2019 | 11 | DECLARATION of CHRISTOPHER MILLER, Superintendent, in Opposition. Document filed by Christopher L Miller. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7) (Hummel, Jordan) (Entered: 04/01/2019) |
|---|---|---|
| 04/01/2019 | 12 | MEMORANDUM OF LAW in Opposition re: 11 Declaration in Opposition, . Document filed by Christopher L Miller. (Hummel, Jordan) (Entered: 04/01/2019) |
| 04/01/2019 | 13 | STATE COURT TRANSCRIPT of proceedings in the Supreme Court, County of Bronx, Case Number 3681/2011, (Attachments: # 1 Transcript 2, # 2 Transcript 3, # 3 Transcript 4, # 4 Transcript 5, # 5 Transcript 6, # 6 Transcript 7, # 7 Transcript 8, # 8 Transcript 9, # 9 Transcript 10, # 10 Transcript 11, # 11 Transcript 12, # 12 Transcript 13, # 13 Transcript 14, # 14 Transcript 15, # 15 Transcript 16, # 16 Transcript 17)(Hummel, Jordan) (Entered: 04/01/2019) |
| 04/03/2019 | 14 | PROPOSED ORDER FOR SUBSTITUTION OF ATTORNEY. Document filed by James Garlick. (Bova, Matthew) (Entered: 04/03/2019) |
| 04/04/2019 | 15 | CONSENT ORDER GRANTING SUBSTITUTION OF ATTORNEY. Notice is hereby given that, subject to approval by the court, James D. Garlick substitutes Matthew Bova, State Bar No. 5073135 as counsel of record in place of Katharine Rachel Skolnick, and as further specified in this Consent Order. The substitution of attorney is hereby approved and so ORDERED. Attorney Matthew Bova for James Garlick added. Attorney Katharine Rachel Skolnick terminated. (Signed by Magistrate Judge Henry B. Pitman on 4/4/2019) (rjm) (Entered: 04/04/2019) |
| 04/05/2019 | 16 | FIRST LETTER addressed to Magistrate Judge Henry B. Pitman from Matthew Bova dated April 5, 2019 re: Reply Papers. Document filed by James Garlick.(Bova, Matthew) (Entered: 04/05/2019) |
| 04/15/2019 | 17 | MEMO ENDORSEMENT on re: 16 Letter filed by James Garlick. ENDORSEMENT: Application Granted. So Ordered. (Replies due by 4/22/2019.) (Signed by Magistrate Judge Henry B. Pitman on 4/12/2019) (js) (Entered: 04/15/2019) |
| 04/22/2019 | 18 | FIRST REPLY MEMORANDUM OF LAW in Support re: 12 Memorandum of Law in Opposition . Document filed by James Garlick. (Bova, Matthew) (Entered: 04/22/2019) |
| 04/25/2019 | 19 | FIRST LETTER addressed to Magistrate Judge Henry B. Pitman from Matthew Bova dated April 25, 2019 re: Request for Oral Argument. Document filed by James Garlick.(Bova, Matthew) (Entered: 04/25/2019) |
| 05/22/2019 | 20 | NOTICE OF APPEARANCE by Joshua Phillip Weiss on behalf of Christopher L Miller. (Weiss, Joshua) (Entered: 05/22/2019) |
| 10/02/2019 | | Magistrate Judge Sarah L. Cave is so redesignated. (ad) (Entered: 10/02/2019) |
| 10/03/2019 | | NOTICE OF REASSIGNMENT OF A REFERRAL TO ANOTHER MAGISTRATE JUDGE. The referral in the above entitled action has been reassigned to Magistrate Judge Sarah L. Cave, for Habeas Corpus. Magistrate Judge Henry B. Pitman no longer referred to the case. (ad) (Entered: 10/03/2019) |
| 10/25/2019 | 21 | ORDER SCHEDULING ORAL ARGUMENT: The referral in this case has been reassigned to the undersigned. The request for oral argument in the LetterMotion at ECF No. 19 is GRANTED. Oral Arguments are scheduled for Thursday, November 21, 2019 at 4:00 p.m. in |

| | | |
|---|---|---|
| | | Courtroom 18A, 500 Pearl Street, New York, New York. (Oral Argument set for 11/21/2019 at 04:00 PM in Courtroom 18A, 500 Pearl Street, New York, NY 10007 before US Magistrate Judge Sarah L Cave.) (Signed by US Magistrate Judge Sarah L Cave on 10/25/2019) (rro) (Entered: 10/25/2019) |
| 11/15/2019 | 22 | NOTICE OF APPEARANCE by Robert Christopher McIver on behalf of Christopher L Miller. (McIver, Robert) (Entered: 11/15/2019) |
| 11/18/2019 | 23 | FIRST LETTER addressed to Magistrate Judge Sarah L. Cave from MATTHEW BOVA dated Nov. 18, 2019 re: Request for Production of Client in Custody. Document filed by James Garlick.(Bova, Matthew) (Entered: 11/18/2019) |
| 11/19/2019 | 24 | ORDER: IT IS ORDERED that the Superintendent or other official in charge of the Great Meadow Correctional Facility transfer inmate James Garlick, #13-A-5111, from the correctional facility located at 11739 NY-22, Comstock, NY, 12821, to the undersigned's courtroom, Daniel Patrick Moynihan Courthouse, 500 Pearl Street, Courtroom 18A, New York, NY 10007 by 3:00 p.m. on November 21, 2019 so that he may attend oral arguments scheduled for 4:00 p.m. IT IS FURTHER ORDERED that if Garlick cannot be produced in person, the Superintendent or other official in charge of the Great Meadow Correctional Facility produce Garlick on November 21, 2019, no later than 3:45 p.m., to a suitable location within the Great Meadow Correctional Facility that is equipped with a telephone, for the purpose of listening by telephone to the oral arguments. IT IS FURTHER ORDERED that petitioner's counsel must: (1) transmit this order to the Superintendent immediately; (2) if Garlick cannot be transported to the Courthouse in person at the designated time, contact Great Meadow Correctional Facility to arrange the telephone call in the alternative; and (3) determine the number at which the plaintiff will be reachable at the scheduled date and time. (Signed by Magistrate Judge Sarah L Cave on 11/19/2019) (rro) (Entered: 11/19/2019) |
| 11/21/2019 | 25 | Minute Entry for proceedings held before Magistrate Judge Sarah L Cave: Oral Argument held on 11/21/2019 re: 1 Petition for Writ of Habeas Corpus filed by James Garlick. Attorney Matthew Bova appeared on behalf of Petitioner. Attorneys Robert McIver and Joshua Weiss appeared on behalf of Defendant. Petitioner James Garlick appeared telephonically. See transcript for details. A transcript of this proceeding is available by utilizing the attached order form. (ne) (Entered: 11/21/2019) |
| 11/21/2019 | 26 | ORDER: The Court having heard oral arguments in this matter today, November 21, 2019, Respondent shall submit the following supplemental materials to the Court by December 2, 2019: 1. Information describing the role of a Medico-Legal Investigator in the New York City Office of the Chief Medical Examiner; 2. Information as to who completed the "Notice of Death" form dated November 1, 2011 (ECF No. 11-7 at 18); and 3. A copy of the surveillance video shown at Petitioner's trial. (Signed by Magistrate Judge Sarah L Cave on 11/21/2019) (ne) (Entered: 11/21/2019) |
| 12/02/2019 | 27 | FIRST LETTER MOTION for Local Rule 37.2 Conference addressed to Magistrate Judge Sarah L. Cave from A.D.A. Joshua P. Weiss dated 12/02/2019. Document filed by Christopher L Miller. (Attachments: # 1 Medicolegal investigator duties, # 2 Additional cases)(Weiss, Joshua) (Entered: 12/02/2019) |
| 12/03/2019 | 28 | ORDER terminating 27 Letter Motion for Local Rule 37.2 Conference. The filing at ECF No. 27 containing the requested information was inadvertently filed as a motion for a Rule 37.2 Conference. The Clerk of Court is respectfully directed to terminate the Letter-Motion at ECF |

| | | No. 27. SO ORDERED. (Signed by Magistrate Judge Sarah L Cave on 12/3/19) (yv) (Entered: 12/03/2019) |
|---|---|---|
| 04/27/2020 | [29](#) | REPORT AND RECOMMENDATION re: [5](#) Petition for Writ of Habeas Corpus filed by James Garlick. For the foregoing reasons, the Court respectfully recommends that Garlick's petition be DENIED. Because, however, Garlick has made a substantial showing of the denial of a constitutional right, the Court also recommends that, if the District Court adopts this Report and Recommendation and denies the Petition, a certificate of appealability issue on the questions (1) whether the Supreme Court's Confrontation Clause precedent clearly establishes that an autopsy report was testimonial and, (2) if so, whether the First Department's decision denying Garlick's Confrontation Clause claim was contrary to, or involved an unreasonable application of, that precedent. See 28 U.S.C. § 2253. Objections to R&R due by 5/11/2020. (Signed by Magistrate Judge Sarah L Cave on 4/27/2020) (va) (Entered: 04/27/2020) |
| 05/06/2020 | [30](#) | FIRST LETTER MOTION for Extension of Time to File *Objections to Magistrate Judge Cave's Report and Recommendation* addressed to Judge Colleen McMahon from Matthew Bova dated May 6, 2020. Document filed by James Garlick..(Bova, Matthew) (Entered: 05/06/2020) |
| 05/09/2020 | [31](#) | FIRST LETTER addressed to Judge Colleen McMahon from Matthew Bova dated May 9, 2020 re: Request for Extension. Document filed by James Garlick..(Bova, Matthew) (Entered: 05/09/2020) |
| 05/11/2020 | [32](#) | OBJECTION to [29](#) Report and Recommendations Document filed by Christopher L Miller.. (Weiss, Joshua) (Entered: 05/11/2020) |
| 05/11/2020 | [33](#) | OBJECTION to [29](#) Report and Recommendations Document filed by James Garlick..(Bova, Matthew) (Entered: 05/11/2020) |
| 05/12/2020 | [34](#) | ORDER denying as moot [30](#) Letter Motion for Extension of Time to File. Objections have been received - Application is moot. (Signed by Judge Colleen McMahon on 5/12/2020) (mml) (Entered: 05/12/2020) |
| 05/25/2020 | [35](#) | FIRST RESPONSE . Document filed by Christopher L Miller..(Weiss, Joshua) (Entered: 05/25/2020) |
| 05/25/2020 | [36](#) | FIRST RESPONSE re: [32](#) Objection to Report and Recommendations . Document filed by James Garlick..(Bova, Matthew) (Entered: 05/25/2020) |
| 06/02/2020 | [37](#) | DECISION AND ORDER adopting [29](#) Report and Recommendations: I hereby adopt the following conclusions from the R&R: (i) the Autopsy Report was testimonial; (ii) surrogate testimony from a qualified expert in medical examination was not a sufficient substitute for cross examination; (iii) the First Department's ruling on the testimonial nature of the autopsy report was incorrect under Supreme Court precedent; and (iv) the trial court's admission of the autopsy report without providing Garlick the opportunity to confront the medical examiner who prepared it did not constitute harmless error. I do not adopt the portion of the R&R recommending denial of the petition on the grounds that the First Department's decision was not an unreasonable application of clearly established law. For the reasons set forth above, Garlick's habeas petition is GRANTED. Accordingly, Respondent is directed to release Garlick from custody unless the People of the State of New York decide to re-try him within the next ninety days. Because I have granted the petition, there is no need to issue a Certificate of Appealability for purposes of appeal. The Clerk of the Court is directed to close this case. (Signed by Judge Colleen |

| | | McMahon on 6/2/2020) BY ECF TO ALL PARTIES (jwh) Transmission to Orders and Judgments Clerk for processing. (Entered: 06/02/2020) |
|---|---|---|
| 06/03/2020 | 38 | CLERK'S JUDGMENT re: 37 Order Adopting Report and Recommendations. in favor of James Garlick against Christopher L Miller. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Decision and Order dated June 2, 2020, I hereby adopt the following conclusions from the R&R: (i) the Autopsy Report was testimonial; (ii) surrogate testimony from a qualified expert in medical examination was not a sufficient substitute for cross examination; (iii) the First Department's ruling on the testimonial nature of the autopsy report was incorrect under Supreme Court precedent; and (iv) the trial courts admission of the autopsy report without providing Garlick the opportunity to confront the medical examiner who prepared it did not constitute harmless error. I do not adopt the portion of the R&R recommending denial of the petition on the grounds that the First Department's decision was not an unreasonable application of clearly established law. Garlick's habeas petition is granted; Accordingly, Respondent is directed to release Garlick from custody unless the People of the State of New York decide to re-try him within the next ninety days; because the petition was granted, there is no need to issue a Certificate of Appealabilty for purposes of appeal, this case is closed. (Signed by Clerk of Court Ruby Krajick on 06/03/2020) (Attachments: # 1 Notice of Right to Appeal) (dt) (Entered: 06/03/2020) |
| 06/09/2020 | 39 | FIRST NOTICE OF APPEAL from 37 Order Adopting Report and Recommendations,,,,,. Document filed by Christopher L Miller. Filing fee $ 505.00, receipt number ANYSDC-20174843. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Weiss, Joshua) (Entered: 06/09/2020) |
| 06/09/2020 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 39 Notice of Appeal. (tp) (Entered: 06/09/2020) |
| 06/09/2020 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 39 Notice of Appeal, filed by Christopher L Miller were transmitted to the U.S. Court of Appeals. (tp) (Entered: 06/09/2020) |
| 06/23/2020 | 40 | LETTER from Daniel Bradford Jr.(DIN#11B1044), dated 6/17/20 re: I would like to purchase a copy of all relevant documents filed in connection with the habeas corps petition in this matter. Please advise of the fee for copying cost. Document filed by James Garlick.(sc) (Entered: 06/24/2020) |
| 06/23/2020 | | Request for Copies of Documents Received: Re 40 Letter,. Request for all relevant documents in connection with the habeas corpus petition from Daniel Bradford Jr.(DIN#11B1044) received on 6/23/20. Transmission to Records Management for processing. (sc) (Entered: 06/24/2020) |
| 06/24/2020 | 41 | NOTICE of Intent of the Bronx District Attorney's Office to retry petitioner. Document filed by Christopher L Miller..(Weiss, Joshua) (Entered: 06/24/2020) |
| 06/25/2020 | | Request for Copies/Transcripts/Docket Sheet Processed: Mailed letter to Daniel Bradford Jr. #11B1044 at Attica Correctional Facility, P.O. Box 149, Attica, NY 14011 advising that copy/copies of the Entire File requested will be furnished upon receipt of the statutory fee of $$604.50 in the form of a company check, certified check or money order payable to the Clerk of the Court, SDNY. (dn) (Entered: 06/25/2020) |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                    :
                                              Docket #18cv11038
 GARLICK,                                 : 1:18-cv-11038-CM-SLC

                    Petitioner,           :

   - against -                            :

 MILLER,                                  :
                                              New York, New York
                      Defendant.          : November 21, 2019

------------------------------------:


PROCEEDINGS BEFORE
THE HONORABLE SARAH L. CAVE,
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:

For Petitioner:           CENTER FOR APPELLATE LITIGATION
                          BY:  MATTHEW BOVA, ESQ.
                          120 Wall Street
                          New York, New York  10005

For Defendant:            BRONX DISTRICT ATTORNEY'S OFFICE
                          BY:  ROBERT MCIVER, ESQ.
                               JOSHUA WEISS, ESQ.
                          198 East 161st Street
                          Bronx, New York  10451




Transcription Service: Carole Ludwig, *Transcription Services*
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

<u>**INDEX**</u>

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---------|--------|-------|-----------|----------|-------|
| None | | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

1

THE CLERK:  Your Honor, this is in the matter of Garlick versus Miller, 18cv11038.  Counsel, please state your appearance for the record.

MR. MATTHEW BOVA:   Matthew Bova for petitioner, James Garlick.

THE COURT:  Good afternoon.

MR. BOVA:  Good afternoon.

MR. ROBERT MCIVER:  Robert McIver for the Bronx County District Attorney's Office on behalf of Mr. Christopher Miller.

THE COURT:  Good afternoon.

MR. JOSHUA WEISS:  Josh Weiss, also for the Office of Darcel D. Clark on behalf of Christopher Miller, good afternoon, Your Honor.

THE COURT:  Good afternoon, Mr. Weiss. Mr. Bova, are you prepared to proceed?

MR. BOVA:  Yes, Your Honor.

THE COURT:  Sorry, and I understand we have the petitioner on the phone, correct?

MR. BOVA:  Yes, we do, Your Honor.

THE COURT:  Mr. Garlick, can you hear us?

THE PETITIONER: Yes, ma'am, thank you.

THE COURT:  Okay, very good.  Please proceed.

MR. BOVA:  May it please the Court, Your

Honor, this case is, this habeas application is unique
in that the Appellate Division not only diverged from
clearly established Supreme Court law, but the
Appellate Division applied a standard that in
*Melendez-Diaz* seven years earlier, the United State
Supreme Court expressly teed up as Massachusetts'
argument in that case and rejected categorically.
What the Appellate Division held here was that the
confrontation clause is very narrow and it's limited
to evidence proving who did it.  As the Appellate
Division put it, this statement is not testimonial
since it did not "link the commission of the crime to
a particular person."  That is exactly the argument
that the State of Massachusetts made in *Melendez-Diaz*
*v. Massachusetts.*

THE COURT:  And it almost never would, am I
right, I mean the medical examiner or somebody else
performing some kind of forensic analysis typically
wouldn't have the suspect's identification in front of
them as part of doing their job, right?

MR. BOVA:  Well, yes, that's true. And also an
autopsy report, just like a blood alcohol test, in
*Bullcoming*, just like a drug test in *Melendez-Diaz*,
will never prove identity. What these forensic tests

tend to do, perhaps with the exception of DNA, is

prove, in the context of *Bullcoming,* what a substance

is. *Melendez-Diaz*, the same thing. Here we're

talking about cause of death. And what the Supreme

Court held was that it doesn't matter whether it

proves who did it or it proves a particular element of

the offense, what matters is that it's evidence that

the state is using to meet its burden. What the

Supreme Court held in *Melendez-Diaz* was there's two

categories of evidence, evidence helpful to the

prosecution in its effort to prove the case, and

evidence that it's helpful to the defense, which is

covered by the compulsory process clause. There is

not, as the *Melendez-Diaz* majority held, a third class

of evidence, which is evidence helpful to the

prosecution and yet immune from confrontation. That is

exactly the standard that the Appellate Division

applied. That standard is under 2254 contrary to

clearly established Supreme Court law. Therefore, de

novo review applies. That's the long set of standard

since the leading case on the standard of review in

this area, which is *Williams.*

Under de novo review, however, Your Honor, or

under a deferential standard of review, it really

1   doesn't matter in this case because there is no

2   reasonable reading of this record and the clearly

3   established Supreme Court law that supports the

4   Appellate Division's determination.

5   

6         THE COURT:  Tell me how you think this

7   particular autopsy report is testimonial?

8         MR. BOVA:  Because what happened here was a

9   body arrives in the medical examiner's office with

10  numerous notations from several officials, police

11  officers, and also people working in OCME that the

12  belief is that a stabbing has occurred.  The body has

13  several stab wound and the person is deceased. In

14  turn, a medical examination occurs.  Even before that,

15  the record shows that the report says apparent

16  circumstances was that the cause of death was a

17  homicide.

18        So the medical examiner is not, as in cases

19  like from the Second Circuit, *United States v. James*,

20  kind of looking at what could probably be a suicide or

21  likely something else, it is guaranteed that the

22  result here is going to be evidence used in a criminal

23  case.  Only a foolish and unreasonable medical

24  examiner would conclude otherwise.  And then the

25  medical examiner performs the autopsy.  At that point,

Mr. Garlick is already a suspect.  She then drafts the

autopsy report and formally certifies it after Mr.

Garlick has been indicted for murder.

THE COURT:  Did I read the record correctly

that there were two police officers present for

autopsy, as well?

MR. BOVA:  Yes.  Yes, there were.  So that's

another thing, too, is that the police are directly

involved in this.  And that makes sense, because this

is obviously a homicide and that's why the medical

examiner is getting involved.  As far as I can tell,

the state's only real counter to that is that medical

examiners tend to look at other things. They don't

just analyze cause of death in the context of

homicide, they also look at things like potential

suicide, other public health concerns.  As a general

matter, we don't disagree with that.  Our argument is

not that there's a categorical rule that everything a

medical examiner does is going to be testimonial.  Our

point is that in this case when the medical examiner

performs an autopsy in what is obviously a homicide

during an active investigation, then puts pen to paper

saying cause of death homicide by a 4-1/2 to 5-1/2

stab wound. There is no reasonable view of those facts

1

2  that will lead to any other conclusion other than that

3  this was testimonial in that under the Supreme Court

4  standard it is likely going to be used as evidence in

5  a criminal case.

6      THE COURT:  Do you have any case that you're

7  aware of post *Crawford, Bullcoming, Melendez-Diaz* and

8  even *US v. James,* which, albeit, is a Second Circuit

9  case, finding that an autopsy report was testimonial?

10     MR. BOVA:  Yes, there are numerous cases. One

11 of them is *United States v. Ignasiak,* which is at out

12 of the 11th Circuit.  The DC Circuit has also agreed

13 with that same conclusion, the case cite on that is,

14 just give me one moment, Your Honor, is *United States*

15 *v. Moore,* the DC Circuit from 2011, same result

16 reached by *Commonwealth v. Carr*, Massachusetts, 2013.

17 And just so the record is clear, these are all cited

18 at page 28, footnote 131 of our memo.

19     THE COURT:  Thank you.

20     MR. BOVA:  Additionally, *Miller v. State,*

21 *State v. Kennedy*.  I mean I think what tends to happen

22 in this area, Your Honor, is that a strawman is

23 erected, that what the defendant is claiming is that

24 ultimately all autopsy reports are testimonial, and

25 that's not our argument.  Circumstances matter and

these circumstances point in only one direction.

        And as to the impact, well actually before I
get to the impact that this had on the case, I want to
also stress that this was a formalized, certified
report, just like in *Bullcoming*.  The record clearly
indicates at A910, Dr. Maloney says "I hereby certify
that I, Katherine Maloney, have performed the autopsy
on the body of Gabriel Sherwood."  She then lays out
her conclusions, at the end of the report she notes,
"draft 11/2, final 12/29," as if this is a formal
finding.  She then signs it, Katherine Maloney, MD.
And in her conclusion she lays out that this, the
cause of death is homicide.

        THE COURT:  Is there anything in the record
that explains that delay between the date that the
autopsy was performed and the finalizing, I think you
said, is it December 29th or November 29th?

        MR. BOVA:  Yeah, the final date is December
29th.

        THE COURT:  So that's almost two months later.
Is there anything in the record, and I'll ask your
adversary the same question when gets up, is there
anything in the record that explains that?

        MR. BOVA:  No, not that I'm aware of. And I

think it's important because what we're talking about
here is formal certifications and the finalized date
is important because that's then it's formally
certified.  A rough draft of a brief, for instance, is
not a formally certified brief until it's filed, and
the date that it's filed is going to be the real, the
date that controls whether it's a formal filing.
That's exactly what happened here.

This evidence was critical to the state's
case. Without this autopsy report, the state would
have had to have proven homicide with no medical
evidence, whatsoever. They would have had to have
proven that it was Mr. Garlick and not Rivera, who is
seen on the video pummeling the victim 12 times in the
head with what appears to be something in her hand.
Admittedly, the video is not crystal clear, but that's
precisely the point, the government bears the burden,
so they're going to have a very difficult time
disproving that without any medical evidence.

The jury would have been left scratching its
head because there's this alternative conclusion,
which even leads the police to believe, when they
watch the video the police believe that Rivera is
responsible, as the officer testifies that he saw her

1
2  pummeling the head. So the police are even concluding
3  and they charge her with murder after the District
4  Attorney's Office authorizes that.  So there's a very
5  difficult cause of death problem that would be created
6  by the preclusion of this autopsy report.

7          Additionally, it's critical evidence of state
8  of mind. Now Mr. Garlick was acquitted of murder but
9  convicted of first degree manslaughter. And the
10 element that's required for that is intent to cause
11 serious physical injury.  And what this autopsy report
12 confirms is that there's a 4-1/2 inch to 5-1/2 inch
13 deep wound. That is critical because the video
14 demonstrates a struggle for, there's a reasonable
15 argument, and certainly a compelling one, the
16 defendant could have argued that this was out of the
17 case, that this is a struggle during a conflict and
18 during that struggle there is a stabbing. That would
19 have been an excellent argument to make at trial
20 because there is no clear indication of any forceful
21 stab wound that you would expect to see something like
22 4-1/2 to 5-1/2 inches deep.

23         THE COURT:  The best case he could have been
24 convicted of assault, which presumably has a much
25 lower sentence.

1

2          MR. BOVA:  Yes, the lesser -- yes, yes, the

3   lesser included. The lesser included that was charged

4   here was the judge actually charge the lesser included

5   of assault. So the judge found a reasonable view and

6   the judge also noted on the record that the reason why

7   he was interested in that theory and wanted to charge

8   him was because the video did not clearly indicate

9   whether in fact there was a knife in Mr. Garlick's

10  hand.

11         So what this autopsy does, is it fills the

12  significant holes that would have existed in the

13  state's case. That's a classic example of something

14  working injury to the defense,  That's a classic

15  example of something that cannot be classified as

16  harmless error.  Thank you.

17         THE COURT:  I have a couple of more questions,

18  Mr. Bova, before you sit down.  So there are at least

19  two cases that we have found, or your adversary has

20  pointed out, one is *Soler*, S-O-L-E-R, and one is

21  *Santana*, in which the lower Courts describe the

22  uncertainty, and I'm quoting from *Santana*, "the

23  uncertainty left by *Williams, Bullcoming* and *Melendez

24  Diaz*, reveals that there is no clearly established law

25  from the Supreme Court." And this was regarding

report, but forensic expert testimony. And similarly,

*Soler* says "the Courts have failed to evolve a clear

set of rules."

So how do you deal with that language or those

holdings in light of the standard of review?

MR. BOVA: Well, I think a really good example

of an analytical framework that demonstrates the

problems with the state's argument is actually the

First Circuit case, *Hensley,* that the District

Attorney cites. And in that case, again, what the

Court is doing is it's focusing in on this narrow

argument. Again, what I think can be fairly

characterized as a strawman, that autopsy reports have

never been held to be testimonial as a categorical

matter by the Supreme Court. And that doesn't matter

because, first of all, that goes to deference. That's

a standard that you look at, that's a deference

argument because you're looking at whether there is a

case that is clearly on point, and that's what you're

doing when you're applying the deference.

But my first argument is this Court should not

apply that, because what we have here is a contrary to

violation and de novo review applies. But even if

we're wrong on that, these kinds of analyses where

1

2 we're looking at whether an "autopsy report" has been

3 held to be testimonial, that's the kind of narrow analysis

4 that the Supreme Court has rejected time and time again in

5 cases like *Harrington v. Richter* and progeny.  That's

6 exactly the kind of focus that we don't look at.

7          What we do is we say is there a clearly

8 established principle and does it apply here. Now it could

9 very well be that there's a reasonable basis to draw

10 distinctions based on factual circumstances as a general

11 matter, but in this area there is absolutely none.

12          THE COURT:  How do you articulate the clearly

13 established principle?

14          MR. BOVA:  The clearly established principle the

15 one that starts with *Crawford* and goes all the way through

16 to *Bullcoming.*  And the clearly established principle is

17 when a statement is made for the primary purpose of

18 proving past events that are potentially relevant to a

19 criminal case.  That is --

20          THE COURT:  A primary or the primary?

21          MR. BOVA:  The primary or a primary. And I think

22 whatever, whatever the formulation would be in this case,

23 there's only one purpose.  The only reason why that

24 medical examiner is putting pen to paper and writing

25 details about the cause of death and the depth of the stab

1  |  
2  | wounds, and certifying that report, which is then made
3  | prima facie evidence under state law, comes in as a
4  | hearsay exception under CPLR 4520.  The only reason why
5  | that's happening, be it objectively, is for criminal
6  | prosecution.

7  |            Several of the other cases that the District
8  | Attorney cites rely on *Vega v. Walsh*.  That case is also
9  | distinguishable because that *Vega v. Walsh* said was that
10 | in 2006, there was no clearly established Supreme Court
11 | law proving that autopsy reports are testimonial.  And
12 | that's irrelevant to our case.  We are not arguing that in
13 | 2006 there was clearly established Supreme Court law
14 | supporting this position, what we're saying is that comes
15 | out of *Bullcoming* and that comes out of *Melendez Diaz*,
16 | which is '09 and 2010.  So *Vega v. Walsh* doesn't in any
17 | way, shape or form, resolve this issue. The issue is,
18 | therefore, open in the Second Circuit, and in this unique
19 | case where you have both an Appellate Division holding
20 | that violates clearly established law, and a record that
21 | only points in one reasonable direction, there's a
22 | violation of the federal constitution regardless of
23 | deference, and therefore the (indiscernible) at issue.
24 |            THE COURT:  And how do you deal with *James*?
25 |            MR. BOVA:  *James* actually is an excellent case for

1
2  our argument, because in James there was absolutely no
3  indication that it was a homicide, it looked like a suicide in
4  that case. And that's exactly what the Second Circuit focused
5  on. The Second Circuit focused on at that point in time there
6  was no indication that it was a homicide, that's absolutely
7  not what happened here.  So *James* is actually very helpful
8  because it provides a useful contrast to our point that
9  circumstances matter and that these circumstances are
10 controlled.
11         So, again, in terms of cases like, in terms of
12 what these cases are doing, I would just, to sum it up
13 I would say that the focus of the inquiry should be on
14 what was in front of this medical examiner at the time
15 that she sat down, did the analysis and then wrote the
16 report. Those are the circumstances that control.
17         THE COURT:  Thank you.
18         MR. BOVA:  Thank you.
19         THE COURT:  Mr. McIver.
20         MR. MCIVER:  Thank you, Your Honor.  Briefly,
21 as mentioned by my friend, we have several cases that
22 I called the Court about on Monday and we had
23 permission to bring these and serve on my adversary.
24         THE COURT:  okay.
25         MR. MCIVER:  And I'd like to do that at this

point.  So the cases that we've provided here, there's

four cases in front of Your Honor.  There's *Hensley v.*

*Roden*, which is out of the First Circuit, *Portes v.*

*Capra* out of the Eastern District of New York,

*Mitchell v. Kelly* out of the Sixth Circuit, and *Vega*

*v. Walsh.*  And each one of these cases are habeas

petition cases in which they reject the idea that

testimonality of autopsy reports has been established

in any significant way.

I would direct your attention particularly to

*Hensley v. Roden.*  In that case, what they're doing is

they actually pages 734 to 735, which is actually page

number 6 of the Westlaw printout I've given you, that

directly address my friend's argument here. Their

argument is essentially that, yes, the Supreme Court

has not addressed testimonality of autopsy reports

directly, but what they're arguing there then is that

*Melendez v. Diaz*, and by extension *Bullcoming*,

established the testimonality of laboratory reports.

That case, in *Hensley,* the First Circuit specifically

rejects for the purposes of habeas review, that that

is clearly established under AEDPA review.

So ultimately that's the most important aspect

that we're putting forth before the Court today, is

that this remains an unsettled issue, and pointing to

*Bullcoming,* pointing to *Melendez v. Diaz*, ultimately

don't prove that this was an unreasonable application.

Because there are significant distinctions between a

police lab testing for cocaine, where the sole purpose

of those affidavits were to prove facts that would be

proven at trial. By contrast, there are numerous

reasons for OCME for actually produce an autopsy

report. Ultimately --

THE COURT:  I don't disagree with you on that,

Mr. McIver.

MR. MCIVER:  Sure.

THE COURT:  That, in general, autopsy reports

have lots of uses, but when you look at this autopsy

report, and I think what is clear from *Melendez-Diaz*

and *Bullcoming,* et cetera, is that it is a fact

specific review to determine whether it's testimonial.

You have a medical-legal investigator, whatever that

is, calling it a homicide. You have that person

calling the precinct and a Detective DeGrazio

(phonetic) telling him, the person at the medical

examiner's office, the case is pending, two detective

present at the autopsy, the police report comes out

the same day that the autopsy is performed, and the

defendant is indicted for murder before the report is

even finalized. So in the face of those facts,

applying the fact specific report that *Melendez-Diaz*,

et cetera, require, that seems pretty straightforward.

MR. MCIVER: So what I think is happening here

is that what is being conflated is that there's the

possibility that the likelihood that this foreseeable,

that this will be used. They're arguing that that

means, therefore, that OCME, the independent medical

examiners, have primary purposes of doing so. And the

answer to that question right now is maybe. We don't

know the answer to that question, it is certainly not

clearly established under Supreme Court precedent, and

that's what the cases I've provided you put forward.

Is that, yes, it is a fact intensive inquiry. And

that was one of the reasons that *Crawford* left open

the idea. It didn't sit there and delineate all of the

examples of what would be testimonial under the

confrontation clause, it left that open.

THE COURT: But does the standard require that

there be an all fours factual scenario exactly

comparable to what the State Court is looking at in

order for it to be clearly established as opposed to

what Mr. Bova said, which is a clearly established

principle that then the State Court is expected to

apply?

MR. MCIVER:  And that's exactly what *Hensley*,

and that's exactly what *Vega* dealt with.  And in

particular, I also want to direct the Court's

attention, in *Vega*, yes, that case took place before

the State Appellate Court review, the last substantive

review of that took place prior to *Melendez-Diaz* and

*Bullcoming*, but in footnote 2, it's actually in the

very back if you flip the entire packet over, footnote

2 of that case makes clear there are significant

differences between narcotics and blood alcohol

analysis in autopsies. And the broader context of the

entire footnote is we also note a fair issue exists as

to whether the Appellate Division's reason would have

been contrary to an unreasonable application of

*Melendez-Diaz*, even assuming that they'd already been

decided as there are significant differences between

narcotics and blood alcohol analyses.

I'm not saying that these are bad arguments

when this case reaches the US Supreme Court, but I'm

saying that it has to go up. It has to become clearly

established, and that's what the First Circuit, the

Second Circuit, Sixth Circuit, Ninth Circuit and

Eastern District have all addressed on that point.

So the issue here is the review has to require, it's not, when my friend says that it has to be contrary to, it has to be contrary to established case law. And that's why these circuit court cases are coming down the same way. They're all saying that it's not clearly established, so it can't, contrary to what, that's the issue under these circumstances.

THE COURT: So how is basically a four-part test that exists in *Freyssinet* (phonetic) and *Hall*, how is that consistent with, I mean what I'm struggling with is there seems to be a disconnect between what the State Court, even the State Court's template, they don't even seem to be following the parameters of *Bullcoming* and its progeny.

MR. MCIVER: So I think -- I'm sorry.

THE COURT: No --

MR. MCIVER: I interrupted Your Honor.

THE COURT: No, no, no, please go ahead.

MR. MCIVER: So *Freyssinet* preceded these things obviously, but it was analyzing testimonality under *Crawford.* I'm sorry, *Freyssinet* was analyzing, I may have misspoken there --

THE COURT: No, it's 2008, so it references

1

2  *Crawford.*

3          MR. MCIVER:  Correct.

4          THE COURT:  But then I think it's *Hall* is 2011, so

5  that's subsequent to both *Melendez-Diaz* and *Bullcoming.*

6          MR. MCIVER:  Right, and *Acevedo,* and *Portes*, and

7  also this case.

8          THE COURT:  Right.

9          MR. MCIVER:  So what they're saying is that

10  ultimately this four factor test for autopsy reports is

11  attempting to, based on the state of the law, it's trying to

12  determine testimonality under *Crawford.*  And it does

13  distinguish, and the Appellate Division cases, they don't

14  necessarily lay it out in black and white, but they're saying

15  that this is not necessarily intention with *Crawford*  and

16  *Bullcoming.*

17          Now I think the most important case on this point is

18  ultimately *Portes, Portes v. Capra*, the Eastern District case,

19  the second one in the packet that I've given you. That's

20  analyzing the Appellate Division's decision from 2015 in

21  *Portes v., People v. Portes.*  That's the exact same standard

22  here that's applied in *Freyssinet*, I believe it cites *Hall*,

23  but it's the Second Department case applying *Freyssinet* and

24  that was given AEDPA review under the circumstances and they

25  also said this is still not a clearly established standard for

the purposes of the review here.  So habeas review cannot lie.

So ultimately what we have here is the Second

Circuit has said this isn't clearly established, the Eastern

District said it's not clearly established applying

*Freyssinet*, and then the First Circuit has addressed the

distinction that I think we're trying to draw in this case.

There is no distinction in terms of *Bullcoming* and *Melendez-*

*Diaz* until the Supreme Court takes the case and says yes

within the context of autopsy reports.  This is how we

determine testimonality.

I would say, I just want to push back briefly on the

suggestion that the autopsy report here was necessarily

testimonial even under the case law at this point.  Putting

aside the standard review and the deference, the issue is not

their not affidavits.  That there's, yes, there's a signature,

yes, there's a CPLR Article 45 affirmation, but that doesn't

certify the accuracy of the report, it certifies that this was

done by a person and it certifies that it is admissible and

kept as a business record.

So what I would point to here in terms of where

we're at on the law of the land is that this is kind of like,

I think it's very, very close to *Williams v. Illinois* in which

Justice Thomas writes a separate concurrence saying these are

not affidavits because they were not affirmed, that the

accuracy of the report, that they were kept as a

business record, that there were certifications but

those certifications did not go to the actual

testimony of the contents of the report.

THE COURT:  If it was found that Dr. Maloney

lied in the affidavit, in the autopsy report that she

signed, sorry, excuse me, in the autopsy report that

signed, if she lied, if she made up a fact that was in

there, would she be subject to forgery charges for

that or some other even administrative penalty for an

intentionally false statement in that report?

MR. MCIVER:  I don't want to mislead Your

Honor, I don't know the answer to that question

necessarily. There is no, in New York State when we

have police officers sign things, they'll have a

specific signing that says this is subject to

prosecution of a class A misdemeanor. So that's not in

this report, if my memory serves, so I don't believe

the report, itself, makes that clear, whether there's

some ethical concerns that they have as a medical

examiner I don't know the answer to. But I think that

the point in bringing up Justice Thomas' concurrence,

is that the idea that this necessarily violates

*Bullcoming* and *Melendez-Diaz*, and necessarily *Williams*

*v. Illinois,* which was making a very similar analysis,

it's up in the air. It remains up in the air both in

terms of whether autopsy reports categorically or

whether they're done in conjunction with an ongoing

homicide investigation are testimonial. We don't know

the answer to that question at this point.

          And then if we assume testimonality will

control under *Melendez-Diaz* and *Bullcoming,* cases that

are distinguishable because there is no other reason

for a police lab to test cocaine other than to prove a

fact at trial, whereas an autopsy report is going to

have a number of different uses. But the point is that

we don't even know if we necessarily apply the rules

what the Court is going to do.  I don't even want to

get into politics about the fact that there's been

turnover on the Court, which I think has further

uncertainty of this.  But just looking at *Williams v.*

*Illinois*, how these autopsy reports, whether they're

going to be characterized as affidavits or something

that falls short of it in view of the fact that the

CPLR certification does not address the actual merits

being said, that's still up in the air. And that's why

the First, Second, Sixth and Ninth Circuits all get

this correct.

2          I think that the best thing to do in this

3   situation is to look at the Eastern District's

4   handling of this case. That's the appropriate analysis

5   and it's on all fours because it's coming out of the

6   Second Circuit, or the Second Department, I'm sorry.

7          THE COURT:  Two questions that I asked Mr.

8   Bova that I wanted to ask you are the delay between

9   the day that the autopsy was performed and the

10  finalization of the report, is there anything in the

11  record that explains that?

12         MR. MCIVER:  I'm unaware of anything in the

13  record. We handled the sur-petition with response to

14  this. I don't know, it may just be ultimately that

15  they were waiting for certain things to be finalized

16  or toxicology report, but I don't know the answer to

17  that question, so I don't want to lead you astray.

18         THE COURT:  Okay.

19         MR. MCIVER:  I will say we don't know the

20  import of that analysis until the Supreme Court

21  handles the issue.

22         THE COURT:  And Dr. Maloney, herself, why was

23  she not produced?

24         MR. MCIVER:  Both of them moved, Dr. Gill and

25  Dr. Maloney, I can't remember which one moved where,

one moved to Connecticut and then the other one moved,

I believe, to Rochester.  Dr. Maloney went to

Rochester.

THE COURT:  Okay.  But was there any reason

why she couldn't have traveled to testify at the

trial.

MR. MCIVER:  The record is unclear with

respect to that point, but go back to the other point

is that we don't know the import of what, the

speculation there is that when the Supreme Court

handles this issue that certain parts of the defense

bar have said, well, we're not saying that this needs

to be a per se rule, but the people also need to

establish actual genuine inability to come and

testimony. That's speculation, it's an argument that

the defense bar will make when it goes up, but until

the Supreme Court says, yes, that's a relevant

consideration, the area remains too unsettled for

habeas review.

The only other thing that I'm -- oh, I'm

sorry.

THE COURT:  No, please go ahead.

MR. MCIVER:  I would just like to touch

briefly upon the issue of harmlessness. In this case,

the standard under habeas review is the substantial

and injurious effect. The main reason for this case

moving forward and the focus of the prosecutor's

statements were the video.  That there is video, I

believe it's been supplied to the Court, if not I can

make sure that a copy comes. But the video shows the

graphic stabbing and they watched the individual lapse

into unconsciousness on video. That's the basis for

the prosecution.  The petitioner doesn't dispute the

cause of death, what they're now saying in the post-

conviction realm is that this would undercut the

homicidal intent. The problem with that is that that

has, he actually pursued justification defense down

below, it has a tenuous connection to that, but

defense counsel also used the autopsy report at trial

and was able to argue that the depth of the stabs

proved the lack of homicidal intent.  So they used

that under these circumstances to make the argument

that they now make.

        Ultimately this was harmless error in view of

the strength of the case which showed defendant

stabbing the man to death. The idea that Rivera, who

was charged with acting in concert, not that she was

actually the cause of death but that she shared that

community of purpose with the assailant here,

ultimately this is harmless because the fact that the

individual was stabbed repeatedly was the obvious

reason that he died, not several blows to the head.

            Thank you, Your Honor.

            THE COURT:  Thank you.  Mr. Bova.

            MR. BOVA:  Defense did not pursue a

justification defense below, that was never submitted

to the jury. And second of all, the fact that a

defense lawyer has to struggle to deal with bad facts

doesn't prove harmless error. I mean defense counsel,

because the autopsy report comes in, has to think of a

way to persuade the jury that 4-1/2 to 5-1/2 inches

stab wound does not prove either intent to kill or

intent to cause serious physical injury. That's a

very, very difficult sell to make to a jury, without

the autopsy report he would have been able to make

that argument very compellingly.

            The fact also that a defendant does not pursue

a particular theory at the trial is exactly the point.

The reason why the defense could not aggressively

pursue a cause of death defense is because the autopsy

report came in.  If the autopsy report had been out,

the whole case, the entire tenor of the case would

have changed.

There was a lot said about the, about what the standard is and how the New York Courts have dealt with it. I think the very simple way is to train our eye to exactly what the Appellate Division said here. The Appellate Division said here the reason why this report is not testimonial is because it did not link the commission of the crime to a particular person. As far as I can tell, the state does not defend that rule. The state cannot defend that rule because in *Melendez-Diaz*, the Court at 313 and 314 of that decision, in an entire section labeled section A, categorically rejected that argument. Quote, this, teeing up the argument that Massachusetts made which is a person who finds that a drug alcohol -- that a substance is a narcotic, is not an "accusatory witness, in that they do not directly accuse petitioner of wrongdoing. Rather, their testimony is inculpatory only when taken together with other evidence linking petitioner to the contraband. And then what the Court says is "this finds no support in the text of the Sixth Amendment or in our case law."

So that's the test that the Appellate Division applied, that's contrary to the square holding of

1 *Melendez-Diaz.* And if you take back, if you go to the

2 cases that the Appellate Division cited, it goes from

3 *John*, which is a Court of Appeals case, then that goes

4 directly to *Peeler*, and it goes all the way back to

5 *Freyssinet.* And each one of those cases is repeating

6 the same standard. *Freyssinet* was a pre-*Melendez-Diaz*

7 case. The problem is the Court of Appeals has not

8 updated its law in light of the clear holdings of the

9 Supreme Court in *Melendez-Diaz*. That's exactly the

10 kind of area where AEDPA deference should not apply,

11 where you have a Court, where you have a State Court,

12 I mean we unequivocally pressed this argument in the

13 Appellate Division and we said that *Melendez-Diaz*

14 squarely overrules this entire analysis and the Court

15 just said, and the Court said no. That's exactly the

16 kind of area where AEDPA deference doesn't apply

17 because you have a clear holding from the Supreme

18 Court that it's being ignored.

19 

20        The Second Circuit's decision in *Vega,* the

21 conviction in that case became final in 2006 under

22 AEDPA, the clearly established line is defined by the

23 law that is in existence at the time of the State

24 Court's last adjudication on the merits. In 2006,

25 *Bullcoming* and *Melendez-Diaz* did not apply. The

1

2 unpublished Eastern District decision, I believe

3 *Porta*, also relies on *Vega*. I mean it's the same

4 analysis and *Porta* is misreading what *Vega* says. I

5 mean *Vega* says that at this time the law did not exist

6 in the defendant's favor, but we're not in 2006 in

7 this case, we're in 2016 when the Appellate Division

8 reaches the merits.

9          The only other thing that I'd like to say is,

10 *Bullcoming* expressly held that it does not matter that

11 it is an affidavit. I mean that kind of formalism is

12 exactly the kind of formalism that the Supreme Court

13 rejected in *Bullcoming*. This is a formal certified

14 document about a very solemn matter. And the medical

15 examiner says I hereby certify, she lays out her

16 opinions in type and then she signs it. I mean that is

17 a classic certification that is exactly the kind of

18 formal solemn statement that *Bullcoming* and *Melendez-*

19 *Diaz* hold is going to be testimonial under *Crawford* and

20 its progeny.

21          THE COURT:  Do you know the answer to the question

22 that I asked Mr. McIver about the penalties for false

23 statements in an autopsy report of other examples of an

24 autopsy report being deemed essentially the equivalent of an

25 affidavit in any context?

1

2          MR. BOVA:  Off the top of my head I would admittedly

3    be speculating.  One crime that comes to mind is obstruction

4    of governmental administration. I'd be happy to follow up with

5    Your Honor in written submission on that.

6          THE COURT:  I don't think it's necessary right

7    now.  I was just curious as to your answer to that

8    question.  If you'll allow us, we're just going to

9    take a brief recess and we'll be back in a couple of

10   minutes.

11         MR. BOVA:  All right, thank you.

12              (OFF THE RECORD)

13         THE COURT:  Mr. McIver, I just had a couple of

14   clarifying questions about the record.  First of all,

15   the record reflects that an individual named Damian

16   Leave (phonetic) was a "medical legal investigator,"

17   what does that mean?

18         MR. MCIVER:  That's I think the term of art

19   that goes to OCME's -- I don't know that off the top

20   of the top of my head, I don't want to lead you down

21   the --

22         THE COURT:  That's fine, if you wouldn't mind

23   a supplemental submission, if you can just provide

24   some kind of authority for what that person's role is

25   and who they report to and their job duties, I think

1
2   that would be helpful.

3          MR. MCIVER:  The only thing that I would add

4   to that is, again, the import of that analysis, while

5   it remains unclear, I think that that's still, for the

6   purposes of the habeas, I understand that Your Honor

7   needs to know the information no matter what.

8          THE COURT:  Yes.  The second thing, the second

9   question I had was, I'm looking at page 5 of your

10  brief just for reference, there's a notice of death

11  form that was completed.  Who completed the notice of

12  death form, is that by the OCME or is that by the

13  police department?

14         MR. MCIVER:  I believe that that was OCME but

15  I'll follow that up in the same submission.

16         THE COURT:  Just include that in your

17  submission. And then going on, I don't have the form

18  in front of me, but taking the quote from your brief,

19  it says "app.manner: homicide," I assume app is short

20  for apparent?

21         MR. MCIVER:  I would assume so as well. Would

22  you also like, if I can find those in the record,

23  copies?

24         THE COURT:  Sure.

25         MR. MCIVER:  Okay.

1

2          THE COURT:  That's fine.  And then finally at

3    the end of that paragraph, it says time.pct number, is

4    pct short for precinct?

5          MR. MCIVER:  Yes, I believe so.

6          THE COURT:  Okay.  And then, finally, Mr.

7    McIver, I'm not sure that we have the video, so if

8    it's not too cumbersome to provide that to the Court,

9    as well, that would be helpful.

10          MR. MCIVER:  That shouldn't be an issue.

11          THE COURT:  Okay, very good.  Any final points

12    from the parties?

13          MR. MCIVER:  Yes.

14          THE COURT:  Okay.

15          THE COURT:  Just very, very briefly to go back

16    in terms of the reply, in terms of the Appellate

17    Division rules down below, it does cite to *Freyssinet,*

18    so it's not just the isolated statement of the

19    Appellate Division.  State Courts generally don't have

20    the time to repeat the analysis every single time,

21    what they do is they cite to a broader principle of

22    law and they incorporate by the citation as a

23    reference. So we are defending that standard. And

24    again, that entire analysis still assumes that the

25    arguments in *Bullcoming* and *Melendez-Diaz* will

necessarily carry the day, and that remains unclear.
And *Portes* and *Hensley* I think ultimately, *Portes*,
rather, and *Hensley,* I think finish the analysis for
that.  With respect to *Vega,* again, I'd point to
footnote 2, that is dicta, I'll acknowledge that
that's dicta within *Vega*, but I think it's important
in terms of showing the lack of certainty.  *Portes v.*
*Capra* has footnote 3 that also addresses the lack of
certainty, as well, into those two.

THE COURT:  Okay.

MR. MCIVER:  Thank you, Your Honor.

THE COURT:  All right, thank you.  Mr. Bova.

MR. BOVA:  If I may, yes, Your Honor.  Just
because this is the first time that the state is
defending the entire *Freyssinet* analysis as opposed to
the specific language that the Appellate Division
used. And first I'd say the cases cited don't really
matter in this case because the Court articulates its
reasoning.  In any event, and when it articulates its
reasoning, it says since the report did not link the
commission of a crime to a particular person. So the
reasoning is clear and categorical.  But again, even
if we're wrong on that, and we go all the way back to
*Freyssinet*, it's still the same problem because the

four factor test has the same problem.  What

*Freyssinet* said, again, in a pre-*Melendez* era, was you

look at whether the statement is a contemporaneous

account of what you're seeing or an account of what

happened in the past.  You will look at whether it is

made by an objective law enforcement agency.  You will

look at the potential for pro-law enforcement bias and

you look at if it proves who did it as opposed to what

happened. That's that four factor test which I believe

comes from an Ohio State Court decision that

*Freyssinet* adopted, every single one of those

standards has been categorically rejected by the

Supreme Court.  The Supreme Court in *Bullcoming* and

*Melendez-Diaz* rejected all four of those standards,

because what they're really saying is you look at

whether it's reliable.  All these are proxies for

that.  And what the Supreme Court has held in *Crawford*

and very clearly clarified in *Bullcoming* and *Melendez-*

*Diaz'* reliability is irrelevant to the confrontational

clause analysis.

        THE COURT:  Thank you.  This argument has been

very helpful and so the Court is grateful to the

parties for preparing. Mr. McIver, we'll look forward

to your supplemental submission.

1

2          MR. MCIVER:  Absolutely.

3          THE COURT:  Do you think a week is sufficient

4   or do you think you need past the holiday? I think

5   December 2nd is the Monday after the holiday.

6          MR. MCIVER:  Can we set December 2nd as the

7   return date and I'll get it to you as soon as

8   possible?

9          THE COURT:  Yes, of course, that's fine. And

10  then in the meantime, at my peril I will invite the

11  parties, if there are any subsequent cases that the

12  parties become aware of, particularly with respect to,

13  well, first of all, whether there are any subsequent

14  cases that are interpreting *Bullcoming* or *Melendez-*

15  *Diaz*, if you become aware of any newer decisions that

16  come down before the Court issues its decision, the

17  parties are welcome to just submit a brief letter with

18  the case citation, no argument.

19         MR. MCIVER:  Just to clarify, Your Honor, I'm

20  sorry, does that mean habeas only or on the merits, as

21  well?

22         THE COURT:  On the merits.

23         MR. MCIVER:  Okay, and when you mean

24  subsequent, do you mean --

25         THE COURT:  After today.  Decided after today.

1

2          MR. MCIVER:  So can we also, if we find other

3   cases from like 2017 that said this is absolutely up

4   in the air, are you okay with that or?

5          THE COURT:  That's fine.

6          MR. MCIVER:  Okay, thank you.

7          THE COURT:  Okay?  All right, thank you very

8   much, we're adjourned.  Thank you, Mr. Garlick.

9              (Whereupon the matter is adjourned.)

10         THE PETITIONER:  Thank you.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing
transcript of proceedings in the United States District
Court, Southern District of New York, Garlick versus Miller,
Docket #18cv11038, was prepared using PC-based transcription
software and is a true and accurate record of the
proceedings.

*Carole Ludwig*

Signature_____

                Carole Ludwig

Date:  November 25, 2019

 **OFFICE OF THE DISTRICT ATTORNEY, Bronx County**

| | | |
|---|---|---|
| **Darcel D. Clark** | **198 East 161st Street** | **Phone 718-838-7322** |
| *District Attorney* | **Bronx, NY 10451** | **Fax:   718-590-6523** |

Filed via Electronic Case Filing
The Honorable Sarah L. Cave
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
500 Pearl Street, Room 702
New York, NY 10007

December 2, 2019

Re: *James Garlick v.*
*Chistopher Miller*
18 Civ. 11038 (CIM-SLC)

Your Honor:

Our office represents the respondent, Christopher Miller, in the above-entitled habeas corpus proceeding. Following oral argument on November 21, 2019, Your Honor ordered the People to submit the following supplemental materials to the Court by December 2, 2019: 1. Information describing the role of a Medicolegal Investigator in the New York City Office of the Chief Medical Examiner and 2. Information as to who completed the "Notice of Death" form dated November 1, 2011 (ECF No. 11-7 at 18),

Fundamentally, a medicolegal investigator is tasked with investigating whether a reported death falls within OCME's jurisdictional purview. In this capacity, medicolegal investigators facilitate and support investigations intended to determine whether a particular death that has been referred to OCME occurred under circumstances for which performance of an autopsy is required by law. While one's specific duties can vary based on training and experience, the role of a medicolegal investigator is aimed at "obtain[ing] a factual history and record of events, emphasizing the manner and circumstance of death" (Attachment 1, p.1). The attached memorandum from the Office of the Chief Medical Examiner delineates the specific duties and responsibilities entrusted to its medicolegal investigators. There are three different assignment levels within this role that correspond to graduating levels of difficulty and skill. Generally, the investigators document evidence and direct its removal, while safeguarding quality and maintaining a chain of evidence. They also provide "information to family and authorized others as to cause of death, manner and circumstances as determined, thus providing counseling, understanding, and education" (Attachment 1, p. 2). The investigators identify potential need for follow up investigations and may perform related investigations and interviews, as necessary (Attachment 1, p. 3). Medicolegal investigators are also present at "hospitals, hospices and other medical care facilities for completion of autopsy reports" (Attachment 1, p. 4). They help determine whether OCME should perform an autopsy and oversee the

handling of site or bodies. Medico-investigators of all assignment levels may testify in court. These professionals are not licensed physicians, but may be physician's assistants (Attachment 1, pp. 5-7).

With respect to the Notice of Death form, on November 27, 2019, I spoke with Leslie Kamelhar, Esq., an attorney employed within OCME's office of legal counsel, to gather additional information. Ms. Kamelhar explained that a Notice of Death form is completed by OCME intake personnel at the time that a death is first reported to OCME. The information contained in the Notice of Death form is typically supplied to OCME by doctors, physician's assistants, nurse practioners or administrative staff affiliated with the medical facility where the decedent was pronounced dead; OCME does not investigate deaths reported by private citizens. In this case, Dr. Varughese, an emergency-room resident physician at Saint Barnabas Hospital at the time, was the individual who reported Gabriel Sherwood's death to OCME intake, leading to the creation of his Notice of Death form. According to Ms. Kamelhar, depending on the sufficiency of the information obtained in the course of preparing the Notice of Death Form, a medicolegal investigator may be assigned if it remains unclear whether a death comes within OCME's jurisdiction so as to require an autopsy. The notice of death form is also significant inasmuch as it begins the time period for family members to object to the performance of an autopsy. See N.Y. Pub. Health Law § 4214 (1).

In addition to the significant number of habeas cases that have found this area of the law to be unsettled and that, therefore, support the People's position that the Appellate Division's ruling was neither contrary to nor an unreasonable application of clearly defined federal lawYour the People are now providing two additional cases that are of particular note. Copies of the two cases are attached to this letter motion.

In Johnston v. Mahally, 348 F. Supp. 3d 417 (E.D. Pa. 2018), the Eastern District of Pennsylvania addressed one of petitioner's central contentions. There, the petitioner acknowledged that the testimonality of autopsy reports was unsettled, but "argue[d] that the state courts should have applied the general principles from the Supreme Court's precedents to his case." Id. at 433. Citing Williams v. Taylor, 529 U.S. 362, 412 (2000), the District Court rejected this reasoning and noted that the "unreasonably refuses to extend" argument was inappropriate in this context. Id. at 434-35. In Williams, the Supreme Court noted that "[t]he difference between applying a rule and extending it is not always clear" and that refusal to extend a rule would support habeas relief under AEDPA only when "it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question." Johnston, 348 F. Supp. 3d 434, quoting Williams, 529 U.S. at 427. The Johnston court concluded "The foregoing exposition shows why Petitioner's unreasonable-failure-to-extend argument fails for two reasons. First, as already stated above, there is no "clearly established Federal law" or "squarely established" rules concerning autopsy reports. Second, whatever the clearly established law is, the Circuit Courts disagree about how to apply it to autopsy reports." Id. at 435.

Further, in Flournoy v. Small, 681 F.3d 1000, 1004 (9th Cir. 2012), the Ninth Circuit agreed with the People's position as well. That analysis is similar to that in Vega v.

Walsh (cited by the People at oral argument). In Flournoy, the Ninth Circuit recognized that Bullcoming and Melendez-Diaz were decided after the state courts' decisions in the case and thus did not support habeas relief. Like the Vega court, the Flournoy court provided important dicta demonstrating that Bullcoming and Melendez-Diaz did not resolve the uncertainty as applied to autopsy reports. In particular, the Ninth Circuit focused on Justice Sotomayor's concurring opinion, in which she "specifically identified Confrontation Clause questions that in her view remained unanswered by the Court's holdings in that 2011 case." Flournoy, 681 F.3d at 1005. This included, among other things, whether a supervisor, reviewer, or person with limited connection to the case could provide surrogate testimony. With those questions left unanswered, the Ninth Circuit found that "it is impossible to conclude that the California court's conclusions in this case were contrary to clearly established federal law at the time." Id. at 1005.

In addition to the foregoing items, Your Honor's order sought the surveillance footage video played at petitioner's trial, a CD-ROM copy of which was sent to chambers on November 27, 2019. Thank you for your consideration in this matter. If you have any questions, please contact me by phone at (718) 838-6229 or via e-mail at weissjo@bronxda.nyc.gov.

Respectfully,

Joshua P. Weiss
Assistant District Attorney

Cc:     Matthew Bova, Esq.
        Center for Appellate Litigation
        120 Wall Street
        New York, NY 1005

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES GARLICK, | |
| Petitioner, | |
| -v- | CIVIL ACTION NO.: 18 Civ. 11038 (CM) (SLC) |
| SUPERINTENDENT CHRISTOPHER L. MILLER, Great Meadows Correctional Facility, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

**SARAH L. CAVE,** United States Magistrate Judge.

**TO THE HONORABLE COLLEEN McMAHON**, Chief United States District Judge, Southern District of New York:

## I.      INTRODUCTION

Petitioner James Garlick, who is incarcerated at Green Meadows Correctional Facility, filed a petition pursuant to 28 U.S.C. § 2254 seeking a writ of habeas corpus (the "Petition") on the grounds that the trial court violated the Confrontation Clause of the Sixth Amendment when it permitted the prosecution to introduce an autopsy report without producing for cross examination the witness who prepared it (ECF No. 5 at 5), and that the First Department's affirmance of that decision was "contrary to" and constituted an "unreasonable application" of clearly established Supreme Court precedent (ECF No. 4 at 20–21).  Respondent Christopher L. Miller, Superintendent of the Green Meadows Correctional Facility, acting through the Attorney General of the State of New York (the "State"), opposes the Petition on the ground that introduction of the autopsy report at trial and the First Department's rejection of the Confrontation Clause claim were neither contrary to nor an unreasonable application of Supreme Court precedent.  (ECF No. 12 at 9).

For the reasons set forth below, the Court respectfully recommends that the Petition be denied.  Given, however, that the Petition raises significant questions whether, at the time the First Department affirmed Garlick's conviction, the Supreme Court's Confrontation Clause precedent clearly established that an autopsy report was a "testimonial" statement, and if so, whether the First Department's decision was contrary to or involved an unreasonable application of clearly established Federal law, the Court also recommends that a certificate of appealability be granted.

## II.      BACKGROUND

### A.      Factual Background

During the early evening of November 1, 2011, police responded to a report of an assault at an apartment building in the Bronx.  (ECF No. 13-4 at 11; ECF No. 13-5 at 1).  Police Officer Bagan, who was on foot patrol on nearby Fordham Road, responded to the call, and found Gabriel Sherwood ("Sherwood") lying bleeding on the floor in the building lobby.  (ECF No. 13-4 at 11).  Officer Bagan accompanied Sherwood in an ambulance to the hospital, where Sherwood was pronounced dead.  (Id. at 14).

That same evening, Detective Thomas DeGrazia, the lead homicide detective assigned to the case, initiated an investigation and sought video footage of the incident.  (ECF No. 13-5 at 2). The building's surveillance video showed a man struggling with Sherwood in the lobby, and a female repeatedly striking Sherwood on the head.  (ECF No. 4 at 7).  The two assailants then fled the scene.  (Id.)  Surveillance video then showed the same man who had struggled with Sherwood and a second woman enter an apartment building down the street.  (ECF No. 13-6 at 22).

1.   **Identifying the suspects**

Later that evening, police identified one of the women in the video as Lisa Rivera.  (ECF No. 13-5 at 2).  After interviewing Lisa Rivera, police identified Johanna Rivera as the woman seen in the video hitting and kicking Sherwood, and promptly arrested her as a suspect in Sherwood's homicide.  (Id. at 3–4).  During her post-arrest interrogation, Johanna Rivera explained that she and Lisa Rivera were being harassed by Sherwood, and implicated Garlick as the male assailant seen in the video.  (Id. at 5; ECF No. 13-1 at 33–34).  The next morning, November 2, 2011, the District Attorney's office authorized an intentional murder charge against Johanna Rivera on the theory that her blows to Sherwood's head caused his death.  (ECF No. 13-6 at 32; ECF No. 13-8 at 1–4).  At 4:45 a.m. on November 2, 2011, Detective DeGrazia issued a department-wide notification (an "I-Card") to arrest Garlick for his involvement in the apparent homicide.  (ECF No. 13-5 at 5).

On November 11, 2011 the police arrested Garlick on a charge of murder.  (Id.)  In his oral and written statements following his arrest, Garlick stated that he had arrived at the scene because Sherwood was sexually harassing his girlfriend, Lisa Rivera.  (Id. at 11, 14).  He claimed that when he arrived, he and Sherwood began fighting outside of the apartment building and then moved into the lobby.  (Id. at 15).  Garlick stated that Sherwood brandished what he thought was a weapon and that the two struggled for it.  (Id.)  He told his interrogators that he did not have a knife and that all he was trying to do was defend himself and his girlfriend.  (Id. at 11, 15).  He apologized, stating, "I wasn't trying to hurt anybody."  (Id. at 15).

2.    **The Autopsy Report**

On November 1, 2011, the evening of Sherwood's death, staff at the New York City Office of the Chief Medical Examiner ("OCME")—the agency that determines cause of death in homicide or suspicious cases—discussed the examination of Sherwood's body with Detective DeGrazia and arranged for the body's transport.[1]  (ECF No. 13 at 24; ECF No. 11-7 at 17).  Detective DeGrazia told the OCME staff that the body had multiple stab wounds, and that he was in the process of securing additional information about the incident.  (ECF No. 11-7 at 17).

With the information from Detective DeGrazia, OCME then prepared a "Notice of Death" form, which stated:  "Circumstances of death: App. manner: Homicide."  (Id. at 18).  OCME also prepared a "Supplemental Case Information" sheet, which documented the conversation with Detective DeGrazia (a "call was placed to the 52nd PCT Detective Squad . . . and conversation was had with Detective Tommy Degrasio [sic] who is assigned to the case"), and noted that Sherwood was found with "multiple (4) stab wounds" in the lobby of a Bronx apartment building.  (ECF No. 4 at 8; ECF No. 11-7 at 17).

The next day, November 2, 2011, Dr. Katherine Maloney of the OCME performed an autopsy on Sherwood.  (ECF No. 13 at 29).  Another pathologist, Dr. James Gill, was present during

---

[1] See N.Y. County Law § 673 ("A coroner or medical examiner has jurisdiction and authority to investigate the death of every person dying within his county, or whose body is found within the county, which is or appears to be:  (a)  A violent death, whether by criminal violence, suicide or casualty; (b)  A death caused by unlawful act or criminal neglect; (c)  A death occurring in a suspicious, unusual or unexplained manner; (d)  A death caused by suspected criminal abortion; (e)  A death while unattended by a physician, so far as can be discovered, or where no physician able to certify the cause of death as provided in the public health law and in form as prescribed by the commissioner of health can be found; [and] (f)  A death of a person confined in a public institution other than a hospital, infirmary or nursing home.").

the examination, as were two Bronx homicide detectives, Detectives Speranza and Farmer.  (ECF No. 13-6 at 25; ECF No. 11-7 at 4, 20 ("Det. Speranza Bx Homicide present @ autopsy 11-02-11")).

On the same day she performed the autopsy, Dr. Maloney prepared an autopsy report (the "Autopsy Report"), which declared that Sherwood's cause of death was a "stab wound of torso with perforation of heart" and that the manner of death was "homicide."  (ECF No. 11-7 at 3).  The "Case Worksheet," prepared at the same time, repeated that finding, indicating that the perceived immediate cause of death was a "stab wound of torso with perforation of heart." (Id. at 13).  After Dr. Maloney notified the police of her findings, the police decided not to pursue the murder charge against Johanna Rivera and instead sought to charge Garlick with murder because, as Detective DeGrazia later testified, "the medical examiner made it clear that it was the stab wounds that caused the death."  (ECF No. 13-7 at 23).

On December 29, 2011, after OCME received the toxicology and microscopic analysis reports (dated December 21, 2011 and December 29, 2011, respectively), Dr. Maloney finalized the Autopsy Report.  (ECF No. 11-7 at 8–10).  Dr. Maloney certified that she performed the autopsy, signed the Autopsy Report, and OCME certified the Autopsy Report as a business record under New York's statutory business-record rule and affixed the official OCME seal.  (Id. at 2–8).  As mandated by state and local laws,[2] OCME delivered the Autopsy Report to the Bronx District Attorney's office after it was signed.  (ECF No. 4 at 9).

---

[2] See N.Y. County Law § 677(4) ("The . . . medical examiner shall promptly deliver to the district attorney copies of all records pertaining to any death whenever, in his opinion, or in the judgment of the person performing the autopsy, there is any indication that a crime was committed."); see also N.Y. City Charter § 557(g) (same); N.Y. C.P.L.R. § 4520 ("Where a public officer is required or authorized, by special provision of law, to make a certificate or affidavit to a fact ascertained, or an act performed, by him in the course of his official duty, and to file or deposit it in a public office of the state, the certificate or affidavit so filed or deposited is prima facie evidence of the facts stated."); N.Y. Pub. Health Law § 4103(3) ("A certified copy of the record of a birth or death, a certification of birth or death, a transcript of a birth or death certificate, a certificate of birth data or a certificate of registration of birth,

### B.   Procedural History

#### 1.   Indictment

On November 28, 2011, Garlick was indicted on charges of Second Degree Murder (Penal Law § 125.25(1)), First Degree Manslaughter (Penal Law § 125.20(1)), First Degree Assault (Penal Law § 120.10(1)), and Second Degree Assault (Penal Law § 120.05 (2)).  (Bronx Cty. Ind. No. 3681/11; ECF No. 11-2 at 7–8).

#### 2.   Trial

At trial, the State introduced the Autopsy Report as its first exhibit.  (ECF No. 13 at 34).  Garlick's counsel objected to the Autopsy Report as testimonial evidence, citing "[t]he difference . . . between introducing something as a business record and introducing it for the purpose of the opinions and observations contained therein."  (Id. at 31).  The Trial Court admitted the Autopsy Report into evidence as a business record, and, relying on People v. Hall, 84 A.D.3d 79 (1st Dep't 2011), "allow[ed] the People to establish that it's a document that th[e] witness can use to express an opinion based on its contents."  (Id. at 31, 33–34).  The Trial Court told defense counsel he could reiterate his objections as the testimony continued.  (Id.)

Over Garlick's Confrontation Clause objection, the Trial Court permitted Dr. Susan Ely, who did not prepare the Autopsy Report and was not involved in Sherwood's autopsy, to testify about the Autopsy Report.  (See id. 16–34).  The State did not assert that Dr. Maloney or Dr. Gill were unavailable to testify, only that they no longer worked at OCME.  (Id. at 29).  Before Dr. Ely's testimony, Garlick's counsel repeated his Confrontation Clause objection, and reiterated that Dr.

---

when properly certified by the commissioner or persons authorized to act for him, shall be prima facie evidence in all courts and places of the facts therein stated.").

Ely should not be allowed to testify to the Autopsy Report because "she [had] no participation in this autopsy at all" and there could not be "an effective cross-examination" without Dr. Maloney. (Id. at 21).  The Trial Court overruled the objection and allowed Dr. Ely to testify.  (Id. at 23).

Dr. Ely testified as an expert in the fields of clinical, anatomic, and forensic pathology.  (Id. at 28).  She laid the foundation for and testified about the Autopsy Report.  (Id. at 28–29).  At the end of her testimony, Garlick's defense counsel reiterated his "objection to permitting Dr. Ely to testify as to the autopsy report and the introduction of the report," and the Trial Court overruled the objection.  (ECF No. 13-1 at 26).

The State relied on the Autopsy Report throughout the trial.  In its opening statement, the State used the Autopsy Report to describe Sherwood's wounds, the placement of the wounds, and promised that the medical examiner would go through each in detail.  (ECF No. 13 at 2–3).  As noted above, Dr. Ely methodically testified about the contents and conclusions of the Autopsy Report.  (See id. at 28–34; ECF No. 13-1).  The State also used the Autopsy Report to eliminate Johanna Rivera as a potential cause of Sherwood's death, to illustrate Garlick's perceived intent to cause "serious harm," and to support its argument during the charging conference that the jury be allowed to consider a murder charge against Garlick.  (ECF No. 13-11 at 5) ("The testimony from the Medical Examiner is the victim died as a result of the seven knife wounds.").  In its closing argument, the State again relied on the Autopsy Report, describing its conclusions as the "final diagnosis" of Sherwood's "cause of death" (ECF No. 13-12 at 23), and recounting Dr. Ely's testimony about Sherwood's wounds (id. at 26–27).

Ultimately, the jury found Garlick not guilty of the murder charge, but found him guilty of first-degree manslaughter.  (ECF No. 4 at 6).  The Trial Court sentenced him to 20 years' imprisonment and five years of supervised release.  (ECF No. 5 at 1).

### 3.    Direct appeal to the First Department

On appeal to the First Department, Garlick argued that the Autopsy Report was testimonial and therefore inadmissible through a surrogate witness.  (ECF No. 11-1 at 49).  The State argued that the Confrontation Clause "does not bar the use of out-of-court statements by declarants who are not 'witnesses'—that is, those who do not 'bear testimony.'"  (ECF No. 11-2 at 44).  The State rested its argument on People v. Freycinet, in which the New York Court of Appeals listed four factors to analyze whether a statement is testimonial:  (1) "the extent to which the entity conducting the procedure is an arm of law enforcement;" (2) "whether the contents of the report are a contemporaneous record of objective fact, or reflect the exercise of fallible human judgment;" (3) "whether a pro-law-enforcement bias is likely to influence the contents of the report;" and (4) "whether the report's contents are directly accusatory in the sense that they explicitly link the defendant to the crime.  11 N.Y.3d. 38, 41 (2008) (internal citations omitted).

The First Department held that the introduction of the Autopsy Report through Dr. Ely, who was not involved in Sherwood's autopsy, did not violate Garlick's Confrontation Clause right because the Autopsy Report, which "'[did] not link the commission of the crime to a particular person,' was not testimonial (People v. John, 27 NY3d 294, 315 [2016])."  People v. Garlick, 144 A.D.3d 605, 606 (1st Dep't 2016).  The First Department cited People v. Acevedo, 112 A.D.3d 454, 455 (1st Dep't 2013) in rejecting Garlick's "contention that People v. Freycinet (11 NY3d 38 [2008]) has been undermined by subsequent decisions of the United States Supreme Court."  Id.

4.     **Discretionary appeals**

On March 3, 2017, the New York Court of Appeals denied leave to appeal, <u>People v. Garlick</u>, 29 N.Y.3d 948 (2017), and on December 4, 2017, the United States Supreme Court denied Garlick's petition for a writ of certiorari.  <u>Garlick v. New York</u>, 138 S. Ct. 502 (2017).

C.     **Federal Habeas Corpus Petition**

1.     **Garlick's arguments**

In his Petition, Garlick argues that the trial court violated the Sixth Amendment's Confrontation Clause when it permitted the State to introduce the Autopsy Report at trial without producing for cross examination the witness who prepared it (ECF No. 5 at 5), and that the First Department's affirmance was "contrary to" and constituted an "unreasonable application" of clearly established Supreme Court precedent (ECF No. 4 at 20).  Garlick argues that, by holding that an autopsy report is not testimonial unless it "link[s] a defendant with a crime," the First Department's decision contradicted the Supreme Court's holding in <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305 (2009), which established that the Confrontation Clause is not limited to evidence that identifies the defendant.  (ECF No. 4 at 22).  He asserts that under <u>Melendez-Diaz</u>, the First Department was required to consider whether the Autopsy Report's primary purpose was to "establish or prove past events potentially relevant to later criminal prosecution" (<u>id.</u> at 24 (quoting <u>Michigan v. Bryant</u>, 562 U.S. 344, 357 (2011) and <u>Melendez-Diaz</u>, 577 U.S. at 310)), but that, instead, it violated clearly established Confrontation Clause precedent when it considered whether the Autopsy Report directly linked Garlick to the crime.  (<u>Id.</u>)

In the alternative, Garlick argues that even if a link to a specific defendant is required for a statement to be testimonial, the Autopsy Report here <u>was</u> testimonial because, before the

autopsy was performed, police had identified Garlick as a suspect and had issued the I-Card for his arrest.  (Id. at 28–29).  He asserts that, because the State had already isolated Garlick as a suspect, the determination that Sherwood's death was a homicide implicated Garlick in his death. (Id.)

Finally, Garlick argues that the Autopsy Report meets the formality requirements of a testimonial document, and that admitting the Autopsy Report into evidence without making its author available for cross examination was not harmless error.  (Id. at 31–33).

### 2.    The State's arguments

In opposition to the Petition, the State argues that the Trial Court's decision was neither contrary to nor an unreasonable application of Supreme Court precedent because the Supreme Court has not specifically addressed whether an autopsy report is testimonial.  (ECF No. 12 at 10). The State argues that the state courts correctly applied that precedent, and that Melendez-Diaz and Bullcoming v. New Mexico, 564 U.S. 647 (2011), are distinguishable because the reports in those cases "directly linked the accused to the charged crime."  (Id. at 17–18).  Here, the State argues, Dr. Maloney did not know the suspect's identity or that the police were conducting a homicide investigation, and thus the Autopsy Report could not have directly targeted Garlick.  (Id. at 20–21).

Finally, the State argues that even if Melendez-Diaz and Bullcoming are controlling, the Autopsy Report here was not "formalized," and any error in admitting the Autopsy Report using Dr. Ely instead of Dr. Maloney was harmless.  (Id. at 24 n.7, 25–26).[3]

---

[3] On November 21, 2019, this Court heard oral arguments on the Petition.

A-061

### III.   DISCUSSION

**A.   Applicable Legal Standards**

 **1.   Exhaustion**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not consider a petition for a writ of habeas corpus by a prisoner in state custody unless the petitioner has exhausted all state judicial remedies.  28 U.S.C. § 2254(b)(1)(A); see Jackson v. Conway, 763 F.3d 115, 133 (2d Cir. 2014).  To satisfy the exhaustion requirement, the petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the opportunity to correct the alleged violations of federal rights.  Picard v. Connor, 404 U.S. 270, 275 (1971).  The exhaustion requirement is fulfilled once the federal claims have been presented to "the highest court of the state."  Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (internal citation omitted).

Here, Garlick raised his Confrontation Clause claim on direct appeal to the First Department and in seeking leave to appeal to the Court of Appeals.  Garlick, 144 A.D.3d at 605; Garlick, 29 N.Y.3d at 948.  He has therefore exhausted his claim for the purposes of federal court review.  See Galdamez, 394 F.3d at 74 (explaining that "one complete round" of New York's appellate review process involves appeal to Appellate Division and then application to Court of Appeals for certificate granting leave to appeal).  Further, the Petition is timely because it was filed on November 28, 2018, within one year of December 4, 2017, the date on which the Supreme Court denied Garlick's petition for writ of certiorari.  Garlick, 138 S. Ct. at 502.

2.    **Standard of Review**

Where the state court has adjudicated the merits of a claim, this Court must apply a "highly deferential" standard in reviewing that claim in a habeas corpus proceeding.  28 U.S.C. § 2254(d); Renico v. Lett, 559 U.S. 766, 773 (2010); Williams v. Taylor, 529 U.S. 362, 413 (2000). A claim has been "adjudicated on the merits" when the state court ruled on the substance of the claim itself, rather than on a procedural or other ground.  See Bell v. Miller, 500 F.3d 149, 154– 55 (2d Cir. 2007); Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced").

Here, the First Department considered and rejected Garlick's Confrontation Clause objection on its merits.  Garlick, 144 A.D.3d at 605.  Therefore, this Court must adhere to the standard of review set forth in section 2254(d), which permits, in relevant part, a court to grant a writ of habeas corpus on a claim that has been previously adjudicated on the merits by a state court only if the state adjudication:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or,

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

a)    **Clearly established federal law**

The relevant date for determining applicable "clearly established Supreme Court law" is the date of the last state court adjudication of the petitioner's claim "on the merits."  Greene v.

Fisher, 565 U.S. 34, 40 (2011).  Here, that date is November 29, 2016, the date of the First Department's decision affirming Garlick's conviction.  See DeJesus v. Superintendent of Attica Corr. Facility, No. 17 Civ. 3932 (GBD) (AJP), 2017 WL 6398338, at *14 (S.D.N.Y. Dec. 13, 2017) ("The relevant Supreme Court jurisprudence is that in effect at the time of the state court's adjudication on the merits (in New York, usually the decision of the Appellate Division), not at the time of a subsequent decision (e.g., the New York Court of Appeals) denying leave to appeal.").

As to what constitutes clearly established federal law, "a principle is clearly established Federal Law for § 2254(d)(1) purposes only when it is embodied in a Supreme Court holding, framed at the appropriate level of generality."  Washington v. Griffin, 876 F.3d 395, 403 (2d Cir. 2017) (internal citations omitted).  In White v. Woodall, the Supreme Court discussed "clearly established Federal law" in the habeas context:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.  Thus, if a habeas court must extend a rationale before it can apply it to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.

The Court went on to explain:

> This is not to say that §2254(d)(1) requires an identical factual pattern before a legal rule must be applied.  To the contrary, state courts must reasonably apply the rules "squarely established" by this Court's holdings to the facts of each case.

572 U.S. 415, 426–27 (2014) (internal citations omitted).

Federal courts have reached differing conclusions as to what constitutes "clearly established" law for purposes of section 2254 in this context.  The Sixth Circuit found Supreme

Court Confrontation Clause precedent to be clearly established as of 2008.  See McCarley v. Kelly, 801 F.3d 652, 664–65 (6th Cir. 2015) (finding that, by 2008, after Crawford and Davis, the state of the Supreme Court's Confrontation Clause precedent was clearly established).  In contrast, one court in this District found the state of the law to be unsettled as of the same time period.  See Soler v. United States, No. 15 Civ. 4342 (LAP), 2015 WL 4879170, at *14–16 (S.D.N.Y. Aug. 14, 2015) (finding Confrontation Clause precedent as to testimonial statements at the time of 2007 trial to be unsettled and subsequent case law had not developed a clear set of rules).  The passage of time has not aligned courts' interpretation of how to define "testimonial" statements for Confrontation Clause purposes.  See, e.g., Hensley v. Roden, 755 F.3d 724, 734 (1st Cir. 2014) (finding the state of the Confrontation Clause precedent as of 2009 uncertain, and rejecting petitioner's claim that testimonial nature of autopsy reports was clearly established).  (See infra § III.C.3 & nn. 11–14).

### b)    Contrary to clearly established federal law

Under section 2254(d)(1), a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that contradicts Supreme Court precedent or confronts a case with materially similar facts to a Supreme Court case and arrives at a different result.  See Rosario v. Ercole, 601 F. 3d 118, 123 (2d Cir. 2010) (quoting Williams, 529 U.S. at 412–13).  This is a very high bar to meet.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (quoting Harrington v. Richter, 562 U.S. 86, 101 (2011)).  In fact, "[t]he state court decision must be so

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. (internal citations omitted).

### c) An unreasonable application of clearly established federal law

An "unreasonable application" of clearly established federal law occurs when the state court identifies and applies the correct governing legal principle, but its application was "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 73–76 (2003) (citing Williams, 529 U.S. at 409). Under section 2254(d)(2), the Court must consider the reasonableness of the decision in light of the evidence presented at the proceeding under review. See Cardoza v. Rock, 731 F.3d 169, 182 (2d Cir. 2013). Even if the standard under section 2254(d)(2) is met, the petitioner "still bears the ultimate burden of proving by a preponderance of the evidence that his constitutional rights have been violated." Id. (internal citation omitted). The question under the AEDPA "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable, which is a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

### d) Harmless error

A Confrontation Clause violation is considered harmless error unless it "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946); accord Fry v. Pliler, 551 U.S. 112, 116, 121–22 (2007) (clarifying that the Brecht standard applies when reviewing a state court judgment under 28 U.S.C. § 2254(d)). When considering whether a limit or preclusion of cross examination was harmless error, courts consider: "(1) the strength of the state's case; (2) the importance of the witness's testimony; (3) whether the excluded testimony

would have been cumulative; (4) the presence of evidence that would have corroborated the testimony; and (5) the extent of the cross-examination that was permitted." McGhee v. Uhler, No. 17 Civ. 1103 (CM) (SDA), 2019 WL 4228352, at *9 (Apr. 18, 2019). See also Nappi v. Yelich, 793 F.3d 246, 252 (2d Cir. 2015); Brinson v. Walker, 547 F.3d 387, 395 (2d Cir. 2008). Courts in this Circuit also "consider a sixth factor in addition to the Supreme Court's five: '[W]hether the cross-examination of which the defendant was deprived was of a nature that was likely to affect the result.'" Alvarez v. Ercole, 763 F.3d 223, 233 (2d Cir. 2014) (quoting Brinson, 547 F.3d at 396).

### B.   Confrontation Clause Claim

Garlick argues that the First Department's decision was "contrary to" and constituted an "unreasonable application" of clearly established Supreme Court precedent. (ECF No. 5 at 5). The Supreme Court's modern Confrontation Clause jurisprudence has not defined an exhaustive list of "testimonial" statements, and, as a result, lower courts apply by extension and analogy the principles set forth in the Supreme Court's Confrontation Clause cases, namely, Crawford v. Washington, 541 U.S. 36 (2004), Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), Bullcoming v. New Mexico, 564 U.S. 647 (2011), and Williams v. Illinois, 567 U.S. 50 (2012).

### 1.   The status of Confrontation Clause precedent

"Clearly established" Supreme Court precedent refers to the state of the law as of the date of the First Department's decision, and thus this Court must review Supreme Court Confrontation Clause precedent as of November 29, 2016. Garlick, 144 A.D.3d at 605; see Greene, 565 U.S. at 40; DeJesus, 2017 WL 6398338, at *14. Although certain Confrontation Clause principles can be divined from Crawford and its progeny, as set forth below, what

constitutes "clearly established" law for purposes of section 2254 review, however, is a more complicated matter.

### a)     The Confrontation Clause

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In <u>Ohio v. Roberts</u>, 448 U.S. 56 (1980), the Supreme Court established that the out-of-court statement of an unavailable witness was admissible provided it has adequate indicia of reliability, <u>i.e.</u>, it fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness."  448 U.S. at 66.

### b)     Crawford v. Washington

In <u>Crawford v. Washington</u>, the Supreme Court revisited its Confrontation Clause precedent, abrogating its decision in <u>Roberts</u>, and establishing modern Confrontation Clause standards.  541 U.S. 36 (2004).  Following a historical analysis of the Confrontation Clause, the Court held in <u>Crawford</u> that the "indicia of reliability" test impermissibly relied on tenants of evidence law, rather than following the procedure of examination prescribed in the Constitution, namely, confrontation through cross examination.  <u>Id.</u> at 51 ("Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices.").  The Court emphasized in <u>Crawford</u> that, regardless of reliability, the Constitution requires confrontation for testimonial evidence to be admitted against a criminal defendant.  <u>Id.</u> at 68–69 ("Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one that the Constitution actually prescribes:  confrontation.").

As to whether a statement is testimonial, the Court in Crawford looked to the definition of "testimony" as of 1828:  "[a] solemn declaration or affirmation made for the purposes of establishing or proving some fact."  Id. at 51 (citing 2 N. Webster, Am. Dictionary of the English Language (1828)).   The Court then set out two additional formulations of a "testimonial" statement:  (1) statements that were "ex parte in-court testimony or its functional equivalent— that, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," and (2) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  Id. at 51–52.

Applying this framework, the Court considered whether the tape-recorded statement to police made by the wife of for the defendant, who was accused of stabbing another man, could be entered into evidence, even though the wife was exempt from cross examination by the marital privilege.  Id. at 40.  The Court held that the wife's statements were testimonial, and thus their admission into evidence without the opportunity for cross examination violated the Confrontation Clause.  Id. at 67–69 ("The Constitution prescribes a procedure for determining the reliability of testimony in criminal trials, and we, no less than the state courts, lack authority to replace it with one of our own devising.").

Following Crawford, then, lower courts essentially had a Confrontation Clause tool-box containing a small category of explicitly testimonial statements, a Court-endorsed definition of "testimony," and two formulations to determine whether a statement is testimonial:  (1) "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial

examinations, prior testimony that the defendant was unable to cross examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," and (2) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  Id. at 51–52.

### c)      Melendez-Diaz v. Massachusetts

Five years later in Melendez-Diaz v. Massachusetts, the Supreme Court again addressed the testimonial standard, this time as applied to certificates attesting to the laboratory analysis of a suspected controlled substance.  557 U.S. 305 (2009).

After seizing a substance during Melendez-Diaz's arrest, police submitted a sample of the substance to the state laboratory for chemical analysis.  Id. at 308.  At trial, the prosecution introduced three "certificates of analysis" indicating that the substance was cocaine.  Id. Melendez-Diaz objected to the admission of the certificates, arguing that Crawford required the analysts who performed the chemical analyses to testify in person.  Id. at 309.  The trial court overruled the objection, and admitted the certificates into evidence, a decision the appellate court affirmed.  Id.

On its review, the Supreme Court began by reiterating the testimonial formulations described in Crawford:  whether the statement was "ex-parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was able to cross examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; whether the statement was "contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and whether the "[s]tatements [] were made under circumstances which would lead an objective

witness reasonably to believe that the statement would be available for use at a later trial." Id. at 310 (quoting Crawford, 541 U.S. at 51–52).

Applying these formulations, the Court stated that there was "little doubt that the documents in this case fall within the core class of testimonial statements thus described." Id. (internal citation omitted).  The Court explained that, although Massachusetts labeled the documents "certificates," they were "quite plainly affidavits" because they were notarized and were "incontrovertibly" a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. (quoting Crawford, 541 U.S. at 51).  Thus, the certificates were functionally equivalent to live, in-court testimony.  Id. at 310–11.  Further, the Court found that the affidavits were "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'"  Id. at 311 (quoting Crawford, 541 U.S. at 52).  The Court demonstrated that under any of these formulations, the certificates were testimonial and could not be admitted against a defendant unless he had the opportunity to cross examine the analyst who had conducted the test.

The Court then assessed and rejected each of the prosecution's arguments.  First, the prosecution argued that "the analysts [were] not subject to confrontation because they [were] not 'accusatory' witnesses, in that they [did] not directly accuse the petitioner of wrongdoing; rather, their testimony [was] inculpatory only when taken together with other evidence" that linked the conclusions in the certificates to Melendez-Diaz.  Id. at 313.  The Court rejected the proposition that statements are not "testimonial" unless they identify or accuse a specific witness as an argument that "finds no support in the text of the Sixth Amendment or our case law."  Id. In fact, the Court explained, the Confrontation Clause and adjacent Compulsory Process Clause

set up a clear dichotomy of witnesses against a criminal defendant: those against him, whom the defendant has the right to confront, and those in his favor: "[t]he prosecution <u>must</u> produce the former; the defendant <u>may</u> call the latter . . . there is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation." <u>Id.</u> at 313–14. Thus, the Court held, a statement need not identify a specific suspect for it to be testimonial under the Confrontation Clause. <u>Id.</u>

Second, the prosecution argued that the analysts should be immune from confrontation because they were not "conventional" witnesses "whose <u>ex parte</u> testimony was most notoriously used at the trial of Sir Walter Raleigh," which had "long been thought a paradigmatic confrontation violation" that exemplified "the core of the right to confrontation[.]" <u>Id.</u> at 315 (quoting <u>Crawford</u>, 341 U.S. at 52). The Court noted that conventional witnesses "recall[] events observed in the past," and that the analysts in <u>Melendez-Diaz</u> "observe[d] neither the crime nor any human action related to it." <u>Id.</u> at 315–16. The Court found no basis for limiting the confrontation right based on the "conventionality" of the witnesses and rejected the notion that a witness must observe a crime or related activity for confrontation to be required. <u>Id.</u> at 315–16 ("The dissent provides no authority for this particular limitation of the type of witnesses subject to confrontation.").

Third, the prosecution contended that there was a difference between testimony that was "prone to distortion or manipulation" and the testimony in <u>Melendez-Diaz</u>, which it described as the "result of neutral, scientific testing." <u>Id.</u> at 317 (internal citation omitted). The Court rejected this argument, stating that it was "little more than an invitation to return to [the] overruled decision in <u>Roberts</u>," which used the purported reliability and trustworthiness of

evidence at issue to determine when cross examination was necessary.  Id. at 318.  The Court explained that statements that are the result of supposedly "neutral, scientific testing" should still be subject to the rigor of cross examination because not only are such tests not "as neutral or as reliable" as suggested, but they are not "uniquely immune from the risk of manipulation." Id.  The Court elaborated that confrontation "is designed to weed out not only the fraudulent analyst, but the incompetent one as well." Id. at 319.  Because "[s]erious deficiencies" have been found in the forensic evidence used in criminal trials, "an analyst's lack of proper training or deficiency in judgment may be disclosed in cross-examination." Id. at 319–20.

Discussing forensic evidence more generally, the Court noted that even scientific tests and expert analysts rely on subjective decisions, such as which tests to perform and how to interpret the results.  See id. at 320.  This inevitable subjective element, "presents a risk of error that might be explored on cross-examination." Id.  Quoting a National Academy of Sciences report, the Court discussed the "wide variability across forensic science disciplines with regard to techniques, methodologies, reliability, types and numbers of potential errors, research, general acceptability, and published material." Id. at 320–21.

Fourth, the prosecution argued that the "analysts' affidavits are admissible without confrontation because they are akin to the types of official and business records admissible at common law." Id. at 321 (internal citation omitted).  The Court explained that the certificates at issue did not qualify as traditional official or business records, but even if they did, "their authors would be subject to confrontation nonetheless." Id.  Thus, although Federal Rule of Evidence 803 sets forth exceptions to the general prohibition against the entry of hearsay evidence, including that documents kept in the regular course of business may ordinarily be admitted at trial despite

their hearsay status, the Court explained, "that is not the case if the regularly conducted business activity is the production for evidence for use at trial."  Id.

The Court clarified that "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because— having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial."  Id. at 324.  The Court distinguished the accident reports in Palmer v. Hoffman, which, even though kept in the regular course of business, were not admissible without confrontation because they were "calculated for use essentially in the court, not in business."  Id. at 321 (quoting Palmer v. Hoffman, 318 U.S. 109, 114 (1943)).  Thus, even though functionally similar to other business records, whether the statements contained in those records were testimonial was a separate question, and the one that determined whether confrontation of the declarant was required under the Sixth Amendment.  The Court also noted that the certificates at issue in Melendez-Diaz were not admissible as public records because Federal Rule of Evidence 803(8) specifically excludes "matter[s] observed by law-enforcement personnel" in a criminal case, and thus required confrontation through cross examination.  Id.  Thus, even if a statement qualifies as a business or public record, the declarant must testify to the statement if it is testimonial under one of the tests endorsed by the Court.

In sum, the Court in Melendez-Diaz rejected the concepts that:  (1) a statement is not testimonial unless it directly accuses a known suspect, 557 U.S. at 313; (2) testimonial statements can only be made by "conventional witnesses," id. at 315; (3) evidence produced as the "result[t] of neutral, scientific testing" is not testimonial, id. at 317; and (4) business and public records are

admissible without confrontation because such records were "admissible at common law," id. at 321 (internal citations omitted). At the same time, the Court reaffirmed the formulations of testimonial statements outlined in Crawford: (1) a statement that is "ex-parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was able to cross examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" (2) an extrajudicial statement "contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; or (3) a statement "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 310. The Court also reaffirmed the use of the 1828 definition of "testimony" when analyzing whether the documents at issue, here labeled "certificates," were testimonial. Id. (finding the certificates were "incontrovertibly a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact'").

The Court concluded that because the certificates established the fact that the substance found on the defendant was cocaine, which is the precise testimony the analyst would provide if called at trial, the "certificates [we]re functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination." Id. at 311–12 (internal citations omitted). Therefore, the Court held that the admission of the certificates into evidence without providing the defendant the opportunity to cross examine the analyst was error. Id. at 329.

### d)     **Bullcoming v. New Mexico**

In 2011, the Court in Bullcoming v. New Mexico undertook to clarify the contours of the Confrontation Clause in relation to forensic evidence, this time in connection with a blood alcohol

test.  564 U.S. 647 (2011).  Bullcoming was arrested on charges of driving while intoxicated, and the principal evidence against him was a laboratory report certifying that his blood-alcohol concentration was above the legal limit.  Id. at 651.

At trial, the prosecution did not call the analyst who signed the laboratory report, and instead called another analyst who was familiar with the laboratory's testing procedures, but had no role in testing the sample.  Id.  Over Bullcoming's objection, the trial court admitted the laboratory report into evidence as a business record, and allowed the prosecution to use a surrogate witness to testify about the laboratory procedures.  Id. at 656.

On appeal to the New Mexico Supreme Court, and now with the guidance of Melendez-Diaz, the court held that, like the affidavits in Melendez-Diaz, the blood-alcohol report introduced at Bullcoming's trial constituted testimonial evidence because it was "functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination."  Id.  The court held, however, that the report's admission did not violate the Confrontation Clause because the analyst "'was a mere scrivener,' who 'simply transcribed the results generated by the gas chromatograph machine,'" and that the surrogate witness "'qualified as an expert witness with respect to the gas chromatograph machine.'"  Id. at 657 (internal citations omitted).  Thus, the New Mexico Supreme Court concluded, there was no Confrontation Clause violation because Bullcoming could not have cross examined the machine or the written report, and was able to cross examine "a qualified analyst" who served as an acceptable surrogate.  Id.

The Supreme Court disagreed.  Id.  The Court found that the blood alcohol report was more than a mere number; it certified that the analyst had received the sample intact, had checked that the sample corresponded to the correct report number, and had performed a

particular test following a specified protocol.  Id. at 660.  The Court concluded that, "[t]hese representations, relating to past events and human actions not revealed in raw, machine-produced data, are meet for cross-examination." Id.  "[T]he comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar," the Court continued, noting that it had "settled in Crawford that the 'obviou[s] reliab[ility]' of a testimonial statement does not dispense with the Confrontation Clause." Id. at 661 (quoting Crawford, 541 U.S. at 62).

The Supreme Court also disapproved of the use of surrogate expert testimony, because such testimony "could not convey what [the analyst conducting the test] knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed." Id.  Further, surrogate testimony could not "expose any lapses or lies on the certifying analyst's part." Id. at 662.  The Court stated that,

> [m]ore fundamentally, as this Court stressed in Crawford, "[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts." . . . Accordingly, the Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination.

Id. (quoting Crawford, 541 U.S. at 54).

The state argued that the affirmations by the analyst were not testimonial because they were observations of an "independent scientis[t]" made "according to a non-adversarial public duty." Id. at 663–64 (internal citation omitted).  The Supreme Court quickly dispensed of this justification as "far[ing] no better here than it did in Melendez-Diaz.  A document created solely for an 'evidentiary purpose,' Melendez-Diaz clarified, made in aid of a police investigation, ranks as testimonial." Id. at 664.  The state attempted to distinguish the certificate at issue from that

in Melendez-Diaz by emphasizing that the report there was sworn before a notary public, in contrast to the blood-alcohol report, which was unsworn. Id. The Court disagreed, holding that "[t]he same purpose was served by the certificate in question here" as the certificates in Melendez-Diaz, which the Court held were "'incontrovertibly . . . affirmation[s] made for the purpose of establishing or proving some fact' in a criminal proceeding." Id. (citing Melendez-Diaz, 557 U.S. at 310). The Court rejected as overly formalistic and easily avoidable any interpretation of the Confrontation Clause "that would render inadmissible only sworn ex parte statements, while leaving admission of formal, but unsworn statements, 'perfectly OK.'" Id. at 664. Rather, the Court held that, "[i]n all material respects, the laboratory report in this case resembles those in Melendez-Diaz." Id. The similarities between the report at issue in Bullcoming and those in Melendez-Diaz were intractable: in both cases, a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations; both analysts tested the evidence and prepared a certificate containing the result of the analysis; and, both certificates were "formalized" in a signed document labeled "report." Id. at 665. These elements, the Court held, were "more than adequate to qualify [the analyst's] assertions as testimonial." Id. Thus, admission of the report, even as a business record, did not render the report immune from confrontation. Id.

Justice Sotomayor issued a concurring opinion in which she agreed that the report at issue was testimonial, but wrote separately to highlight her rationale. Bullcoming, 564 U.S. at 668. Justice Sotomayor explained her position, as outlined in Michigan v. Bryant,[4] that "[t]o determine

---

[4] In Davis v. Washington, the Court considered "when statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial' and thus subject to the requirements of the Sixth Amendment's Confrontation Clause." 547 U.S. 813, 817 (2006). A few years later in Michigan v. Bryant, the Court again considered

if a statement is testimonial, we must decide whether it has 'a primary purpose of creating an

out-of-court substitute for trial testimony.'" Id. at 669.  (quoting Bryant, 562 U.S. at 358).  When

the "primary purpose" of a statement is "not to create a record for trial," she continued, "the

admissibility of [the] statement" is governed by the state and federal rules of evidence, rather

than the Confrontation Clause.  Id.  In Bullcoming, as in Melendez-Diaz, she concluded that the

certificates had the "primary purpose of creating an out-of-court substitute for trial testimony"

and were therefore testimonial.  Id. at 670 (quoting Bryant, 562 U.S. at 358).

Justice Sotomayor also found the formality of the statements important to determining

their purpose.  Id. at 671.  Although "'[f]ormality is not the sole touchstone of our primary

purpose inquiry,' a statement's formality or informality can shed light on whether a particular

statement has a primary purpose for use at trial."  Id. (quoting Bryant, 562 U.S. at 366).  Under

this "primary purpose" analysis, Justice Sotomayor agreed that the blood-alcohol certification

---

whether statements made to police were testimonial.  562 U.S. 344 (2011).  In both cases, the Court focused its analysis on the presence of an "ongoing emergency" as an important factor in determining whether such statements were testimonial.  Davis, which also decided the companion case Hammond v. Indiana, No. 05 Civ. 5705, considered statements made to a 911 operator in response to an ongoing domestic assault and statements made to police responding to a report of a domestic disturbance, while Bryant, 562 U.S. at 344, considered statements made to police officers after the declarant had been shot and was found mortally wounded.

In Davis, the Court explained that Crawford set forth "various formulations" of testimonial statements, without endorsing a single test.  Davis, 547 U.S. at 822 (quoting Crawford, 541 U.S. at 52).  For this context, the Court held, "[w]ithout attempting to produce an exhaustive classification" that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  Id.

Davis also reaffirmed several formulations of testimonial statements discussed in Crawford.  It reiterated the definition of "testimony" as "'a solemn declaration or affirmation made for the purpose of establishing or proving some fact,'" Davis, 547 U.S. at 824 (quoting Crawford, 652 U.S. at 51), and that formal, ex parte statements and the evidentiary products of such statements are testimonial.  See id.; see also Crawford, 652 U.S. at 51–52.  Notably, Davis also introduced the "primary purpose" language as a formulation to determine whether statements made to police officers are testimonial.

was a formal statement, despite the lack of notarization. Id.  Thus, she explained that "the report ha[d] a primary purpose of creating an out-of-court substitute for trial testimony, which renders it testimonial." Id. at 671–72 (internal citations omitted).

In sum, the Bullcoming Court considered and rejected the propositions that: (1) testimonial evidence does not implicate the Confrontation Clause on the basis that the forensic analyst is a "mere scrivener" who "simply transcribed" machine-generated results, id. at 660; (2) testimonial evidence could be subject to cross examination by a surrogate expert witness, and does not require the certifying expert to testify, id. at 664; and, (3) blood-alcohol analysis was not testimonial because the analyst was not "adversarial" or "inquisitorial" because it simply contained observations of an "independent" scientist made "according to a non-adversarial public duty." Id.  The Court reaffirmed the formulations of testimony outlined in Crawford:  (1) ex parte communications contained in formalized documents are testimonial, even if not sworn before a notary, id. at 664–65, 671; (2) statements made for use at a later trial are testimonial, id. at 664, 670 (Sotomayor, J., concurring); and (3) an out-of-court statement made for the purpose of proving some fact is testimonial, id. at 652.  Justice Sotomayor's concurrence employed the primary purpose test for the first time outside of the context of statements to police officers. Id. at 669.

### e)    Williams v. Illinois

In its most recent Confrontation Clause case, the Supreme Court addressed whether "Crawford bar[s] an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify[.]"

Williams v. Illinois, 567 U.S. 50, 56 (2012).  The Justices did not agree on an answer to this question and issued a fractured opinion with no single approach endorsed by a majority.

At Williams's bench trial, a forensic expert at the Illinois State Police laboratory testified about a report that concluded that a DNA profile, prepared by an outside laboratory from the victim's swab, matched a DNA profile produced by the state police from Williams's blood.  Id. at 56.  The expert, who had no role in the DNA analysis, attested to the central issue in the case: that the DNA on the victim's swab matched Williams's DNA profile.  Id.  In response to confrontation clause objections to the expert testimony, the State explained that under Illinois Rule of Evidence 703 (identical to the federal rule), "an expert is allowed to disclose the facts on which the expert's opinion is based, even if the expert is not competent to testify to those underlying facts."  Id. at 63.  The trial judge agreed and declined to exclude the expert's testimony.  Id. at 63–64.  The Illinois Appellate Court and Illinois Supreme Court found no Confrontation Clause violation because the statement that the DNA profiles matched "was not admitted for the truth of the matter asserted; rather, it was offered to provide a basis for [the expert's] opinion."  Id. at 64.

The plurality opinion, written by Justice Alito and joined by Chief Justice Roberts, Justice Kennedy, and Justice Breyer, affirmed the Illinois Supreme Court decision on two independent bases, first, "that this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted," and second, that the report was not testimonial because "it was produced before any suspect was identified," it was not made to obtain evidence, "but for the purpose of finding a rapist who was on the loose," and the report "was not inherently

inculpatory." Id. at 58.  The Williams plurality heavily relied on the fact that the trial had been a bench trial, noting that a jury would be less likely to discern between evidence admitted for its truth and evidence admitted to explain the basis of the expert's opinion.  Id. at 70.

In his concurrence, Justice Thomas agreed with the plurality's judgment, but "share[d] the dissent's view of the plurality's flawed analysis."  Id. at 103–04.  In addition to rejecting the plurality's finding that the DNA report was not offered for its truth, id. at 106, Justice Thomas's testimonial analysis focused solely on the formality of the statement.  Id. at 110–11.  He concluded that the DNA report was "not a statement by a witness within the meaning of the Confrontation Clause" because it lacked "the solemnity of an affidavit or deposition," it was "neither a sworn nor a certified declaration of fact," and it did not "attest that its statements accurately reflect[ed] the DNA testing processes used or the results obtained."  Id. at 111.  He distinguished this report from those in Melendez-Diaz and Bullcoming because, unlike the reports in those cases, the report here "certifie[d] nothing."  Id. at 112.

Justice Thomas also rejected the "primary purpose" test the plurality invoked.  He noted that the original formulation of that test, in Davis, "asked whether the primary purpose of an extrajudicial statement was 'to establish or prove past events potentially relevant to later criminal prosecution.'"  Id. at 113 (quoting Davis, 547 U.S. at 822).  In contrast, "[t]he new primary purpose test asks whether an out-of-court statement has 'the primary purpose of accusing a targeted individual of engaging in criminal conduct.'"  Id. at 114 (quoting plurality op. at 81–82).  He then posited that such a test "lacks any grounding in constitutional text, in history, or in logic."  Id. ("There is no textual justification, however, for limiting the confrontation right to statements made after the accused's identity became known."); id. at 115 ("Historical practice confirms that

a declarant could become a 'witness' before the accused's identity was known."). As in Melendez-Diaz, Justice Thomas read the text of the Sixth Amendment as contemplating "two classes of witnesses—those against the defendant and those in his favor." Id. at 116 (quoting Melendez-Diaz, 557 U.S. at 313–14). He also reiterated the Court's previous finding that these two exclusive categories necessarily preclude a third category of witnesses "helpful to the prosecution, but somehow immune from confrontation" id. (quoting Melendez-Diaz, 557 U.S. at 314), and thus the "distinction between those who make 'inherently inculpatory' statements and those who make other statements that are merely 'helpful to the prosecution' has no foundation in the text of the Amendment." Id.

The dissent, written by Justice Kagan and joined by Justices Scalia, Ginsburg, and Sotomayor, found the DNA report to be testimonial under the Court's Confrontation Clause precedent. Id. at 119. The dissent viewed Justice Alito's plurality opinion as a dissent "in all except its disposition" because "[f]ive Justices specifically reject[ed] every aspect of its reasoning and every paragraph of its explication." Id. at 120. The dissent concluded that the DNA report was "identical to the one in Bullcoming (and Melendez-Diaz) in 'all material respects.'" Id. at 123 (quoting Bullcoming, 564 U.S. at 664). Justice Kagan explained that, as in those cases, the DNA report was "made to establish some fact at a criminal proceeding" and "detail[ed] the results of forensic testing of evidence gathered by the police." Id. (internal citations omitted). Like the report in Bullcoming, the DNA report in Williams had "a comparable title; similarly describ[ed] the relevant samples, test methodology, and results; and likewise include[d] the signatures of laboratory officials." Id. On these facts alone, the dissent concluded that the report should have only come into evidence if Williams had the opportunity to cross examine the analyst. Id. But,

he did not have this opportunity, and thus could not question the appropriate analyst as to what he knew or observed during the testing, and did not have the opportunity to expose any lapses or shortcomings with the procedures.  Id. at 124.  In the dissent's view, "[u]nder our case law [these facts are] sufficient to resolve this case."  Id.

As to the plurality's second basis for finding the DNA report nontestimonial, the dissent, in tandem with Justice Thomas, rejected the proposition that in order to be testimonial, evidence must "be prepared for the primary purpose of accusing a targeted individual."  Id. at 135–37.  The dissent responded, "[w]here that test comes from is anyone's guess.  Justice Thomas rightly shows that it derives neither from the text nor the history of the Confrontation Clause . . . And it has no basis in our precedents."  Id. at 135 (internal citations omitted) ("None of our cases have ever suggested that, in addition, the statement must be meant to accuse a previously identified individual; indeed, in Melendez-Diaz, we rejected a related argument that laboratory 'analysts are not subject to confrontation because they are not 'accusatory' witnesses.'").  The dissent also rejected the plurality's attempt to re-introduce reliability as a tenet of whether a statement was testimonial.  Id. at 138 ("Dispensing with [cross examination] because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty.").

Finally, in response to Justice Thomas's formality approach, the dissent found that the reports in Bullcoming, Melendez-Diaz, and Williams were all functionally similar, and that the similarities "dwarf[ed] the distinctions."  Id. at 139.  In each case, the report "[wa]s an official and signed record of laboratory test results, meant to establish a certain set of facts in a legal proceeding."  Id.  Because five justices rejected the plurality's proposed "identification" requirement of testimonial evidence, no single test was endorsed by a majority of the justices.

In response to this fractured opinion, lower courts have found that <u>Williams</u> does not alter the

Court's Confrontation Clause jurisprudence, and should be limited to the set of facts in that case.

<u>See</u>, <u>e.g.</u>, <u>United States v. James</u>, 712 F.3d 79 (2d Cir. 2013).

> ### 2.    Second Circuit application of Supreme Court Confrontation Clause precedent

In <u>United States v. James</u>, with the benefit of all of the Supreme Court Confrontation

Clauses cases discussed above, the Second Circuit carefully analyzed the effects of <u>Williams</u> on

the Court's Confrontation Clause jurisprudence, and reviewed its own precedent in <u>United States</u>

<u>v. Feliz</u>, 467 F.3d 227 (2d Cir. 2006), which had held that autopsy reports could be admitted as

business records without violating the Confrontation Clause.  712 F.3d 79, 88 (2d Cir. 2013).

In <u>James</u>, the defendant argued that the district court erred in admitting testimony

regarding an autopsy that the witness had not personally conducted, and in allowing a foreign

medical examiner to testify to the results of a toxicology test that he had ordered but did not

conduct.  <u>Id.</u> at 87.  The Second Circuit held that the autopsy report and toxicology report were

not testimonial "because they were not created 'for the purpose of establishing or proving some

fact at trial.'"  <u>Id.</u> at 88 (quoting <u>Melendez-Diaz</u>, 557 U.S. at 324).

In reviewing the Supreme Court's pre-<u>Williams</u> precedent, the Second Circuit distilled the

guiding principle to be that "a laboratory analysis is testimonial if the circumstances under which

the analysis was prepared, viewed objectively, establish that the primary purpose of a reasonable

analyst in the declarant's position would have been to create a record for use at a later criminal

trial."  <u>Id.</u> at 94.  The Second Circuit considered whether <u>Williams</u> changed that rule, but found

that "[n]o single rationale disposing of the <u>Williams</u> case enjoys the support of a majority of the

Justices."  <u>Id.</u> at 95.  Unable to discern a single controlling holding, the Second Circuit concluded

that it must "rely on Supreme Court precedent before <u>Williams</u> to the effect that a statement triggers the protections of the Confrontation Clause when it is made with the primary purpose of creating a record for use at a later criminal trial." <u>Id.</u> at 96.

Notably, because the defendants in <u>James</u> had not made a Confrontation Clause objection to the surrogate testimony concerning the OCME autopsy report at trial, the Second Circuit reviewed the Confrontation Clause challenge only for "plain error." <u>Id.</u> at 96.[5] The Second Circuit stated that it must "determine whether, under the circumstances, the autopsy report (including the toxicology report) was prepared with the primary purpose of creating a record for use at a later criminal trial." <u>Id.</u> at 97.

In its discussion of the facts, the court reviewed the relationship between OCME and law enforcement. <u>Id.</u> at 97–98. The court explained that OCME is independent, but that "the police are required to notify it when someone has died 'from criminal violence, by accident, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility or in any suspicious or unusual manner[.]'" <u>Id.</u> at 98 (quoting N.Y.C. Charter § 557(a), (f)(1)). Because the defendants did not object to the introduction of the surrogate testimony at trial, the court was left with a "scant record of the circumstances under which [the OCME analyst] produced her autopsy report." <u>Id.</u> Based on the limited record, the Second Circuit found that no one involved in the autopsy suspected foul play, nor anticipated that the autopsy report would be used at a criminal trial. <u>Id.</u> at 99. The autopsy report referred to the cause of death as

---

[5] Had the defendant preserved his Confrontation Clause challenge, the Second Circuit would have reviewed the issue for "harmlessness," "which requires [the Court] to ask whether [they] are satisfied 'upon a review of the entire record . . . beyond a reasonable doubt that the error complained of . . . did not contribute to the verdict obtained.'" <u>James</u>, 712 F.3d at 99 (citing <u>United States v. Lee</u>, 549 F.3d 84, 90 (2d Cir. 2008)).

"undetermined" and was conducted "substantially before any criminal investigation into [the] death had begun." Id. The Second Circuit held that "the autopsy report was not testimonial because it was not prepared primarily to create a record for use at a criminal trial." Id. On that basis, the court found no error in admitting the report into evidence or allowing a surrogate witness to testify to the report. Id.

The James defendants had objected at trial to the foreign medical examiner's testimony about forensic testing he had ordered but not conducted himself, thus adequately preserving their Confrontation Clause challenge. Id. The Second Circuit found the district court's basis for admitting the forensic testimony "of questionable validity" in light of the development of Supreme Court jurisprudence on the issue, but nevertheless held the evidence was properly admitted. Id. at 101. The Second Circuit reasoned that there was "no indication in [the foreign medical examiner's] testimony or elsewhere in the record that a criminal investigation was contemplated during the inquiry" and therefore found that the report was nontestimonial. Id.

Judge Eaton filed a separate concurrence, stating that "[b]ecause of the unsettled state of the law," he agreed that "the admission into evidence of the autopsy report prepared by [the OCME pathologist] did not constitute plain error," but disagreed with the majority's conclusion that the report was not testimonial. Id. at 108. Judge Eaton would have found that "the admission of any medical examiner's report prepared by OCME would trigger the protections in the Confrontation Clause" because "[a]ll such reports are made to establish facts about the cause of death of the decedent; they are made by and to government officials in a formalized recording; they contain statements a medical examiner could reasonably foresee would be used in a

criminal prosecution; and if a prosecutor seeks to introduce the report for its truth, it would substitute for live testimony adverse to the defendant." Id. at 111.

**C.      Application of Supreme Court Precedent**

This Court follows the Second Circuit in James in largely relying on pre-Williams case law to guide its analysis of Garlick's Confrontation Clause claim.  Id. at 95–96.  In applying the pre-Williams principles to this case, the Court analyzes first the Trial Court's decision to allow the Autopsy Report into evidence at Garlick's trial, and then the First Department's affirmation of the Trial Court's decision.

**1.      Introduction of the Autopsy Report at trial**

Relying on People v. Freycinet, 11 N.Y.3d 38 (2008) and People v. Hall, 84 A.D.3d 79 (1st Dep't 2011), the Trial Court entered the Autopsy Report into evidence, and allowed Dr. Ely to testify about the Autopsy Report as an expert.  (See supra § II.B.2).

In allowing Dr. Ely to testify to the Autopsy Report over Garlick's Confrontation Clause objection, the Trial Court rejected defense counsel's interpretation of Freycinet, and noted that, "more recently in People against Hall . . . similar issues were before the court and it was held that it was proper to allow a witness to testify to the contents of an autopsy report, even though the witness had not participated in the autopsy."  (ECF No. 13 at 21–22).  During Dr. Ely's testimony, when defense counsel repeated the Confrontation Clause objection, the State asserted that "[t]he autopsy report is admissible as a business record.  Once it's admissible, I can call any expert witness, whether they're connected with the medical examiner's office or not, so long as they're an expert to interpret it."  (Id. at 32).  The Trial Court agreed, and, citing Hall, allowed the Autopsy Report and the surrogate testimony.  (Id. at 32–34).  Thereafter, the Trial Court allowed Dr. Ely

to testify to both the factual findings and the opinions in the Autopsy Report.  (ECF No. 13-1 at

1–13).  Dr. Ely essentially read the Autopsy Report into evidence, recounting what Dr. Maloney

observed from Sherwood's body (ECF No. 13-1 at 1), noting the age Dr. Maloney believed

Sherwood to be (id. at 2), describing the differences between the different types of wounds that

Dr. Maloney had identified (id. at 2–3), and opining as to which injuries contributed to

Sherwood's death (id. at 3 ("[Sherwood] also had some blunt force trauma to his face.  That's a

different kind of injury which I can describe in a moment and was not part of his cause of death

ultimately."), 13 ("The cause of death is stab wound of torso with preformation of heart.")).

As discussed further below, this Court concludes that the Autopsy Report was testimonial,

and thus its introduction into evidence without providing Garlick an opportunity to cross examine

the pathologist who performed the autopsy violated the Confrontation Clause.

### a)  The Autopsy Report is testimonial under Supreme Court precedent

As set forth above (supra §§ III.B.1.b–d), pre-Williams Supreme Court precedent endorsed

the following formulations of testimonial statements:

1.  "A solemn declaration or affirmation made for the purposes of establishing
    or proving some fact."[6]

2.  "[E]x parte in-court testimony or its functional equivalent—that is, material
    such as affidavits, custodial examinations, prior testimony that the
    defendant was unable to cross examine, or similar pretrial statements that
    declarants would reasonably expect to be used prosecutorially."[7]

---

[6] Crawford, 541 U.S. at 52 (citing 2 N. Webster, Am. Dictionary of the English Language (1828)); Bullcoming, 564 U.S. at 652 ("The question presented is whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purposes of proving a particular fact—through the in-court testimony of a [surrogate witness].").

[7] Crawford, 541 U.S. at 52; Melendez-Diaz, 557 U.S. at 310 (quoting Crawford, 541 U.S. at 51–52) (also formulating testimonial statements as "contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"); Bullcoming, 564 U.S. at 664–65 ("[T]he formalities attending the 'report of blood alcohol analysis' are more than adequate to qualify [the analyst's] assertions as testimonial.  The absence of notarization does not remove his certification from Confrontation Clause governance."); Bullcoming, 564 U.S. at 671 (Sotomayor,

3.  "[S]tatements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."[8]

4.  Statements that have "a primary purpose of creating an out-of-court substitute for trial testimony."[9]

Under each of these formulations, the Autopsy Report qualifies as a testimonial statement.

### (i)      Solemn declaration or affirmation

The Autopsy Report is "[a] solemn declaration or affirmation made for the purposes of establishing or proving some fact."  Crawford, 541 U.S. at 52.  According to Supreme Court precedent, a document need not be notarized to be testimonial.  Bullcoming, 564 U.S. at 664–65 ("[T]he formalities attending the 'report of blood alcohol analysis' are more than adequate to qualify [the analyst's] assertions as testimonial.  The absence of notarization does not remove his certification from Confrontation Clause governance."); id. at 671 (Sotomayor, J., concurring) ("I agree with the Court's assessment that the certificate at issue here is a formal statement, despite the absence of notarization.").  In its discussion of requisite formalities of testimonial evidence in Bullcoming, the Court considered that the report there, as in Melendez-Diaz, was sufficiently formal because in both cases, a law-enforcement officer provided seized evidence (white powder and blood, respectively) to a state laboratory required by law to assist in police investigation;

---

J., concurring) ("I agree with the Court's assessment that the certificate at issue here is a formal statement, despite the absence of notarization.").

[8] Crawford, 541 U.S. at 52; Melendez-Diaz, 557 U.S. at 310 (quoting Crawford, 541 U.S. at 51–52); Bullcoming, 564 U.S. at 664 ("A document created solely for an 'evidentiary purpose,' Melendez-Diaz clarified, made in aid of a police investigation, ranks as testimonial.").

[9] Bullcoming, 564 U.S. at 670 (Sotomayor, J., concurring) (quoting Bryant, 562 U.S. at 358) ("[T]he BAC report and [the analyst's] certification on it clearly have a 'primary purpose of creating an out-of-court substitute for trial testimony.'").

both analysts tested the evidence and prepared a certificate containing the result of the analysis; and, both certificates were "formalized" in a signed document labeled "report."  Id. at 665.

All of these factors are met here.  After Detective DeGrazia communicated with OCME, the state agency charged with assisting police in cases of unusual death, Sherwood's body was transported to OCME for an autopsy.  (ECF No. 13 at 24; ECF No. 4 at 8).  Then, the OCME pathologist (Dr. Maloney) conducted the autopsy, prepared a certificate containing the results of the procedure, and formalized the process and conclusions in a signed document labeled "Report."  (ECF No. 11-7).  Thus, the Autopsy Report is testimonial under the first formulation.

### (ii)    Functional equivalent of ex parte in-court testimony

The second formulation is whether the Autopsy Report is "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially."  Crawford, 541 U.S. at 51.  Here, the Autopsy Report is the functional equivalent of in-court testimony, and the Court finds that a reasonable pathologist in the same situation would expect the findings could be used prosecutorially.  Like the reports in Palmer v. Hoffman, where the Supreme Court held that railroad company accident reports, even though kept in the regular course of business, were not admissible without confrontation because they were "calculated for use essentially in the court, not in the business," so too are autopsy reports.  318 U.S. at 114.  OCME regularly conducts autopsies, (see ECF No. 13 at 24 (Dr. Ely testifying that the OMCE performs "thousands" of autopsies a year)), and even though not all autopsy reports will be used in litigation, it is a distinct

possibility, and one of which a pathologist would be aware.[10]   In New York City, OCME conducts autopsies in suspicious cases or in cases of suspected homicide.  See N.Y. County Law § 673(a) ("A coroner or medical examiner has jurisdiction and authority to investigate the death of every person dying within his county, or whose body is found within the county, which is or appears to be:   A violent death, whether by criminal violence, suicide or casualty).   By statute, the facts contained in autopsy reports created by OCME are considered "prima facie" evidence of the facts they state.  See N.Y. C.P.L.R. § 4520 ("Where a public officer is required or authorized, by special provision of law, to make a certificate or affidavit to a fact ascertained, or an act performed, by him in the course of his official duty, and to file or deposit it in a public office of the state, the certificate or affidavit so filed or deposited is prima facie evidence of the facts stated."); N.Y. Pub. Health Law § 4103(3) ("A certified copy of the record of a birth or death, a certification of birth or death, a transcript of a birth or death certificate, a certificate of birth data or a certificate of registration of birth, when properly certified by the commissioner or persons authorized to act for him, shall be prima facie evidence in all courts and places of the facts there in stated.").

In addition, several circuit courts and highest state appellate courts have held that autopsy reports are testimonial in all, or certain, circumstances.  See United States v. Ignasiak, 667 F.3d 1217 (11th Cir. 2012) (holding that in light of the medical examiner's duty to assist the police, autopsy reports were testimonial, even though not all would be used in criminal trials); United States v. Moore, 651 F.3d 30 (D.C. Cir. 2011) (finding an autopsy report testimonial when

---

[10]See James, 712 F.3d at 111 (Eaton, J., concurring) (noting that he would have found "the admission of any medical examiner's report prepared by OCME would trigger the protections in the Confrontation Clause" because "[a]ll such reports are made to establish facts about the cause of death of the decedent; they are made by and to government officials in a formalized recording; they contain statements a medical examiner could reasonably foresee would be used in a criminal prosecution; and if a prosecutor seeks to introduce the report for its truth, it would substitute for live testimony adverse to the defendant.").

the autopsy had been conducted in the presence of law enforcement officers, and when the findings were formalized in documents titled "reports"); <u>State v. Kennedy</u>, 735 S.E.2d 905 (W. Va. 2012) (holding that for purpose of use in criminal prosecutions, autopsy reports are, under all circumstances, testimonial hearsay under the Confrontation Clause); <u>Wood v. State</u>, 299 S.W.3d 200 (Tex. Ct. App. 2009) (finding autopsy reports testimonial when the nature of death was suspect and a police officer attended the autopsy, because it was reasonable to believe that the medical examiner would assume the report and her opinions would be used prosecutorially).

In <u>Melendez-Diaz</u>, the forensic analysis established that the seized substance was cocaine, in <u>Bullcoming</u>, the blood-alcohol report established the impermissibly high blood-alcohol level, and here, the Autopsy Report established Sherwood's cause of death.  <u>Melendez-Diaz</u>, 557 U.S. at 308; <u>Bullcoming</u>, 564 U.S. at 651.  All three reports "are functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination."  <u>Melendez-Diaz</u>, 557 U.S. at 310–11 (internal citations omitted); <u>see</u> <u>Bullcoming</u>, 564 U.S. at 656 (quoting <u>Melendez-Diaz</u>, 557 U.S. at 310–11).  If called to testify, Dr. Maloney, the pathologist who prepared the Autopsy Report in this case, would likely have testified as to the report's conclusion as to Sherwood's cause of death, and what the wounds revealed, if anything, as to Garlick's motive or the type of weapon used.  Therefore, the Autopsy Report is testimonial under the second formulation.

### (iii)      Objective witness standard

Under the third formulation, the Autopsy Report is testimonial because it contains "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  <u>Crawford</u>, 541 U.S. at 52; <u>Melendez-Diaz</u>, 557 U.S. at 310; <u>Bullcoming</u>, 564 U.S. at 664.  Several facts in this

case illustrate that a pathologist in the same situation as Dr. Maloney in this case would have reasonably believed that her report would be used at a later criminal trial.  First, Detective DeGrazia spoke with OCME, which thereafter prepared a "Supplemental Case Information" sheet noting that the victim had multiple stab wounds.  (ECF No. 4 at 8, ECF No. 11-7 at 17).  Second, before the autopsy, OCME prepared a "Notice of Death" form, which stated:  "Circumstances of death: App[arent] manner: Homicide."  (ECF No. 11-7 at 18).  Third, two homicide detectives, Detectives Speranza and Farmer, were present during the autopsy.  (Id. at 21, ECF No. 13-6 at 25).  Finally, the "Case Worksheet," prepared at the same time as the Autopsy Report, repeated the finding as to the cause of death as "stab wound of torso with perforation of heart."  (ECF No. 11-7 at 13).  A reasonable pathologist conducting an autopsy under these circumstances should have reasonably believed that a criminal investigation was underway, and that the subsequent autopsy report would very likely be used in that criminal investigation.  See James, 467 F.3d at 111 (Eaton, J., concurring) (noting that he would find all OCME autopsy reports testimonial because "they contain statements a medical examiner could reasonably foresee would be used in a criminal prosecution").

### (iv)     Primary purpose

The Autopsy Report is also testimonial under the "primary purpose" formulation discussed in Bryant and Justice Sotomayor's concurrence in Bullcoming—whether the statement has "'a primary purpose of creating an out-of-court substitute for trial testimony.'"  Bullcoming, 564 U.S. at 669 (quoting Bryant, 562 U.S. at 358).  As discussed above, the Autopsy Report itself constitutes an out-of-court substitute for trial testimony, in that it contains the same information that Dr. Maloney would have testified to had she been called as a witness.

In considering the primary purpose of a statement, several Justices have pointed to the formalities of the document at issue.  Bullcoming, 564 U.S. at 671 (while "'[f]ormality is not the sole touchstone of our primary purpose inquiry,' a statement's formality or informality can shed light on whether a particular statement has a primary purpose of use at trial") (quoting Bryant, 562 U.S. at 366).  Here, the document, titled "Report of Autopsy," certified that Dr. Maloney performed the autopsy of Gabriel Sherwood on November 2, 2011, and is affixed with the seal of the City of New York.  (ECF No. 11-7 at 3).  The Autopsy Report indicates that the final version was sent to the Bronx District Attorney's Office on December 30, 2011 and was signed by Dr. Maloney in three places.  (Id. at 1, 8, 10, 14).  Just as the report in Melendez-Diaz had the primary purpose of establishing the contents of the seized substance, and the report in Bullcoming had the primary purpose of determining blood-alcohol level, here, the Autopsy Report had the primary purpose of establishing Sherwood's cause of death.  See Bullcoming, 564 U.S. at 670 (discussing why the reports in Melendez-Diaz and Bullcoming had the "primary purpose of creating an out-of-court substitute for trial testimony").  Thus, the Autopsy Report is testimonial under the "primary purpose" analysis.

### (v)  The Autopsy Report is testimonial under James and Williams

In James, the Second Circuit distilled from the Supreme Court's pre-Williams case law the principle that "a laboratory analysis is testimonial if the circumstances under which the analysis was prepared, viewed objectively, establish that the primary purpose of a reasonable analyst in the declarant's position would have been to create a record for use at a later criminal trial." James, 712 F.3d at 94.  As noted above, the circumstances surrounding the Autopsy Report

indicate that Dr. Maloney reasonably should have been aware of the pending criminal investigation into Sherwood's death.  (See supra §§ II.A.2, III.C.1.a.iii).

Although the Second Circuit in James concluded that the autopsy report before it was not testimonial, this case differs in several important respects.  In James, first of all, the court was applying only plain error review because the Confrontation Clause objection had not been preserved, unlike in this case, where it is undisputed that defense counsel preserved the issue. (See ECF No. 11-2 at 42 (State's First Dep't Brief) ("During voir dire, defense counsel argued that the autopsy report was testimonial and that, therefore, allowing a medical examiner who did not conduct the autopsy to testify at trial about the contents of the report would violate defendant's confrontation right.").  As a result, from the "scant record of the circumstances" under which the autopsy report was produced, the Second Circuit found no suggestion anyone suspected foul play or suspected that a criminal investigation might ensue.  James, 712 F.3d at 98–99.  The report in James also stated the cause of death as "undetermined" and the autopsy was conducted before any criminal investigation had begun.  Id.  In contrast, here there is a thorough record of the circumstances under which Sherwood's autopsy was conducted, and that record contains multiple indications of an on-going criminal investigation into a potential homicide.  (See supra §§ II.A.1–2).

In addition, this Court agrees with Judge Eaton's concurrence in James that "the admission of any medical examiner's report prepared by OCME would trigger the protections in the Confrontation Clause" because "[a]ll such reports are made to establish facts about the cause of death of the decedent; they are made by and to government officials in a formalized recording; they contain statements a medical examiner could reasonably foresee would be used in a

criminal prosecution; and if a prosecutor seeks to introduce the report for its truth, it would substitute for live testimony adverse to the defendant." James, 712 F.3d at 111.

Finally, even under the plurality's formulation in Williams, the Autopsy Report is testimonial because it was "inherently inculpatory." 567 U.S. at 58. At the time of Sherwood's autopsy, the police had issued an I-Card for Garlick's arrest. (ECF No. 13-5 at 5) (discussing that at 4:45 a.m. on November 2, 2011, Detective DeGrazia issued an I-card to arrest Garlick for his involvement in the apparent homicide). The Autopsy Report is also inculpatory because it clarified the cause of death as a stab wound, not head trauma, thus incriminated Garlick and exculpated Johanna Rivera. (ECF No. 11-7 at 3). The Autopsy Report was "prepared for the primary purpose of accusing a targeted individual," and is therefore testimonial. Williams, 567 U.S. at 82–86; but see Griffin, 876 F.3d at 409 (discussing Williams, and noting that "both Justice Thomas in his concurrence and Justice Kagan in her dissent specifically reject the proposition that Confrontation Clause protections should be limited to circumstances in which a suspect has been identified").

Accordingly, under any of the five formulations of "testimonial," the Autopsy Report qualifies as testimonial and should not have been admitted into evidence at trial without giving Garlick the opportunity to cross examine Dr. Maloney, the pathologist who conducted the autopsy. Crawford, 541 U.S. at 52, 61 ("[T]he Confrontation Clause applies to 'witnesses' against the accused—in other words, those who 'bear testimony'" and "commands . . .that reliability be assessed in a particular manner:  by testing in the crucible of cross-examination.").

**b) Surrogate expert testimony does not satisfy the Confrontation Clause**

Because the Autopsy Report is testimonial, surrogate testimony, even by an expert, was not a constitutionally sufficient substitute for the cross examination of Dr. Maloney herself.  In Bullcoming, the New Mexico Supreme Court had approved the admission of surrogate testimony about the DNA report because the witness "qualified as an expert witness with respect to the gas chromatograph machine and the . . . laboratory procedures."  Bullcoming, 564 U.S. at 661 (internal citations omitted).  The Supreme Court rejected this justification, stating that surrogate testimony "could not convey what [the analyst conducting the test] knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed."  Id.  Further, surrogate testimony could not "expose any lapses or lies on the certifying analyst's part."  Id. at 662.  As emphasized in Crawford,

> "[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts." . . . Accordingly, the Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination.

Id. (quoting Crawford, 541 U.S. at 54).  Just as in Bullcoming, Dr. Ely's surrogate testimony regarding the Autopsy Report could not convey which tests were used, why those tests were employed, and whether there were any potential lapses in the autopsy process.

In addition, Williams may suggest that when the underlying testimonial statement is not being offered for its truth, but rather as the evidence on which the expert testimony is based, no Confrontation Clause issue exists.  567 U.S. at 58.  In Williams, however, the plurality relied on the fact that the case involved a bench trial and speculated that a jury would be less able to discern between evidence admitted for its truth and evidence admitted to explain the basis of

the expert's opinion.  Id. at 70.  Here, the Autopsy Report was offered for its truth—in fact, the prosecutor argued, "[t]he autopsy report is admissible as a business record.  Once it's admissible, I can call any expert witness, whether they're connected with the medical examiner's office or not, so long as they're an expert to interpret it."  (ECF No. 13 at 32).  Contrary to the prosecutor's argument, however, as the Supreme Court established, when the business records are regularly used as evidence for trial, an expert's interpretation does not satisfy the Confrontation Clause. Melendez-Diaz, 557 U.S. at 321 ("Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status.  But that is not the case if the regularly conducted business activity is the production of evidence for use at trial.") (internal citations omitted); Bullcoming, 564 U.S. at 661; Crawford, 541 U.S. at 54.  Accordingly, the Trial Court should not have permitted Dr. Ely to testify to the contents of the Autopsy Report, even as an expert.

> c) **The cases on which the state courts relied do not reflect current Supreme Court Confrontation Clause precedent**

In allowing Dr. Ely to testify to the Autopsy Report at trial, the Trial Court relied on People v. Freycinet, 11 N.Y.3d 38 (2008) and People v. Hall, 84 A.D.3d 79 (1st Dep't 2011).  On close review, however, these cases do not reflect current Supreme Court Confrontation Clause precedent.

People v. Freycinet was decided on June 26, 2008, after Crawford, but before Melendez-Diaz and Bullcoming.  11 N.Y.3d 38 (2008).  In that case, the defendant's girlfriend died of a knife wound, and the defendant was indicted for murder, among other crimes.  Id. at 39.  As in the current case, a pathologist with OCME performed the autopsy and prepared a report with his findings.  Id. at 40.  Although the pathologist who performed the autopsy did not testify at trial,

the report was entered into evidence, over the defendant's objection.  Id.  Notably, the report

had been "redacted to eliminate [the pathologist's] opinions as to the cause and manner of the

victim's death[.]"  Id.  The court permitted surrogate testimony of another OCME pathologist as

an expert, who in theory was only providing her own opinions based on the underlying facts in

the autopsy report.  Id.  After a bench trial, the trial judge acquitted the defendant of murder,

but convicted him of manslaughter in the second degree.  Id.

On appeal, both the Appellate Division and the Court of Appeals affirmed the conviction,

finding no Confrontation Clause violation.  Id.  The Court of Appeals stated that the question

presented was "whether the redacted version of [the pathologist's] autopsy report was

'testimony' as that term is used in Crawford."  Id. at 41.  The court considered several factors

outlined in People v. Rawlins, 10 N.Y.3d 136,153–56 (2008):  (1) "the extent to which the entity

conducting the procedure is an arm of law enforcement;" (2) "whether the contents of the report

are a contemporaneous record of objective fact, or reflect the exercise of fallible human

judgment;" (3) "whether a pro-law-enforcement bias is likely to influence the contents of the

report;" and (4) "whether the report's contents are directly accusatory in the sense that they

explicitly link the defendant to the crime."  Id. (internal citations omitted).  Considering these

factors, the Freycinet court found that the autopsy report was not testimonial because OCME

was an independent agency, the report was redacted to eliminate opinions, the report was a

contemporaneous record of objective facts, and the report was unlikely to have been affected

by pro-law-enforcement bias.  Id. at 42.  Finally, the court concluded that the report was not

testimonial because "it did not directly link defendant to the crime."  Id.  As discussed further

below, Supreme Court precedent does not support using these factors.

The first <u>Freycinet</u> factor—the extent to which the entity conducting the procedure is an arm of law enforcement—is not found in Supreme Court precedent.  The integral role OCME plays in police investigations suggests that its employees are aware that their reports and findings may be used in future criminal prosecutions.  (<u>See</u> <u>supra</u> § III.C.1.a.iii).

The second and third factors—whether the contents of the report are a contemporaneous record of objective fact, or reflect the exercise of fallible human judgment, and whether a pro-law-enforcement bias is likely to influence the contents of the report, respectively—consider the reliability of statements, but the Supreme Court in <u>Crawford</u> and <u>Melendez-Diaz</u> soundly rejected the reliability formulation of testimonial statements.  (<u>See</u> <u>supra</u> §§ III.B.1.b–c).

The final <u>Freycinet</u> factor, whether statements are "directly accusatory," also refers to a concept the Supreme Court has rejected.  <u>Melendez-Diaz</u> explicitly found that evidence need not identify a specific individual or be "directly accusatory" to be considered testimonial.  557 U.S. at 313 (stating that the identification requirement "finds no support in the text of the Sixth Amendment or our case law.").  Accordingly, in relying on <u>Freycinet</u>, the Trial Court did not apply the Supreme Court's modern Confrontation Clause precedent.

The Trial Court also relied on <u>People v. Hall</u>, 84 A.D.3d 79 (1st Dep't 2011).  (ECF No. 13 at 22).  The defendant in <u>Hall</u> appealed his murder conviction, asserting that "the admission of an unredacted autopsy report violated his right under the Confrontation Clause."  <u>Hall</u>, 84 A.D. at 81.  At the trial in <u>Hall</u>, an OCME pathologist testified as an expert to the autopsy report performed by another OCME pathologist.  <u>Id.</u> at 82.  The First Department, following <u>Freycinet</u>, found that the "factual part of the autopsy report is nontestimonial and thus admissible, and, in

this case, <u>Melendez-Diaz</u> does not mandate a contrary result." <u>Id.</u> The First Department then discussed the <u>Freycinet</u> factors in the context of <u>Melendez-Diaz</u>, reasoning that because "<u>Melendez-Diaz</u> did not explicitly hold that autopsy reports are testimonial . . . the Court of Appeals' decision in <u>Freycinet</u> is directly on point as applicable to this case." <u>Id.</u> The First Department explained that the holding in <u>Melendez-Diaz</u> could be arguably limited to the "formalized testimonial materials" that Justice Thomas discussed, and because "here, the autopsy report, which was unsworn, cannot fairly be viewed as formalized testimonial material." <u>Id.</u> at 83 (internal citation omitted). The Supreme Court's decision in <u>Bullcoming</u>, however, directly addressed the issues of notarization and surrogate testimony through an expert, and unequivocally stated that a document need not be notarized to be testimonial, and that surrogate expert testimony does not satisfy the Confrontation Clause. <u>Bullcoming</u>, 564 U.S. at 66264. Therefore, by relying on <u>Hall,</u> the Trial Court was also not applying the most recent Supreme Court precedent.

### 2.    The First Department's decision

On appeal to the First Department, Garlick argued that the introduction of the Autopsy Report through surrogate testimony violated his Confrontation Clause rights. (ECF No. 11-1 at 49). The First Department held:

> "Defendant's right of confrontation was not violated when an autopsy report prepared by a former medical examiner, who did not testify, was introduced through the testimony of another medical examiner" (<u>People v. Acevedo</u>, 112 AD3d 454, 455 [1st Dept 2013], <u>lv denied</u> 23 N.Y.3d 1017 [2014], since the report, which "[did] not link the commission of the crime to a particular person," was not testimonial (<u>People v. John</u>, 27 NY3d 294, 315 [2016]). Defendant's contention that <u>People v. Freycinet</u> (11 NY3d 38 [2008] has been undermined by subsequent decisions of the United States Supreme Court is unavailing (<u>see Acevedo</u>, 112 AD3d at 455).

<u>Garlick</u>, 144 A.D.3d at 606.  Because the First Department's discussion of this issue relied heavily on <u>People v. Acevedo</u>, and <u>People v. John</u> in addition to <u>Freycinet</u>, in reviewing whether the First Department's decision was contrary to or an unreasonable application of clearly established law, this Court now considers how those cases interpreted and applied Supreme Court precedent.

a)    **<u>People v. Acevedo</u>**

The First Department cited <u>People v. Acevedo</u>, 112 A.D. 3d 454 (1st Dep't 2013) for the propositions that Garlick's Confrontation Clause right was not violated when Dr. Ely was allowed to testify to the Autopsy Report Dr. Maloney prepared, and that <u>Freycinet</u> was still good law. (<u>See</u> <u>supra</u> § II.B.3).  The First Department's reliance on this case is questionable, however, because <u>Acevedo</u> did not correctly apply Supreme Court precedent, and does not support the propositions for which the First Department cited it.

In <u>Acevedo</u>, the First Department held that the defendant's Confrontation Clause rights were not violated when a medical examiner was permitted to testify to an autopsy report that he did not conduct, and upheld Acevedo's jury conviction for murder.  112 A.D. 3d at 454.  In its opinion, the First Department concluded, without discussion, that surrogate testimony by a medical examiner who did not perform the autopsy report at issue was not a confrontation clause violation.  The court summarily stated, "[t]he report was not testimonial," citing <u>Freycinet</u> and <u>Hall</u>, and added, "neither <u>Bullcoming v. New Mexico</u> nor any other decision of the Supreme Court of the United States is contrary," citing pages 87 and 88 of the Second Circuit's opinion in <u>James</u>. <u>Id.</u> at 455.

As explained above, at the time of the trial in <u>Acevedo</u>, and on review by the First Department in this case, <u>Freycinet</u> propounded a test that did not reflect Supreme Court

precedent.  (See supra § III.C.1.c).  Thus, the First Department's reliance on those cases for the proposition that Acevedo's right of confrontation was not violated by surrogate testimony was not consistent with Supreme Court precedent.

In addition, the First Department's citation to pages 87 and 88 of James does not support the proposition that Freycinet is consistent with Supreme Court precedent.  Id.  On page 87 of the James opinion, the Second Circuit outlines the facts of the case and begins the discussion of the Confrontation Clause issue, 712 F.3d at 87, and on the beginning of page 88, the Second Circuit summarizes its analysis, finding that "the autopsy reports in this case are nevertheless not testimonial—and therefore do not implicate the Confrontation Clause—because they were not created 'for the purpose of establishing or proving some fact at trial,'" id. at 88 (quoting Melendez-Diaz, 557 U.S. at 324).  These pages reflect the Second Circuit's use of the "primary purpose" test when confronted with the question of whether an autopsy report is testimonial, but the First Department did not actually apply the primary purpose analysis to the facts in Acevedo.  Thus, the conclusion it reached, that Acevedo's Confrontation Clause rights were not violated by surrogate testimony, is not supported by James.

Just as the First Department did not engage in the primary purpose analysis in Acevedo, it also did not do so in its review of the Trial Court's decision in this case.  Here, the First Department did not consider the primary purpose of the Autopsy Report; if it had, it would have been compelled to find that the Autopsy Report was testimonial, as it had the primary purpose of serving as evidence in a homicide investigation and trial.  (See supra §§ II.A.2, III.C.1.a).  Just as the primary purpose of a road-side blood-alcohol test is not to determine a driver's blood alcohol level in isolation, but rather is primarily used to determine whether the blood-alcohol level is

above the legal limit, so too, here, the primary purpose of the autopsy was not to determine the cause of death in a vacuum, but was primarily used to determine whether the death was a homicide, which naturally would lead to a criminal action.  See Bullcoming, 564 U.S. at 668.

Accordingly, the First Department's reliance on Acevedo for the propositions that Garlick's Confrontation Clause right was not violated when Dr. Ely was allowed to testify to the Autopsy Report prepared by Dr. Maloney, and that Freycinet was still good law, are unsupported and do not reflect modern Confrontation Clause principles endorsed by the Supreme Court.

### b)    People v. John

The First Department also relied on People v. John, 27 N.Y.3d 294, 315 (2016), for the proposition that the Autopsy Report was not testimonial because it did not link the crime to a particular person.  Garlick, 144 A.D. 3d at 606.  Setting aside the fact that the Autopsy Report did link Garlick to the crime (see supra § III.C.1.a.), the Supreme Court has rejected this formulation of testimonial evidence.  (See supra §§ III.B.1.b–d).  Further, the First Department did not engage in the analysis discussed in John, which found that a DNA report was testimonial and that the facts "fit into even the narrow primary purpose test articulated by the Williams plurality," while also noting the "continued viability of the Bullcoming and Melendez-Diaz decisions[.]"  John, 27 N.Y.3d at 308, 311.

John also cited James for the "link-to-a-particular-person" standard.  Id. at 315.  In James, as discussed above, however, the Second Circuit rejected that standard.  James, 712 F.3d at 95 ("Nor do we think we can apply the [ ] narrowed definition of testimonial," proposed by the plurality decision in Williams, "which would require that the analyst had 'the primary purpose of accusing a targeted individual of engaging in criminal conduct[.]'").  (See supra §§ III.B.1.e, III.B.2).

The <u>John</u> court found that, even under <u>Williams</u>, the facts of the case established that the DNA report <u>was</u> testimonial because there was a criminal action pending against the defendant at the time the report was prepared, the primary purpose of the DNA evidence was to establish a fact in a criminal trial—that the defendant possessed the gun—and the OCME laboratory reports noted that the police requested the test because "the 'perp' handled the gun." <u>John</u>, 27 N.Y.3d at 307–08.  Similarly, in this case, police had already identified Garlick as a suspect and were seeking his arrest, the primary purpose of the autopsy report was to establish Sherwood's cause of death, and communications between OCME and the police indicated that this autopsy was to be conducted as part of a homicide investigation.  (See <u>supra</u> §§ II.A.1–2, III.C.1.a.iv).

Finally, the First Department cited to page 315 of <u>John</u> to support its proposition that a link to a particular defendant is required, but that page discussed which analysts should testify, redactions of autopsy reports, and began the dissent authored by Judge Garcia.  <u>Id.</u> at 315.  Nowhere does it support the conclusion that the Autopsy Report was not testimonial because it did not link Garlick to the crime.  Thus, the analysis in <u>John</u> actually supports the conclusion that the Autopsy Report was testimonial, the opposite of the First Department's decision here.

### 3.    The impact of the scope of habeas review

Because the First Department adjudicated Garlick's Confrontation Clause objection on its merits, this Court may grant a writ of habeas corpus only if the state adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  (See <u>supra</u> § III.A.2).

As set forth above, this Court has concluded that the cases on which the Trial Court and the First Department relied do not reflect current Supreme Court Confrontation Clause precedent.  (Supra §§ III.C.1–2).  As this Court has explained, under any formulation provided by the Supreme Court, including Williams, the Autopsy Report is testimonial.  (See supra § III.C.1.a).  Nevertheless, this Court is constrained by the requirement that the Supreme Court's precedent be "clearly established," 22 U.S.C. § 2254(d)(1), and must consider, for purposes of habeas review, whether this line of precedent was "clearly established" at the time of the First Department's decision.

In considering whether the Supreme Court's Confrontation Clause precedent was "clearly established," this Court has considered how other federal district and circuit courts have interpreted the law in connection with autopsy reports.  While many courts have found autopsy

reports testimonial on direct review,[11] others have found the opposite.[12]  There are few cases that review this issue in the highly deferential habeas context,[13] and even fewer have reviewed this issue in the habeas context after Williams.[14]

---

[11] See United States v. Ignasiak, 667 F.3d 1217 (11th Cir. 2012) (holding that in light of the medical examiner's duty to assist the police, autopsy reports were testimonial, even though not all would be used in criminal trials); United States v. Moore, 651 F.3d 30 (D.C. Cir. 2011) (finding an autopsy report testimonial when the autopsy had been conducted in the presence of law enforcement officers, and when the findings were formalized in documents titled "reports"); State v. Bass, 132 A.3d 1207 (N.J. 2016) (finding an autopsy report testimonial where the police were engaged in an active homicide investigation and had a suspect, and the autopsy was conducted in the presence of two law enforcement officers, even when the report was not entered into evidence); Rosario v. State, 175 So.3d 843 (Fl. App. 2015) (holding that an autopsy report created during a homicide investigation and asserting that the cause of death was homicide was testimonial); Commonwealth v. Carr, 986 N.E.2d 380, 389–400 (2013) (finding that a death certificate created during a homicide investigation that stated the cause of death was a "gunshot wound of the head with fracture of skull and perforation of the brain" was testimonial) (abrogated on other grounds by Commonwealth v. Crayton, 21 N.E. 3d 157 (2014)); Miller v. State, 313 P.3d 934, 967–70 (Okla. Crim. App. 2013) (finding an autopsy report testimonial and surrogate testimony a Confrontation Clause violation "because the current state of the law so clearly established that it violated the Confrontation Clause to allow [the surrogate witness'] to give voice to the analysis, findings and conclusions [in the autopsy report]."); State v. Navarette, 294 P.3d 435, 440–42 (N.M. 2013) (finding an autopsy report testimonial and surrogate testimonial a Confrontation Clause violation when the autopsy report contained statements "made with the primary intention of establishing facts that the declarant understood might be used in a criminal prosecution and where the statements in the report were relayed to the jury as the basis for the pathologist's opinions"); State v. Kennedy, 735 S.E.2d 905 (W. Va. 2012) (holding that for purpose of use in criminal prosecutions, autopsy reports are, under all circumstances, testimonial hearsay under the Confrontation Clause); Wood v. State, 299 S.W.3d 200 (Tex. Ct. App. 2009) (finding autopsy reports testimonial when the nature of death was suspect and a police officer attended the autopsy, because it was reasonable to believe that the medical examiner would assume the report and her opinions would be used prosecutorially); State v. Locklear, 681 S.E.2d 293 (N.C. 2009) (finding autopsy reports to be the "type of forensic report discussed in Crawford").

[12] Ackerman v. State, 51 N.E.3d 171 (Ind. 2016) (finding autopsy report nontestimonial when there was no evidence linking the defendant to the death at the time of the autopsy); State v. Medina, 306 P.3d 48 (Ariz. 2013) (finding an autopsy report not testimonial after considering "the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances."); People v. Leach, 980 N.E.2d 570 (Ill. 2012) (finding an autopsy report not testimonial because it was not prepared for the primary purpose of accusing a targeted individual or for the primary purpose of providing evidence in a criminal trial).

[13] McCarley v. Kelly, 801 F.3d 652, 664–65 (6th Cir. 2015) (finding the state of the Supreme Court's law to be clearly established after Crawford and Davis); Vega v. Walsh, 669 F.3d 123 (2d Cir. 2012) (finding the date of the law as of 2005 unclear); Portes v. Capra, No. 16 Civ. 6294 (LDH), 2018 WL 4288627 (E.D.N.Y. Sept. 7, 2018) (finding an autopsy report nontestimonial by relying on the Freycinet factors and relying on Vega, which only considered the state of the law after Crawford); Soler v. United States, No. 15 Civ. 4342 (LAP), 2015 WL 4879170 (S.D.N.Y. Aug. 14, 2015) (finding the law at the time of the trial in 2007 to be unsettled and discussing that the subsequent case law has not developed a clear set of rules on this point).

[14] Hensley v. Roden, 755 F.3d 724 (1st Cir. 2014) (finding the state of confrontation clause precedent uncertain, and rejecting the habeas petitioner's claim that the testimonial nature of autopsy reports was clearly established).

As the Second Circuit stated in <u>Griffin</u> when faced with the question whether Supreme Court precedent was clearly established, "[a] state court cannot be faulted for declining to apply a specific legal rule 'that has not been squarely established by [the Supreme] Court', nor even for incorrectly applying an established rule where reasonable jurists could disagree as to its application." <u>Griffin</u>, 876 F.3d at 407 (citing <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2009)); <u>White v. Woodall</u>, 572 U.S. 415, 426–27 (2014); <u>see</u> <u>Jimenez v. Walker</u>, 458 F.3d 130, 147 (2d Cir. 2006) ("[W]e must conclude not only that the trial court's [action] was unconstitutional but that it was so plainly unconstitutional that it was objectively unreasonable for the Appellate Division to conclude otherwise.").

This Court also recognizes Judge Eaton's concurrence in <u>James</u>, in which he agreed that "the admission of any medical examiner's report prepared by OCME" would be testimonial, but ultimately concurred in the denial of habeas relief, explaining that "[b]ecause of the unsettled state of the law, I agree that the admission into evidence of the autopsy report prepared by [the OCME] did not constitute plain error." <u>James</u>, 712 F.3d at 108.  Accordingly, on this limited habeas review, this Court is constrained by <u>James</u> to conclude that the Supreme Court's Confrontation Clause precedent as to autopsy reports is unsettled, and therefore insufficiently "established" to grant relief to Garlick here.  <u>See id.</u>; <u>Soler v. United States</u>, No. 15 Civ. 4342 (LAP), 2015 WL 4879170 (S.D.N.Y. Aug. 14, 2015) (finding the law in 2007 to be unsettled and discussing that the subsequent case law has not developed a clear set of rules on this point); <u>see also</u> <u>Hensley v. Roden</u>, 755 F.3d 724 (1st Cir. 2014) (finding the state of the law uncertain, undercutting the habeas petitioner's claim that the testimonial nature of autopsy reports was

clearly established); <u>Vega v. Walsh</u>, 669 F.3d 123 (2d Cir. 2012) (finding the state of Supreme Court Confrontation Clause precedent as of 2005 unclear).

      **4.**     **Harmless error**

Garlick argues that the Autopsy Report "played a critical role in this prosecution" and thus had a "substantial and injurious effect or influence" on the verdict that does not amount to a harmless error.  (ECF No. 4 at 33) (citing <u>Brecht</u>, 507 U.S. at 623).  He argues that the Autopsy Report pinpointed Sherwood's cause and manner of death, prompting the police to drop the charges against Johanna Rivera, and turn their attention to Garlick as the only suspect.  (<u>Id.</u> at 33–34).  Garlick notes that the Autopsy Report was also used to prove his intent to cause injury, which was especially important because of his post-arrest statement that he had no intention to harm Sherwood.  (<u>Id.</u> at 34).  Garlick argues that the Autopsy Report's assertions as to the depth of the wounds and the blood loss contradicted Garlick's position regarding his intent.  (<u>Id.</u>)  Accordingly, he argues, the admission of these findings was not harmless.  (<u>Id.</u>)

In response, the State contends that its evidence against Garlick was strong.  (ECF No. 12 at 26).  In support of this proposition, the State points to the lobby surveillance footage, Johanna Rivera's testimony regarding the events leading up to the incident, medical testimony of the EMT who arrived on the scene, and the fact that Garlick admitted that he had fought Sherwood.  (<u>Id.</u>)  As to Garlick's intent, the State contends that even absent the Autopsy Report, the remaining evidence offered at trial would have still permitted the jury to find that Garlick "intended to seriously injure Sherwood."  (<u>Id.</u> at 27).

A Confrontation Clause violation may be harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht</u>, 507 U.S. at 623 (quoting <u>Kotteakos</u>

v. United States, 328 U.S. 750, 776 (1946)).  When reviewing preclusion of cross examination for harmless error, courts in this Circuit consider:  (1) the strength of the state's case; (2) the importance of the witness's testimony; (3) whether the excluded testimony would have been cumulative; (4) the presence of evidence that would have corroborated the testimony; (5) the extent of the cross examination that was permitted; and (6) whether the cross examination of which the defendant was deprived was of a nature that was likely to affect the result.  McGhee, 2019 WL 4228352, at *9; Alvarez, 763 F.3d at 233.

### a)       Strength of the State's case

The State's case relied heavily on the surveillance video that showed Garlick fighting with Sherwood, and allegedly showed Garlick stabbing Sherwood.  The State contends that "the stabbing . . . was clearly captured on surveillance video."  (ECF No. 12 at 26).  But, as Garlick points out, the Trial Court found during the charge conference that, "[t]he video itself presents a jury question whether a knife or sharp object is visible on the film."  (ECF No. 13-11 at 20).  There was no other account of the initial encounter between Sherwood and Garlick in the lobby, as Johanna Rivera testified at trial that she was outside of the building when Garlick initially chased Sherwood into the building lobby.  (ECF No. 13-1 at 35).  The Autopsy Report, as discussed, concluded that Sherwood had been stabbed.  (ECF No. 11-7 at 3).  Had the Autopsy Report not been admitted, the only evidence that would have suggested Garlick had a knife or sharp object would have been the lobby surveillance video, which did not clearly show a knife.  (ECF No. 13-11 at 20).  Although Garlick admitted to fighting with Sherwood on the night of his death, without the Autopsy Report, the jury would have had to determine whether Garlick had a sharp object in his hand, whether he intended to harm Sherwood based on only the surveillance video, and whether the stab

wounds caused Sherwood's death.  Accordingly, the Court finds that, absent the Autopsy Report, the State's case is considerably weaker.

**b)**      **Importance of Dr. Ely's testimony**

The Court next considers the importance of Dr. Ely's testimony in the State's case, and finds that her testimony, through which the Autopsy Report was entered into evidence, played a central role in the case.  The State discussed the Autopsy Report twice in its opening statement, called Dr. Ely as its first witness, and introduced the Autopsy Report as its first exhibit.  (ECF No. 13 at 2 ("And he stabbed the victim through the heart, in the left chest, in the right chest, in the back.  You'll get that testimony tomorrow from medical examiner, Dr. El[]y."); 7 ("You'll learn from the autopsy report that the deceased, Gabriel Sherwood, was drunk."); 17 ("We have Dr. Ely here who [will] be the first witness."); 33 ("At this time I would offer into evidence as People's 1 the certified autopsy report on the body of Gabriel Sherwood.")).  The State also relied on the Autopsy Report during summation, recounting the location and depth of Sherwood's wounds and the loss of blood.  (ECF No. 13-12 at 26–27).  The State, during summation, also told the jury that "we know from the medical examiner none [of Johanna Rivera's actions] contributed in any way to the death[.]"  (Id. at 28).  "And remember" the prosecutor said, "the stab that did the killing, the deepest wound went in a distance of up to five and one-half inches.  Five and one-half inches into the body of the victim."  (ECF No. 13-13 at 10).  Thus, Dr. Ely's testimony regarding the Autopsy Report was one of the most important elements of the State's case.

**c)**      **Cumulative and corroborating evidence**

As to the issue of cumulative and corroborating evidence, there was no other medical evidence offered at trial as to the cause or manner of Sherwood's death.  Although the video

showed part of the fight, and what may have been a weapon, and Officer Bagan also testified

that Sherwood was found with stab wounds and could not be revived (ECF No. 4 at 7; ECF No.

13-11 at 20; ECF No. 13-4 at 13), the Autopsy Report was the only evidence that indicated

Sherwood's cause of death was stabbing, as opposed to Johanna Rivera's blows to his head and

body, and was the only evidence that indicated the depth of the wounds, which the State used

to prove intent.  (See supra § III.C.1).  Accordingly, the Court finds that there was little additional

evidence that corroborated the findings in the Autopsy Report, and it was not cumulative of other

evidence offered at trial.

### d)       Extent of cross examination

This Court also considers the extent of cross examination that was permitted and whether

cross examination of Dr. Maloney would have affected the result of the case.  Here, defense

counsel cross examined Dr. Ely, but at the crux of the Confrontation Clause is the premise that

even cross examination of a surrogate witness is insufficient because, not having conducted the

autopsy, she could not testify to any particulars of the procedures apart from what was contained

in the Autopsy Report.  Bullcoming, 564 U.S. at 662.  Of course, had Dr. Maloney been permitted

to testify, these same facts would have been presented at trial, but Dr. Maloney would have had

to answer on cross examination questions regarding her process and qualifications.  Id. at 661

(surrogate testimony "could not convey what [the analyst conducing the test] knew or observed

about the events his certification concerned, i.e., the particular test and testing process he

employed.").

Taken together, these factors indicate that the Trial Court's introduction of the Autopsy

Report may not have been harmless error.  Because, however, the Court finds that the Supreme

Court's Confrontation Clause precedent regarding autopsy reports remains unsettled under the habeas review standard, the Court does not conclusively determine whether the introduction of the Autopsy Report through surrogate testimony constituted harmless error.

### IV.      <u>CONCLUSION</u>

For the foregoing reasons, the Court respectfully recommends that Garlick's petition be DENIED.   Because, however, Garlick has made a substantial showing of the denial of a constitutional right, the Court also recommends that, if the District Court adopts this Report and Recommendation and denies the Petition, a certificate of appealability issue on the questions (1) whether the Supreme Court's Confrontation Clause precedent clearly established that an autopsy report was testimonial and, (2) if so, whether the First Department's decision denying Garlick's Confrontation Clause claim was contrary to, or involved an unreasonable application of, that precedent.  <u>See</u> 28 U.S.C. § 2253.

Dated:        New York, New York
              April 27, 2020

_____
**SARAH L. CAVE**
**United States Magistrate Judge**

\*                    \*                    \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  <u>See</u> <u>also</u> Fed. R. Civ. P. 6(a), (d) (adding

three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Chief Judge McMahon.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JAMES GARLICK,

                          Petitioner,

                                      **RESPONDENT'S**
                                      **DECLARATION IN**
                                      **SUPPORT OF OBJECTIONS**
                                      **TO MAGISTRATE JUDGE'S**
                                      **REPORT AND**
                                      **RECCOMMENDATION**

               -against-                   18 Civ. 11038 (CM)(SLC)

CHRISTOPHER MILLER, Superintendent,
Great Meadow Correctional Facility,

                          Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

     JOSHUA P. WEISS, an attorney admitted to practice in the State of New York,

and before this Court, declares under penalty of perjury, pursuant to 28 U.S.C. §1746,

that the following statements are true, except those made upon information and

belief, which he believes to be true:

     1.      I am an Assistant District Attorney in the Office of DARCEL D. CLARK,

District Attorney, Bronx County, and I submit this declaration in support of the

State's objections to the finding of trial court error set forth in United States

Magistrate Judge Sarah L Cave's Report and Recommendation on the underlying

habeas petition.[1]

---

[1] The Report incorrectly identifies the State Attorney General as the party
representing Respondent, Christopher L Miller, Superintendent of the Great Meadow

2.      Pursuant to an agreement with the Office of the Attorney General of the State of New York, this Office represents the respondent in this action.

3.      A detailed factual and procedural history of the case can be found in the State's declaration submitted by Assistant District Attorney Jordan K. Hummel in opposition to the original petition.

4.      By petition dated November 27, 2018, petitioner moved through assigned counsel, Matthew Bova, Esq. from the Center for Appellate Litigation, for a writ of <u>habeas corpus</u>. Counsel argued that the introduction of autopsy evidence at petitioner's trial through a surrogate witness violated his right to Confrontation under clearly established Supreme Court precedent.

5.      On April 1, 2019, the State opposed an award of <u>habeas</u> relief, arguing that the Appellate Division's rejection of petitioner's claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. The State stressed, irrespectively of the merits, that petitioner was ineligible for habeas relief because the petition raises a legal question that implicates a hotly contested issue of federal constitutional law that remains unsettled. There is a "fair-minded disagreement" among jurists about whether autopsy reports are testimonial in nature. <u>See</u> <u>White v. Woodall</u>, 572 U.S. 415, 419 [2014]).

6.      On November 21, 2019, the parties appeared before Magistrate Judge Cave for oral argument on the petition.

---

Correctional Facility, on the petition. In fact, Respondent is represented by the Office of the Bronx District Attorney pursuant to agreement with the Attorney General (Declaration in Opposition by Jordan K. Hummel, ¶ 2).

7.    By Report and Recommendation, dated April 27, 2020, Magistrate Judge Cave concluded that petitioner had failed to establish entitlement to <u>habeas</u> relief inasmuch as the issue of testimonality with respect to autopsy reports was not "clearly established" under Supreme Court precedent when the Appellate Division considered the claim on petitioner's direct appeal.  22 U.S.C. §2254 (d)(1) (<u>id</u>. at 55-59).

Despite that dispositive finding, Magistrate Judge Cave continued to analyze the merits and incorrectly stated that it was error to admit the autopsy results using a surrogate witness.  Specifically, Magistrate Judge Cave found that the Confrontation Clause required excluding the autopsy evidence because existing precedent at the time of the appeal provided that autopsy reports were testimonial and, therefore, entitled petitioner to cross-examine the medical examiner who was personally responsible for conducting the autopsy (SLC Report & Recommendation, at 46).

After briefly discussing the issue of harmlessness (without coming to a definitive conclusion), Magistrate Judge Cave recommended that a certificate of appealability presenting the following questions be issued:  (1) whether the Supreme Court's Confrontation Clause precedent clearly established that an autopsy report was testimonial; and, (2) if so, whether the Appellate Division's decision denying Garlick's Confrontation Clause claim was contrary to, or involved an unreasonable application of, that precedent. See 28 U.S.C. § 2253 (<u>id</u>. at 59-63).

8.    The State objects to Magistrate Judge Cave's finding that the introduction of the autopsy report into evidence through a witness other than the medical examiner who performed the autopsy runs afoul of controlling federal jurisprudence.    Consistent with the Appellate Division's application of the federal precedent governing this issue when it considered and rejected the claim, the State maintains that autopsy reports prepared by employees within the New York City Office of the Medical Examiner (hereinafter, "OCME") are not testimonial within the meaning of the Confrontation Clause. See United States v. James, 712 F.3d 79, 98-99 (2nd Cir. 2013); see also Williams v. Illinois, 567 U.S. 50 (2012); Davis v. Washington, 547 U.S. 813 (2006).  Rather, OCME is an entirely separate entity that is not subject to regulation or control by law enforcement. Every one of OCME's duties and responsibilities is derived from wholly discrete sources of authority that include New York's Public Health Law, the New York City Charter, and the Administrative Code of the City of New York. See NY Public Health Law §§4209 and 4210; NYC Charter § 557; NYC Admin Code § 17-203.  Accordingly, since the Appellate Division's conclusion, both when it decided the appeal and today, that the autopsy report upon which the expert witness based her opinion was not testimonial and did not implicate the right to confrontation, fully comports with federal precedent, Magistrate Judge Cave should not have found that its admission under these circumstances was error.

9.    In any event, Magistrate Judge Cave's correct finding that Supreme Court precedent concerning the admissibility of autopsy reports through surrogate testimony was not "clearly established" when the appeal was decided defeated

petitioner's claim for habeas relief as a matter of law. Consequently, her resolution of that dispositive question against petitioner rendered her discussion and findings on the merits surplusage. See Hensley v. Roden,755 F.3d 724 (1st Cir. 2014); see also Flournoy v. Small, 61 F.3d 1000 (9th Cir. 2012). Since Magistrate Judge Cave's threshold determination that the relevant precedent was not "clearly established" disqualified petitioner from consideration for habeas relief, there is no reason for this Court to issue a certificate of appealability.

10.    Lastly, with respect to Magistrate Judge Cave's Report and Recommendation, the State objects to the following factual characterizations and offers a corresponding explanation for purposes of clarifying the record:

a.   pp. 3: "The next morning, November 2, 2011, the District Attorney's office authorized an intentional murder charge against Johanna Rivera on the theory that her blows to Sherwood's head caused his death."

- It was never the State theory's that the actions of codefendant, Johanna Rivera, directly caused Sherwood's death. The indictment explicitly charges codefendant Rivera under a theory that she acted in concert with petitioner to cause the death of Gabriel Sherwood. See Bronx County Indictment No. 3681/2011.

b   pp. 4: "On November 1, 2011, the evening of Sherwood's death, staff at the New York City Office of the Chief Medical Examiner ("OCME")—the agency that determines cause of death in homicide" "or suspicious cases—discussed the examination of Sherwood's body with Detective DeGrazia and arranged for the body's transport."

- Respondent objects to the characterization regarding the role and responsibilities of OCME to the extent that it offers a misleadingly narrow description about the scope of the agency's jurisdictional mandate. By statute, OCME has a duty to "determin[e] the cause or manner of injuries and/or death" (NYC Charter § 557[f][3]) under various circumstances, only one of which pertains to instances of violent deaths. Indeed, medical examiners also perform autopsies when the death is "by accident, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility, or

in any suspicious or unusual manner." NYC Charter § 557(f)(1). In New York State, the relationship between law enforcement and OCME is neither linked nor interdependent. The ongoing statutory obligations executed by OCME employees are unaffected by mere conceivability that the results of an autopsy may lead to the commencement of a criminal action.

c. pp. 7 "[Dr. Elly] laid a foundation for and testified about the autopsy report."…"As noted above, Dr. Elly testified methodically about the contents and conclusion of the autopsy Report."

- The State objects to Magistrate Cave's description of Dr Elly`s trial testimony. Dr. Elly offered her expert opinion as to the manner and cause of the victim's death based solely upon her own independent assessment of the underlying facts set forth in the autopsy report. While those facts certainly informed her opinion, Dr. Elly did not parrot or let alone reference the conclusions documented by the performing medical examiner (T.35-37).

WHEREFORE, respondent respectfully requests that the objection raised herein be sustained, the Magistrate Judge's finding that the autopsy report was testimonial be disaffirmed, the petition for <u>habeas</u> <u>corpus</u> be denied in all respects, and that no certificate of appealability be issued.

Dated:      Bronx, New York
            May 11, 2020

Respectfully submitted,

/s/_____

Joshua P. Weiss (JD-2336)
Assistant District Attorney

U̲NITED̲ S̲TATES̲ D̲ISTRICT̲ C̲OURT̲
S̲OUTHERN̲ D̲ISTRICT̲ OF̲ N̲EW̲ Y̲ORK̲

JAMES GARLICK,

     *Petitioner*,

          *v.*

SUPERINTENDENT CHRISTOPHER L.
MILLER, Great Meadow Correctional
Facility,

     *Respondent.*[1]

Civil Action No. 18 Civ.
11038 (CM) (SLC)

**PETITIONER'S OBJECTIONS TO THE MAGISTRATE'S REPORT AND
RECOMMENDATION DENYING THE HABEAS CORPUS PETITION**

**INTRODUCTION**

The Magistrate's April 27, 2020 Report and Recommendation ("R & R") found se-

rious constitutional problems here. Magistrate Judge Cave correctly held[2] that the

State's introduction of the autopsy report at Mr. Garlick's trial violated the Confron-

tation Clause.[3] Judge Cave also correctly found that the legal standards employed by

the Appellate Division in resolving Mr. Garlick's confrontation claim violated well-

---

[1] As Mr. Garlick has recently been transferred to Eastern Correctional Facility (Ulster County,
New York), this Court should modify the caption to read that the Respondent is "William Lee, Super-
intendent of Eastern Correctional Facility." *E.g., Maples v. Phelps*, 2008 W.L. 1743400, n.1 (D. Del.
2008).

[2] R & R 37-55 (April 27, 2020).

[3] R & R 37-47.

established Supreme Court precedent.[4] Nevertheless, Judge Cave, with little explanation, found that Supreme Court law was not "clearly established" and thus denied the writ.[5]

Petitioner objects to: (1) the Report's failure to apply *de novo* review; (2) the Report's failure to find that the autopsy report here was materially indistinguishable from forensic reports found testimonial by the Supreme Court; and (3) the Report's conclusion that no "clearly established" Supreme Court precedent rendered an autopsy report—created during a homicide investigation and declaring that the cause of death was "homicide"—testimonial.[6] These timely objections entitle Petitioner to *de novo* review.[7]

## STATEMENT OF THE CASE

### A. The police identify Mr. Garlick as the lead suspect before Dr. Maloney performs her autopsy.

At 6:20 p.m. on November 1, 2011, the police responded to a report of an assault at a Bronx apartment building.[8] Inside the building's lobby, the police found Gabriel Sherwood lying on the ground bleeding.[9] The police brought Sherwood to the hospital, where he was pronounced dead.[10]

---

[4] R & R 47-55.

[5] R & R 55-59.

[6] R & R 55-59.

[7] Federal Magistrates Act § 636(b)(1)(c).

[8] Petitioner's Appendix 348-49, 361 ("A"). A disc containing this appendix was electronically submitted to the Magistrate and can be supplied to this Court upon request.

[9] A349-50.

[10] A349-52.

That evening, the police launched a homicide investigation.[11] They began by re-viewing the building lobby's surveillance video, which indicated that a man struggled with the victim on the ground inside the lobby. Then, a woman forcefully struck the victim in the skull over a dozen times. The two assailants fled.[12]

Around midnight, the investigation's lead detective (DeGrazia) concluded that Jo-hanna Rivera was the female suspect who had repeatedly struck Sherwood in the head, prompting him to arrest her.[13] During an interrogation, Rivera informed the detective that Mr. Garlick was the male assailant.[14]

The next morning, the District Attorney's Office authorized the police to charge Rivera with intentional murder under the theory that her blows to Sherwood's head caused his death.[15] The lead detective issued a department-wide notification to arrest Mr. Garlick.[16]

## B. Dr. Maloney's autopsy report declares that a homicidal stabbing caused the death.

On the day of the homicide, staff at the New York City Office of Chief Medical Examiner ("OCME")—the agency charged with determining the cause of death in homicide cases—discussed this case with Bronx police, including the lead detective.[17]

---

[11] A377-79.
[12] Trial Ex. 5.
[13] Suppression Hearing: A30-33, A51; Trial: A380.
[14] Suppression Hearing: A51-52.
[15] Suppression Hearing: A44.
[16] Suppression Hearing: A29, A50-52.
[17] A925.

In turn, OCME staff prepared a "Supplemental Case Information" Sheet, which indicated that Sherwood was found with "multiple (4) stab wounds" in the lobby.[18]

On the following morning, Dr. Maloney of OCME performed the autopsy.[19] Dr. Gill, another pathologist, was present, as were two homicide detectives.[20] Before the autopsy, OCME staff conversed with lead detective and prepared a "Notice of Death" form, stating: "Circumstances of death: App. Manner: Homicide."[21]

Later that day, Dr. Maloney drafted an autopsy report in which she declared that the cause of death was a stabbing, not Rivera's blows to the head.[22] That conclusion ruled out Rivera as the person who caused the death. Dr. Maloney notified the police of her findings.[23] After receiving this information, the NYPD declined to pursue murder charges against Rivera and instead charged Mr. Garlick with murder because the autopsy "made it clear" the stab wounds "caused the death."[24]

## C. During interrogation, Mr. Garlick confirms he did not intend to harm Sherwood and that Sherwood brandished a weapon during a struggle.

About a week later, the police arrested Mr. Garlick for murder. During an interrogation, Mr. Garlick stated that he had arrived at the scene because his girlfriend

---

[18] A925.

[19] Autopsy Report (Pros. Ex. 1): A907-927 ("Autopsy Report")

[20] A435; Autopsy Report: A919.

[21] Autopsy Report: A926.

[22] Autopsy Report: A909-14, A918

[23] A468-69.

[24] A469, A488. Rivera was ultimately indicted for first-degree assault and pled guilty to second-degree assault. A2-3, A267, A468.

had frantically told him by phone that Sherwood was sexually harassing and threatening her.[25] When he arrived at the scene, he got into a fist fight with Sherwood outside the apartment building, which spilled into the lobby.[26] During the fight, Mr. Garlick explained, Sherwood brandished a weapon and the two struggled for it.[27] Mr. Garlick stated that he never possessed a knife and never meant to hurt anyone.[28]

Less than two weeks later, on November 17th, the State indicted Mr. Garlick for intentional murder, first-degree manslaughter (intent to cause serious physical injury), and assault with a dangerous weapon (first and second degree).[29]

### D. Dr. Maloney certifies and signs the autopsy report more than a month after the indictment was issued.

On December 29, 2011, more than a month after Mr. Garlick was indicted, Dr. Maloney completed and signed the final version of her autopsy report.[30] On the report, Dr. Maloney indicated a "DRAFT" date of "11/2/2011" and a "FINAL" date of "12/29/2011."[31]

At the beginning of her report, Dr. Maloney "certif[ied]" that she performed the autopsy.[32] She asserted that the "manner of death" was "homicide" and that a "stab wound of [the] torso with perforation of heart" "cause[d] the death."[33] Dr. Maloney also concluded that the "depth of penetration" of the purportedly fatal wound to the

---

[25] A387-92; Autopsy Report: A909-10.
[26] A387-92.
[27] A387, A391.
[28] A391.
[29] Indictment: A1-3.
[30] Autopsy Report: A914.
[31] A914.
[32] A910.
[33] A907-A914, A918.

left chest was "4-1/2 to 5-1/2" inches.[34] This fatal wound "perforat[ed] [the] heart," collapsed the lung, and led to the loss of 1.5 liters of blood.[35]

Dr. Maloney's report found that the victim had "blunt impact injuries of [the] head," numerous "abrasions" on the head and face, and "contusions of the face."[36] She asserted, however, that her "internal examination" of the head indicated no "contusions," hemorrhages, or "fracture[s]."[37]

OCME certified the autopsy report as a business record under New York's statutory business-record rule and "affixed the official seal of the office of the Chief Medical Examiner of the City of New York" to the report.[38]

As state and local laws expressly mandate, OCME delivered the inculpatory report to the District Attorney's Office the very day Dr. Maloney signed it.[39] Under New York law, an autopsy report is admissible as prima facie evidence of the cause of death.[40]

### E. The trial court overrules Mr. Garlick's Confrontation Clause objection; the prosecutor relies heavily on the autopsy report at trial.

At trial, the State proffered Dr. Maloney's autopsy report as Exhibit 1. The State refused to produce Dr. Maloney or Dr. Gill (the other pathologist present during the autopsy) for live testimony subject to cross-examination. Instead, as its first witness,

---

[34] A911; *see also* A229-30.

[35] A911; *see also* A230.

[36] A909, A912.

[37] A912.

[38] A908; N.Y. C.P.L.R. § 4518(a),(c).

[39] A907; N.Y. County Law § 677(4); N.Y. City Charter § 557(g).

[40] N.Y. C.P.L.R § 4520; N.Y. Pub. Health Law § 4103(3).

the State proffered Dr. Ely, who had no involvement in the autopsy.[41]

The State never claimed that either Dr. Maloney or Dr. Gill was unavailable. Instead, they had simply moved (to upstate New York and Connecticut).[42]

Petitioner objected to the report's admission on Confrontation Clause grounds. He argued that the autopsy report was testimonial under *Crawford v. Washington*[43] and its progeny because it was a certified document and an objective witness would reasonably believe that it would be available for use at trial.[44] The trial court overruled Mr. Garlick's objection, finding the autopsy report non-testimonial.[45]

The State called Dr. Ely as its first witness and introduced the autopsy report through her.[46] Parroting the report, Dr. Ely claimed that the "actual cause of death" was a "stab wound of torso with perforation of heart," not head trauma.[47]

Dr. Ely contrasted "stab wounds" with "incised wounds."[48] She explained that a stab wound is a deep wound created by the tip of the knife entering the body, while an incised wound is created by the side of the knife laterally cutting the body.[49] To distinguish between these wounds, a pathologist must assess "certain characteristics" that pathologists are "are trained to recognize."[50] Specifically, the pathologist

---

[41] A97-98, A173.

[42] A173, A238-39.

[43] 541 U.S. 36 (2004).

[44] A173-79 (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009)).

[45] A211-13.

[46] A224-25, A238-39.

[47] A229, A236-38.

[48] A227-28; Autopsy Report: A909-12 (finding that two of the wounds were "stab wounds" to the chest while five other wounds were "incised" wounds).

[49] A228-29, A243-45.

[50] A244.

searches for a "very skinny triangle of a wound" that can only be observed upon a "very careful[ ]" examination.[51]

Defense counsel asked Dr. Ely if Dr. Maloney was certified in forensic pathology when she performed the autopsy. Dr. Ely answered, "I can't say for sure, I do not believe she was, but I'm not certain of that."[52]

The State further contended at trial that the surveillance video established cause of death and the requisite intent—that is, intent to kill (murder) or intent to cause serious physical injury (first-degree manslaughter). But, as the trial court found during the charge conference, "[t]he video itself presents a jury question whether a knife or sharp object is visible on the film."[53] Further, the video fails to foreclose the possibility that Mr. Garlick inadvertently hurt Mr. Sherwood with the knife during a struggle for it.[54] Finally, the video does not clearly indicate whether Rivera had an object in her hand when striking Sherwood in the head.[55]

Mr. Garlick requested that the court instruct the jury to consider the lesser-included count of third-degree assault (intentionally causing physical injury).[56] Mr. Garlick pressed that "intent is an . . . issue [here] and it is a questionable jury question based on the evidence that was adduced at trial."[57] The State resisted such an instruction, stressing that the autopsy report concluded that "[t]here are seven stab

---

[51] A244.

[52] A246-47.

[53] A607.

[54] Pros. Ex. 5.

[55] Pros. Ex. 5.

[56] A572; N.Y. Penal Law § 120.00(1).

[57] A574.

wounds . . . a stab to the heart, collapsed lung, one stab caused the victim to lose one and a half liters, one-third of the blood in his body. The stab designated A [in the autopsy report's diagram], . . . pierced the diaphragm."[58]

Finding that a reasonable juror could find that Mr. Garlick's intent was merely to cause physical injury (thus rendering him not guilty of first-degree manslaughter), the court agreed to submit a third-degree-assault charge to the jury.[59]

In summation, the prosecution again relied heavily upon the autopsy report, pressing that it confirmed that Petitioner caused Sherwood's death and intended to cause him serious harm.[60] The prosecution added that the "most deadly" and "fatal wound" was the wound "designated" wound "C" on the autopsy report.[61]

Also relying on the autopsy report, the prosecutor pressed that although Rivera was "pounding," "punching," and "kicking" Sherwood, "we know from the medical examiner none of that contributed in any way to death."[62] The prosecutor reminded the jury that the autopsy report caused the police to (1) accuse Mr. Garlick of murder and (2) withdraw  homicide charges against Rivera.[63] "And remember," the prosecutor stated, "the stab that did the killing, the deepest wound" was "five and one-half inches" deep.[64]

The jury acquitted Mr. Garlick of intentional murder but convicted him of first-

---

[58] A586-87; Autopsy Report: A917 (diagram).
[59] A607-08.
[60] A644.
[61] A644; Autopsy Report: A917 (diagram).
[62] A646.
[63] A652.
[64] A658.

degree manslaughter.[65] Mr. Garlick was sentenced to 20-years in prison.[66]

### F. Appellate Litigation

Relying on precedent from the New York Court of Appeals, the Appellate Division

found no constitutional violation because the report did not prove identity:

> "Defendant's right of confrontation was not violated when an autopsy
> report prepared by a former medical examiner, who did not testify, was
> introduced through the testimony of another medical examiner" (quot-
> ing *People v Acevedo*, 112 A.D.3d 454, 455 (1st Dept. 2013)), since the
> report, which "did not link the commission of the crime to a particular
> person," was not testimonial (quoting *People v. John*, 27 N.Y.3d 294, 315
> (2016)). Defendant's contention that *People v. Freycinet*, 11 N.Y.3d 38
> (2008), has been undermined by subsequent decisions of the United
> States Supreme Court is unavailing (citing *Acevedo*, 112 A.D.3d at
> 455).[67]

In *Freycinet*, upon which the Appellate Division relied, the New York Court of

Appeals found an autopsy report non-testimonial because it "did not directly link de-

fendant to the crime. The report is concerned only with what happened to the victim,

not who killed her."[68] The Court of Appeals ratified that analysis in *People v. Pealer*[69]

and *People v. John*,[70] which the Appellate Division also cited.[71]

After leave to the Court of Appeals and a petition for a writ of certiorari were

denied, Mr. Garlick filed a timely federal habeas petition in the Southern District

---

[65] A720, A734.

[66] A752.

[67] A884.

[68] 11 N.Y.3d at 42.

[69] 20 N.Y.3d 447, 454 (2013).

[70] 27 N.Y.3d at 315 ("We are not retreating from our prior decisions holding that, given the pri-
mary purpose of a medical examiner in conducting autopsies, such redacted reports—'a contempora-
neous, objective account of observable facts that [do] not link the commission of the crime to a particu-
lar person'—are not testimonial") (citing *Pealer*, 20 N.Y.3d at 454 and *Freycinet*, 11 N.Y.3d at 42).

[71] A884.

Court.

In a Report and Recommendation dated April 27, 2020, Judge Cave held that the autopsy report's admission violated the Confrontation Clause under Supreme Court precedents.[72] Judge Cave also concluded that the "cases on which the state courts relied do not reflect current Supreme Court Confrontation Clause precedent."[73] Nevertheless, Judge Cave found that Supreme Court law was not "clearly established" and thus denied the writ.[74] Judge Cave recommended that a certificate of appealability issue.[75]

## OBJECTIONS TO THE REPORT & RECOMMENDATION

### A.  <u>First Objection</u>: Judge Cave's Decision Failed to Apply *De Novo* Review.

Under 28 U.S.C. § 2254(d)(1), the habeas court must "train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims."[76]  A federal habeas court must first determine whether the legal standards employed by the state court were "contrary to" Supreme Court precedent.[77] If they were, *de novo* review applies.[78] Further, even if the state court correctly identifies the controlling standard, the defendant can secure relief in two other

---

[72] R & R 37-48.

[73] R & R 48-55.

[74] R & R 55-59.

[75] R & R 63.

[76] *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (quotation marks omitted).

[77] 28 U.S.C. § 2254(d)(1).

[78] *See* Pet. Opening Memo. of Law 19-24 (Nov. 27, 2018); Pet. Reply Memorandum of Law 1-3 (April 22, 2020); *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (when a "state court applies a rule that contradicts the governing law set forth in our cases," a federal court is "unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause"); *Lafler v. Cooper*, 566 U.S. 156, 173 (2012) (defendant argued that counsel was ineffective for failing to reasonably advise
(fn. continued on next page . . . )

ways: (1) the state court "decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts"; or (2) the state court unreasonably applied clearly-established Supreme Court law to the facts of the case.[79]

Here, Judge Cave erred in failing to apply *de novo* review. Judge Cave correctly found[80] that the introduction of the autopsy report violated the Confrontation Clause under *Crawford v. Washington*,[81] *Melendez-Diaz v. Massachusetts*,[82] *Bullcoming v. New Mexico*,[83] and *Williams v. Illinois*.[84] Judge Cave also comprehensively held that the legal standards employed by the Appellate Division in resolving Mr. Garlick's claim violated Supreme Court precedent.[85] Judge Cave correctly held that the *sole* articulated basis for the Appellate Division's decision—the report "did not link the commission of the crime to a particular person"—violated the "explicit" holding of *Melendez-Diaz v. Massachusetts*.[86] And Judge Cave correctly held that *Freycinet,* a 2008 Court of Appeals decision upon which the Appellate Division relied, articulated

---

him regarding a favorable plea offer; state court rejected the ineffective-assistance claim because the plea was "knowing and voluntary"; Supreme Court held that *de novo* review applied because this legal standard "is not the correct means by which to address a claim of ineffective assistance of counsel"); *Issa v. Bradshaw,* 904 F.3d 446, 453 (6th Cir. 2018); *Cargle v. Mullin,* 317 F.3d 1196, 1202 (10th Cir. 2003); Brian R. Means, Federal Habeas Manual, *Consequence of "Contrary To" Determination* § 3:50 (updated through 2019) ("A state court decision that is 'contrary to' clearly established Supreme Court precedent is reviewed under the pre-AEDPA *de novo* standard.") (collecting authority).

[79] 28 U.S.C. § 2254(d)(1); *Williams,* 529 U.S. at 405-413.

[80] *See* R & R 37-55.

[81] 541 U.S. 36 (2004).

[82] 557 U.S. 305 (2009).

[83] 564 U.S. 647 (2011).

[84] 567 U.S. 50 (2012).

[85] R & R 48-55; *Garlick,* 144 A.D.3d at 606.

[86] *Garlick,* 144 A.D.3d at 606 (finding no constitutional violation "since the report, which 'd[id] not *link the commission of the crime to a particular person*,' was not testimonial.") (emphasis added); *Melendez-Diaz,* 557 U.S. at 313-14 (this standard "finds no support in the text of the Sixth Amendment or in our case law"; "would be contrary to longstanding case law"; and clashes with the structure of the Clause)**;** R & R 20-21, 50 ("*Melendez-Diaz* explicitly found that evidence need not identify a specific individual or be 'directly accusatory' to be considered testimonial"); Pet. Memo. of Law 19-24.

12

three others testimonial "factors" that have been squarely rejected by the Supreme Court.[87]

As the Appellate Division applied legal standards that violate clearly-established Supreme Court precedent, Judge Cave erred in declining to apply *de novo* review.[88] As *Williams v. Taylor* held, when a "state court applies a rule that contradicts the governing law set forth in our cases," a federal court is "unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause."[89] That rule controls here.

The Magistrate's error here was dispositive because the Magistrate found that the autopsy report's admission unconstitutional under Supreme Court precedent.[90] Thus, had *de novo* review been applied, the Magistrate would have issued the writ.

---

[87] *Freycinet*, 11 N.Y.3d at 41-42 (a court should consider the extent to which the entity conducting the autopsy is an "arm of law enforcement"); R & R 50 (the "arm of law enforcement" factor is "not found in Supreme Court precedent"); *Melendez-Diaz*, 557 U.S. at 317 (explicitly rejecting the theory that the declarant's apparent neutrality is relevant because, under *Crawford*, "reliability" is irrelevant) (citing *Crawford*, 541 U.S. at 61-62); *Bullcoming*, 567 U.S. at 664 ("The State maintains that the affirmations made by analyst [ ] were . . . simply observations of an independent scientist made according to a non-adversarial public duty. That argument fares no better here than it did in *Melendez-Diaz*.") (alterations and quotation marks omitted); *see also Freycinet*, 11 N.Y.3d at 41-42 (a court should consider whether "the contents of the report are a contemporaneous record of objective facts, or reflect the exercise of fallible human judgment" and, similarly, "whether a pro-law-enforcement bias is likely to influence the contents of the report"); R & R 50 (explaining that *Crawford* and *Melendez-Diaz* "soundly rejected" these factors); *Bullcoming*, 564 U.S. at 659-60 (it is irrelevant whether the report is an "objective" account of "contemporaneous" observations); *id.* at 661 ("[T]he 'obvious reliability' of a testimonial statement does not dispense with the Confrontation Clause . . . Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'") (quoting *Crawford*, 541 U.S. at 62, and *Melendez-Diaz*, 557 U.S. at 319 n. 6); Pet. Memo. of Law 17-18.

[88] R & R 56-59; *see* Pet. Memo. of Law 19-24; Pet. Reply Memo. of Law 1-3 (April 22, 2020).

[89] 529 U.S. at 405-06.

[90] R & R 37-48.

13

**B.** <u>Second Objection</u>: **Judge Cave erred in failing to grant relief on the ground that the autopsy report was materially indistinguishable from the reports in *Melendez-Diaz* and *Bullcoming*.**

The R & R also did not specifically address our additional argument that the facts of *Melendez-Diaz* and *Bullcoming* are "materially indistinguishable" from those here, thus overcoming § 2254(d)(1).[91] While the Magistrate essentially held there was no meaningful distinction between the autopsy report here and the narcotics and blood-alcohol reports found to be testimonial in *Melendez-Diaz* and *Bullcoming*, the Magistrate, without explanation, declined to issue the writ on "materially-indistinguishable" grounds.[92] That was error too. Indeed, *Melendez-Diaz* and *Bullcoming* are directly on point.

*Melendez-Diaz* held that a forensic report declaring that a substance was an illegal drug fell within the "core class of testimonial statements" because it was written "'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'"[93] The formal report there

---

[91] *Williams*, 529 U.S. at 412-13; Pet. Memo. of Law 24-27; Pet. Reply Memo. of Law 9-12.

[92] R & R 39-40 (the report here was just as "formal" as the reports in *Bullcoming* and *Melendez-Diaz*); R & R 42 (like the blood alcohol report in *Bullcoming* and the narcotics report in *Melendez-Diaz*, the report here was "'functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination'") (quoting *Melendez-Diaz*, 557 U.S. at 310-11 and citing *Bullcoming* 564 U.S. at 656); R & R 44 ("Just as the report in *Melendez-Diaz* had the primary purpose of establishing the contents of the seized substance, and the report in *Bullcoming* had the primary purpose of determining blood alcohol level, here, the Autopsy Report had the primary purpose of establishing Sherwood's case of death. ") (citing *Bullcoming*, 564 U.S. at 670); R & R 53-54 ("Just as the primary purpose of a road-side blood-alcohol test is not to determine a drive's blood alcohol level in isolation, but rather is primarily used to determine whether the blood-alcohol level is above the legal limit, so too, here, the primary purpose of the autopsy was not to determine the cause of death in a vacuum, but was primarily used to determine whether the death was a homicide, which naturally would lead to a criminal action.") (citing *Bullcoming*, 564 U.S. at 668).

[93] *Melendez-Diaz*, 557 U.S. at 310-11 (quoting *Crawford*, 541 U.S. at 52).

was transmitted directly to law enforcement personnel and contained "the precise testimony [the witness] would be expected to provide if called at trial."[94]

*Bullcoming* reaffirmed that "[a]n analyst's certification prepared in connection with a criminal investigation or prosecution . . . is 'testimonial' and therefore within the compass of the Confrontation Clause."[95]  Because state law there required the laboratory to assist the police investigation, there was no doubt the blood alcohol report at issue was "'made for the purpose of establishing or proving some fact' in a criminal proceeding."[96]

*Melendez-Diaz* and *Bullcoming* dictate that, as here, when a medical examiner creates an autopsy report during an active homicide investigation and asserts that the cause of death is homicide, the report falls within the "core class of testimonial statements."[97] Such reports are created "'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'"[98] As in *Melendez-Diaz* and *Bullcoming*, medical examiners know that, under such circumstances, their report will serve as crucial evidence in a criminal case. That is particularly true when, as here: (1) investigating police officers are present during the autopsy; (2) state law mandates, as in *Bullcoming* and *Melendez-Diaz*, that the analyst "assist in [state criminal] investigations" by immediately forwarding the autopsy report to prosecuting authorities; and (3) state law renders the

---

[94] *Id.* at 310-11.

[95] *Bullcoming*, 564 U.S. at 658-59 (citing *Melendez-Diaz*, 557 U.S. at 319-24).

[96] *Bullcoming*, 564 U.S. at 664-65 (quoting *Melendez-Diaz*, 557 U.S. at 310).

[97] *Melendez-Diaz*, 557 U.S. at 310-11.

[98] *Melendez-Diaz*, 557 U.S. at 310-11 (quoting *Crawford*, 541 U.S. at 51-52).

report, as in *Bullcoming* and *Melendez-Diaz*, "prima facie evidence" of the facts asserted therein.[99]

And just as in *Bullcoming* and *Melendez-Diaz*, "the formalities attending" the autopsy report here are "more than adequate to qualify [the report] as testimonial."[100] In *Bullcoming* and *Melendez-Diaz*, the analysts "prepared a certificate concerning the result of [their] analysis" and "formalized" the report in a "signed document headed 'a report.'"[101] And in *Bullcoming*, the report "contain[ed] a legend referring to municipal and magistrate courts' rules that provide for the admission of certified blood-alcohol analyses."[102]

So too here, the autopsy report is headed "REPORT OF AUTOPSY" and bears the official seal of OCME.[103] Dr. Maloney certified and signed the report, indicating a "draft" date and a "final" date.[104] In turn, OCME formally certified the report as a business record for purposes of litigation, expressly citing state law authorizing the report's admission into evidence.[105] The "formalities attending" this report are thus just like those attending the reports in *Bullcoming* and *Melendez-Diaz*.

As *Melendez-Diaz* and *Bullcoming* are materially indistinguishable from this case, the writ should issue.

---

[99] *Bullcoming*, 564 U.S. at 665; *Melendez-Diaz*, 557 U.S. at 309, 311; N.Y. C.P.L.R § 4518, 4520; N.Y. Pub. Health Law § 4103(3); N.Y. County Law § 677(4), N.Y. City Charter § 557(g); N.Y. County Law § 674(2),(3)(a), N.Y. County Law § 674(4), 676.

[100] *Bullcoming*, 564 U.S. at 664-65; R & R 39-40.

[101] *Bullcoming*, 564 U.S. at 664-65; *Melendez-Diaz*, 557 U.S. at 308.

[102] *Bullcoming*, 564 U.S. at 664-65.

[103] A909.

[104] A910, A914.

[105] A908.

C. **Third Objection**: The R & R 's Analysis of the "Unreasonable Application" Question is Legally Flawed.

The R & R stated, without specific explanation, that the "Supreme Court's Confrontation Clause precedent *as to autopsy reports* is unsettled."[106] From that premise, the R & R reasoned that Mr. Garlick could not show that the Appellate Division unreasonably applied "clearly established" law.[107]

To the extent the Magistrate was holding that the primary purpose standard— that is, whether the statements were made for the primary purpose of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution"[108]—is not "clearly established," that is wrong. The Supreme Court has repeatedly articulated that rule, thus rendering it clearly established.[109]

---

[106] R & R 58 (emphasis added).

[107] R & R 55-59.

[108] *Davis*, 547 U.S. at 822.

[109] *Melendez-Diaz*, 557 U.S. at 310-11 (a forensic report was testimonial because it was "made under circumstances which would lead an objective witness reasonable to believe that the statement would be available for use at a later trial") (quoting *Crawford*, 541 U.S. at 51-52 (defining the "core class" of "testimonial statements" to include "statements that were made under circumstances which would lead an objective witness reasonable to believe that the statement would be available for use at a later trial")); *id.* at 324; *Bullcoming*, 564 U.S. at 663-64 ("We turn, finally, to the State's contention that the . . . blood-alcohol analysis reports are nontestimonial in character, therefore no Confrontation Clause question even arises in this case. *Melendez-Diaz* left no room for that argument, the New Mexico Supreme Court concluded, *a conclusion we find inescapable.* In *Melendez-Diaz*, a state forensic laboratory, on police request, analyzed seized evidence (plastic bags) and reported the laboratory's analysis to the police (the substance found in the bags contained cocaine). [The certificates,] this Court held, were 'incontrovertibly affirmations made for the purpose of establishing or proving some fact' in a criminal proceeding. The same purpose was served by the certificate in question here.") (internal citations, brackets and ellipsis omitted; emphasis added); *Michigan v. Bryant*, 562 U.S. 344, 356 (2011) ("'Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'") (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)); *McCarley v. Kelly*, 801 F.3d 652, 664-65 (6th Cir. 2015) (the "primary purpose" standard constitutes clearly established Supreme Court law); *see also Melendez-Diaz*, 557 U.S. at 316-17 (the absence of an interrogation is irrelevant).

And to the extent the R & R was relying on the fact that the Supreme Court has not yet specifically considered an "autopsy" case, that approach also violates Supreme Court precedent.[110] "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied."[111] AEDPA deference is thus overcome where the state court "unreasonably refuses to extend [a Supreme Court] principle to a new context where it should apply."[112] And here, although the Supreme Court has never expressly addressed "autopsy reports," it has articulated clearly-established principles that confirm that an autopsy report made under the circumstances here is testimonial.

The R & R adds that since some state/federal courts have found autopsy reports non-testimonial, the Appellate Division's non-testimonial decision was a reasonable application of Supreme Court precedent.[113] But as *Williams* held, the text of the decisions of the Supreme Court, not polls of lower-court decisions, drive the § 2254(d)(1) inquiry.[114] This subjective polling approach would, if adopted, invariably lead to the rejection of any habeas claim so long as a few decisions (from federal appellate and state appellate courts) support the state court's ultimate conclusion.

---

[110] R & R 58 (rejecting relief because it found that the "Supreme Court's Confrontation Clause precedent *as to autopsy reports* is unsettled") (emphasis added).

[111] *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (internal citation omitted).

[112] *Williams*, 529 U.S. at 407.

[113] R.R. 56-58 & ns. 11-14.

[114] 529 U.S. at 409-10; *cf. Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (a habeas court "may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to this Court, be accepted as correct").

In any event, the lower-court poll weighs heavily in Mr. Garlick's favor.[115] As the R & R noted, at least a dozen Circuit Court and State Supreme Courts have found autopsy reports to be testimonial,[116] while far-less have found to the contrary.[117] The R & R thus appears to call for *unanimity* in the lower courts, a virtually insurmountable standard having no basis in AEDPA's text or Supreme Court precedent.

The federal habeas cases cited in the R & R also fail to establish that, as of 2016 (when the Appellate Division decided Petitioner's appeal), the relevant law was not "clearly established."[118] The Second Circuit's decision in *Vega* found it reasonable, *as of 2005*, to find an autopsy report non-testimonial; *Soler* (an unpublished Eastern District decision) held the same as of 2007. But those decisions are irrelevant because they assessed the state of the law before *Bullcoming* and *Melendez-Diaz*, which confirm that a forensic report made for the primary purpose of codifying evidence is testimonial.

Contrary to Judge Cave's decision, Judge Eaton's concurring opinion in *United States v. James*,[119] which stated that the law governing forensic reports is "unsettled," does not "constrain" this Court.[120] Besides the fact that a concurring opinion is not binding, the majority's analysis in *James* bolsters Mr. Garlick's petition—a point recognized in the R & R itself.[121] There, the Second Circuit correctly held that "we must

---

[115] R & R 56-57 ns. 11-13.

[116] R & R 57 n. 11 (collecting authority),

[117] R & R 57 n. 12.

[118] R & R 58-59 (citing *Vega v. Walsh*, 669 F.3d 123 (2d Cir. 2012) and *Soler v. United States*, 2015 W.L. 4879170 (S.D.N.Y. Aug. 14, 2015)).

[119] 712 F.3d 79, 108 (2013).

[120] R & R 58.

[121] R & R 45.

determine whether, under the circumstances, the autopsy report . . . was prepared with the primary purpose of creating a record for use at a later criminal trial."[122] And in applying that well-established standard, *James* found the autopsy reports there non-testimonial because, unlike here, nothing indicated that "a criminal investigation was contemplated during the inquiry into the cause of [the victim's] death."[123] Indeed, the report there indicated that the cause of death was "undetermined."[124] *James* thus confirms what *Melendez-Diaz* and *Bullcoming* command: when, as here, "a criminal investigation was contemplated during the inquiry into the cause of [the victim's] death," the report is testimonial.[125]

Finally, the First Circuit's non-binding decision in *Hensley v. Roden*[126] does not justify a denial of habeas relief. For one, *Hensley* considered the reasonableness of a state court decision handed down before *Bullcoming* clearly established that there is no notary requirement and that surrogate testimony is impermissible.[127]

Perhaps more importantly though, *Hensley* focused heavily on an irrelevant and distracting question: whether autopsy reports should, *categorically*, "be considered testimonial."[128] But that is not the question presented here. Mr. Garlick's claim is

---

[122] 712 F.3d at 99.

[123] *Id.* at 101.

[124] *Id.* at 99.

[125] *Id.* at 101.

[126] 755 F.3d 724, 732 (1st Cir. 2014).

[127] *See* R & R 39-40, 50-51.

[128] *Hensley*, 755 F.3d at 732-35.

that, under the *circumstances here*—the medical examiner prepares an autopsy re-
port during an active criminal investigation declaring that the cause of death is hom-
icide—the report is testimonial.

### D. Conclusion

Either under *de novo* review or § 2254(d)(1) deference, Petitioner's Confrontation
Clause claim prevails. Further, this constitutional error was not harmless. As the R
& R found, the prosecution relied heavily on the autopsy report at trial to prove cause
of death and intent to cause serious injury. [129] Further, the deprivation of the right to
confront Dr. Maloney was prejudicial because it prevented Mr. Garlick from attacking
her qualifications and reliability.[130] Thus, this constitutional error had a substantial
and injurious effect on the verdict.[131] The writ should issue.

At a minimum, this Court should adopt the Magistrate's recommendation that a
certificate of appealability should issue so the Second Circuit can address this Con-
frontation Clause issue.[132]

Respectfully submitted,
ROBERT S. DEAN (RD-0772)
*Attorney for Petitioner*

BY: *Matthew Bova*

MATTHEW BOVA (5073135)
*Of Counsel*
May 11, 2020

---

[129] R & R 59-63 (finding that "absent the autopsy report, the State's case is considerably weaker"
and that the report "played a central role in the case"); Pet. Memo. of Law 28-29. Ultimately, Judge
Cave did not squarely reach this question in light of her merits determination. R & R 62-63.

[130] R & R 62.

[131] *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

[132] R &R 63.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
JAMES GARLICK,

                  Petitioner,

                                     **RESPONDENT'S DECLARATION IN OPPOSITION TO PETITIONER'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

                  -against-                    18 Civ. 11038 (CM)(SLC)

CHRISTOPHER MILLER, Superintendent,
Great Meadow Correctional Facility,

                      Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

     JOSHUA P. WEISS, an attorney admitted to practice in the State of New York, and before this Court, declares under penalty of perjury, pursuant to 28 U.S.C. §1746, that the following statements are true, except those made upon information and belief, which he believes to be true:

     1.      I am an Assistant District Attorney in the Office of DARCEL D. CLARK, District Attorney, Bronx County, and I submit this declaration in opposition to petitioner's Objections to the Report and Recommendation issued by U.S. Magistrate Judge Sarah L. Cave, dated April 27, 2020, recommending that the extant habeas petition be denied.

2.      Pursuant to an agreement with the Office of the Attorney General of the State of New York, this Office represents the respondent in this action.

3.      A detailed factual and procedural history of the case can be found in the State's declaration submitted by Assistant District Attorney Jordan K. Hummel in opposition to the original petition.

4.      By petition dated November 27, 2018, petitioner moved through assigned counsel, Matthew Bova, Esq. from the Center for Appellate Litigation, for a writ of <u>habeas</u> <u>corpus</u>. Counsel argued that the introduction of autopsy evidence at petitioner's trial through a surrogate witness violated his right to Confrontation under clearly established Supreme Court precedent.

5.      On April 1, 2019, the State opposed an award of <u>habeas</u> relief, arguing that the Appellate Division's rejection of petitioner's claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. The State stressed, irrespective of the merits, that petitioner was ineligible for habeas relief because the petition raises a legal question that implicates a hotly contested issue of federal constitutional law that remains unsettled. There is a "fair-minded disagreement" among jurists about whether autopsy reports are testimonial in nature. <u>See</u> <u>White v. Woodall</u>, 572 U.S. 415, 419 [2014]).

6.      On November 21, 2019, the parties appeared before Magistrate Judge Cave for oral argument on the petition.

7.      By Report and Recommendation, dated April 27, 2020, Magistrate Judge Cave recommended that Your Honor deny the writ.  Initially, Magistrate Judge

Cave found, incorrectly Respondent submits, that the Appellate Division's ruling upholding the introduction autopsy reports through a surrogate witness was erroneous because its ruling had relied on several New York State Court of Appeals decisions that had misapplied Supreme Court precedent governing the Confrontation Clause (R&R, p. 55).

Mindful of the highly deferential standard of review circumscribing a habeas court's authority to grant relief, however, Magistrate Judge Cave ultimately held that denial of the writ was mandated under 28 USC § 2254(d) because it was clear that the relevant Court precedent was unsettled at the time of the Appellate Division determination on petitioner's direct appeal that his confrontation claim lacked merit "and therefore insufficiently established to grant [petitioner] relief here" (R&R. p. 56-58).

8. On May 11, 2020, the State filed Objections to Magistrate Judge Cave's Report and Recommendation in order to contest her finding that the autopsy report was testimonial within the meaning of the Confrontation Clause and that, as a result, its admission into evidence at petitioner's trial was legal error.

The State's objections also identified a number of factual characterizations set forth in the Report & Recommendation that betray either an unfair or inaccurate interpretation of highly relevant portions of the record. Nonetheless, the State urged this Court to adopt Magistrate Judge Cave's recommendation because her finding that the Supreme Court precedent controlling this issue was not "clearly established"

when the claim was litigated on direct appeal was dispositive in foreclosing petitioner's eligibility for habeas relief.

8, On May 11, 2020, petitioner filed Objections to Magistrate Judge Cave's Report & Recommendation For the reasons that follow, petitioner's objections are insufficient to overcome Magistrate Judge Cave's determination that petitioner is not entitled to habeas relief.

### PETITIONER'S OBJECTIONS ARE IMPROPERLY AIMED AT OBFISCATING THE DISPOSITIVE ISSUE ON HABEAS REVIEW AND MUST BE REJECTED

Petitioner asserts three objections to the Report & Recommendation. First, petitioner claims that Magistrate Judge Cave erred in failing to subject the claim to a *de novo* standard of review (Pet. Obj. 11-13). Further, petitioner argues the autopsy report prepared in this case was materially indistinguishable from the forensic reports in <u>Melendez-Diaz</u> and <u>Bullcoming</u> that the Supreme Court has designated testimonial (Pet. Obj. p. 14-16). Additionally, petitioner disputes Magistrate Judge Cave's determination that Supreme Court precedent was not clearly established at the time of the Appellate Division's ruling (Pet. Obj. p.17-21). None of these objections, however, justifies departing from the recommendation that the petition be denied.

Initially, Magistrate Judge Cave did not err in failing to apply de novo review to petitioner's confrontation claim. The standard of review under which this Court may review the Appellate Division's finding is set forth in 28 U.S.C. § 2254(d)(1). Pertinently, § 2254(d)(1) restricts a federal court from disturbing a state court ruling

unless its determination runs contrary to, or constitutes an unreasonable application of, clearly established Supreme Court precedent. It establishes a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181, 131 S.Ct. 1388 (2011) <u>quoting</u> <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24, 123 S.Ct. 357 (2002). The Supreme Court has noted that section 2254(d) imposes a "substantially higher "threshold for obtaining relief than de novo review. <u>Renico v. Lett,</u> 559 U.S. 766, 773, 130 S.Ct. 1855, 1862 (2010) <u>quoting</u> <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473, 127 S.Ct. 1933 (2007).

Here, it is uncontested that the Supreme Court has never expressly answered whether or under which circumstances autopsy reports are encompassed by the definition of testimonial evidence. Because there was no basis to conclude that the Appellate Division's ruling that the autopsy was nontestimonial could not have offended clearly established Supreme Court precedent, Magistrate Judge Cave correctly applied § 254(d)(1) in finding that habeas relief was unavailable.

For one, Magistrate Judge Cave appropriately recognized that she was bound to decide the writ petition in accordance with § 2254(d)(1)'s jurisdictional constraints. Guided by that controlling standard of review, she correctly determined that an award of habeas relief was unmerited, regardless of her belief that the New York Court of Appeals' precedents upon which the state court relied in rejecting the claim on direct appeal had misapplied federal precedent and that such precedent dictated

that autopsy reports were testimonial <u>Harrington v. Richter</u>, 562 U.S. 86, 102, 131 S.Ct 770 (2011).

Indeed, petitioner's assertion that *de novo* review applies finds no legal support. Habeas review is not a vehicle for relitigating questions of constitutional law that were decidedly adversely to the petitioner in state court. The standard for relief under 2254(d)(1) is a high one "because the purpose of AEDPA is to 'ensure that federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice system', and not for error correction." <u>Green v. Fischer</u>, 565 U.S. 34, 38, 132 S.Ct. 38, 43 (2003) <u>quoting</u> <u>Richter</u> 562 U.S. at 102-03, 131 S.Ct. 1776. Petitioner is thus reminded that if this standard seems "difficult to meet, that is because it was meant to be" <u>Richter</u>, at 102, 131 S.Ct. 786.

Critically, the inability for petitioner to show, in the first instance, that the Appellate Division's ruling contravenes clearly established Supreme Court precedent is dispositive and obviates further review of the claim. In <u>Richter</u>, the Fourth Circuit considered a federal habeas petition predicated on ineffective assistance of counsel. At the outset of its opinion, the Circuit Court explicitly stated that it had reviewed the claim de novo. Concluding that the claim was meritorious, the Fourth Circuit found a <u>Strickland</u> violation and issued the writ. The Supreme Court, however, determined that the Fourth Circuit`s analysis under AEDPA was deficient and reversed the award of habeas relief. It observed that the Fourth Circuit had misapplied the statute insofar as it "overlook[ed] arguments that would otherwise justify the state court's result and ignores further limitations of § 2254(d), including

its requirement that the state court's decision be evaluated according to the precedents of this Court." Id. at 102, 131 S.Ct. at 786. The Court further explained that the Court of Appeals had failed to consider possible arguments supporting the state's courts ruling and "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. Unable to decipher how the circuit court's decision would have differed had the issue before it arisen outside the habeas context, the Court found that the Fourth Circuit's analysis had impermissibly "ignored the only question that matters under § 2254(d)." Id; citing Lockyer v. Andrade, 538 U.S. 63, 71, 123 S.Ct. 1166 (2003). Accordingly, this Court should decline petitioner's invitation to now do the same.

Attempting to elude this bar to relief, petitioner further objects to the Report & Recommendation on the ground that Magistrate Judge Cave should have found the facts at bar relating to the performance of the victim's autopsy were materially indistinguishable from the forensic reports deemed testimonial by the Supreme Court in Melendez-Diaz and Bullcoming. In Melendez-Diaz, the Supreme Court found that certificates of analysis determining a substance seized by police to be cocaine, and which under the relevant state statute were generated for the sole purpose of creating evidence for use in a criminal prosecution, were testimonial. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311, 129 S.Ct. 2527 (2009). On facts indistinguishable "in all material respects," the Supreme Court in Bullcoming held that blood-alcohol reports produced by a state laboratory also constitute testimonial evidence and

cannot be admitted at trial unless the report's creator is made available for cross-examination. Bullcoming v. New Mexico, 574 U.S. 657, 131 S.Ct. 2705, 2717 (2011).

"The Supreme Court has not said that autopsy reports are indistinguishable from the reports in Melendez-Diaz or Bullcoming. To the contrary, several holdings indicate that it is an open question as to whether they represent a distinct category of evidence from the forensic reports that have been considered and deemed testimonial by the Supreme Court. See Roden v. Hensley, 755 F3d 724, 732 (1st Cir. 2014). ("Melendez–Diaz did not say one way or the other whether autopsy reports should be considered testimonial.").[1] To this end, petitioner's complaint discounts the implications of the Supreme Court's ruling in Williams on the current state of law. See Williams v. Illinois, 567 U.S. 50, 132 S.Ct 2221, 2246 (2012). That ruling, though fragmented, seems to reflect an effort to cabin the scope of evidence recognized as testimonial under the Confrontation Clause. There, for reasons that varied, a majority of Justices that a forensic report determining that a DNA profile produce in an outside laboratory was nontestimonial. Id.

---

[1] See Hacheney v. Obenland, 732 Fed.Appx 541, 543 (9th Cir. 2018), cert. denied, 139 S. Ct. 388, 202 L. Ed. 2d 296 (2018) (holding that neither Crawford nor Melendez-Diaz found that autopsies were testimonial); Nardi v. Pepe, 662 F.3d 107, 111-112 (1st Cir. 2011) (upholding a district court's denial of a habeas corpus petition on the basis that "[a]bstractly, an autopsy report can be distinguished from, or assimilated to, the sworn documents in Melendez-Diaz and Bullcoming . . . The law has continued to evolve and no one can be certain just what the Supreme Court would say about that issue today"); Millender v. Johnson, No. CV 19-2809-KS, 2020 WL 1331053, at *7 (C.D. Cal. Mar. 20, 2020) (collecting cases) (appeal filed); Portes v. Capra, 420 F. Supp. 3d 49, 55-56 (E.D.N.Y. 2018); see also Mitchell v Kelly 520 Fed.Appx. 329, 331 (6th Cir. 2013) (finding state court did not unreasonably apply Crawford in holding autopsy report was not testimonial).

Notably, in his concurring opinion, Justice Breyer criticized the plurality's failure to coherently apply the principles distilled from Melendez-Diaz and Bullcoming, which he explained had endorsed the precept that the "need for cross-examination is considerably diminished when the out-of-court statement was made by an accredited laboratory employee operating at a remove from the investigation in the ordinary course of professional work." Williams, 132 S.Ct at 2246 (Breyer, J. concurring), He explicitly invoked autopsy reports as an example of a business record that serve a vital role in criminal investigations and cautioned that "to bar admission [of such out of court records] could undermine, not fortify, the accuracy of factfinding at a criminal trial". Id. at 2251. Justice Breyer's voiced concerns, taken together with the views expressed by the other Justices who joined in the result in Williams, thus raise serious questions about whether Melendez-Diaz and Bullcoming even support petitioner's position.

Moreover, the Second Circuit in James, a case with nearly identical facts, underscored that the fractured nature of the decision in Williams had created an "intractable problem" with respect to discerning the Court's controlling principles. U.S. v. James, 712 F.3d 79, 102 (2nd Cir. 2013). Ultimately, the majority in James found, as the State has maintained here, that the autopsy report at issue was nontestimonial largely because OCME is an autonomous agency tasked with distinct legal functions that are unaffected by the prosecutorial determinations made by the Office of the District Attorney.

Importantly, although the Court in <u>James</u> did not have to consider the permissiveness of surrogate testimony since it found the report nontestimonial, it explicitly noted, by citing to Justice Breyer's concurrence, that the Supreme Court's Confrontation Clause jurisprudence was unhelpfully opaque <u>Id</u>. <u>citing Williams v. Illinois</u>, 567 U.S. 50, 132 S.Ct 2221, 2246 (2012) (Breyer, J., concurring) (underscoring that the Court's Clause jurisprudence has evolved in a manner that lacks a "logical stopping place between requiring the prosecution to call as a witness one of the laboratory experts who worked on the matter and requiring the prosecution to call all of the laboratory experts who did so."). Put simply, despite petitioner's self-serving and selective extrapolation from the Court's decisions, <u>Melendez-Diaz</u> and <u>Bullcoming</u>, do not clearly establish that autopsy reports are testimonial under the unique factual scenario present here.

Petitioner's final objection challenging Magistrate Judge Cave's determination that relevant legal principles were not clearly established under federal law when the state court adjudicated his confrontation claim on direct appeal fares no better. Clearly established law is defined under § 2254(d)(1) as the governing legal principles that have been set forth by the U.S. Supreme Court. <u>Andrade</u>, 538 U.S. at 71, 123 S.Ct. at 1172-73. It specifically "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.". <u>Williams v. Taylor</u>, 529 U.S. 362, 412, 120 S.Ct. 1495 (2003). As the Supreme Court has not addressed the question raised here and offered no guidance after <u>Williams</u> that better defines the contours of the testimonial/nontestimonial dichotomy, the law regarding

the admissibility of autopsy reports was not clearly established in 2016, when the Appellate Division rejected the claim on direct appeal.

Against the backdrop of ongoing uncertainty, Magistrate Judge Cave properly determined that the Appellate Division's ruling at the time was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Davis v. Ayala, 576 U.S. 257, 135 S.Ct. 2187, 2199 (2015); citing Richter, 562 U.S. at 103, 131 S.Ct. at 786. In doing so, she a rightly recognized that the majority and concurring opinions in James were in agreement on the operative question for purposes of habeas review under § 2254(d)(1): that the law relating to the interplay between autopsy evidence and the Confrontation Clause remains unsettled. James, 712.F.3d at 102; Id. at 108. Thus, it was correct to find petitioner ineligible for the writ. See Hensley, 755 F3d at 735; see also Flournoy v. Small, 61 F.3d 1000 (9th Cir. 2012); Herb v. Smith, No. 14-CV-4405 (NGG), 2017 WL 1497936, at *9 (E.D.N.Y. Apr. 25, 2017) (Refusing to disturb state appellate court's ruling that autopsy report was properly admitted at the petitioner's trial since "the determination of whether a particular autopsy report is "testimonial" is highly fact-specific, and must be made without clear guidance from the Supreme Court. Given the highly deferential standard for state court rulings… the court finds no basis for concluding that the Appellate Division's opinion was contrary to clearly established Supreme Court precedent.").

As a final matter, petitioner's contention that Magistrate Judge Cave demanded a showing of unanimity among the lower appellate courts is unfounded.

Instead, Magistrate Judge Cave properly relied on the myriad of conflicting state and federal decisions that have considered whether autopsy reports are testimonial as compelling proof that this area of law has remained unsettled (R&R, p. 57.). Indeed, the sheer numerosity of decisions comprising the split persuasively demonstrates that this constitutional question continues to confound and engender disagreement among the most erudite of jurists nationwide. Therefore, it was proper for Magistrate Judge Cave to conclude based on the wide divergence of opinion that "the Supreme Court's Confrontation Clause precedent as to autopsy reports is unsettled, and therefore insufficiently" "established" to grant relief to Garlick here" (R&R, at 58); see Taylor, 529 U.S. at 181, 126 S.Ct. at 1507 ("If this Court has not broken sufficient legal ground to establish an asked-for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA.").

In sum, petitioner's objections to the Report & Recommendation are not persuasive. The finding on habeas review that fair-minded jurists could disagree about the correctness of the state court's ruling is fatal to petitioner's claim. Regardless, denial is appropriate because any error resulting from admitting the autopsy evidence at trial was harmless. Petitioner's criminal actions were caught on video surveillance shown to the jury.

WHEREFORE, respondent respectfully requests that the objection raised by petitioner be rejected as meritless, the Magistrate Judge's finding that the autopsy

report was testimonial be disaffirmed, the petition for <u>habeas</u> <u>corpus</u> be denied in all

respects, and no certificate of appealability issue.


Dated:      Bronx, New York
              May 23, 2020



                                     Respectfully submitted,

/s/_____
                                     Joshua P. Weiss (JD-2336)
                                     Assistant District Attorney

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| JAMES GARLICK, |
| Petitioner, |
| -against- |
| SUPERINTENDENT WILLIAM LEE, Eastern Correctional Facility |
| Defendants. |

No. 18-cv-11038 (CM) (SLC)

**DECISION AND ORDER**

McMahon, C.J.:

I have received and reviewed the Report and Recommendation of The Hon. Sarah L. Cave, dated April 27, 2020 (Dkt. No. 29; hereinafter the "R&R"), denying Petitioner James Garlick's petition for a writ of habeas corpus.  Garlick seeks relief on the grounds that the prosecution relied on an autopsy report prepared by an individual whom Garlick was not given the opportunity to cross examine at trial, in violation of the Confrontation Clause of the Sixth Amendment.  He claims that the decision of the First Judicial Department of the Supreme Court of the State of New York affirming his conviction "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1),

Judge Cave concluded that Garlick's petition did not meet the exacting standard for relief under the Antiterrorism and Effective Death Penalty Act ("AEDPA").  Nonetheless, the R&R acknowledges that Garlick's petition "made a substantial showing of the denial of a constitutional right," and recommends that this Court certify the following questions for appeal

1

(*see* 28 U.S.C. § 2253(c)(2)): (1) whether the Supreme Court's Confrontation Clause precedent

clearly established, as of the date Garlick's conviction was affirmed by the First Department, that

an autopsy report was testimonial; and (2) if so, whether the First Department's decision denying

Galrick's Confrontation Clause claim was contrary to, or involved an unreasonable application

of, that precedent (R&R at 63).

Timely objections to the R&R were received from Petitioner and Respondent Christopher

L. Miller, Superintendent of the Great Meadows Correctional Facility, where Petitioner Garlick

was housed at the time he filed his petition. (Dkt. Nos. 32, 33.)[1] The Court has considered

thoroughly all of the Petitioner's and Respondent's arguments in support of their objections, and

has considered *de novo* all of the points raised.  *See* 28 U.S.C. § 636(b)(1)(c).

Although I adopt substantially all of Judge Cave's analysis of the issues and conclusion

of law in the R&R, I respectfully disagree with the recommendation that I deny Garlick's

petition for failure to meet the standard set forth in § 2254(d)(1).  Garlick has, in fact, made the

necessary showing to obtain habeas relief.  Accordingly, the petition for a writ of habeas corpus

is GRANTED.

## BACKGROUND

### A.  Factual Background

A thorough treatment of the facts is set forth in the R&R. (R&R at 2-9.)

In sum: at Garlick's trial on charges of Second Degree Murder, First Degree

Manslaughter, First Degree Assault, and Second Degree Assault, the prosecution entered into

evidence a report prepared by Dr. Katherine Maloney of the New York Office of the Chief

---

[1] Garlick was recently transferred from Great Meadows to Eastern Correctional Facility; accordingly, the Court has substituted the superintendent of that facility, William Lee, as respondent in the case caption.  *See* Fed. R. Civ. P. 25(d).

Medical Examiner ("OCME"), summarizing an autopsy she had performed on Garlick's alleged victim.  The autopsy occurred after Garlick and another individual had been identified as suspects, with two homicide detectives in attendance. In the autopsy report, Dr. Maloney stated that the cause of death was homicide resulting from multiple stab wounds, which caused the police to rule out the other suspect in the case and focus on Garlick.

Although Garlick admitted to having used force against the victim (in defense of his girlfriends), he disputed throughout the trial that he had possessed or used a knife during the altercation.  The prosecution did not call Dr. Maloney at the trial, since she was no longer employed by OCME, instead calling Dr. Susan Ely, who had not attended the autopsy, to lay the foundation and testify about Dr. Maloney's report.  Garlick's counsel objected that Dr. Ely's testimony violated Garlick's right to confrontation, but was overruled.

The jury convicted Garlick on the manslaughter charge, and the First Department affirmed the trial court's ruling on the Confrontation Clause issue.  The appellate court ruled unanimously:

> "'Defendant's right of confrontation was not violated when an autopsy report prepared by a former medical examiner, who did not testify, was introduced through the testimony of another medical examiner' (*People v Acevedo*, 112 AD3d 454, 455 [1st Dept 2013], *lv denied* 23 NY3d 1017 [2014]), since the report, which '[did] not link the commission of the crime to a particular person,' was not testimonial (*People v John*, 27 NY3d 294, 315 [2016]). Defendant's contention that *People v Freycinet* (11 NY3d 38 [2008]) has been undermined by subsequent decisions of the United States Supreme Court is unavailing (*see Acevedo*, 112 AD3d at 455)."

*People v. Garlick*, 144 A.D.3d 605, 606, 42 N.Y.S.3d 28 (N.Y. App. Div. 2016).

Garlick's habeas petition was timely filed within one year after he exhausted his available remedies on direct review.

**B.  Confrontation Clause Precedent**

This Court adopts the R&R's thorough and well-reasoned discussion of several recent Supreme Court decisions dealing with out-of-court statements subject to the defendant's right to confrontation under the Sixth Amendment.  The following is reproduced to focus the scope of this Court's review of the R&R.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  This entitles a criminal defendant the right to cross examine all those "who bear testimony" against him, including those who make out-of-court statements "that declarants would reasonably expect to be used prosecutorially," and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  *Crawford v. Washington*, 541 U.S. 36, 51-52, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (internal quotation marks omitted).

In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed. 2d 314 (2009), the Supreme Court ruled that forensic reports – certified by state laboratory analysts and identifying a controlled substance as cocaine – fell within the "core class of testimonial statements" covered by the Confrontation Clause, and that the defendant had a right to confront the analysts at trial.  *Id.* at 311.  In so holding, the court rejected the argument that the Sixth Amendment only guarantees a criminal defendant the right to confront "accusatory witnesses" – those that specifically accuse him or her of committing the crime.  *Id.* at 313.  Justice Scalia, writing for the majority, made clear that the constitution "contemplates two classes of witnesses – those against the defendant and those in his favor . . . there is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation." *Id.* at 313-14.

Two years later, the Supreme Court extended the reasoning of *Melendez-Diaz* to another type of certified report: analyses of blood alcohol collected from persons suspected of driving under the influence.  In *Bullcoming v. New Mexico*, 564 U.S. 647, 661, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), the court held that "analysts who write reports introduced as evidence must be made available for confrontation," even where those analysts do nothing more than transcribe the results generated by a gas chromatograph machine.  *Id.* at 661.  In doing so, the Supreme Court rejected the respondent's argument that "observations of independent scientists" are not covered by the Confrontation Clause, reiterating the holding in *Melendez-Diaz* that certified analyses submitted "for the purpose of establishing or proving some fact in a criminal proceeding" are testimonial in nature. *Id.* at 664 (internal quotation marks omitted).  Therefore, when the prosecution "elected to introduce [an analyst's] certification, [the analyst] became a witness Bullcoming had the right to confront. Our precedent cannot sensibly be read any other way." *Id.* at 663.

To be sure, the Supreme Court has not ruled that every certified, out-of-court scientific report is a testimonial statement that gives rise to a right to confrontation.  For example, in *Williams v. Illinois*, 567 U.S. 50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), a plurality found that the prosecution's introduction of a DNA profile that had been certified and "produced before any suspect was identified," and "sought not for the purposes of obtaining evidence," did not require "calling the technicians who participated in preparation of the profile."  *Id.* at 58.  In other words, the DNA report in *Williams* was not created during the course of the criminal proceeding in which it was ultimately offered as evidence, it was not the type of statement made "against" the defendant that *Meledendez-Diaz* defined as testimonial in nature.

### C.  The conclusions of the Report and Recommendation

After reviewing that precedent, Judge Cave determined that: (i) "the Autopsy Report qualifies as testimonial and should not have been admitted into evidence at trial without giving Garlick the opportunity to cross examine Dr. Maloney [the medical examiner who conducted the autopsy" (R&R at 46); (ii) surrogate testimony from an expert witness who was not present at the autopsy "was not a constitutionally sufficient substitute for cross examination of Dr. Maloney herself" (*id.* at 47); and (iii) the First Department's decision to affirm Garlick's conviction on the grounds that the autopsy report was not testimonial was not consistent with Supreme Court precedent (*id.* at 48-49); and (iv) admission of the autopsy report under such circumstances was not harmless error, (*id.* at 59-63.)

The R&R correctly stated that the certified autopsy report, prepared during the course of an investigation that had already identified Garlick as a suspect, was the sort of "declaration of facts written down and sworn to by the declarant" that the Supreme Court deemed testimonial in *Melendez-Diaz* and *Bullcoming*. (R&R at 34-46.) The R&R also recognized that the First Department's decision, as well as the authorities it cited, relied on the "accusatory witnesses" distinction rejected by the Supreme Court in 2009.  (*Id.* at 51-55.)  Therefore, the R&R provided a roadmap to conclude that the First Department's 2016 affirmance of Garlick's conviction was either contrary to, or an unreasonable application of, Supreme Court precedent.  Judge Cave also concluded that the admission of the report did not constitute harmless error.

Nonetheless, Judge Cave ruled that "the Supreme Court's Confrontation Clause precedent is unsettled, and therefore insufficiently 'established' to grant relief to Garlick here."  (R&R at 58.)  She had two reasons: for one thing, not all lower courts have agreed that autopsy reports are testimonial statements within the ambit of the Confrontation Clause have

agreed that they were; for another, some courts in this Circuit have commented that the Supreme Court's Confrontation Clause "does not conclusively establish under which guidelines the use of forensic reports at trial . . . may intrude on a defendant's right to confrontation." *Soler v. U.S.*, No. 10-cv-4342 (LAP), 2015 WL 4879170, at *16 (S.D.N.Y. Aug. 14, 2015); *Vega v. Walsh*, 669 F.3d 123, 127 (2d Cir. 2012) (finding "reasonable jurists could disagree" whether a medical examiner's testimony about an autopsy report he had not prepared violated the confrontation clause).

### D.  The Parties' objections to the Report and Recommendation

#### i.  Petitioner's Objections

Petitioner objects to: (1) the R&R's failure to analyze the First Department's error under the "contrary to" prong of the habeas statute, a process that entails *de novo* review; (2) the Report's failure to find that the autopsy report here was materially indistinguishable from forensic reports found testimonial by the Supreme Court; and (3) the Report's conclusion that no "clearly established" Supreme Court precedent rendered an autopsy report—created during a homicide investigation and declaring that the cause of death was "homicide"—testimonial. (Dkt. No. 33 at 2.)

#### ii.  Respondent's Objections

The Respondent objects to two findings in the R&R on two grounds.  First, Respondent asserts that Judge Cave should not have found "that the introduction of the autopsy report into evidence through a witness other than the medical examiner who performed the autopsy runs afoul of controlling federal jurisprudence." (Dkt. No. 32 at ¶ 8.)  The rationale for this argument is similar to Judge Cave's contention that the law in this area was not "clearly established" as of the time of the First Department's decision, discussed in greater detail below.

Second, Respondent challenges certain of Judge Cave's characterization of the trial

record. (*Id.* ¶ 10.) I have reviewed the material Judge Cave cited in the R&R, and find both her

conclusions and characterizations faithful and accurate.  Respondent's objections in this regard

are overruled.

## STANDARDS OF REVIEW

### I.    Reviewing a Magistrate's Report and Recommendation

In reviewing a report and recommendation, a district court "may accept, reject, or

modify, in whole or in part, the findings or recommendations made by the magistrate [judge]."

28 U.S.C.A. § 636(b)(1)(C). The Court must make a *de novo* determination to the extent that a

party makes specific objections to a magistrate's findings. *See* 28 U.S.C. § 636(b)(1)(C). To the

extent, however, that a party makes only conclusory or general objections, or simply reiterates

original arguments, the Court will review the Report strictly for clear error. *Pearson-Fraser v.*

*Bell Atl.*, 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003).

### II.    The Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d)(1)

AEDPA constrains a federal court's ability to grant a state prisoner's application for a writ

of habeas corpus for claims adjudicated on the merits in state court. AEDPA limits issuance of

the writ to circumstances in which the state proceedings "resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Williams v. Taylor,* 529

U.S. 362, 412 (2000).

A state court decision is contrary to federal law if the state court applies "a conclusion

opposite to that reached by [the Supreme] Court on a question of law or if [it] decides a case

differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*,

529 U.S. at 413.  A state court's merely incorrect application of the correct legal rule to the particular facts of the case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Id.* at 406.

Under the "unreasonable application" prong of Section 2254(d)(1), federal court may only overrule state court decisions found to be "objectively unreasonable." *Id.* at 409.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 634 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). The more general the rule announced by the Supreme Court, the more leeway state courts enjoy in applying it. *Id.* "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance,* 556 U.S. 111, 122, 129 S.Ct. 1411, 1413–14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

When judging whether a state court ruling was contrary to or an unreasonable application of Supreme Court precedent, a federal court measures state court decisions "against [the Supreme] Court's precedents as of the time the state court renders its decision." *Cullen v. Pinholster*, 563 U.S. 170, 182, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).

### DISCUSSION

Garlick's habeas petition meets the standard set forth in § 2254(d)(1). The First Department unreasonably applied clearly established law when it affirmed Garlick's conviction.  The Court having adopted the portions of the R&R to which Respondent objects, Petitioner's objections are disposed of as follows.

I.    **The First Department's decision was not "contrary to" Supreme Court Precedent.**

In discussing the impact of the scope of habeas review on Garlick's petition, the R&R focuses entirely on the unreasonable application prong.  Petitioner's first two objections claim that Judge Cave committed error by passing over the "contrary to" prong.  Had she not done so, the magistrate would have enjoyed free reign to "determine the principles necessary to grant relief," as opposed to deferring to the rule announced by the state court, and determining whether that rule was applied correctly.  *Lafler v. Cooper*, 566 U.S. 156, 173, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012) (citing *Panetti v. Quarterman*, 551 U.S. 930, 948, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007)).

The "contrary to" prong is inapplicable in this case.  A state court decision is only contrary to Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in our cases," or "confront a set of fact that are materially indistinguishable from a decision of [the Supreme] Court and arrives at a different result from out precedent."  *Williams*, 529 U.S. at 405-6.  Neither is the case here.  The First Department located the correct rule: out-of-court statements are only subject to confrontation to the extent that they are testimonial.  And, although not subject to a different legal rule than those addressed in *Crawford*, *Melendez-Diaz*, and *Bullcoming* (as will be discussed in greater detail below), the out-of-court statements at issue here were collected in manner factually distinguishable from the circumstances presented to the Supreme Court in those cases.

Because it identified the correct rule and applied it to facts distinguishable from the Court's prior decisions, the First Department's decision was not "contrary to" Supreme Court

Precedent, and Judge Cave correctly focused on whether the state court had unreasonably applied the relevant law. Therefore, Petitioner's first two objections to the R&R are overruled.

## II.     The First Department's decision was an unreasonable application of clearly established law.

The R&R concluded that the Supreme Court's Confrontation Clause precedent was not "clearly established" at the time of the First Department's decision, and thus the decision could not merit habeas relief under either prong.  (R&R 55-59.)  Garlick objects to that finding.  This Court agrees, and concludes that the First Department unreasonably applied clearly established law when affirming Garlick's conviction.  For the following reasons, Petitioner's third objection to the R&R is sustained.

As an initial matter, Garlick was not required to find a Supreme Court opinion holding autopsy reports testimonial in order to prevail on his claim that "clearly established law" mandated a different result in his case.  The federal habeas statute does not demand "an identical factual pattern before a legal rule must be applied."  *White v. Woodall*, 572 U.S. 415, 427, 134 S.Ct. 1697, 188 L.Ed.2d 698 (2014).  So the question raised by Garlick's petition is not whether autopsy reports are testimonial, but whether the First Department unreasonably applied the Supreme Court's precedents to conclude that a certified report (of any kind), prepared in the course of a criminal investigation and tending to prove the victim's cause and manner of death, was testimonial in nature.

There are, no doubt, many types of forensic reports containing the types of statements deemed testimonial in *Crawford*, *Melendez-Diaz*, and *Bullcoming*.  But the fact that different types of documentation exist does not mean that each type must be deemed subject to the Supreme Court's recent Confrontation Clause precedents before those precedent can be applied to them.  The relevant question in all such cases is whether the out-of-court statements are

11

testimonial in nature, not what label appears on the document that the prosecution seeks to introduce to bring those statements into evidence.  The Supreme Court's Confrontation Clause precedents clearly instruct courts to examine the nature of potentially testimonial statements -- rather than the classification of the document in which they appear -- to determine whether the statement triggers the defendant's right to confront the speaker.

Nor do disagreements between lower state and federal courts on the testimonial nature of particular autopsy reports preclude a finding of "clearly established law" in the area of out-of-court certifications.  The habeas statute is clear: it is the word of the Supreme Court, and only the Supreme Court, that matters when determining what is "clearly established law."  28 U.S.C. § 2254(d)(1).  As the court made clear in *Marshall v. Rodgers*, 569 U.S. 58, 133 S.Ct. 1446, 185 L.Ed.2d 540 (2013), lower courts are not free to "canvass circuit decisions to determine whether a particular rule of law . . . would, if presented to the Court, be accepted as correct." 569 U.S. at 64.  Respondent may not substitute conflicts between lower courts in cases that happen to apply *Crawford* and its progeny to autopsy reports for "clearly established law" announced by the Supreme Court regarding certified out-of-court statements made in the course of a criminal investigation.

Limiting "clearly established law" to the statutory definition quickly reveals that the First Department unreasonably applied the Supreme Court's precedents when denying Garlick's appeal. The court ruled that the autopsy report was not testimonial since it did "not link the commission of the crime to a particular person," *Garlick*, 44 A.D.3d at 606, even though *Melendez-Diaz* definitively did away with the accusatory/non-accusatory distinction some seven years earlier. *Melendez-Diaz*, 557 U.S. at 313-14.  What is more, the First Department ignored the holding in *Bullcoming* that the only sensible way to read the Supreme Court's prior

12

Confrontation Clause decisions demands that a certified statement prepared during a criminal investigation which tends to prove some fact in the case is testimonial in nature. *Id.* at 663.

*Bullcoming* not only demonstrates the merit of Garlick's petition; it also fits quite neatly with *Harrington*'s formulation of the "unreasonable application" standard, which denies relief to any petition that challenges a state court ruling subject to "fairminded disagreement." *Harrington*, 562 U.S. at 103. But fairminded jurists could not possibly disagree about the testimonial nature of certified reports prepared to aid a criminal investigation, given that the Supreme Court previously held that those reports are testimonial and that its precedents "cannot sensibly be read any other way." *Bullcoming*, 564 U.S. at 663.

As for *Vega* and *Soler* – two cases from this Circuit that Judge Cave cited for the proposition that the Supreme Court "has not developed a clear set of rules" governing the testimonial nature of autopsy reports (R&R at 58) – they provide no insight into the state of "clearly established law" at the time that the First Department affirmed Garlick's conviction. That is because a federal court reviewing a state court decision must " 'focus on what a state court knew and did,' and . . . measure state-court decisions 'against this Court's precedents *as of the time the state court renders its decision*." *Green v. Fisher*, 565 U.S. 34, 38, 132 S.Ct. 38, 181 L.Ed.2d 336 (2011) (emphasis in original) (quoting *Cullen*, 563 U.S. at 182). That date, the R&R correctly stated, was November 29, 2016, several years after the Supreme Court decided the cases relevant to this petition. (R&R at 13.)

Neither Vega nor Soler could avail themselves of the Confrontation Clause principles announced in *Melendez-Diaz* and *Bullcoming* that the First Department disregarded when affirming Garlick's conviction. *Vega* challenged a conviction affirmed in 2005. *Vega*, 669 F.3d at 125. *Soler* challenged a federal conviction, as opposed to a state court decision, under 28

U.S.C. § 2255(d)(1), arguing that he received ineffective assistance of counsel at his 2007 trial when his attorney failed to raise a Confrontation Clause objection to the introduction of a forensic report. *Soler*, 2015 WL 4879170, at *16. The court in *Soler* denied the petition on the grounds that an attorney in 2007 could not have anticipated the Supreme Court's subsequent decisions, which "represented a distinct change in the state of the law." *Id.* Therefore, both *Vega* and *Soler* highlight the importance of the Supreme Court's post-2007 Confrontation Clause decisions, which expressly eliminated the accusatory witness distinction on which the First Department rested its decision, and which made clear that statements contained within certified reports composed in the course of a criminal investigation are testimonial in nature.

For the same reason that it would be unfair to state courts (and a misapplication of § 2254(d)(1)) to second-guess their judgment in light of law that only became "clearly established" after they delivered a final decision on the merits, *see, e.g.*, *Greene*, 565 U.S. at 38, it would be unfair to Garlick deny him the benefit of the holdings in *Melendez-Diaz* and *Bullcoming*. Taking the view from 2016, as this Court must, the First Department's affirmance was an unreasonable application of clearly established law regarding the testimonial nature of certified out-of-court statements.

## CONCLUSION

I hereby adopt the following conclusions from the R&R: (i) the Autopsy Report was testimonial; (ii) surrogate testimony from a qualified expert in medical examination was not a sufficient substitute for cross examination; (iii) the First Department's ruling on the testimonial nature of the autopsy report was incorrect under Supreme Court precedent; and (iv) the trial court's admission of the autopsy report without providing Garlick the opportunity to confront the medical examiner who prepared it did not constitute harmless error.  I do not adopt the portion of

the R&R recommending denial of the petition on the grounds that the First Department's

decision was not an unreasonable application of clearly established law.

 For the reasons set forth above, Garlick's habeas petition is GRANTED. Accordingly,

Respondent is directed to release Garlick from custody unless the People of the State of New

York decide to re-try him within the next ninety days. Because I have granted the petition, there

is no need to issue a Certificate of Appealability for purposes of appeal. The Clerk of the Court is

directed to close this case.


Dated: June 2, 2020

                _____

                     Chief Judge


BY ECF TO ALL PARTIES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
JAMES GARLICK,

                               Petitioner-appellee,
                                                                  **NOTICE OF APPEAL**

                  -against-                                   18 Civ. 11038 (CM) (SLC)


WILLIAM LEE, Superintendent, Eastern Correctional
Facility

                                Respondent-appellant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       PLEASE TAKE NOTICE that WILLIAM LEE, Superintendent of Eastern Correctional

Facility, hereby appeals from each and every part of the written decision and order of the United

States District Court for the Southern District Of New York (Hon. Colleen McMahon), entered on June

2, 2020, which granted the petition for a writ of habeas corpus and ordered the petitioner's release from

the custody of the New York State Department of Corrections and Community Services unless the People

of the State of New York retry him within ninety days from the date of the aforementioned order.


DATED:        Bronx, New York
                  June 9, 2020

                                             Yours etc.
                                             Joshua P. Weiss
                                             Office of the Bronx District Attorney
                                             198 East 161st Street
                                             Bronx, New York 10451
                                            (718) 838-6229
                                             weissjo@bronxda.nyc.gov


CC:      Matthew Bova, Esq.
          Attorney for petitioner
          Center for Appellate Litigation
          120 Wall Street
          New York, NY 10005
          (via ECF)

A-171

 **OFFICE OF THE DISTRICT ATTORNEY, Bronx County**

---

**DARCEL D. CLARK**
**District Attorney**

**198 East 161st Street**
**Bronx, New York 10451**

**(718) 838-6144**
**Fax  590-6523**

June 24, 2020

Hon. Colleen McMahon
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York, 10007

Re:   *Garlick v Lee*
Case 18 Civ. 11038 (CM) (SLC)

Re: Notice of intent to retry petitioner

Your Honor:

    I represent appellant William Lee in the above-captioned matter. By a decision and order, dated June 2, 2020, this Court granted the petitioner's federal habeas petition and ordered his release from the custody of the New York State Department of Corrections and Community Supervision (DOCCS) unless the People of the State of New York decide to retry petitioner within ninety days of the order. The State is presently in the process of perfecting an appeal from that order in the Second Circuit and has been granted a deadline of August 31, 2020 by which to file its appellant's brief.

    Pursuant to this Court's order, I write to advise that the Office of the Bronx District Attorney intends to retry petitioner on the original indictment if the State's efforts to obtain reversal of the decision awarding habeas relief, after pursuing all available avenues of appeal, are unsuccessful.

    Thank you for your consideration in this matter.

Respectfully submitted,

*Joshua P. Weiss*

Joshua P. Weiss
Assistant District Attorney

A-172

Bronx District Attorney's Office
(516) 316-5355

cc:    (via ECF)
       Matthew Bova
       Attorney for Petitioner-Defendant
       Center for Appellate Litigation
       120 Wall Street, 28th Floor
       New York, NY 10005

# APPENDIX A

Friedman, J.P., Sweeny, Saxe, Kapnick, Gesmer, JJ.

2333    The People of the State of New York,    Ind. 3681/11
                        Respondent,

                -against-

        James Garlick,
                Defendant-Appellant.

-------------------------

Robert S. Dean, Center for Appellate Litigation, New York
(Matthew Bova of counsel), for appellant.

Darcel D. Clark, District Attorney, Bronx (Jordan K. Hummel of
counsel), for respondent.

-------------------------

    Judgment, Supreme Court, Bronx County (Denis J. Boyle, J.),
rendered November 1, 2013, convicting defendant, after a jury
trial, of manslaughter in the first degree, and sentencing him,
as a second felony offender, to a term of 20 years, unanimously
affirmed.

    The court properly denied defendant's midtrial request for a
protective order pursuant to CPL 240.50(1) as to a surveillance
videotape of the incident.  That provision was inapplicable,
because discovery had already concluded.  In any event, the risk
that jurors might view media coverage of the case, in violation
of the court's thorough admonitions against doing so, did not
present circumstances sufficiently compelling to rebut the
presumption of the public's right to access a trial exhibit
pursuant to the common law (*see In re Application of Natl.*

2a

*Broadcasting Co. [United States v Myers]*, 635 F2d 945, 952–953
[2d Cir 1980]) and the First Amendment (*see Mosallem v Berenson*,
76 AD3d 345, 349 [1st Dept 2010]).  The prosecutor did not make
the videotape available to the news media until after it had been
received in evidence and played for the jury in open court.  We
have considered and rejected arguments concerning preservation
and the scope of our review.

The court properly exercised its discretion in declining to
conduct individual inquiries of two jurors as to whether they had
violated the court's repeated instructions against viewing news
coverage of the case, following the revelation that a local TV
news station had aired part of the video with inflammatory
commentary.  The court asked the entire jury panel if anyone had
seen any media coverage, and it dismissed the only juror who
admitted to having done so, after the court conducted an
individual inquiry of that juror and then asked the entire panel
about this matter a second time, before the jurors were able to
see that the one juror was dismissed.  Defense counsel's
statement that the facial expressions of the two jurors at issue,
which the court had not perceived, suggested they might have
violated the instructions did not compel individual inquiries
under the circumstances (*see People v Joaquin*, 138 AD3d 422, 422
[1st Dept 2016], *lv denied* 28 NY3d 931 [2016]; *see also People v*

*Mejias*, 21 NY3d 73, 79-80 [2013]).

"Defendant's right of confrontation was not violated when an autopsy report prepared by a former medical examiner, who did not testify, was introduced through the testimony of another medical examiner" (*People v Acevedo*, 112 AD3d 454, 455 [1st Dept 2013], *lv denied* 23 NY3d 1017 [2014]), since the report, which "d[id] not link the commission of the crime to a particular person," was not testimonial (*People v John*, 27 NY3d 294, 315 [2016]). Defendant's contention that *People v Freycinet* (11 NY3d 38 [2008]) has been undermined by subsequent decisions of the United States Supreme Court is unavailing (*see Acevedo*, 112 AD3d at 455).

We perceive no basis for reducing the sentence.

THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED:    NOVEMBER 29, 2016

CLERK

APPENDIX B

# State of New York
# Court of Appeals

BEFORE: HON. SHEILA ABDUS-SALAAM, Associate Judge

THE PEOPLE OF THE STATE OF NEW YORK,

|  | Respondent, | **ORDER** |
| -against- |  | **DENYING** |
|  |  | **LEAVE** |

JAMES GARLICK,

Appellant.

Appellant having applied for leave to appeal to this Court pursuant to Criminal Procedure Law § 460.20 from an order in the above-captioned case;*

UPON the papers filed and due deliberation, it is

ORDERED that the application is denied.

Dated:     MAR 0 3 2017

*Sheila Abdus-Salaam*

Associate Judge

*Description of Order: Order of the Appellate Division, First Department, entered November 29, 2016, affirming a judgment of Supreme Court, Bronx County, rendered November 1, 2013.

No. 17A-_____

---

IN THE

# Supreme Court of the United States

---

JAMES GARLICK,

*Petitioner,*

*v.*

STATE OF NEW YORK,

*Respondent.*

---

On Petition for a Writ of Certiorari
to the Appellate Division, Supreme Court of
New York, First Judicial Department.

---

## PETITION FOR A WRIT OF CERTIORARI

---

Jeffrey L. Fisher
Stanford Law School
   Supreme Court Litigation Clinic
559 Nathan Abbott Way
Stanford, CA  94305

Robert S. Dean
   *Counsel of Record*
Center For Appellate Litigation
120 Wall Street, 28th Floor
New York, New York 10005
(212) 577-2523 ext. 502
rdean@cfal.org

---

## QUESTION PRESENTED

Whether a certified autopsy report—created as part of a homicide investigation and asserting that the cause of death was homicide—is "testimonial" under the Confrontation Clause framework established in *Crawford v. Washington*, 541 U.S. 36 (2004)?

## TABLE OF CONTENTS

QUESTION PRESENTED ................................................................. i

TABLE OF CONTENTS .................................................................. ii

TABLE OF AUTHORITIES ............................................................ iii

PETITION FOR A WRIT OF CERTIORARI ................................... 1

OPINIONS BELOW ...................................................................... 1

JURISDICTION ............................................................................ 1

RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS ...... 1

STATEMENT OF THE CASE ......................................................... 2

REASONS FOR GRANTING THE WRIT ................................... 11

   I.    Courts Are Intractably Divided Over Whether Autopsy Reports, Created as Part of a Homicide Investigation and Asserting that the Cause of Death Was Homicide, Are Testimonial ............................ 11

   II.  The Question Presented is Important to the Administration of Justice and Should be Settled Now ................................................. 16

   III. This Case Is an Ideal Vehicle for Resolving the Issue. .................. 19

   IV. The Appellate Division's Decision Contravenes This Court's Precedents. .......................................................... 22

CONCLUSION ............................................................................ 32

APPENDICES

Appendix A, Opinion of the Appellate Division, Supreme Court of New York, First Judicial Department ......................................................... 1a

Appendix B, Decision of the New York Court of Appeals Denying Leave to Appeal ...................................................................................... 4a

Appendix C, Autopsy Report, State Trial Exhibit 1 ................................. 5a

Appendix D, *People v. Freycinet*, 892 N.E.2d 843 (N.Y. 2008) ................ 16a

# TABLE OF AUTHORITIES

## Cases

*Ackerman v. State,* 51 N.E.3d 171 (Ind. 2016),
  *cert. denied* 137 S. Ct. 475 (2016) ...................................... 12

*Bullcoming v. New Mexico,* 564 U.S. 647 (2011) ...................................... passim

*Commonwealth v. Brown,* 139 A.3d 208 (Pa. App. 2016) ............................... 12

*Crawford v. Washington,* 541 U.S. 36 (2004) .......................................... passim

*Davis v. Washington,* 547 U.S. 813 (2006) .............................. 11, 28

*Diaz v. United States,* 223 U.S. 442 (1912) ...................... 24

*Giles v. California,* 554 U.S. 353 (2008) ...................... 24, 31

*King v. Turner,* 1 Mood. 347, 168 Eng. Rep. 1298 (1832) ................. 26

*Kirby v. United States,* 174 U.S. 47 (1899) .......................... 26

*Melendez-Diaz v. Massachusetts,* 557 U.S. 305 (2009) ........................... passim

*Michigan v. Bryant,* 564 U.S. 344 (2011) ........................... 25

*Miller v. State,* 313 P.3d 934 (Okla. Crim. App. 2013) ................ 12

*People v. Acevedo,* 112 A.D.3d 454 (N.Y. App. Div. 2013)......................... 10, 14

*People v. Dungo,* 286 P.3d 442 (Cal. 2012) ................................. 13, 16, 29, 30

*People v. Edwards,* 306 P.3d 1049 (Cal. 2013),
  *cert. denied* 134 S. Ct. 2662 (2014). ................................ 16

*People v. Freycinet,* 892 N.E.2d 843 (N.Y. 2008) .................................... passim

*People v. John,* 52 N.E.3d 1114 (N.Y. 2016)............................... 10, 13

*People v. Leach,* 980 N.E.2d 570 (Ill. 2012) ................................. 13, 14, 15, 25

*People v. Lopez,* 72 A.D.3d 593 (N.Y. App. Div. 2010) ...................... 21

*People v. Pealer*, 985 N.E.2d 903 (N.Y. 2013) ..................................... 13

*Rosario v. State*, 175 So.3d 843 (Fla. App. 2015) ............................. 13

*State v. Bass*, 132 A.3d 1207 (N.J. 2016) ...................................... 12, 13

*State v. Frazier*, 735 S.E.2d 727 (W. Va. 2012) ........................... 12, 13

*State v. Hutchison*, 482 S.W.3d 893 (Tenn. 2015) ................. 13, 15, 25

*State v. Locklear*, 681 S.E.2d 293 (N.C. 2009) ................................... 12

*State v. Lui*, 315 P.3d 493 (Wash. 2014),
   *cert. denied*, 134 S. Ct. 2842 (2014) ...................................... 15, 27

*State v. Maxwell*, 9 N.E.3d 930 (2014),
   *cert. denied* 135 S. Ct. 1400 (2015) ...................................... passim

*State v. Medina*, 306 P.3d 48 (Ariz. 2013),
   *cert. denied* 134 S. Ct. 1309 (2014) ............................................ 13

*State v. Navarette*, 294 P.3d 43 (N.M. 2013),
   *cert. denied* 134 S. Ct. 64 (2013) ......................................... 12, 13

*United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012)............... 13

*United States v. James*, 712 F.3d 79 (2d Cir. 2013) ......................... 20

*United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2012) ...................... 13

*Williams v. Illinois*, 132 S. Ct. 2221 (2012) .............................. passim

*Wood v. State,* 299 S.W.3d 200 (Tex. App. 2009)............................... 13

## Statutes and Constitutional Provisions

28 U.S.C. § 1257 ....................................................................................... 1

N.Y. City Charter § 557 ................................................................... 2, 6, 23

N.Y. Civ. Practice Laws and Rules § 4518 ......................................... 6

N.Y. County Law § 677 ................................................................... 1, 6, 23

U.S. Const., amend. VI......................................................................1, 11

## Other Authorities

Balko, Radley, *The Saga of Shawn Parcells, the Uncredited Forensics 'Expert' in the Michael Brown Case*, Wash. Post (Dec. 2, 2014)................................17

Cooley, Craig M., *Reforming the Forensic Science Community to Avert the Ultimate Injustice,* 15 Stan. L. & Pol'y Rev. 381 (2004) .............................17

Evidence-Official Records-Coroner's Inquest, 65 U. Pa. L. Rev. 290 (1917)...24

Ginsberg, Marc D., *The Confrontation Clause and Forensic Autopsy Reports— a "Testimonial,"* 74 La. L. Rev. 117 (2013) ...................................................12

Higley, Andrew, *Tales of the Dead: Why Autopsy Reports Should Be Classified As Testimonial Statements Under the Confrontation Clause*, 48 New Eng. L. Rev. 171 (2013) ......................................................................................12

Homepage, NYC Office of Chief Medical Examiner, *available at* http://www1.nyc.gov/site/ocme/index.page ...................................................17

Mnookin, Jennifer L., *Expert Evidence and the Confrontation Clause After Crawford v. Washington*, 15 Brooklyn J.L. & Pol'y 791 (2007) ....................32

Molko, Robert, *The Law of Unintended Consequences Strikes Again: Does Murder Have a Statute of Limitations Now? The Sky Will Fall Unless the Supreme Court Changes Its Interpretation of the Right of Confrontation*, 63 Drake L. Rev. 527 (2015).............................................................................12

National Academy of Sciences, *Strengthening Forensic Science in the United States: A Path Forward* (2009)..........................................................17, 18, 19

National Association of Medical Examiners, *Forensic Autopsy Performance Standards* (2006), *available at* http://www.mtf.org/pdf/name_standards_2006.pdf........................................18

Robertson, Campbell, *Questions Left for Mississippi Over Doctor's Autopsies*, N.Y. Times (Jan. 7, 2013)........................................17, 18

Tsiatis, George M., *Putting Melendez-Diaz on Ice: How Autopsy Reports Can Survive the Supreme Court's Confrontation Clause Jurisprudence*, 85 St. John's L. Rev. 355 (2011) ...........................................................................18

Vasalech, Crystal, *Autopsy Reports Are a Victim's Last Statement: the Residual Exception and Surrogate Testimony*, 37 T. Jefferson L. Rev. 473 (2015) ................................................................................................ 12

Zabrycki, Carolyn, Comment, *Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement*, 96 Cal. L. Rev. 1093 (2008) ...................................................... 29, 31

## PETITION FOR A WRIT OF CERTIORARI

Petitioner James Garlick respectfully petitions for a writ of certiorari to review the judgment of the Appellate Division, Supreme Court of New York, First Judicial Department.

## OPINIONS BELOW

The opinion of the Appellate Division, Supreme Court of New York, First Judicial Department, Pet. App. 1a, is published at 144 A.D.3d 605. The opinion of the New York Court of Appeals denying leave to appeal, Pet. App. 4a, is published at 29 N.Y.3d 948. The relevant proceedings and order from the trial court are unpublished.

## JURISDICTION

The judgment of the Appellate Division was entered on November 29, 2016. Pet. App. 1a-3a. On March 3, 2017, the New York Court of Appeals denied leave to appeal. Pet. App. 4a. On May 18, 2017, Justice Ginsburg extended the time for filing a petition for a writ of certiorari to and including July 3, 2017. *See* No. 16A1124. This Court has jurisdiction under 28 U.S.C. § 1257(a).

## RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

New York County Law § 677(4) provides: "The . . . medical examiner shall promptly deliver to the district attorney copies of all records pertaining to any death

whenever, in his opinion, or in the judgment of the person performing the autopsy, there is any indication that a crime was committed."

New York City Charter § 557 (g) provides: "The chief medical examiner shall keep full and complete records in such form as may be provided by law. The chief medical examiner shall promptly deliver to the appropriate district attorney copies of all records relating to every death as to which there is, in the judgment of the medical examiner in charge, any indication of criminality. Such records shall not be open to public inspection."

## STATEMENT OF THE CASE

The Confrontation Clause generally prohibits the prosecution from introducing "testimonial" statements from witnesses without putting the witnesses on the stand to face cross-examination. *Crawford v. Washington*, 541 U.S. 36 (2004). In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), this Court held that formalized forensic reports fall within the "'core class of testimonial statements.'" *Id.* at 310 (quoting *Crawford*, 541 U.S. at 51). Two years later, *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), confirmed that there is no "'forensic evidence' exception" to the Confrontation Clause. *Id.* at 658-59 (citing *Melendez-Diaz*, 557 U.S. at 317-21). "An analyst's certification prepared in connection with a criminal investigation or prosecution . . . is 'testimonial,' and therefore within the compass of the Confrontation Clause." *Id.*

This case presents an important question which has intractably split state courts of last resort and federal courts of appeals: whether the rule of *Melendez-Diaz* and

*Bullcoming* applies to autopsy reports that are prepared as part of a homicide investigation and assert that the cause of death was homicide. This issue is important to the administration of justice and has sufficiently percolated throughout state supreme courts. This Court should resolve the issue now.

1. At 6:20 p.m. on November 1, 2011, the police responded to a report of an assault at an apartment building in The Bronx. Trial Transcript ("Tr.") 156-57, 169. Inside the building's lobby, the police found Gabriel Sherwood lying on the ground bleeding. The police secured the "crime scene" and an officer brought Sherwood to the hospital. Tr. 158-59. Within five minutes of his arrival at the hospital, Sherwood was pronounced dead.

That evening, the police launched a homicide investigation. They began by reviewing the apartment building lobby's surveillance video. The video indicated that a male struggled with the victim on the ground inside the lobby. Then, a female forcefully struck the victim in the skull over a dozen times. The two assailants then left the building.

Around midnight, the investigation's lead detective (Detective DeGrazia) concluded that Johanna Rivera was the female who had repeatedly struck Sherwood in the head, and the detective arrested her in her home. Rivera informed the detective that petitioner was the male assailant depicted in the surveillance video.

The next morning, the District Attorney's Office authorized the police to charge Johanna Rivera with intentional murder under the theory that her blows to

Sherwood's head caused Sherwood's death. Tr. 250, 291; Suppression Hearing Tr. 29, 40. The lead detective then notified the New York City Police Department that petitioner was the male suspect depicted on the video by issuing a department-wide notification at 4:45 a.m. to arrest him. Tr. 188-89; Suppression Hearing Tr. 45-47.

Also that morning, Dr. Katherine Maloney of the New York City Office of Chief Medical Examiner ("OCME") performed an autopsy on the victim. Dr. James Gill was present at the autopsy, as were two homicide detectives. Pet. App. 8a; Tr. 243. Before the autopsy, OCME staff conversed with the lead detective (DeGrazia) and prepared a "Notice of Death" form, stating: "Circumstances of death: App. Manner: Homicide."

Later that day, Dr. Maloney drafted an autopsy report in which she declared that the cause of death was a stabbing—not blows to the head. Pet. App. 7a-12a. She then notified the police of her findings. Tr. 277. After receiving this information, the NYPD declined to pursue murder charges against Rivera and instead charged petitioner with murder. Tr. 276-77.[1]

2. About a week later, the police arrested petitioner for murder. During an interrogation, petitioner stated that he had arrived at the scene because his girlfriend had frantically told him that Sherwood was sexually harassing and threatening her. Tr. 194-95; Trial Ex. 4 (written statement). When he arrived at the scene, he got into

---

[1] Rivera was ultimately indicated for assault and pled guilty to assault.

a fist fight with Sherwood outside the apartment building, which then spilled into the building's lobby. During the fight, Sherwood brandished a knife and the two struggled for it. Tr. 194-95; Trial Ex. 4. As petitioner explained: "All I was trying to do was defend myself and my girlfriend. It was a tragedy. This wasn't supposed to happen and I'm sorry for my part in this. I wasn't trying to hurt anybody." Trial Ex. 4.

Shortly thereafter, the State indicted petitioner for intentional murder, voluntary manslaughter (intent to cause serious physical injury), and assault.

More than a month after the indictment was issued, Dr. Maloney completed and signed the final version of her autopsy report. At the beginning of her comprehensive report, Dr. Maloney "certif[ied]" that she performed the victim's autopsy. Pet. App. 8a. She then asserted that the "manner of death" was "homicide" and that a "stab wound of [the] torso with perforation of heart" "cause[d] the death." Pet. App. 7a. Dr. Maloney also claimed that the "depth of penetration" of the purportedly fatal wound to the left chest was "4-1/2 to 5-1/2" inches. Pet. App. 9a. This fatal wound "perforated the heart," collapsed the lung ("the lung is atelectatic"), and led to the loss of 1.5 liters of blood. Pet. App. 9a. Dr. Maloney further noted in her report that the victim had "blunt impact injuries of [the] head," numerous "abrasions" of the head and face, and "contusions of the face." Pet. App. 7a, 10a. She asserted, however, that her "internal examination" of the head indicated no "scalp contusions" or skull "fracture[s]." Pet. App. 10a. "There is no epidural, subdural or subarachnoid hemorrhage. The brain has no contusions." Pet. App. 10a

5

OCME certified the autopsy report as a business record under New York's statutory business-record rule and "affixed the official seal of the office of the Chief Medical Examiner of the City of New York" to the report. Pet. App. 6a ("Certification as a Business Record"); *see also* N.Y. Civ. Practice Laws and Rules § 4518 (business records are admissible hearsay). As state and local law expressly mandate, OCME delivered the inculpatory report to the District Attorney's Office the very day Dr. Maloney signed it. Pet. App. 5a; N.Y. County Law § 677(4) ("The . . . medical examiner shall promptly deliver to the district attorney copies of all records pertaining to any death whenever, in his opinion, or in the judgment of the person performing the autopsy, there is any indication that a crime was committed."); *accord* N.Y. City Charter § 557(g).

3. At trial, the State proffered Dr. Maloney's autopsy report as its first exhibit. The State, however, refused to produce Dr. Maloney or Dr. Gill (the other medical examiner who was present during the autopsy) for live testimony subject to cross-examination. Instead, as its first witness, the State proffered Dr. Susan Ely, who had no involvement in the autopsy whatsoever. Pre-Trial Tr. 637; Tr. 46-47.

The State never claimed that that Dr. Maloney or Dr. Gill was unavailable. The medical examiners had simply changed offices; Dr. Maloney was working in upstate New York while Dr. Gill was working about an hour away in Stamford, Connecticut. Tr. 47-48; Pre-Trial Tr. 637. Nothing in the record suggests either witness could not have traveled to New York City for the trial.

Petitioner objected on Confrontation Clause grounds. He argued that the autopsy report was testimonial because it was a certified document and an "'objective witness [would] reasonably . . . believe that the . . . report would be available for use later at trial.[']" Pre-Trial Tr. 637-43 (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009)). The trial court overruled petitioner's objection, holding that the autopsy report was not testimonial. Tr. 20-22.

The State then called Dr. Ely as its first witness and introduced the autopsy report as Exhibit 1. Tr. 23, 33-34. Reciting the report, the surrogate witness claimed that the "actual cause of death" was a "stab wound of torso with perforation of heart" and that head trauma did not cause the death. Tr. 37, 44, 46.

The surrogate witness also contrasted "stab wounds" with "incised wounds." *See also* Pet. App. 9a-10a (autopsy report) (finding that two of the wounds were "stab wounds" to the chest while five of the wounds were "incised" wounds). Dr. Ely explained that a stab wound is a deep wound created by the tip of the knife entering the body, while an incised wound is created by the side of the knife laterally cutting the body. Tr. 36-37, 51-53. To distinguish between these wounds, a forensic pathologist must assess "certain characteristics that . . . forensic pathologists . . . are trained to recognize." Tr. 52. Specifically, the pathologist searches for a "very skinny triangle of a wound" that can only be observed upon a "very careful[ ]" examination. Tr. 52.

Defense counsel asked Dr. Ely if Dr. Maloney was certified in forensic pathology when she performed the autopsy. Dr. Ely answered, "I can't say for sure, I do not believe she was, but I'm not certain of that." Tr. 54-55. And when asked if the autopsy report "support[ed] the conclusion that the instrument that caused the wounds was being held by two people at the same time"—thus indicating a struggle for the knife— Dr. Ely answered: "The autopsy report wouldn't tell me that information." Tr. 48-49.

The State also contended at trial that the surveillance video established cause of death and homicidal intent, that is, intent to kill or cause serious physical injury. But, as the trial court found during the charge conference, "[t]he video itself presents a jury question whether a knife or sharp object is visible on the film." Tr. 415. Further, the video fails to foreclose the possibility that petitioner inadvertently hurt Mr. Sherwood with the knife during a struggle for it. Trial Ex. 5. Finally, the video does not clearly indicate whether or not Rivera had an object in her hand when she was striking Sherwood in the head. *Id.*

At the close of the evidence, petitioner requested that the court instruct the jury to consider the lesser-included count of intentional assault (intent to cause physical injury). Tr. 380. Petitioner pressed that "intent is an issue in this case, an issue that the People have to prove beyond a reasonable doubt, and it is a questionable jury question based on the evidence that was adduced at trial." Tr. 382. The State resisted such an instruction, stressing that the autopsy report concluded that "[t]here are seven stab wounds here, . . . a stab to the heart, collapsed lung, one stab caused the

8

victim to lose one and a half liters, one-third of the blood in his body. The stab designated A [in the autopsy report's body diagram], which is also a stab wound, pierced the diaphragm." Tr. 394-95; Pet. App. 15a.

Finding that a reasonable juror could conclude that petitioner's intent was merely to cause physical injury, the court agreed to submit the intentional assault charge to the jury. Tr. 415-16.

In summation, the prosecution again relied heavily upon the autopsy report:

> The victim here had seven knife injuries and also some bruises which didn't contribute to death.
>
> Let's talk about the wound that was the most damaging; a fatal wound, the most deadly wound. It's the wound that is designated as wound C [on the autopsy report's body diagram]. That wound perforated the victim's heart. It went through his heart. There was significant bleeding in his chest cavity. That stab wound alone cost Gabriel Sherwood one and one-half liters of blood. One-third of the blood in his body was lost by that one fatal stab. And that stab also caused him to suffer a collapsed lung. Another stab went through Mr. Sherwood's diaphragm. . . .
>
> Johanna is pounding him, she's punching and kicking him. And we know from the medical examiner none of that contributed in any way to death.
> . . .
>
> [I]t was made very clear that when the detective apprehended Johanna [after examining the surveillance video] he didn't know what the cause of death was. He didn't know it was a stab through the heart. And he said he wouldn't have charged Johanna with murder if he knew that.
>
> . . .
>
> And remember, the stab that did the killing, the deepest wound went in a distance of up to five and one-half inches. Five and one-half inches into the body of the victim.

9

Tr. 452-53, 454, 460, 466; Pet. App. 15a (diagram of the body).

After asking the judge during deliberations to "explain all three charges" again Tr. 527, the jury acquitted petitioner of intentional murder but convicted him of voluntary manslaughter. Tr. 541.

Petitioner was sentenced to 20 years of incarceration in prison.

4. On appeal to the Appellate Division, First Judicial Department, petitioner renewed his contention that the autopsy report was testimonial and thus inadmissible. Relying on precedent from the New York Court of Appeals, the Appellate Division rejected the argument:

> "Defendant's right of confrontation was not violated when an autopsy report prepared by a former medical examiner, who did not testify, was introduced through the testimony of another medical examiner" (quoting *People v. Acevedo*, 112 A.D.3d 454, 455 (N.Y. App. Div. 2013)), since the report, which "did not link the commission of the crime to a particular person," was not testimonial (quoting *People v. John*, 52 N.E.3d 1114 (N.Y. Ct. App. 2016). Defendant's contention that *People v. Freycinet*, 892 N.E.2d 843 (N.Y. 2008), has been undermined by subsequent decisions of the United States Supreme Court is unavailing (citing *Acevedo*, 112 A.D.3d at 455).

Pet. App. 3a.

5. Petitioner sought discretionary review of this Confrontation Clause claim before the New York Court of Appeals. Without comment, the court denied leave to appeal. Pet. App. 4a.

## REASONS FOR GRANTING THE WRIT

I. **Courts Are Intractably Divided Over Whether Autopsy Reports, Created as Part of a Homicide Investigation and Asserting that the Cause of Death Was Homicide, Are Testimonial.**

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const., amend. VI. "Witnesses" are those who give testimony. Accordingly, in *Crawford v. Washington*, 541 U.S. 36 (2004), this Court held that the Confrontation Clause regulates the admissibility of "testimonial" statements. 541 U.S. at 42-62. Under *Crawford*, the prosecution (absent narrow exceptions not pertinent here) cannot introduce testimonial statements unless the witness is unavailable and the defendant had a prior opportunity to cross-examine her. *Id.* at 53-54, 59.

*Crawford* stopped short of offering a comprehensive definition of "testimonial." *See* 541 U.S. at 68 & 68 n. 10. But in *Crawford*'s wake, this Court has held that out-of-court statements are testimonial if their primary purpose is to "establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006). And applying that test, this Court has twice held that certified scientific reports created to assist police investigations—first, a controlled-substance analysis and, second, a blood-alcohol analysis—are testimonial. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); *Bullcoming v. New Mexico*, 564 U.S. 647 (2011). On the other hand, this Court has held that an informal report drafted by a

private company to aid law enforcement agents' DNA analysis is not testimonial. *See Williams v. Illinois*, 132 S. Ct. 2221, 2242-44 (2012) (plurality opinion); *see also id.* at 2259-64 (Thomas, J., concurring in the judgment).

This Court has never considered how *Crawford* applies to autopsy reports. Lacking "clear guidance on this issue," state and federal courts have become intractably "split over whether an autopsy report is testimonial hearsay." *Ackerman v. State*, 51 N.E.3d 171, 180 (Ind. 2016), *cert. denied* 137 S. Ct. 475 (2016); *accord Commonwealth v. Brown*, 139 A.3d 208, 215 (Pa. App. 2016) ("We acknowledge that there is a sharp split in authority on whether autopsy reports are testimonial.").[2]

1. Six state courts of last resort and two federal courts of appeals have held since *Melendez-Diaz* that an autopsy report asserting the cause of death to be homicide is testimonial. *See State v. Bass*, 132 A.3d 1207, 1222-1227 (N.J. 2016); *State v. Navarette*, 294 P.3d 435, 440-42 (N.M. 2013), *cert. denied* 134 S. Ct. 64 (2013); *Miller v. State*, 313 P.3d 934, 967-71 (Okla. Crim. App. 2013); *Commonwealth v. Carr*, 986 N.E.2d 380, 398-400 (Mass. 2013); *State v. Frazier*, 735 S.E.2d 727, 730-32 (W. Va. 2012); *State v. Locklear*, 681 S.E.2d 293, 304-05 (N.C. 2009); *United States v.*

---

[2] The scholarly community is divided as well. *See* Robert Molko, *The Law of Unintended Consequences Strikes Again: Does Murder Have a Statute of Limitations Now? The Sky Will Fall Unless the Supreme Court Changes Its Interpretation of the Right of Confrontation*, 63 Drake L. Rev. 527 (2015); Crystal Vasalech, *Autopsy Reports Are a Victim's Last Statement: The Residual Exception and Surrogate Testimony*, 37 T. Jefferson L. Rev. 473 (2015); Andrew Higley, *Tales of the Dead: Why Autopsy Reports Should Be Classified As Testimonial Statements Under the Confrontation Clause*, 48 New Eng. L. Rev. 171 (2013); Marc D. Ginsberg, *The Confrontation Clause and Forensic Autopsy Reports—A "Testimonial,"* 74 La. L. Rev. 117 (2013).

*Ignasiak*, 667 F.3d 1217, 1229-35 (11th Cir. 2012); *United States v. Moore*, 651 F.3d 30, 69-73 (D.C. Cir. 2012). At least two state intermediate courts agree. *See Rosario v. State*, 175 So.3d 843, 854-58 (Fla. App. 2015); *Wood v. State,* 299 S.W.3d 200, 208-10 (Tex. App. 2009).

The reasoning of these decisions is straightforward: when the autopsy is conducted during an "active homicide investigation," its primary purpose is to "establish facts for later use" in prosecution. *Bass*, 132 A.3d at 1225; *see also, e.g., Navarette*, 294 P.3d at 440. This is especially so where, as here, state law mandates that autopsy reports finding homicide be provided to the prosecutor's office for use in a criminal case. *See Ignasiak*, 667 F.3d at 1231-32; *Frazier*, 735 S.E.2d at 731-32.

2. On the other side of the split, five state supreme courts since *Melendez-Diaz* have held that autopsy reports created as part of criminal investigations are nontestimonial. *See State v. Hutchison*, 482 S.W.3d 893, 905-14 (Tenn. 2015); *State v. Maxwell,* 9 N.E.3d 930, 945-52 (Ohio 2014), *cert. denied* 135 S. Ct. 1400 (2015); *State v. Medina*, 306 P.3d 48, 62-64 (Ariz. 2013), *cert. denied* 134 S. Ct. 1309 (2014); *People v. Leach,* 980 N.E.2d 570, 582-94 (Ill. 2012); *People v. Dungo*, 286 P.3d 442, 447-50 (Cal. 2012). The New York Court of Appeals reached the same conclusion just before *Melendez-Diaz* in *People v. Freycinet*, 892 N.E.2d 843, 845-46 (N.Y. 2008), and has adhered to that position in the wake of *Melendez-Diaz* and *Bullcoming. See People v. John*, 52 N.E.3d 1114, 1128 (N.Y. 2016); *People v. Pealer*, 985 N.E.2d 903, 905-08 (N.Y. 2013). Intermediate courts in New York have thus continued, as here, to treat

13

*Freycinet* as binding precedent. Pet. App. 3a; *see also People v. Acevedo*, 112 A.D.3d 454, 455 (N.Y. App. Div. 2013).

Like the courts whose views this Court rejected in *Melendez-Diaz*, these courts have advanced "a potpourri" of arguments. *See Melendez-Diaz*, 557 U.S. at 312.

a. Some courts hold that autopsy reports are nontestimonial because medical examiners are "authorized to perform autopsies in a number of situations, only one of which is when a death is potentially a homicide." *Maxwell*, 9 N.E.3d at 951. Thus, this reasoning goes, the primary purpose of an autopsy report is never to create evidence for a criminal trial. *Id.*

b. Other courts similarly hold that autopsy reports asserting that the cause of death was homicide are nontestimonial because an autopsy does not invariably support a criminal prosecution. *See Leach*, 980 N.E.2d at 591-92. For instance, an autopsy may be performed to rule out suicide or accident, or it might unexpectedly produce exculpatory evidence. *Id.*

c. The apparent "reliability" of autopsy reports has also entered the fray. Medical examiners, the New York Court of Appeals has asserted, are "independent" from police and prosecutors and cannot be "significantly affected by a pro-law-enforcement bias." *Freycinet*, 892 N.E.2d at 846. Furthermore, autopsy reports contain largely "contemporaneous, objective account[s] of observable facts," as opposed to debatable "exercise[s] of judgment." *Id.*

d. Still other courts, like the court here, have ruled autopsy reports nontestimonial because they do not "directly link defendant to the crime. [An autopsy] report is concerned only with *what* happened to the victim, not with *who* killed her." *Freycinet*, 892 N.E.2d at 846 (emphasis added), *cited in* Pet. App. 16a-19a; *accord Leach*, 980 N.E.2d at 592; *Hutchison*, 482 S.W.3d at 913-14.

e. Finally, courts have held that "policy" reasons justify deeming autopsy reports nontestimonial—thereby categorically exempting medical examiners from the requirements of the Confrontation Clause. Specifically, "[a] medical examiner who conducted an autopsy may be unavailable or deceased when a trial begins" and "a second autopsy may not be possible." *Maxwell*, 9 N.E.3d at 951. To ensure that a prosecution can proceed under such circumstances, the Ohio Supreme Court has held that autopsy reports are *never* testimonial, even if the medical examiner is perfectly available.

3. Two other state high courts have attempted to steer a middle course, although even these two courts disagree over what the proper rule should be. The Washington Supreme Court has held that statements in autopsy reports are testimonial when they have a directly "inculpatory effect," but not necessarily when they are incriminating only when assessed in combination with other evidence. *State v. Lui*, 315 P.3d 493, 510-11 (Wash. 2014), *cert. denied*, 134 S. Ct. 2842 (2014). The California Supreme Court has similarly held that "anatomical and physiological observations" in an autopsy report are not testimonial, while reserving decision on whether

"conclusions as to the cause of the victim's death" are testimonial. *Dungo*, 286 P.3d at 448-50; *see also People v. Edwards*, 306 P.3d 1049, 1087-90 & n. 12 (Cal. 2013), *cert. denied* 134 S. Ct. 2662 (2014).

4. The conflict over the status of autopsy reports created under the circumstances here is now deeply entrenched. Numerous state high courts have weighed in, and courts are no longer usefully contributing to any process of percolation. Only this Court can resolve the conflict over how the Confrontation Clause applies in this context.

## II. The Question Presented is Important to the Administration of Justice and Should be Settled Now.

1. The testimonial status of autopsy reports is a recurring issue whose resolution is necessary to the fair administration of justice. Indeed, *Crawford*'s application to autopsy reports is an issue that arises almost exclusively in homicide prosecutions—the most serious criminal cases; the convictions that trigger the longest sentences; and the only ones in state courts that can justify the death penalty. A uniform and proper construction of the Sixth Amendment is especially important in this context.

2. Confrontation of medical examiners is also essential to prevent wrongful convictions. This Court already has recognized that forensic analysts are sometimes "incompetent" or even "fraudulent." *Melendez-Diaz*, 557 U.S. at 319. And recent news reports confirm that medical examiners sometimes perform flawed or fraudulent

analyses.[3] It is therefore vital that defendants have the opportunity to cross-examine the authors of forensic reports to "expose any lapses or lies." *Bullcoming*, 564 U.S. at 662.

On a more subtle level, "[a] forensic analyst responding to a request from a law enforcement official may feel pressure—or have an incentive—to alter the evidence in a manner favorable to the prosecution." *Melendez-Diaz*, 557 U.S. at 318. As the National Academy of Sciences has explained, medical examiners "serve the criminal justice system as medical detectives by identifying and documenting pathologic findings in suspicious or violent deaths and testifying in courts as expert medical witnesses." National Academy of Sciences, *Strengthening Forensic Science in the United States: A Path Forward* 244 (2009); *see also* Homepage, NYC Office of Chief Medical Examiner, *available at* http://www1.nyc.gov/site/ocme/index.page (declaring that OCME "conducts independent investigations using advanced forensic science in the service of . . . the criminal justice system"). This is particularly true with respect to autopsy reports created during homicide investigations. As here, police officers

---

[3] *See* Radley Balko, *The Saga of Shawn Parcells, the Uncredited Forensics 'Expert' in the Michael Brown Case*, Wash. Post (Dec. 2, 2014); Campbell Robertson, *Questions Left for Mississippi Over Doctor's Autopsies*, N.Y. Times (Jan. 7, 2013); Craig M. Cooley, *Reforming the Forensic Science Community to Avert the Ultimate Injustice*, 15 Stan. L. & Pol'y Rev. 381, 401-02 (2004) ("The most obvious example of forensic fraud is the reporting of results for tests that were never performed. Ralph Erdmann, a forensic pathologist from Texas who was convicted of faking autopsies, has the distinction of being one of the foremost forensic fabricators. At least twenty death penalty convictions were obtained with the aid of his testimony.") (footnotes omitted).

typically converse with forensic examiners prior to, or during, such autopsies. And officers usually tell examiners how they think the death occurred.

In addition, forensic pathology involves a significant amount of subjectivity and judgment—far more than that involved in the drug or alcohol testing this Court analyzed in *Melendez-Diaz* and *Bullcoming*. [4] Unfortunately though, medical examiners sometimes display anything but the skill necessary for the task. A recent investigation in Mississippi, for example, revealed several wrongful convictions due to autopsies performed by "a forensic analyst with inadequate training" and questionable ethics "who was given far too much deference in the courts." Campbell Robertson, *Questions Left for Mississippi Over Doctor's Autopsies*, N.Y. Times (Jan. 7, 2013). Elsewhere in the Nation, medical examiner and coroner "systems function at varying levels of expertise, often with deficiencies in facilities, equipment, staff, education, and training." National Academy of Sciences, *Strengthening Forensic Science in the United States: A Path Forward* 247, 264-65 (2009). In fact, "there are no mandated national qualifications or certifications required for death investigators. Nor is medical expertise always required." *Id.* The field is so unregulated that even a

---

[4] *See* George M. Tsiatis, *Putting Melendez-Diaz on Ice: How Autopsy Reports Can Survive the Supreme Court's Confrontation Clause Jurisprudence*, 85 St. John's L. Rev. 355, 383 (2011) ("Autopsies are also much more complex than the identification of a narcotic, and are more prone to shades of gray, as their outcome is a diagnosis, not a chemical compound match."); *see also* National Association of Medical Examiners, *Forensic Autopsy Performance Standards*, Section B (2006), *available at* http://www.mtf.org/pdf/name_standards_2006.pdf (describing processes for arriving at "interpretation and opinions," as well as exercising "the discretion to determine the need for additional dissection and laboratory tests").

"17-year-old high school senior" has been "appointed [ ] deputy coroner" in one jurisdiction. *Id.* at 247.

3. The sooner this Court clarifies whether autopsy reports prepared for homicide investigations are testimonial, the sooner courts, institutions, and litigants can adapt to this Court's holding. For instance, if autopsy reports are testimonial, states and localities could take steps to ensure that important assertions in autopsy reports are admissible even if a report's author becomes unavailable. Some states require two medical examiners to be present at every autopsy performed as part of a homicide investigation, thus ensuring that if one becomes unavailable, the other can still testify and explain the report. Medical examiners can also take extra photographs or videos, and preserve extra samples to allow retesting if the original examiner becomes unavailable.

## III. This Case Is an Ideal Vehicle for Resolving the Issue.

Four aspects of this case make it perfect for resolving the question presented.

1. The case is procedurally clean. The prosecution introduced the autopsy report directly into evidence, thus foreclosing any possible argument that the testifying medical examiner merely rendered an "independent opinion about underlying testimonial reports *that were not themselves admitted into evidence.*" *Bullcoming*, 564 U.S. at 673 (Sotomayor, J., concurring in part) (emphasis added). And at each level of the New York courts, petitioner challenged the introduction of the autopsy report on Confrontation Clause grounds.

2. There can be no doubt that the autopsy report was created as part of a criminal investigation. At the time of the autopsy itself, petitioner was already a prime suspect. And at the time of the autopsy report's certification, signing, and delivery to the prosecution, petitioner had already been indicted for murder. *Compare United States v. James*, 712 F.3d 79, 99-102 (2d Cir. 2013) (autopsy report was nontestimonial because, at the time it was created, there was no indication of homicide).

The circumstances surrounding this autopsy are typical of cases involving autopsy reports created during homicide investigations. From the moment the body was delivered to the medical examiner's office, the police and medical examiners believed the death was a homicide. Investigating officers also spoke with the medical examiner before she conducted the autopsy, and they remained present while it occurred. Thus, when the medical examiner found the cause of death to be homicide, she knew her forensic findings would be used in a criminal prosecution.

3. The autopsy report is also certified, thus rendering it sufficiently formal to satisfy Justice Thomas's test for the testimonial status of forensic reports. *Compare Bullcoming*, 564 U.S. at 664-65 *with Williams*, 132 S. Ct. at 2259-61 (Thomas, J., concurring). Consequently, there is no chance that the Court will splinter as it did in *Williams*, where the lack of formality prevented a majority from coalescing.

4. Finally, the autopsy report played a critical role in this prosecution, and cross-examination could have revealed flaws in the medical examiner's assertions.

Dr. Maloney's conclusions in her autopsy report caused police and prosecutors to arrest and charge petitioner, as opposed to the woman they initially planned to indict, for the homicide. The State then used the report at trial to pinpoint the cause and manner of death.

The report was also crucial evidence supporting the prosecution's theory of homicidal intent. Petitioner testified that he did not intend to cause serious physical injury to Sherwood. Further, the surveillance footage indicates that petitioner may very well have unintentionally cut Sherwood during a struggle for the knife. But Dr. Maloney declared in her autopsy report that the cause of death was a stab wound with a "depth of penetration" of "4-1/2 to 5-1/2" inches. *See* Pet. App. 9a. Dr. Maloney further asserted that the stabbing pierced the heart and caused the loss of 1.5 liters of blood. Pet. App. 9a. The prosecutor emphasized these findings in summation, painting the picture of an effort to cause serious harm.

In light of the dynamics at issue in this case, the autopsy report played an important role in the jury's assessment of *mens rea. See People v. Lopez*, 72 A.D.3d 593, 593 (N.Y. App. Div. 2010) (depth of stab wound confirmed intent to cause serious injury). Yet had petitioner's confrontation rights been honored, he could have challenged the report's reliability by asking the forensic analyst:

- about her qualifications, which were in doubt;
- whether she was overworked at the time of the autopsy;
- whether her conclusions/observations were consistent with an accidental stabbing during a struggle for the knife;
- whether she omitted any information from the report;

- whether she had carefully considered competing cause-of-death hypotheses;
- whether there were any differences between her initial November 2, 2011 draft and her December 30, 2011 final report; and
- why she had left OCME.

The Confrontation Clause required the State to allow petitioner to ask these important questions before incarcerating him for two decades. *See Bullcoming*, 564 U.S. 647; *Melendez-Diaz*, 557 U.S. 305.

## IV. The Appellate Division's Decision Contravenes This Court's Precedents.

1. An autopsy report created as part of a homicide investigation and concluding that the death was caused by homicide is no different from the forensic statements this Court has previously held testimonial.

In *Melendez-Diaz*, this Court held that formalized forensic reports declaring that a seized substance was an illegal drug fall within the "core class of testimonial statements" covered by the Confrontation Clause. 557 U.S. at 310. Such reports are created "'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Id.* at 311 (quoting *Crawford*, 541 U.S. at 52). Furthermore, such reports are typically transmitted directly to law enforcement personnel and contain "the precise testimony [the witness] would be expected to provide if called at trial." *Id.* at 310.

In *Bullcoming*, this Court reaffirmed that "[a]n analyst's certification prepared in connection with a criminal investigation or prosecution . . . is 'testimonial' and therefore within the compass of the Confrontation Clause." 564 U.S. at 664-65.

Because state law in that case required the laboratory to assist the police investigation, there was no doubt the blood alcohol report at issue was "'made for the purpose of establishing or proving some fact' in a criminal proceeding." *Id.* at 664-65 (quoting *Melendez-Diaz*, 557 U.S. at 310).

*Melendez-Diaz* and *Bullcoming* dictate that autopsy reports created as part of a homicide investigation and asserting that the cause of death was homicide are testimonial. As in those cases, medical examiners know that, under such circumstances, their report will serve as crucial evidence in a criminal case. That is particularly true when, as here, investigating police officers are present during the autopsy and local law mandates that the analyst "assist in [state criminal] investigations" by forwarding the autopsy report promptly and directly to prosecuting authorities. *See Bullcoming*, 564 U.S. at 665; N.Y. County Law § 677(4) (requiring all autopsy reports finding homicide to be sent to the District Attorney); *accord* N.Y. City Charter § 557(g).

Furthermore, "the formalities attending" the autopsy report here are "more than adequate to qualify [the report] as testimonial." *Bullcoming*, 564 U.S. at 664-65. In *Bullcoming* and *Melendez-Diaz*, the analysts "prepared a certificate concerning the result of his analysis" and "formalized" the report in a "signed document headed 'a report.'" *Bullcoming*, 564 U.S. at 664-65; *Melendez-Diaz*, 557 U.S. at 308. And in *Bullcoming*, the report "contain[ed] a legend referring to municipal and magistrate

courts' rules that provide for the admission of certified blood-alcohol analyses." 564 U.S. at 664-65.

So too here, the autopsy report is headed "REPORT OF AUTOPSY" and bears the official seal of the Office of the Chief Medical Examiner of the City of New York. In the report, Dr. Maloney certified that she performed the autopsy and then signed the report, indicating a "draft" date and a "final" date. In turn, the Office of the Chief Medical Examiner formally certified the report as a business record for purposes of litigation, expressly citing state law authorizing the report's admission into evidence. The "formalities attending" this report are thus just like those attending the reports in *Bullcoming* and *Melendez-Diaz*.

2. History reinforces this testimonial analysis. As this Court recently recognized, "coroner's reports" were inadmissible under American common law without the opportunity for prior confrontation. *See Melendez-Diaz*, 557 U.S. at 322 (citing *Crawford*, 541 U.S. at 47 n. 2, *Giles v. California*, 554 U.S. 353, 398-401 (2008) (Breyer, J., dissenting), *and* Evidence-Official Records-Coroner's Inquest, 65 U. Pa. L. Rev. 290 (1917)). And long before *Crawford*, this Court explained that an autopsy report could not be admitted without the consent of the accused "because the accused was entitled to meet the witnesses face to face." *Diaz v. United States*, 223 U.S. 442, 450 (1912).

3. In an effort to sidestep this Court's precedents, the New York and other state courts have advanced a flurry of theories. They all fail.

a. It is true, as the Ohio Supreme Court has observed, that medical examiners do not invariably initiate an autopsy with a criminal investigation in mind. *Maxwell*, 9 N.E.3d at 950-51. It is also irrelevant. Here, as in thousands of autopsies performed every year, the medical examiner knew when conducting the autopsy that a homicide investigation was actively underway. And the medical examiner subsequently determined the cause of death to be homicide. Under those circumstances—the only circumstances that matter under the question presented—an autopsy report's primary purpose is to codify evidence for a criminal prosecution. *See, e.g., Bullcoming*, 564 U.S. at 663-64; *Melendez-Diaz*, 557 U.S. at 310 (quoting *Crawford*, 541 U.S. at 51); *see also Michigan v. Bryant*, 564 U.S. 344, 365 (2011) (the testimonial inquiry hinges on the "context" of the declaration).

b. It is likewise irrelevant that medical examiners sometimes conclude that the cause of death was suicide, an accident, or some other noncriminal occurrence. *See Leach,* 980 N.E.2d at 591-92. When examiners write, sign, and certify a report declaring that the cause of death was *homicide*, and then forward that report directly to the district attorney, the report's primary purpose is to support a criminal case.

c. Some state supreme courts have latched on to the theory that autopsy reports are nontestimonial because they do not prove "identity"—they instead prove the cause of death or *mens rea*. *Freycinet*, 892 N.E.2d at 846; *Leach*, 980 N.E.2d at 591-92; *Hutchison*, 482 S.W.3d at 913. The court below adopted that argument, holding that even though the report declared that petitioner, and not someone else,

committed the homicide, the report was nontestimonial because it "did not link the commission of the crime to a particular person." Pet. App. 3a.

This theory contravenes precedent and common sense. In *Melendez-Diaz*, the Commonwealth argued that narcotics "analysts are not subject to confrontation because they are not 'accusatory' witnesses, in that they do not directly accuse [defendants] of wrongdoing." 557 U.S. at 313. Instead, the argument went, the analysts only establish that a substance is "X." *Id.* This Court had none of it. *Melendez-Diaz* held that limiting the Confrontation Clause to identity evidence "finds no support in the text of the Sixth Amendment or in our case law." *Id.* at 313-14. Instead, *all* witnesses are subject to confrontation because the Sixth Amendment does not establish a "category of witnesses [who are] helpful to the prosecution [ ] but somehow immune from confrontation." *Id.*

*Melendez-Diaz* further confirmed that an identity limitation "would be contrary to longstanding case law," as this Court had previously held that the Confrontation Clause applies to non-identity evidence. *Id.* at 314 (explaining that in *Kirby v. United States*, 174 U.S. 47 (1899), this Court held that although the records proved "only that the property was stolen, and not that [defendant] received it . . . admission of the records violated [defendant's] rights under the Confrontation Clause"); *id.* at 314 (citing *King v. Turner,* 1 Mood. 347, 168 Eng. Rep. 1298 (1832) (confession by one defendant to having stolen certain goods could not be used as evidence against another defendant accused of receiving the stolen property)). Indeed, the vast

majority of forensic reports conducted in criminal cases have nothing to do with identity—they instead bear on the nature of a substance, its weight, or blood content. Nevertheless, this Court has "refused to create a 'forensic evidence' exception" to the Sixth Amendment. *Bullcoming*, 564 U.S. at 658-59.[5]

To be sure, a four-Justice plurality in *Williams* suggested that the Clause should apply to forensic reports only when they "accus[e] a targeted individual." 132 S. Ct. at 2242-43. But the other five Justices rejected this suggestion. As Justice Kagan explained: "Where that test comes from is anyone's guess. Justice Thomas rightly shows that it derives neither from the text nor from the history of the Confrontation Clause." *Williams*, 132 S. Ct. at 2273-74 (Kagan, J., dissenting) (citing *id.* at 2262 (Thomas, J., concurring)).

At any rate, this Court need not revisit that debate from *Williams* here, for even the plurality's "targeted individual" standard would be satisfied here. The *Williams* plurality explained that the Cellmark-DNA report did not "accuse a targeted individual" because—unlike in *Melendez-Diaz* and *Bullcoming*—the police had not yet identified a suspect at the time of the forensic report's creation. *See Williams*, 132 S. Ct. at 2242-44 (plurality opinion). The plurality's "targeted individual" standard

---

[5] This reasoning from *Melendez-Diaz* similarly disposes of the Washington Supreme Court's suggestion that autopsy reports might not be testimonial insofar as they have an "inculpatory effect" only in connection with other evidence. *Lui*, 315 P.3d at 510-11. As *Melendez-Diaz* expressly held, reports prepared for evidentiary use that are "inculpatory only when taken together with other evidence" are still testimonial. *Melendez-Diaz*, 557 U.S. at 313.

thus simply requires that the statement serve as evidence against a *known* criminal suspect. Put another way, it's the *stage of the State's investigation* at the time of the report's creation—not the particular *element* established by the report (*i.e.,* "identity")—that controls.

And here, Dr. Maloney's autopsy report was "prepared for the primary purpose of accusing a targeted individual." *Williams,* 132 S. Ct. at 2242-44 (plurality opinion). At the time of the report's certification and signing, petitioner had already been indicted for murder. Thus, unlike the private laboratory's DNA report in *Williams,* this autopsy report pointed the finger at a *known* homicide suspect. In doing so, the report ruled out Rivera's blows as the cause of death and instead directly accused petitioner of murder. *Id.*

d. The New York Court of Appeals' suggestion, parroted in part by the Appellate Division here, Pet. App. 3a, that autopsy reports are nontestimonial because they seem reliable fares no better. *Melendez-Diaz* squarely rejected the argument that the "near-contemporaneous" nature of observations and statements in a forensic report render them nontestimonial. 557 U.S. at 315-16. *Melendez-Diaz* likewise dispensed with the notion that the supposedly "neutral" orientation of forensic analysts renders their statements nontestimonial. *Id.* at 317. Ordinary witnesses—Sylvia Crawford, for one—are presumably neutral and free from "pro-law-enforcement bias" too. *Freycinet,* 892 N.E.2d at 846. Yet their statements made to assist with police investigations are testimonial. *See Davis,* 547 U.S. at 822, 826.

e. *Melendez-Diaz* also forecloses the California Supreme Court's similar holding that "objective" anatomical and physiological observations in autopsy reports prepared in conjunction with homicide investigations—in contrast to assertions regarding the cause of death—are nontestimonial. *People v. Dungo*, 286 P.3d at 448-50. Witnesses' statements regarding "objective" facts in the physical world—license plate numbers, the color of getaway cars, the time a clock displayed when shots rang out, etc.—are no less testimonial than other statements made to provide evidence for a criminal trial. *See Bullcoming*, 564 U.S. at 660.

At any rate, the autopsy report here was introduced in its totality and included far more than anatomical and physiological observations. It included the medical examiner's opinion that a knife wound, and not the blows to the victim's head, caused the death. Pet. App. 7a. And that opinion played a vital role in this prosecution.

f. That leaves the concern—first raised by some Members of this Court and later embraced by the Ohio Supreme Court—that applying the Confrontation Clause to autopsy reports would "'effectively' . . . function 'as a statute of limitations for murder[.]'" *Williams*, 132 S. Ct. at 2251 (Breyer, J., concurring) (quoting *Melendez-Diaz*, 557 U.S. at 335 (Kennedy J., dissenting) (quoting in turn Carolyn Zabrycki, Comment, *Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement*, 96 Cal. L. Rev. 1093, 1115 (2008)); *Maxwell*, 9 N.E.3d at 951. If the autopsy provides vital evidence, the reasoning goes, and "[the] medical examiner who conducted an autopsy [is] unavailable or deceased

when a trial begins," applying *Crawford* may imperil the prosecution or require dismissal of the charges. *Maxwell*, 9 N.E.3d at 951; *see also Dungo*, 286 P.3d at 457-58 (Chin, J., concurring).

This theory posits that the State can bypass the Confrontation Clause if it has an important "policy" interest in doing so. *Maxwell*, 9 N.E.3d at 951. That theory clashes with precedent, and, alternatively, is irrelevant where, as here, the medical examiner is available.

i. Policy arguments cannot justify introducing formalized forensic reports where the defendant has not "had a prior opportunity for cross-examination." *Melendez-Diaz*, 557 U.S. at 309 (quoting *Crawford*, 541 U.S. at 54). When the sole eyewitness to a crime dies before trial, rendering a successful prosecution impossible without his pre-trial testimonial statements, the Confrontation Clause has always held firm. *See Crawford*, 541 U.S. at 50, 59.

Medical examiners who provide purportedly vital forensic testimony are no different. In *Melendez-Diaz*, Massachusetts asked this Court to "relax the requirements of the Confrontation Clause to accommodate the necessities of trial and the adversary process." 557 U.S. at 325 (internal quotations omitted). This Court rejected the effort: "It is not clear whence we would derive the authority to do so. The Confrontation Clause may make the prosecution of criminals more burdensome, but that is equally true of the right to trial by jury and the privilege against self-incrimination. The Confrontation Clause—like those other constitutional

provisions—is binding, and we may not disregard it at our convenience." *Id.*; *see also Giles*, 554 U.S. at 375 (there is no unavailability exception to the Confrontation Clause, even when the defendant has caused the victim's death, because the Clause is not "subject to whatever exceptions courts from time to time consider 'fair.'"); *accord id.* at 379 (Souter, J., concurring) (agreeing that a declarant's unavailability, due to death, does not justify an exception to the confrontation right).

In any event, the critical role that autopsy reports can play in a homicide prosecution justifies *enforcing* the Confrontation Clause, not suspending it. As Justice Pfeifer of the Ohio Supreme Court has argued: "If having no autopsy report available makes a murder conviction impossible, elevating an autopsy to a central role in a murder trial, does that not make it all the more imperative that a defendant have an opportunity to call into doubt the veracity of the report through cross-examination?" *Maxwell*, 9 N.E.3d at 997 (concurring in part, dissenting in part).

ii. Precedential problems aside, categorically exempting medical examiners from confrontation is the wrong solution to the "statute of limitations" concern. At most, that concern calls for an accommodation in the rare case where, *unlike here*, the examiner is actually deceased or otherwise unavailable at the time of trial. Indeed, the law review article that first articulated the statute of limitations objection argued that "excluding the autopsy report where" a medical examiner is *unavailable*—that is, "a medical examiner dies"—would "effectively function[ ] as a statute of limitations for murder." Zabrycki, *supra*, at 1115; *see also* Jennifer L. Mnookin, *Expert Evidence*

*and the Confrontation Clause After Crawford v. Washington*, 15 Brooklyn J.L. & Pol'y 791, 860-61 (2007) (proposing an unavailability exception to the rule that medical examiners must be produced for cross-examination).

Categorically exempting medical examiners from confrontation to address a statute of limitations concern is akin to "throwing the baby out with the bathwater"—suspending the confrontation right in every homicide trial to address a concern that arises in an exceedingly small number of homicide trials. That makes little sense.

## CONCLUSION

For the foregoing reasons, the petition for a writ of certiorari should be granted.

Respectfully submitted,

Jeffrey L. Fisher
Stanford Law School
  Supreme Court Litigation Clinic
559 Nathan Abbott Way
Stanford, CA 94305

Robert S. Dean
*Counsel of Record*
Center for Appellate Litigation
120 Wall Street, 28th Floor
New York, New York 10005
(212) 577-2523, ext. 502
rdean@cfal.org

June 28, 2017

No. 17-5385

---

# In the Supreme Court of the United States

James Garlick,

*Petitioner,*

*v.*

New York,

*Respondent.*

---

On petition for writ of certiorari
to the Appellate Division, First Judicial Department,
Supreme Court of the State of New York.

---

Brief in Opposition

---

Darcel D. Clark
District Attorney, Bronx County

Nancy D. Killian
Appeals Bureau, Chief

Gina Mignola
Appeals Bureau, Deputy Chief

Jordan K. Hummel
Assistant District Attorney
*Counsel of Record*

Office of the District Attorney, Bronx
County
198 East 161st Street
Bronx, New York 10451
(718) 838 - 7322
hummelj@bronxda.nyc.gov

Attorneys for the State of New York

---

## QUESTION PRESENTED

Whether an autopsy report -- created pursuant to the New York City Chief Medical Examiner Office's statutory duty to determine and document the manner and cause of death – is admissible along with testimony from an expert witness who did not participate in the autopsy, but who testified to her own independent conclusions as to the manner and cause of death, under the Confrontation Clause of the Sixth Amendment to the United States Constitution and this Court's recent decisions interpreting that clause (beginning in *Crawford v. Washington*, 541 U.S. 36, 51 [2004] and most recently in *Ohio v. Clark*, 135 S. Ct. 2173 [2015]).

# TABLE OF CONTENTS

Question Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Relevant Constitutional and Statutory Provisions . . . . . . . . . . . . . . . . . . . . . . . . vi

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Reasons to Deny the Writ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A. There Is No Genuine Conflict Among The Lower Courts. . . . . . . . 10

    B. There Is No Compelling Reason To Review This Issue Now. . . . . 17

    C. This Case Is A Poor Vehicle For This Court To Consider How The Confrontation Clause Applies To Autopsy Reports. . . . . . . . . . . . . 17

    D. The First Department Correctly Held That Given The Facts And Circumstances Of This Case, The Autopsy Report Was Non-Testimonial And The Medical Examiner's Corresponding Testimony Was Proper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    E. Any Error In The First Department's Holding Was Harmless . . . 32

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

SUPPLEMENTAL APPENDIX

Autopsy Report, Trial Exhibit 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 1

Petitioner's Decision Not to Propose Redactions . . . . . . . . . . . . . . . . . . . . SA 22

## TABLE OF AUTHORITIES

### Federal Cases

*Bullcoming v. New Mexico*, 564 U.S. 647 (2011) ................................................ passim

*Crawford v. Washington*, 541 U.S. 36 (2004) ................................. 1, 2, 10, 17

*Davis v. Washington*, 547 U.S. 813 (2006) ................................. 2, 10, 17, 25

*Giles v California*, 554 U.S. 353 (2008) ........................................... 2, 10, 17

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ...................................... passim

*Michigan v. Bryant*, 562 U.S. 344 (2011) ........................................ passim

*Ohio v. Clark*, 135 S. Ct. 2173 (2015) ......................................... passim

*Tacon v. Arizona*, 410 U.S. 351 (1973) ........................................... 18

*United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012) ................................. 11, 14

*United States v. James*, 712 F.3d 79 (2d Cir. 2013),

    *cert denied* 134 S. Ct. 2660 (2014) ..................................................... passim

*United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011) ................................. 14

*Williams v. Illinois*, 567 U.S. 50 (2012) .................................................. passim

### State Cases

*Ackerman v. State*, 51 N.E.3d 171 (Ind. 2016),

    *cert denied* 137 S. Ct. 475 (2016) ............................................. 2, 11, 12, 17

*Commonwealth v. Carr*, 986 N.E.2d 380, 464 Mass. 855 (Mass. 2013) ..................... 15

*Malaska v. State*, 88 A.3d 805, 216 Md. App. 492 (Md. App. 2014),

    *cert denied* 135 S. Ct. 1162 (2015) ....................................................... 3, 17

*People v. Acevedo*, 112 A.D.3d 454 (N.Y. App. Div. 2013), *lv denied* 16 N.E.3d 1280

    (N.Y. 2014) ........................................................................ 27

*People v. Alger*, 2013 WL 5287305 (Cal. App. 1 Dist. 2013),

    *cert denied* 135 S. Ct. 49 (2014) ....................................................... 3, 17

*People v. Austin*, 2017 WL 4680012, 2017 N.Y. Slip Op. 07300 (N.Y. 2017) ............. 27

*People v. Dungo*, 286 P.3d 442, 55 Cal.4th 608 (Cal. 2012) ........................... 13, 16, 29

*People v. Freycinet*, 892 N.E.2d 843 11 N.Y.3d 38 (N.Y. 2008) ......................... passim

*People v. Garlick*, 144 A.D.3d 605 (N.Y. App. Div. 2016), *lv denied* 76 N.E.3d 1082 (N.Y. 2017). ........................................................................................................ 10

*People v. Hall*, 84 A.D.3d 79 (N.Y. App. Div. 2011), *lv denied* 892 N.E.2d 843 (N.Y. 2012), *cert denied* 133 S. Ct. 193 (2012), ........................................................ 7, 25

*People v. John*, 52 N.E.3d 1114, 27 N.Y.3d 294 (N.Y. 2016) .................................... 27

*People v. Leach*, 980 N.E.2d 570, 2012 IL 111534 (Ill. 2012) ............. 13, 15, 16, 17, 25

*People v. Washington*, 654 N.E.2d 967, 86 N.Y.2d 189 (N.Y. 1995) .............. 12, 19, 20

*State v. Bass*, 132 A.3d 1207, 224 N.J. 285 (N.J. 2016) ............................................ 14

*State v. Hardin*, 15 N.E.3d 878, 140 Ohio St.3d 1409 (Ohio 2014),
    *cert denied* 135 S. Ct. 2379 (2015) ....................................................................... 2, 17

*State v. Hutchinson*, 482 S.W.3d 893 (Tenn. 2015) ............................................. 15, 16

*State v. Kennedy*, 735 S.E.2d 905, 229 W.Va. 756 (W.Va. 2012) ............................... 15

*State v. Lui*, 315 P.3d 493, 179 Wash.2d 457 (Wash. 2014),
    *cert denied* 134 S. Ct. 2842 (2014) ....................................................................... 2, 17

*State v. Maxwell*, 9 N.E.3d 930, 139 Ohio St.3d 12 (Ohio 2014),
    *cert denied* 135 S. Ct. 1400 (2015) .................................................... 2, 13, 14, 16, 17

*State v. Medina*, 306 P.3d 48, 232 Ariz. 391 (Ariz. 2013),
    *cert denied* 134 S. Ct. 1309 (2014) .................................................................. passim

*State v. Navarette*, 294 P.3d 435, 2013 -NMSC- 003 (N.M. 2013),
    *cert denied* 134 S. Ct. 64 (2013) ................................................................... 3, 11, 17

*State v. Mattox*, 2017 WI 9, 373 Wis. 2d 122, 890 N.W.2d 256,
    *cert denied* 16-9167, 2017 WL 2189106 (U.S. Oct. 16, 2017) .............................. 3, 17

*Wood v. State*, 299 S.W.3d 200 (Tex. Ct. App. 2009) ................................................. 14

## Federal Statutes

U.S. Const. Amend. VI ................................................................................................... 1

## State Statutes

New York Penal Law § 125.12 ...................................................................................... 30

New York Penal Law § 125.15 .......................................................................30

New York Penal Law § 125.20 .......................................................................32

New York Public Health Law § 4209 ...........................................................12

New York Public Health Law § 4210 ...........................................................12

Virginia Code Annotated §8.01-390.2 ........................................................15

## Other Authorities

Capra, Daniel J., *et. al.*, *Autopsy Reports and the Confrontation Clause: A Presumption of Admissibility*, 2 V.C.J.L. 62, 78-80 (2014) ................... 13, 19, 22, 29

New York City Administrative Code § 17-203 ...................................... 12, 13

## Relevant Constitutional and Statutory Provisions

The New York City Charter § 557 (a) states: "There shall be in the department [of health and mental hygiene] an independent office of chief medical examiner, the head of which shall be the chief medical examiner, who shall be appointed by the mayor from the classified civil service and be a doctor of medicine and a skilled pathologist and microscopist. . . ."

The New York City Charter § 557 (c) states: ". . . The deputy chief medical examiners and medical examiners shall possess the same basic qualifications as the chief medical examiner. The medical investigators shall be physicians duly licensed to practice medicine in the state of New York and shall possess such additional qualifications as may be required by the department of citywide administrative services."

The New York City Charter § 557 (f) states: "(1) The chief medical examiner shall have such powers and duties as may be provided by law in respect to bodies of person dying from *criminal violence, by accident, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility or in any suspicious or unusual manner or where an application is made pursuant to law for a permit to cremate a body of a person*; (2) The chief medical examiner *shall perform the functions of the city mortuary and related functions*, including the removal, transportation and disposal of unclaimed or unidentified human remains and the remains of those individuals who have died outside of a medical institution; (3) The chief medical examiner may, to the extent permitted by law, provide forensic and

related testing and analysis, and ancillary services, in furtherance of investigations concerning persons *both alive and deceased,* including but not limited to: *performing autopsies*; performing deoxyribonucleic acid (DNA) testing and other forms of genetic testing and analysis; obtaining samples and exemplars; performing pathology, histology and toxicology testing and analysis; and *determining the cause or manner of injuries and/or death*; (4) . . . the chief medical examiner *may engage in health research* in conjunction with the department . . . ." (emphasis supplied).

## INTRODUCTION

It is well established that a defendant has the right to confront the witnesses "who bear testimony against him." *See Crawford v. Washington*, 541 U.S. 36, 51 (2004); U.S. Const. Amend. VI. This means that, with certain limited exceptions not applicable in this case, out-of-court testimonial statements may not be introduced against a defendant at trial to establish the truth of the matter asserted. *See Crawford*, 541 U.S. at 42; *Davis v. Washington*, 547 U.S. 813 (2006). Equally clear, however, is that this rule does not bar the use of out-of-court statements by declarants who are not "witnesses"—that is, those who do not "bear testimony." *See e.g. Davis*, 547 U.S. 813; *Michigan v. Bryant*, 562 U.S. 344 (2011); *Ohio v. Clark*, 135 S. Ct. 2173 (2015).

Since *Crawford* was announced in 2004, this Court has addressed the testimonial nature of various out-of-court statements. *See Davis*, 547 U.S. 813; *Giles v California*, 554 U.S. 353 (2008); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); *Bryant*, 562 U.S. 344; *Bullcoming v. New Mexico*, 564 U.S. 647 (2011); *Williams v. Illinois*, 567 U.S. 50 (2012); *Clark*, 135 S. Ct. 2173. Most recently, in *Clark*, this Court distilled the following test to determine if a statement is testimonial: "whether in light of all the circumstances, viewed objectively, the 'primary purpose' of the [statement] was to 'create an out-of-court substitute for

trial testimony.' " *Clark*, 135 S. Ct. at 2180 (*quoting Bryant*, 562 U.S. at 358) (alteration omitted and supplied).[1]

The question of whether autopsy reports are testimonial does not lend itself to any categorical rule because autopsy reports are created under different circumstances, for varying purposes, depending on the rules and practices in each jurisdiction. For this reason, there is no genuine conflict among the state supreme and federal circuit courts. Nor is there any reason to think that the lower courts have misunderstood or misapplied the principles set out by this Court. Indeed, since 2012, ten petitions have been submitted to this Court alleging that the lower courts are conflicted over whether autopsy reports are testimonial under the Confrontation Clause. This Court has declined to review this question in each instance. *United States v. James*, 712 F.3d 79 (2d Cir. 2013), *cert denied* 134 S. Ct. 2660 (2014); *Ackerman v. State*, 51 N.E.3d 171 (Ind. 2016), *cert denied* 137 S. Ct. 475 (2016); *State v. Hardin*, 15 N.E.3d 878, 140 Ohio St.3d 1409 (Ohio 2014), *cert denied* 135 S. Ct. 2379 (2015); *State v. Maxwell*, 9 N.E.3d 930, 139 Ohio St.3d 12 (Ohio 2014), *cert denied* 135 S. Ct. 1400 (2015); *State v. Lui*, 315 P.3d 493, 179 Wash.2d 457 (Wash. 2014), *cert denied* 134 S. Ct. 2842 (2014); *Malaska v. State*, 88

---

[1] *Melendez-Diaz, Bullcoming*, and *Williams*, which addressed a defendant's confrontation rights with respect to forensic reports, align with this Court's most recent testimonial analysis. *Melendez-Diaz* held that certificates identifying a substance as cocaine were testimonial because "under Massachusetts law the *sole purpose* of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substances"; thus, the certificates were "functionally identical to live, in court testimony, doing 'precisely what a witness does on direct examination.' " (557 U.S. at 30-11 [emphasis in original, internal citations omitted]). *Bullcoming* rejected the results of a blood-alcohol-content test as "surrogate testimony" because it was "made for the purpose of proving a particular fact" and admitted through a witness who did not perform the test (564 U.S. at 652). *Williams* held that a DNA profile created by a non-testifying witness was non-testimonial, but a majority of the Justices did not agree on a rationale (567 U.S. at 57-58).

A.3d 805, 216 Md. App. 492, 500 (Md. App. 2014), *cert denied* 439 Md. 696 (Md. 2014), *cert denied* 135 S. Ct. 1162 (2015); *State v. Medina*, 306 P.3d 48, 232 Ariz. 391 (Ariz. 2013), *cert denied* 134 S. Ct. 1309 (2014); *People v. Alger*, 2013 WL 5287305 (Cal. App. 1 Dist. 2013), *cert denied* 135 S. Ct. 49 (2014); *State v. Navarette*, 294 P.3d 435, 2013 -NMSC- 003 (N.M. 2013), *cert denied* 134 S. Ct. 64 (2013). Most recently, this Court rejected such a petition in *State v Mattox*, 2017 WI 9, 373 Wis. 2d 122, 890 N.W.2d 256, *cert denied* 16-9167, 2017 WL 2189106 (U.S. Oct. 16, 2017).

Furthermore, as the New York Courts correctly determined, there was no Confrontation Clause violation in this case. Most notably, the autopsy report was not created as a substitute for trial testimony, but pursuant to the New York City Office of the Chief Medical Examiner's statutory duty to determine and document the cause and manner of the victim's death for public health purposes. Certiorari should be reserved for a case that truly implicates a potential divide and can provide meaningful guidance in its resolution. This is not that case.

## STATEMENT OF THE CASE

On November 1, 2011, after she and Johanna Rivera were verbally assailed by an intoxicated Gabriel Sherwood on a Bronx street, Lisa Rivera felt unsafe so she called her then-boyfriend, petitioner, who arrived on the scene about ten minutes later (T 65-68, 300-01).[2] Petitioner and Sherwood spoke, physically fought, and entered the lobby of an apartment building, where their actions were recorded by the building's surveillance video (T 67-68, 302-03; Exhibit 5). Petitioner struck

---

[2] Numerals preceded by "SA" refer to respondent's supplemental appendix; those preceded by "VD" refer to petitioner's pre-trial proceedings; those preceded by "T" refer to petitioner's jury trial.

Sherwood repeatedly about his chest with an object. After Sherwood fell to the ground, petitioner got on top of him and continued to strike him in the chest (Exhibit 5). Johanna also punched and kicked Sherwood while petitioner stood nearby. Petitioner pulled Johanna off of Sherwood and she, petitioner, and Lisa left (T 68-70, 303-05). No one else touched Sherwood (Exhibit 5).

Police arrived on the scene and saw Sherwood lying on the ground, exhibiting no signs of life, surrounded by blood (T 155-58). EMS arrived and took Sherwood to a hospital where medical staff unsuccessfully tried to revive him and pronounced him dead at 6:40 P.M. (T 49, 159-60; SA 17-19).

Meanwhile, at the scene, the police searched for weapons, but found none. Det. DeGrazia met with the building's superintendent and reviewed security footage depicting that evening's events (T 185-86, 218-19; Exhibit 5). Later, Det. DeGrazia met with Lisa at her apartment (T 187). After midnight on November 2, 2011, Johanna gave a statement to the police at a local precinct and was subsequently arrested and charged with murder on the theory that she had acted in concert with an unapprehended individual to intentionally cause Sherwood's death (T 70-71, 188, 271).

On November 11, 2011, petitioner was arrested (T 189). Petitioner gave oral and written statements admitting that he had fought Sherwood on the date in question, but that he "was trying to defend [himself] and [his] girlfriend" and that he "wasn't trying to hurt anybody."[3] Petitioner also stated that while he and

---

[3] Petitioner's assertion that he "testified" at trial (Petition: 21) is untrue; he presented no evidence. The People admitted his written statement (Exhibit 4).

Sherwood were fighting outside, he saw Sherwood reach into his waistband and, although petitioner did not see what Sherwood was reaching for,[4] he was able to wrestle it away from Sherwood. Petitioner said the fight continued inside and that Sherwood was "stronger than" petitioner and "wasn't trying to let [petitioner] go" so he "kept fighting trying to get [Sherwood] off of [him]." Petitioner said that he eventually left the building, returned to pull Johanna off of Sherwood, and left again (T 195-97; Exhibit 4).

By an indictment, voted on November 17, 2011, and filed on November 28, 2011, petitioner was charged with Second-Degree Murder, First-Degree Manslaughter, and First- and Second- Degree Assault.

Autopsy and Autopsy Report

On November 1, 2011, the Office of the Chief Medical Examiner (hereinafter "OCME") received Sherwood's body. Damien Lee, a Medico-Legal Investigator, completed a "Supplemental Case Information" form that indicated that, according to a doctor at the hospital, Sherwood was "found by EMS supine on the floor . . . in cardiac arrest and with multiple (4) stab wounds to the chest and abdomen." The form further indicated that Lee called the precinct and "Per Detective Degrasio the case is pending further information and no additional information is available." (SA 17). Also, the "Notice of Death" form, completed at the same time, indicated under "Circumstances of Death," "App. Manner: Homicide," and "Other Info: call.loc[ation]

---

[4] Contrary to petitioner's current claim that "Sherwood brandished a knife" (Petition: 5), petitioner stated he "didn't know what [Sherwood] had" and that he "never s[aw] what it was in the course of the fight" (Exhibit 4).

5

? no ems.sheet. stab wound to abdomen & chest n[ext].o[f].k[in]. unk[nown]. at this time.pct#?" (SA 18).

On November 2, 2011, Dr. Katherine Maloney, with Dr. James Gill present, conducted an autopsy on Sherwood's body at OCME and issued a report (T 28-29; SA 21). Based on Dr. Maloney's "Case Worksheet," completed the same day and included in the report, Sherwood's "Immediate cause" of death was a "stab wound of torso with perforation of heart," the same cause of death articulated in the final report on December 29, 2011 (SA 3, 13).

Detectives Speranza and Farmer were also present during the autopsy (T 243; SA 20), though the record is silent as to their participation, if any. Notably, a police report completed on the same day as the autopsy and included as part of the autopsy report stated "Victim was assaulted and stabbed by unknown perp(s) for unknown reason" (SA 20).

In September 2013, when trial began, Dr. Maloney and Dr. Gill were no longer employed at OCME.[5] Accordingly, the People called Dr. Susan Ely, Deputy Chief Medical Examiner of OCME, to testify (T 23).

Prior to testimony, defense counsel argued that the autopsy report was testimonial, therefore, allowing a medical examiner who did not conduct the autopsy to testify about the contents of the report would violate petitioner's confrontation rights. Counsel requested that Dr. Ely be precluded from testifying about the autopsy, the nature and extent of Sherwood's injuries, and the cause of

---

[5] Dr. Gill became the Chief Medical Examiner of Connecticut (T 29). Dr. Ely believed that Dr. Maloney was practicing upstate in Rochester (T 47). The reason for these relocations and promotions was not developed on this record.

death (T 637-43). The court denied the general application, but encouraged specific objections when the expert testified (T 643). Immediately before Dr. Ely testified, counsel renewed his application that her testimony should be precluded. Relying on *People v. Freycinet*, 892 N.E.2d 843 11 N.Y.3d 38 (N.Y. 2008), and *People v. Hall*, 84 A.D.3d 79 (N.Y. App. Div. 2011), *lv denied* 892 N.E.2d 843 (N.Y. 2012), *cert denied* 133 S. Ct. 193 (2012), the court, again, denied the general application and invited further objections during the witness's testimony (T 17-22). With respect to redacting the autopsy report, the People suggested that it be certified as a business record and that the witness be permitted to testify, but that the report not be moved into evidence (T 19). Defense counsel "would not agree to [the prosecutor's] suggestion" because he did not see how he could have "an effective cross-examination without the document being placed into evidence" (T 21).

Dr. Ely's brief direct testimony (T 23-44) began with a description of her training and experience in determining the cause and manner of death (T 25-28). Next, she explained OCME procedures used for documenting autopsies, testified that she had reviewed Sherwood's autopsy report, and laid the foundation necessary to have the report admitted into evidence as a business record (T 28-34). When the report was introduced, defense counsel acknowledged he had reviewed the document, did not object, and declined to *voir dire* the witness (T 34).

Based on her review of the autopsy report and related photographs, Dr. Ely described Sherwood's wounds including their location, nature, and depth. She testified that Sherwood had suffered two stab wounds and four incised wounds to

his torso and blunt force trauma to his face (T 35-36). In addition, Dr. Ely gave her independent opinions and conclusions about Sherwood's injuries. In particular, she opined that the fatal injury was a 4 ½-5 ½ inch stab wound to his chest that penetrated and perforated his skin and rib cage, continued between two ribs, and perforated his heart. This injury caused internal bleeding around his heart and within his left chest cavity, totaling 1 ½ liters of blood (1/3 of his total blood volume), which, in her opinion, caused shock and the collapse of his left lung (T 37-41a; SA 5). Further, Dr. Ely stated that, in her professional opinion, wounds of this nature were most commonly caused by a knife (T 36-37).

On cross-examination, Dr. Ely admitted that she was not present during the autopsy and that her expert opinions were based on the data contained in the autopsy report and corresponding photographs (T 46-47). She further admitted that, based on the autopsy report and photographs, she did not know who had inflicted the stab wounds, if the wounds had been inflicted by multiple people, the height of the assailant, whether the assailant was right or left handed, standing or sitting. She also did not know when or the order in which the wounds had been inflicted (T 48-49, 53-54).

At the conclusion of Dr. Ely's testimony, the court explained that the autopsy report "was admitted subject to certain redactions" the parties would discuss later (T 59). After summations, the court reminded counsel that redactions needed to be addressed and took a brief recess for counsel to retrieve his annotated copy of the report to propose redactions (SA 22-27). Ultimately, counsel reiterated his position

that Dr. Ely's testimony was inadmissible and stated he had no "further application" with respect to redactions (SA 28-30).

During summation, defense counsel focused on the surveillance video of the crime, but argued that the relative depth of Sherwood's wounds, only one of which was lethal, showed that petitioner lacked the intent to kill (T 424-25, 439). He further argued that Dr. Ely could not tell the jury "the time the fatal stab wound was inflicted," "the sequence of the cuts," "the gender," "position," or "size of the stabber," or whether they were "lefthanded or righthanded" (T 440). During the People's summation, which argued "in this case you got the crime on videotape and that's really all you need" (T 450), the prosecutor briefly responded to counsel's claims by describing the seriousness of Sherwood's injuries (T 452-53). The jurors acquitted petitioner of murder, but found him guilty of First-Degree Manslaughter.

On appeal, petitioner argued, *inter alia*, that his federal and state confrontation rights were violated when the court received into evidence the autopsy report and Dr. Ely's testimony based on it. On November 29, 2015, the First Department unanimously affirmed petitioner's conviction, holding that his "right of confrontation was not violated when an autopsy report prepared by a former medical examiner, who did not testify, was introduced through the testimony of another medical examiner" because the report was "not testimonial." The First Department further found petitioner's "contention that *People v. Freycinet*[] had been undermined by subsequent decisions of the United States Supreme Court is

unavailing" (internal citations omitted). *People v. Garlick*, 144 A.D.3d 605 (N.Y. App. Div. 2016), *lv denied* 76 N.E.3d 1082 (N.Y. 2017).

REASONS TO DENY THE WRIT

A. THERE IS NO GENUINE CONFLICT AMONG THE LOWER COURTS.

The question of whether autopsy reports in homicide cases are testimonial for Confrontation Clause purposes does not lend itself to a categorical constitutional rule for, as demonstrated herein, any variance in the outcomes of individual cases reflects differences in the very nature of the medical examiner's duties and authority from state to state, the circumstances under which the autopsy reports were prepared, their intended purpose, and the manner in which they were used as evidence.

Most recently, in *Clark*, this Court espoused a straightforward test to determine if a statement is testimonial: "whether in light of all the circumstances, viewed objectively, the 'primary purpose' of the [statement] was to 'create an out-of-court substitute for trial testimony.' " *Clark*, 135 S. Ct. at 2180 (*quoting Bryant*, 562 U.S. at 358) (alteration omitted and supplied). Since 2004, this Court has considered a "primary purpose" test, in varying forms, to assess the testimonial character of different out-of-court statements. *Crawford*, 541 U.S. at 51 (wife's statements to police about past events); *Davis*, 547 U.S. 813 (victim's statements to 911 operator versus police on scene after victim and defendant separated); *Giles*, 554 U.S. 353 (deceased victim's prior statement and forfeiture by wrongdoing); *Melendez-Diaz*, 557 U.S. 305 (analyst certificate of controlled substance analysis);

*Bryant*, 562 U.S. 344 (statements to police during an ongoing emergency); *Bullcoming*, 564 U.S. 647 (blood alcohol analysis report); *Williams*, 567 U.S. 50 (DNA profiles); *Clark*, 135 S. Ct. 2173 (victim's statement to teacher).

Accordingly, state supreme and federal circuit courts have determined the testimonial nature of autopsy reports by applying a "primary purpose" test culled from this Court's Confrontation Clause jurisprudence. *See e.g. United States v. James*, 712 F.3d 79 (2d Cir. 2013), *cert denied* 134 S. Ct. 2660 (2014); *States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012); *Ackerman v. State*, 51 N.E.3d 171 (Ind. 2016), *cert denied* 137 S. Ct. 475 (2016); *State v. Medina*, 306 P.3d 48, 232 Ariz. 391 (Ariz. 2013), *cert denied* 134 S. Ct. 1309 (2014); *State v. Navarette*, 294 P.3d 435, 2013 -NMSC- 003 (N.M. 2013), *cert denied* 134 S. Ct. 64 (2013).

Critically, though, as one state supreme court observed, "[w]hile these cases exemplify the differing conclusions reached on this issue, they do not necessarily demonstrate a stark division between the States." *Ackerman*, 51 N.E.3d at 183. "Rather, each state considers relevant state statutes and the circumstances of that particular case in applying its understanding of the primary purpose test. In each instance, the circumstances under which the autopsy is performed and relevant state statutes strongly influence the analysis." *Id.* Therefore, whether the particular report at hand is testimonial is, at its core, a fact-dependent determination. One key factor is whether the report was created by someone who functioned as a medical doctor and public health official, independent from law enforcement agents. As petitioner acknowledges, depending on the state, the person

who conducted the autopsy and prepared the autopsy report may not necessarily be a medical expert (Petition: 18). Indeed, this critical factor depends upon the practices and laws within the jurisdiction and the specific facts of the case.

In New York City, the authority, duties, and responsibilities of OCME are dictated by provisions set out in New York's Public Health Law, the New York City Charter, and the Administrative Code of the City of New York. *See* NY Public Health Law §§4209 and 4210; NYC Charter § 557; NYC Admin Code § 17-203. OCME "is not a law enforcement agency." *People v. Washington*, 654 N.E.2d 967, 969, 86 N.Y.2d 189, 192 (N.Y. 1995). On the contrary, by law, it operates "independent of and not subject to the control of" either the police or the office of the prosecutor. *Id.*; *see also Freycinet*, 892 N.E.2d at 846. Thus, "[t]he People have no power to dictate the contents or practices within OCME [and] Medical Examiners have no authority to gather evidence with an eye toward prosecuting a perpetrator." *Washington*, 654 N.E.2d at 969.

Instead, in New York City, OCME's predominant function is to serve public health concerns. By statute, OCME has a duty to "determin[e] the cause or manner of injuries and/or death" (NYC Charter § 557[f][3]) under various circumstances, only one of which is a violent death. Indeed, medical examiners also perform autopsies when the death is "by accident, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility, or in any suspicious or unusual manner." NYC Charter § 557(f)(1). Only "ten percent of deaths investigated by the OCME lead to criminal investigations." *James*, 712 F.3d

at 99 n. 10) (explaining on average OCME performs 5,500 autopsies each year and, in 2010, 533 New York City residents' causes of death were listed as homicides).[6] Furthermore, "[i]t is the OCME that determines whether to conduct an autopsy based on whether 'it may be concluded with reasonable certainty that death occurred from natural causes or obvious traumatic injury' NYC Admin Code § 17-203." *Id.* at 98 (alteration in original).

Notably, where the medical examiner functioned primarily as a medical doctor serving public health interests independent from law enforcement agencies, the courts tend to conclude that the autopsy report that the examiner produced is non-testimonial. *See id.* at 97-99 (OCME is independent from law enforcement); *Freycinet*, 892 N.E.2d at 846 (same); *see also Maxwell*, 9 N.E.3d at 950-51 ("An autopsy is a compelling public necessity if it is needed to protect against an immediate and substantial threat to public health")(internal quotation marks and citations omitted); *Leach*, 980 N.E.2d at 599-92 (medical examiner "was not acting as an agent of law enforcement, but as one charged with protecting the public health"); *Dungo*, 286 P.3d at 450 ("the scope of the coroner's statutory duty to

---

[6] While a determination of a manner of death as homicide may be used in a criminal trial, it may also be used for a multitude of other purposes such as civil litigation (wrongful death, medical malpractice, product liability, etc. [*see People v. Leach*, 980 N.E.2d 570, 592, 2012 IL 111534 ¶ 114-139 [Ill. 2012]), medical and public health research to investigate and catalogue causes of death implicating public health concerns (i.e., identifying a rise in certain diseases or unusual causes of illness and/or death [Capra, Daniel J., *et. al.*, *Autopsy Reports and the Confrontation Clause: A Presumption of Admissibility*, 2 V.C.J.L. 62, 78-80 (2014) (hereinafter "Capra")], "satisfy[ing] the public's interest in knowing the cause of death," particularly in cases that receive media attention, or "provid[ing] answers to grieving family members" (*People v. Dungo*, 286 P.3d 442, 449-450, 55 Cal.4th 608, 619-620 [Cal. 2012]).

investigate [the circumstances, manner, and cause of death] is the same, regardless of whether the death resulted from criminal activity").[7]

In other jurisdictions, where the report was created by someone who functioned, in essence, as a law enforcement official tasked with investigating and advancing a criminal prosecution, courts tended to determine that the report was testimonial. *See State v. Bass*, 132 A.3d 1207, 1225 n.8, 224 N.J. 285, 317, n.8 (N.J. 2016) (statute "envisions close cooperation between a medical examiner and law enforcement. . . . ," including allowing the county prosecutor to require that the medical examiner perform an autopsy in certain situations); *Ignasiak*, 667 F.3d at 1231–32 (under statutory authority "Medical Examiners Commission was created and exists within the Department of Law Enforcement," its members include other members of law enforcement [i.e., state attorney, sheriff, attorney general], must retain / deliver evidence to law enforcement, and state attorney can request an autopsy) (internal citations omitted, emphasis supplied); *United States v. Moore*, 651 F.3d 30, 73 (D.C. Cir. 2011) (law enforcement officers participated in the creation of the report and statute authorized the police, prosecutors, or the court to request an autopsy); *Wood v. State*, 299 S.W.3d 200, 208, 213-214 (Tex. Ct. App. 2009) (statutory authority for prosecuting attorney to request autopsy).

Other factors influence the outcome of the cases as well. Courts considered, for example, whether the preparer created the report knowing that it would be

---

[7] Petitioner is wrong to suggest that the Ohio Supreme Court has determined that "an autopsy report is never to create evidence for a criminal trial" (Petition: 14). In fact, the court concluded that "generally, autopsy reports are neither" prepared for the primary purpose of accusing a targeted individual nor to provide evidence in a criminal trial. *Maxwell*, 9 N.E.3d at 951. Thus, the court plainly left open the possibility that a particular autopsy report could be testimonial.

admitted into evidence at a criminal trial as a substitute for live testimony. Indeed, in certain states, by statute, a properly certified autopsy report is admissible in lieu of live testimony. For example, Virginia provides that a certified autopsy report made under the proper authority "shall be received as evidence in any court[ ]." *See* Va. Code Ann. §8.01-390.2. *See also Commonwealth v. Carr*, 986 N.E.2d 380, 398-400, 464 Mass. 855, 875-877 (Mass. 2013) (statute rendered death certificates prima facie evidence of cause of death without medical examiner testimony); *State v. Kennedy*, 735 S.E.2d 905, 917, 229 W.Va. 756, 768 (W.Va. 2012) (autopsy reports are testimonial because "the autopsy and required report's use in judicial proceedings is one of its statutorily defined purposes"); *cf. Leach*, 980 N.E.2d at 592 ("reports are not usually prepared for the sole purpose of litigation").

Similarly, if the preparer signed the report, but did not swear or attest that the statements contained therein were true and accurate, it was more likely to be viewed as non-testimonial. *See State v. Hutchinson*, 482 S.W.3d 893, 912 (Tenn. 2015) (report "authorized by" doctor containing electronic signature); *Medina*, 306 P.3d at ¶ 63 ("autopsy report does not certify that the report was correct or that [examiner] followed the correct procedures"); *Leach*, 980 N.E.2d at 592 ("autopsy report was not certified or sworn in anticipation of its being used as evidence; it was merely signed by the doctor who performed the autopsy").

Another consideration was whether the portion of the report that was admitted into evidence was limited to the contemporaneous observations of the deceased's physical condition and excluded conclusions about the cause of death. *See*

*Dungo*, 286 P.3d at 444, 449-50 (expert testimony limited to objective observations about the condition of the victim's body); *Freycinet*, 892 N.E.2d at 846 (report was "largely a contemporaneous, objective account of observable facts [and t]he giving of opinions was left to" the testifying expert).

Furthermore, courts have taken into account whether the report targeted a specific suspect or directly linked the defendant to the crime. *See Hutchinson*, 482 S.W.3d at 912, 914 (not made for purpose of proving the guilt of a particular criminal defendant); *Maxwell*, 9 N.E.3d at 951 (reports "generally are neither (1) prepared for the primary purpose of accusing a targeted individual nor (2) prepared for the primary purpose of providing evidence in a criminal trial"); *Medina*, 306 P.3d at ¶ 62 (report "not [created] to gather evidence to accuse Medina"); *Leach*, 980 N.E.2d at 592 ("Nothing in the report directly linked defendant to the crime"); *Freycinet*, 892 N.E.2d at 846 ("report did not directly link defendant to the crime").

Accordingly, the issue that petitioner is asking this Court to consider— whether autopsy reports in homicide cases are testimonial—is fact-specific and depends largely on the laws and practices of the jurisdiction. Because the issue is fact-determinative, it does not lend itself to a categorical constitutional rule that autopsy reports are or are not testimonial. For this same reason, there is no genuine conflict among the lower courts and no reason to think that further guidance is necessary.

B. There is No Compelling Reason to Review This Issue Now.

Recently, this Court has repeatedly denied petitions that raised the same issue and the same alleged conflict that petitioner attempts to present. *See James*, 712 F.3d 79; *Ackerman*, 51 N.E.3d 171; *Hardin*, 15 N.E.3d 878; *Maxwell*, 9 N.E.3d 930; *Lui*, 315 P.3d 493; *Malaska*, 88 A.3d 805; *Medina*, 306 P.3d 48; *Alger*, 2013 WL 5287305; *Navarette*, 294 P.3d 435. In fact, only days ago, this Court rejected a similar bid for review. *See State v Mattox*, 2017 WI 9, 373 Wis. 2d 122, 890 N.W.2d 256, *cert denied* 16-9167, 2017 WL 2189106 (U.S. Oct. 16, 2017). Petitioner offers no reason to chart a different course now.

Moreover, as noted, since 2004, this Court has addressed the testimonial nature of various out-of-court statements in eight opinions. *See Crawford*, 541 U.S. 36; *Davis*, 547 U.S. 813; *Giles*, 554 U.S. 353; *Melendez-Diaz*, 557 U.S. 305; *Bryant*, 562 U.S. 344; *Bullcoming*, 564 U.S. 647; *Williams*, 567 U.S. 50; *Clark*, 135 S. Ct. 2173. Most recently, in *Clark*, 135 S. Ct. 2173, this Court issued a unanimous decision, with concurrences by Justice Scalia joined by Justice Ginsburg (asserting that the primary purpose test was both necessary and sufficient), and Justice Thomas (advocating that formality and solemnity should control). Thus, there is no need now for this Court once again to revisit its Confrontation Clause jurisprudence.

C. This case is a poor vehicle for this Court to consider how the Confrontation Clause applies to autopsy reports.

This case is a poor vehicle for this Court to consider how the Confrontation Clause applies to autopsy reports. Contrary to petitioner's assertions, this case is

not "procedurally clean," and the autopsy report was not "created as part of a criminal investigation," it was not certified in a manner this Court has found renders a statement testimonial, and it did not play "a critical role in this prosecution" (Petition: 19-21).

First, the case is not "procedurally clean" (Petition: 19). In particular, petitioner now complains that the autopsy report was admitted into evidence "in its totality" and that it included the medical examiner's opinion, not just the anatomical and physiological observations (Petition: 29). Petitioner took a contrary position before the trial court, which sullies the issue for this Court's consideration.

Specifically, at trial, when petitioner objected to the admission of the autopsy report on Confrontation Clause grounds, he sought only one remedy: wholesale preclusion of the autopsy report and any testimony by Dr. Ely that was based on it (VD 637-43; T 17-22, 524-26). The People actually offered to introduce the report solely as a basis for the expert medical witness's opinion about the cause of death and agreed not to move it into evidence or to allow the jury to see it (T 19). Defense counsel, however, insisted that he could not have "an effective cross-examination without the document being placed into evidence" (T 21). Further, counsel repeatedly declined the court's invitation to propose redactions (T 59; SA 22-30) which could have included redacting the cause of death, as was the case in *Freycinet*. Accordingly, this issue is not suitable for this Court's review because it was not passed upon by the state courts. *See Tacon v. Arizona*, 410 U.S. 351, 352

(1973) (dismissing writ of certiorari as improvidently granted where state court did not have the opportunity to rule on the issue presented).

Furthermore, petitioner could have sought other remedies that might have obviated any possible Confrontation Clause concern. For example, petitioner could have asked the court to instruct the jurors that the statements in the reports were not accepted for their truth. *See Williams*, 567 U.S. at 57-58 (references to the Cellmark profile did not violate the Confrontation Clause because they were not offered for the truth of the matter asserted). But, because petitioner elected not to make that distinction clear to the jurors, this is not the right case to consider whether and under what circumstances an autopsy report may comport with the requirements of the Confrontation Clause.

Second, the medical examiner did not prepare the autopsy report as "part of a criminal investigation" and prosecution by law enforcement (Petition: 20). OCME is "by law, independent of and not subject to the control of the office of the prosecutor," and is "not a law enforcement agency." *Washington*, 654 N.E.2d at 969. The autopsy report was prepared pursuant to OCME's statutory duties as a public health official, including its duty to "determin[e] the cause or manner of injuries and/or death" (NYC Charter 557[f][3]) in a variety of circumstances, not merely death due to "criminal violence" (NYC Charter 557[f][1]).[8] Since "[t]he People have no power to dictate the contents or practices within OCME [and] Medical

---

[8] Contrary to petitioner's view, it is irrelevant that coroner's reports were inadmissible at common law (Petition: 24). As Professor Capra explains, a coroner's report of yesteryear bears no resemblance to an autopsy report created by modern day expert medical examiners like the ones at OCME. *See* Capra at 89-93.

Examiners have no authority to gather evidence with an eye toward prosecuting a perpetrator" (*Washington*, 654 N.E.2d at 970), the resulting report plainly was not "created as part of a criminal investigation" (Petition: 20).

Furthermore, the medical examiner was required to conduct the autopsy and prepare the report containing her findings and conclusions no matter what she found. Indeed, New York City Charter §557(f)(1) authorizes OCME to perform autopsies where the cause of death is suspected to be criminal, but its powers and duties also extend to deaths arising, *inter alia*, "by accident, by suicide, suddenly when in apparent health, [or] when unattended by a physician, in a correctional facility or in any suspicious or unusual manner." Thus, while it is true that some autopsy reports may later be used in a criminal prosecution, the reports are not prepared specifically for use in a criminal trial, in contrast to the affidavits that were created in *Melendez-Diaz*, 557 U.S. at 324.

To support his current argument, petitioner states, without citation or support in the record, that police officers "typically converse with forensic examiners prior to, or during, such autopsies. And officers usually tell examiners how they think the death occurred" (Petition: 18). Before the trial court, however, petitioner never claimed that the medical examiner was working hand-in-hand with law enforcement agencies to pursue a criminal prosecution. Nor did petitioner suggest that the police had influenced the medical examiner or her assessment of the cause of death. Notably, at trial, *the People* elicited from Det. DeGrazia that two homicide detectives were present during the autopsy (while discussing the

surveillance video, not the autopsy report) (T 243). Petitioner did not attempt to establish that Det. DeGrazia, or any other officer, had spoken to the medical examiner about the victim's injuries, their theories about the cause of death, possible suspects, or anything else related to the pursuit of criminal charges. Nor did petitioner develop or point to any evidence suggesting that the medical examiner was working with the police as part of their investigative team, and not as a truly independent entity. In fact, the totality of the circumstances, viewed objectively, show that the medical examiner was not creating evidence to be used in a criminal prosecution.

The medical examiner had received a report from a doctor at St. Barnabas Hospital which stated that Sherwood had been found by EMS in cardiac arrest with multiple stab wounds to his chest and abdomen (SA 17). Additionally, according to the "Supplemental Case Information" form, which had been completed prior to the autopsy, Det. DeGrazia informed an OCME representative by phone only that, "the case is pending further information and no additional information is available" (SA 17). Similarly, the "Notice of Death" form offered no additional information with respect to a police investigation (SA 18) and a police report, which had been completed on the same day as the autopsy, explicitly stated "Victim was assaulted and stabbed by unknown perp(s) for unknown reason" (SA 20). This evidence plainly demonstrates that the medical examiner had access only to limited information when she conducted the autopsy and that she knew nothing about the

detectives' suspicions or the status of their investigation.[9] Critically, the medical examiner was not aware of any targeted suspect: no suspect was identified in the autopsy report or in the medical examiner's files.

Nor was there any reason for the medical examiner to conclude that her autopsy report would be used as evidence in lieu of testimony at a criminal trial (Petition: 20). An autopsy report is not "inherently inculpatory." *See Williams*, 567 U.S. at 57-58, 84-85; *Id.* at 97-98 (Breyer, J., concurring). Like the DNA profile in *Williams*, the autopsy report here was created at a point when the medical examiner had no way to know whether her observations and conclusions would ultimately prove relevant at a criminal trial.

Here, the medical examiner could not have known whether her observations and conclusions would turn out to be incriminating, exonerating, or both. *See* Capra at 82; *see also Williams*, 567 U.S. at 85. Before the autopsy on November 2, 2011, and throughout the period until the final report was sent to the District Attorney, the medical examiner could not have known what, if any, crime had been committed, much less who was responsible, or whether a prosecution would ensue. There might have been no criminal prosecution against anyone if, for example, the medical examination revealed that Sherwood had died of a heart attack during an unarmed struggle or a drug overdose. Similarly, no prosecution would have ensued

---

[9] The report also shows that OCME conferred with multiple other sources to gather information about the circumstances of Sherwood's death with an eye towards accurately determining his manner and cause of death. Specifically, OCME contacted EMS personnel who responded to the scene, doctors at the hospital who treated Sherwood, and Sherwood's family to learn about where the body was found, what medical treatment was provided (if any), and his medical history.

if the authorities concluded that the fatal wound to the heart had been self-inflicted, accidental, or was legally justified in self-defense or if they had been unable to identify or locate the perpetrator(s). Had the fatal wound been a blow consistent with a kick to the head, and not a stab wound to the heart, the charging decision and the course of a criminal prosecution would have been very different. Even assuming that the authorities pursued a prosecution against a particular individual, the case could have been resolved in any number of ways without using the autopsy report in court. For example, there might have been a plea bargain in which the autopsy report played no part, or a trial in which the parties stipulated to the cause of death (*see Melendez Diaz*, 557 U.S. at 328 [positing defense counsel will stipulate to forensic evidence rather than insist on live testimony that will highlight its importance]; *Bullcoming*, 564 U.S. at 667 [Ginsburg, J.] [same]).

Furthermore, even if there were a trial, the information in the autopsy report might have *exonerated* the accused, or supported his theory of the defense such as justification, third-person responsibility, mitigation, a psychiatric defense, accidental death, or suicide. Notably, in this case, the observations and conclusions contained in the medical examiner's report came to the aid of one individual who had been accused by the authorities—Johanna Rivera. The medical examiner's findings that the cause of death was a stab wound to the heart, and not a head injury, convinced the authorities ultimately not to pursue homicide charges against Ms. Rivera.

Accordingly, it matters little that petitioner had been indicted by the time the autopsy report was certified (as a business record), signed, and delivered to the prosecution (Petition: 20). On the contrary, the critical fact is that Dr. Maloney completed the autopsy and documented her findings—including the fact that the "[i]mmediate cause" of death was a "stab wound of torso with preformation of heart" (SA 13)—on November 2, 2011, nine days before petitioner was arrested and weeks before the grand jury voted an indictment. When the report was finalized, on December 29, 2011, after several other tests were completed (e.g. toxicology), the cause of death remained the same (SA 3). Ultimately, because the medical examiner operated independently of the police and conducted her examination unaware that the police had identified a suspect, it did not matter that by the time she signed and sent the report, the police had arrested petitioner. *See Williams*, 567 U.S. at 135-36 (Kagan, J. dissenting) ("the typical problem with laboratory analyses—and the typical focus of cross-examination—has to do with careless or incompetent work, rather than with personal vendettas[, therefore,] . . . it makes not a whit of difference whether, at the time of the laboratory test, the police already have a suspect"). Since this autopsy report was not created as part of a homicide investigation, this case is not suitable for review on this issue.

Third, the medical examiner did not certify the *findings* or the *results* of the autopsy (Petition: 20). The report contains two certifications. The first was a classic business record certification: a clerk "attest[ed] that the records bearing this certification and authentication are a true and correct copy of the original records so

described and are accurate and genuine" (SA 2). The second certification was a signed statement by Dr. Maloney that she had performed Gabriel Sherwood's autopsy on November 2, 2011, with Dr. Gill present (SA 4). Critically, the medical examiner did not certify, attest, or swear that the statements, findings, or conclusions contained in the autopsy report were true or accurate. This certification is very different than those found to be of testimonial character in *Melendez-Diaz* and *Bullcoming*. *See Leach*, 980 NE2d at 592; *Hall*, 84 A.D.3d at 83-84. Moreover, this is not the kind of formalized statement—like an affidavit, deposition, prior testimony, or confession to police—that would be considered testimonial under Justice Thomas's analysis. *See Williams*, 567 U.S. at 110 (Thomas, J., concurring); *Bryant*, 562 U.S. at 378-79 (Thomas, J., concurring); *Melendez-Diaz*, 557 U.S. at 329-330 (Thomas, J., concurring); *Davis*, 547 U.S. at 836 (Thomas, J., concurring in part and dissenting in part). Thus, it is not clear that this Court will reach the definitive result petitioner suggests (Petition: 20).

Fourth, the autopsy report did not play a "critical role" in the prosecution (Petition: 20-21), as will be discussed in the harmless error section below (*infra*, pp. 33-34).

D. THE FIRST DEPARTMENT CORRECTLY HELD THAT GIVEN THE FACTS AND CIRCUMSTANCES OF THIS CASE, THE AUTOPSY REPORT WAS NON-TESTIMONIAL AND THE MEDICAL EXAMINER'S CORRESPONDING TESTIMONY WAS PROPER.

As this Court recently held, the correct inquiry to determine whether a statement is testimonial is "whether in light of all the circumstances, viewed objectively, the 'primary purpose' of the [statement] was to 'create an out-of-court

substitute for trial testimony.' " *Clark*, 135 S. Ct. at 2180 (*quoting Bryant*, 562 U.S. at 358) (alteration omitted and supplied). Applying this standard, it is clear that the appellate court correctly determined that, under the circumstances here, the autopsy report produced by OCME was non-testimonial.

Petitioner's case was not the first in New York to consider whether an autopsy report is testimonial. In *Freycinet*, the New York Court of Appeals held that a redacted autopsy report was non-testimonial. Like this Court, New York refused to adopt an absolute rule that business records were non-testimonial and, instead, evaluated the totality of the circumstances—"various indicia of testimonality"—to distill the document's primary purpose. *Freycinet*, 892 N.E.2d at 845. In particular, the court noted "the extent to which the entity conducting the procedure is an arm of law enforcement," "whether the contents of the report are a contemporaneous record of objective facts, or reflect the exercise of fallible human judgment," "whether a pro-law-enforcement bias is likely to influence the contents of the report," and "whether the report's contents are directly accusatory in the sense that they explicitly link the defendant to the crime" were important factors to consider. *Id.* (internal citations and quotation marks omitted). The court explained that an autopsy report was non-testimonial given the independent nature of OCME, that the report contained contemporaneous, objective observations (as compared to the opinions communicated during testimony at trial), and that the report did not directly link the defendant to the crime. *Id.* at 846. Put another way, based on the totality of the circumstances, the court found that the primary and sole purpose of

the report was to ascertain "what happened to the victim," not to be used as an out-of-court substitute for live testimony to prove "who killed her." *Id.*

Based on *Freycinet's* clear precedent, in *People v. Acevedo*, 112 A.D.3d 454, 455 (N.Y. App. Div. 2013), *lv denied* 16 N.E.3d 1280 (N.Y. 2014), the First Department held that autopsy reports were non-testimonial and rejected the notion that *Bullcoming* or *Melendez-Diaz* or "any other decision of the Supreme Court of the United States is to the contrary." In *People v. John*, 52 N.E.3d 1114, 1122, 1128-1129, 27 N.Y.3d 294, 307, 315 (N.Y. 2016), the New York Court of Appeals held that a defendant's DNA profile was testimonial in part because it directly linked the defendant to the charged crimes, but explicitly stated that it was "not retreating" from its position that autopsy reports are non-testimonial. Most recently, in *People v. Austin*, 2017 WL 4680012, 2017 N.Y. Slip Op. 07300 (N.Y. 2017), the court reaffirmed its conclusion with respect to a defendant's DNA profile, but, as *John* made clear, this does not alter the court's analysis with respect to autopsy reports.

The Second Circuit has taken a similar position to the state court. In *James*, the court held that an autopsy report was non-testimonial because OCME's independence from law enforcement demonstrated that the report "was not prepared primarily to create a record for use at a criminal trial." 712 F.3d at 98-99. The Circuit Court explained that "a laboratory analysis is testimonial if the circumstances under which the analysis was prepared, viewed objectively, establish that the primary purpose of a reasonable analyst in the declarant's position would

have been to create a record for use at a later criminal trial." *Id.* at 94-95 (citing *Melendez-Diaz*, 557 U.S. at 324; *Bullcoming*, 564 U.S. at 669 [Sotomayor, J., concurring]).

New York's jurisprudence, including the decision in this case, squarely aligns with this Court's precedent, including *Melendez-Diaz* and *Bullcoming*. Most notably, taking into account all of the circumstances, viewed objectively, the primary purpose of the autopsy report at issue was not to "create an out-of-court substitute for trial testimony." *Clark*, 135 S. Ct. at 2180 (*quoting Bryant*, 562 U.S. at 358) (alteration omitted).

As explained above (*supra*, pp. 20-25), the primary purpose of the autopsy report was to document and record the manner and cause of death pursuant to OCME's statutory obligation as a public health official. There is no evidence to suggest that when the medical examiner prepared her report, her primary purpose was to create a *substitute* for live witness testimony or that it was "part of a homicide investigation" (Petition: 3, 11).

In fact, here, the autopsy report was admitted through a live expert medical witness to provide a basis for her opinions about the cause and manner of death. And, of course, that expert witness was subject to cross-examination. Indeed, after reviewing the factual portions of the autopsy report and the nearly 50 photographs that carefully documented Sherwood's injuries, Dr. Ely made her own independent conclusions about the cause of death. She independently concluded that Sherwood's injuries were likely caused by a knife and that the stab wound that penetrated his

heart was the fatal injury (T 35-44, 46-47). On cross-examination, her knowledge and opinions were amply scrutinized. Defense counsel highlighted that Dr. Ely had not been present during the autopsy and that the information in the autopsy report neither identified an assailant, nor ruled out the possibility that the fatal wound was inflicted accidentally during a struggle (T 46-47).

Nor was the autopsy report sufficiently certified to render it testimonial. As noted above (*supra*, pp. 25-26), the medical examiner did not certify the *findings* or the *results* of the autopsy – the report was certified as a business record and the medical examiner certified she performed the examination at issue with Dr. Gil present.[10]

It is equally significant that the factual portions of the report—descriptions of the wounds and the injuries—are statements that were made contemporaneously with the medical examiner's observations. *See Williams*, 567 U.S. at 84-85 (noting the reliability of the scientific process). In this regard, the salient portions of the report are akin to a 911 emergency call in which the speaker recounts current circumstances, rather than someone recalling a story about the past. Additionally, such observations are also comparable to medical records, observing objective facts about an individual to diagnose, which are not considered testimonial. *See Dungo*, 286 P.3d at 450, 449; Capra at 88.

The medical examiner's ultimate determination that the death was a homicide does not change the outcome under this Court's primary purpose test.

---

[10] Additionally, and contrary to petitioner's view, the First Department did not hold that the autopsy report was non-testimonial because it "seem[ed] reliable" (Petition: 28).

This is a forward-looking test that cannot be evaluated in hindsight once a criminal prosecution has ensued. As discussed, the fact that OCME determines a death is a homicide does not mean that a criminal prosecution will follow. *See supra*, pp. 23-24. Also, deaths that are classified by OCME as a suicide or an accident could result in a criminal prosecution (*see e.g.*, New York Penal Law § 125.15[3] [Second-Degree Manslaughter] [criminalizing assisted suicide]; New York Penal Law § 125.12 [Second-Degree Vehicular Manslaughter]), so petitioner's argument that "[i]t is likewise irrelevant that medical examiners sometimes conclude that the cause of death was suicide, an accident, or some other noncriminal occurrence" (Petition: 25) is incorrect and short-sighted. Petitioner's backwards looking rule would require courts to hold that the same exact objective observations made during an autopsy are testimonial if the medical examiner determines the death was a homicide, but non-testimonial if the examiner determines it was a suicide or accident. This post-hoc reconstruction of a medical examiner's purpose for conducting an autopsy and creating a report should be rejected.

Furthermore, the fact that the medical examiner is required by law to send the autopsy report to the prosecutor's office does not transform the report into testimonial evidence (Petition: 13). Pursuant to New York City Charter § 557 (g) "[t]he chief medical examiner shall promptly deliver to the appropriate district attorney copies of all records relating to every death as to which there is, in the judgment of the medical examiner in charge, any indication of criminality." Thus, where a medical examiner suspects criminality, that information must be reported

to the District Attorney. This is no different from the reporting requirement in *Clark*, where this Court noted that "mandatory reporting statutes alone cannot convert a [statement] into a law enforcement mission aimed primarily at gathering evidence for a prosecution." *Clark*, 135 S. Ct. at 2183. Like the teacher in *Clark*, a medical examiner who suspected a crime had been committed "would have acted with the same purpose whether or not they had a state-law duty to report" *Id.*

Finally, petitioner posits that the concern over creating a de facto "statute of limitations" in homicide cases should be addressed by creating "an accommodation in the rare case where, *unlike here*, the examiner is actually deceased or otherwise unavailable at the time of trial" (Petition: 31-32 [emphasis in original]). But it is logically inconsistent and untenable to have a rule that says that a medical examiner's statement is testimonial at its inception as long as she is alive and available, but that the statement loses its testimonial character simply because she has passed away or is unavailable. Furthermore, we are left to wonder what "accommodations" would adequately protect a defendant's right to confront his accuser when the medical examiner has died, but would otherwise be insufficient. If such "accommodations" include things like creating photographs and X-rays that document the medical examiner's procedures, findings, and conclusions (Petition: 19), it should be noted that New York already provides these protections and, in fact, they were available to petitioner. The testifying medical examiner reviewed 46 photographs and 4 X-rays that were contained in OCME's file. Those photographs, which petitioner did not want the jury to know about (T 47), could have been used,

either on cross-examination, or by a defense expert, to show that Dr. Ely's opinions were incorrect or unsound, or that the cause of death was not a knife wound to the heart.[11]

E. ANY ERROR IN THE FIRST DEPARTMENT'S HOLDING WAS HARMLESS.

At trial, the extent of Sherwood's injuries and his cause of death were undisputed. Thus, far from playing "a critical role in this prosecution" (Petition: 20), the autopsy report, and Dr. Ely's expert opinion about what had caused Sherwood's death, were hardly consequential.

Petitioner nevertheless argues that the report was significant because it supported "the prosecution's theory of homicidal intent" (Petition: 21). In fact, at trial defense counsel used the report, and the information it contained, to support the defense theory that petitioner was not guilty of Second-Degree Murder because he did not intend to kill Sherwood (T 424-25, 439).[12] Critically, the jurors —who never saw the report as it was not published and they did not request it– *agreed* with petitioner, *acquitted* him of Second-Degree Murder, and convicted him only of First-Degree Manslaughter.

First-Degree Manslaughter, however, does not require proof of "homicidal intent" (Petition: 21). Rather, all that was needed was proof that petitioner intended to cause Sherwood "serious physical injury" (New York Penal Law § 125.20[1]).

---

[11] Along these same lines, the way to prevent wrongful convictions based on lapses, lies, and medical examiner fraud (Petition: 16-17), is to have another medical expert thoroughly review the medical examiner's work, by scrutinizing not only the notations made in the report, but the accompanying photographs and X-rays that document the examination and the injuries.

[12] Again, contrary to his assertion, petitioner did not testify that he did not intend to cause serious physical injury to Sherwood (Petition: 21). He did not testify at trial at all or present any evidence.

Setting aside the medical evidence, including Dr. Ely's opinion about injuries and cause of death, the circumstances of the dispute on the street and the surveillance video that depicted petitioner repeatedly stabbing at Sherwood, in combination with the fact that petitioner fled the scene and, when finally apprehended, admitted to fighting Sherwood, left no doubt that petitioner intended to seriously injure Sherwood and did not simply cut him "unintentionally" or accidently during a struggle (Petition: 21).

## CONCLUSION

The petition for a writ of certiorari should be denied.

DARCEL D. CLARK
District Attorney, Bronx County

NANCY D. KILLIAN
Appeals Bureau, Chief

GINA MIGNOLA
Appeals Bureau, Deputy Chief

JORDAN K. HUMMEL
Assistant District Attorney
*Counsel of Record*

Office of the District Attorney, Bronx County
198 East 161st Street
Bronx, New York 10451
(718) 838 - 7322
hummelj@bronxda.nyc.gov

No. 17-5385

_____

In The

# Supreme Court of the United States

_____

James Garlick,

*Petitioner,*

*v.*

State of New York,

*Respondent.*

_____

On Petition for a Writ of Certiorari
to the Appellate Division, Supreme Court of
New York, First Judicial Department.

_____

REPLY BRIEF FOR PETITIONER

_____

Jeffrey L. Fisher
Stanford Law School
  Supreme Court Litigation Clinic
559 Nathan Abbott Way
Stanford, CA 94305

Robert S. Dean
  *Counsel of Record*
Center For Appellate Litigation
120 Wall Street, 28th Floor
New York, New York 10005
(212) 577-2523 ext. 502
rdean@cfal.org

_____

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

REPLY BRIEF FOR PETITIONER ........................................................................ 1

   I.   The Conflict is Deep and Intractable. .......................................................... 1

   II.  This Case is an Excellent Vehicle to Resolve the Conflict. ........................ 3

   III. The Appellate Division's Holding is Incorrect. ........................................... 7

CONCLUSION ........................................................................................................ 12

## TABLE OF AUTHORITIES

### <u>Cases</u>

*Bullcoming v. New Mexico*, 564 U.S. 647 (2011) ................................................. passim

*Commonwealth v. Carr*, 986 N.E.2d 380 (Mass. 2013) ................................... 2

*Crawford v. Washington*, 541 U.S. 36 (2004) ...................................................... 8, 9

*Cuesta-Rodriguez v. State*, 241 P.3d 214 (Ok. 2010),
*cert. denied*, 565 U.S. 885 (2011) ........................................................................ 2

*James v. United States*, 134 S. Ct. 2660 (2014) ................................................ 2

*Mattox v. Wisconsin*, 138 S. Ct. ___ (Oct. 16, 2017) (No. 16-9167) ............... 2

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ..................................... passim

*Missouri v. Frye*, 566 U.S. 134 (2012) ................................................................ 11

*Ohio v. Clark*, 135 S. Ct. 2173 (2015) ................................................................ 8

*People v. Childs*, 810 N.W.2d 563 (Mich. 2012) ............................................... 2

*State v. Bass*, 132 A.3d 1207 (N.J. 2016) .......................................................... 2

*State v. Kennedy*, 735 S.E.2d 905 (W. Va. 2012); ............................................ 2

*State v. Liu*, 315 P.3d 493 (Wash. 2014),
*cert. denied*, 134 S. Ct. 2842 (2014) .................................................................. 2

*State v. Locklear*, 681 S.E. 2d 293 (N.C. 2009) ................................................ 2

*State v. Navarette*, 294 P.3d 435 (N.M. 2013),
*cert. denied*, 134 S. Ct. 64 (2013) ...................................................................... 2

*United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012) ............................. 2

*United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011),
*cert. denied*, 567 U.S. 918 (2012) ...................................................................... 2

## **<u>Statute</u>**

N.Y. Penal Law § 125.20 ...................................................................................7

## REPLY BRIEF FOR PETITIONER

The question presented is "[w]hether a certified autopsy report—created as part of a homicide investigation and asserting that the cause of death was homicide—is 'testimonial.'" Pet. i. The State does not dispute that this question is extremely important. And it cannot seriously deny that there is a deep and intractable conflict over the issue. Consequently, the only real question is whether this is the right vehicle—and the right time—to resolve the issue.

It is. None of the State's quibbles with the procedural history or record diminish the suitability of this case as a vehicle for resolving the questioned presented. As the State's "kitchen-sink" approach to the merits of this important and recurring constitutional question confirms that this Court's intervention is essential. This Court should grant certiorari to set the record straight on the Confrontation Clause's application to autopsy reports created as part of homicide investigations and asserting that the cause of death was homicide.

## I.   The Conflict is Deep and Intractable.

The State correctly observes that the testimonial status of an autopsy report hinges on the circumstances of the report's creation. Brief in Opp. (BIO) 10. But the State is wrong that so many factors influence the calculus that it is impossible to identify a "genuine conflict" over whether a certain class of reports is testimonial. BIO 10, 14. As the Petition demonstrates, a deep conflict exists over whether reports "created as part of a homicide investigation and asserting that the cause of death was homicide" are testimonial. Pet. i; *see also id.* at 11-16. That is a significant class of

autopsy reports, and the Confrontation Clause's treatment of them presents a chronic issue whose resolution is essential to the criminal justice system.

Perhaps the best evidence of the conflict over the testimonial status of this class of reports can be found in recent filings from state and federal governments in cases involving autopsy-related reports. Earlier this Term, the State of Wisconsin explained that several courts have held that autopsy reports are testimonial where "law enforcement either participated in the autopsy or was otherwise closely involved," or "it was clear before the autopsy began that the death involved criminal activity." Br. in Opp. 11-12, *Mattox v. Wisconsin,* 138 S. Ct. ___ (Oct. 16, 2017) (No. 16-9167). The Solicitor General has likewise acknowledged that many courts deem autopsy reports testimonial when "the autopsy was conducted as part of a criminal investigation" or "when criminal proceedings were anticipated." Br. in Opp. 26, *James v. United States*, 134 S. Ct. 2660 (2014) (No. 13-632). As support for these assertions, those two filings cited no fewer than *ten* cases from federal courts of appeals or state courts of last resort (the seven cited in the Petition at 12-13, plus three others).[1]

---

[1] *See United States v. Ignasiak*, 667 F.3d 1217, 1229-35 (11th Cir. 2012); *United States v. Moore*, 651 F.3d 30, 69-73 (D.C. Cir. 2011), *cert. denied*, 567 U.S. 918 (2012); *State v. Bass*, 132 A.3d 1207, 1225 (N.J. 2016); *State v. Liu*, 315 P.3d 493, 510-12 (Wash. 2014), *cert. denied*, 134 S. Ct. 2842 (2014); *State v. Navarette*, 294 P.3d 435, 440-42 (N.M. 2013), *cert. denied*, 134 S. Ct. 64 (2013); *Commonwealth v. Carr*, 986 N.E.2d 380, 398-400 (Mass. 2013); *State v. Kennedy*, 735 S.E.2d 905, 917 (W. Va. 2012); *People v. Childs*, 810 N.W.2d 563, 563 (Mich. 2012); *Cuesta-Rodriguez v. State*, 241 P.3d 214, 228-29 (Ok. 2010), *cert. denied*, 565 U.S. 885 (2011); *State v. Locklear*, 681 S.E. 2d 293 (N.C. 2009).

The reports in *Mattox* and *James* were *not* created in connection with homicide investigations. But there can be no serious debate that the report here was. The victim died in a violent altercation. And as the State acknowledges, the medical examiner was told before conducting the autopsy that the "App[arent] Manner" of death was "Homicide." BIO 5; Resp. Supp. Appx. 18; Pet. 4. The investigating detectives were also "present during the autopsy." BIO 6. The examiner declared in her report that the cause of death was indeed homicide and documented the allegedly fatal injuries. *Id.* The medical examiner then promptly delivered the report describing the serious felony to the District Attorney's Office. Pet. 6.

In short, there can be no doubt that the holding below (as well as the decisions from five other jurisdictions cited at Pet. 13) squarely conflict with the ten decisions mentioned above. The time has come to resolve that ever-widening split. The admissibility of autopsy reports created in connection with homicide investigations should not depend on whether the case is being tried in New York or, say, New Jersey. Whatever percolation this Court has been waiting for is no longer serving any useful purpose.

## II. This Case is an Excellent Vehicle to Resolve the Conflict.

The State argues that there are various imperfections with this case that render it unsuitable for resolving whether autopsy reports created in connection with homicide investigations are testimonial. None of the State's arguments is persuasive. The Appellate Division and trial court expressly rejected petitioner's confrontation

argument exclusively on the ground that the autopsy report "was not testimonial." Pet. App. 3a, 18a-24a, 27a. This Court can and should decide whether that holding is correct.

1. The State contends that the case is not "procedurally clean" because petitioner did not to ask the State to redact portions of the autopsy report, to "introduce the report solely as a basis for the expert witness's opinion about cause of death," or to have the expert witness testify based on the report without putting it into evidence. BIO 18. This is all misdirection. The State does not, and cannot, dispute that petitioner argued in the trial court that the autopsy report was inadmissible because it was testimonial. *See* Pet. App. 7a-16a, 23a, 27a. The trial court rejected that argument. *Id.* 18a-20a, 27a. The State then elected to introduce the entire report for the truth of the matter asserted. *Id.* 19a, 25a. Having made that choice—and having persuaded the Appellate Division to condone it on the ground that the report was not testimonial, *see id.* 3a—the State has put the issue into play here.

It does not matter whether petitioner also asked for the State to introduce the report. BIO 18. Petitioner made this request only *after* the trial court held that the report was not testimonial and, therefore, that the State could have a surrogate witness testify based on its content. Pet. App. 18a-19a. Having had those objections overruled, the defense had to do the best it could under the circumstances. And here, as counsel stated on the record, counsel determined that the best way to protect his client was to use the autopsy report to cross-examine Dr. Ely. *See id.* 19a.

Lest there be any doubt that the question presented was properly preserved below, Petitioner "renewed" his objection to the report's admissibility on the brink of the prosecution's introducing it and then again after Dr. Ely's surrogate testimony concluded. Pet. App. 23a-24a, 27a. The trial court responded: "I am sure you covered your record." *Id.* 27a.

2.   The State next maintains that the autopsy report here is not testimonial because various aspects of state and local law render medical examiners in New York City "independent of and not subject to the control of either the police of the office of the prosecutor." BIO 19 (citation omitted). This, however, is not really a vehicle argument. That is, the State does not argue that medical examiners in the ten jurisdictions referenced above—or medical examiners generally—operate under meaningfully different legal regimes. That being so, there is nothing about state and local law governing New York medical examiners that renders this case out of the ordinary.

As for the merits of this "independence" argument, petitioner addresses that below. *See infra* at 10.

3. The autopsy report here contains a certification that the medical examiner "performed Gabriel Sherwood's autopsy." Pet. App. 31a. And the overall report is obviously highly formalized. The State nonetheless argues that the report is not sufficiently formal to meet Justice Thomas's test for the testimonial status of forensic reports. This is so, according to the State, because the examiner did not specifically

5

certify "that the statements, findings, or conclusions contained in the autopsy report were true or accurate." BIO 25.

The State's parsing of the medical examiner's certification strains credulity. The examiner's certification, *see* Pet. App. 31a, is clearly intended to cover the entire document. Indeed, the examiner's signature—the action that makes the certification official and effective—does not appear until the end of the report, after all of the findings and conclusions have been laid out. *Id.* 35a.

Even if the examiner's certification did not cover the entire document, it would not matter. The State does not dispute that the examiner's assertion that she "performed Gabriel Sherwood's autopsy" was sufficiently formal to satisfy Justice Thomas's test. BIO 25. Absent that formalized assertion, none of the findings or conclusions that follow in the report would have had any value; they would have all lacked any basis in evidence. Accordingly, the testimonial status of the examiner's assertion that she conducted the autopsy here is alone sufficient to require resolution of the question presented.

4. The State's harmless-error theory is similarly unavailing. The State never advanced this argument in the New York courts, and no state court has considered this issue. So (insofar as the argument is properly preserved) it should be left for remand. *See, e.g.*, *Bullcoming v. New Mexico*, 564 U.S. 647, 668 n.11 (2011); *Melendez-Diaz*, 557 U.S. 305, 329 n.14 (2009).

In any event, the State's argument is baseless. Petitioner maintained at trial that the prosecution failed to prove that he—as opposed to co-defendant Rivera—caused the victim's death. *See* Tr. 435, 439-41. The State, through its surrogate medical examiner, Dr. Ely, used the autopsy report's findings and conclusions to dispute that contention. Ely 23-58; Pet. 7-8. The prosecutor even asked Dr. Ely to "use the designation[s] in the autopsy report to go through each of the injuries sustained by Mr. Sherwood to tell us exactly what was observed." Ely 37. Dr. Ely did just that. *Id.* at 37-44. Then in summation, the prosecutor showed the report to the jury and relied heavily upon it to establish "the cause of death." Tr. 448-453, 466 (Oct. 2, 2013); *see also* Pet. 9 (quoting summation).

Beyond cause of death, the autopsy report's conclusions regarding the number and nature of the stab wounds proved an intent to cause "serious physical injury," thus bolstering the prosecution's first-degree manslaughter theory. Pet. 8, 21; *see* N.Y. Penal Law § 125.20(1). Had the court precluded the autopsy report, the prosecution could not have disproven the real possibility that petitioner inadvertently hurt Mr. Sherwood with the knife during a struggle for it. Pet. 8, 21.

### III. The Appellate Division's Holding is Incorrect.

The State's argument on the merits confirms the need for this Court's intervention. In *Melendez-Diaz*, and *Bullcoming*, this Court established a simple rule: "An analyst's certification prepared in connection with a criminal investigation or prosecution . . . is 'testimonial.'" *Bullcoming*, 564 U.S. at 658-59 (citing *Melendez-*

7

*Diaz*, 557 U.S. at 318-25). This rule is rooted in an historical principle that is equally straightforward: The Confrontation Clause forbids prosecutorial proof "via *ex parte* out-of-court affidavits." *Melendez-Diaz*, 557 U.S. at 324-25, 329; *accord id.* at 329-30 (Thomas, J., concurring). Try as the State might, it cannot escape that rule here.

   1. Quoting *Ohio v. Clark*, 135 S. Ct. 2173, 2183 (2015), the State first argues that certified autopsy reports created in connection with criminal investigations are not testimonial because their primary purpose is not to "create an out-of-court *substitute* for trial testimony." BIO 25-26 (emphasis added) (internal quotations omitted). There is an immediate problem, however, with this argument: *Clark* is not a forensic evidence case. Indeed, *Clark* did not even mention *Melendez-Diaz* or *Bullcoming* at all. Instead, *Clark* involved a three-year-old child's statement to a teacher, and this Court's analysis applied only to statements describing events in informal "conversations" with teachers or police officers. 135 S. Ct. at 2180. Because the *Clark* opinion does not address, much less overrule, *Melendez-Diaz* or *Bullcoming*, those cases continue to govern here.

Furthermore, applying a "substitute for trial testimony" rule in the context of formal documentary evidence such as forensic reports would subvert history and gut the Confrontation Clause. This Court has observed that "[i]t is doubtful that the original purpose" of the certified statements taken under the 16th century Marian bail and committal statutes "was to produce evidence admissible at trial." *Crawford v. Washington*, 541 U.S. 36, 43-44 (2004). Yet the Confrontation Clause was adopted

to prevent the introduction of precisely these sorts of statements without an opportunity for cross-examination. *Id.* at 50. Thus, whatever the rule may be with respect to statements made in informal conversation, "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact" has always been considered testimonial—even if made simply to serve an "investigative function" as opposed to create evidence for a trial. *Id.* at 51-53 (citation omitted); *see also Bullcoming*, 564 U.S. at 664-65 (report must be made in connection with criminal "investigation *or* prosecution") (emphasis added); *Melendez-Diaz*, 557 U.S. at 310.

Any other rule would lead to absurd results. Suppose a medical examiner declares in a report: "In order to aid the police investigation into this death, I hereby find that John Smith killed the victim by poisoning, and I look forward to testifying against this evil man at trial." Under the State's theory, that autopsy report would be *nontestimonial* since the medical examiner would be merely assisting the investigation, not aiming to create a substitute for trial testimony. So too with pretrial depositions and police interrogations of eyewitnesses, performed and transcribed for purposes such as discovery and pinning down investigative facts. These formalized statements are all "core" testimonial statements. *Crawford*, 541 U.S. at 51-52. Yet applying the "substitute-for-trial-testimony" rule to such statements would exclude them all from the Clause's reach.

That the holding below can be defended only by proposing such a dramatic change in constitutional law makes this Court's intervention all the more necessary.

2. As a fallback, the State offers a dizzying grab bag of "factors" that it says show that the autopsy report here is nontestimonial. But this Court has already rejected the relevance of many of these factors, and the remaining proposals are similarly nonsensical.

a. The State repeatedly asserts that, in light of state and local law, medical examiners in New York are neutral, "independent" "public health official[s]," as opposed to agents of the police department. BIO 11, 12, 13, 19, 21, 24, 26. But *Melendez-Diaz*, which involved analysts employed by the "[d]epartment of [p]ublic [h]ealth," squarely held such "independence" irrelevant. 557 U.S. at 308, 317, 319 n.6. *Bullcoming* likewise rejected the theory that a forensic report is nontestimonial when created by an "'independent scientis[t]'" under "'a non-adversarial public duty.'" 564 U.S. at 664 (alteration in original).

b. The State asserts that the assertions in the autopsy report "were made contemporaneously with the medical examiner's observations." BIO 29. But this Court has twice rejected the relevance of contemporaneity. *Melendez-Diaz*, 557 U.S. at 315-16; *Bullcoming*, 564 U.S. at 660.

c. The State asserts that the autopsy report was not "directly accusatory," insofar as it did not directly identify a perpetrator. BIO 26 (citation omitted). Again, this Court has repeatedly rejected the relevance of this factor. *See* Pet. 26 (citing case law).

d. The State asserts that this case "could have been resolved in any number of ways without using the autopsy report in court," such as through "a plea bargain."

10

BIO 23. True enough. But the same could be said of every formalized pretrial statement that implicates the Confrontation Clause. *Cf. Missouri v. Frye*, 566 U.S. 134, 143 (2012) ("Ninety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas.").

e. The State asserts that medical examiners are required to conduct autopsies and write reports regardless of whether evidence of criminality is found. BIO 20. But the same was true of the analysts in *Melendez-Diaz.* 557 U.S. at 308. And this case concerns only reports that actually allege criminality. Such allegations confirm that the reports will "aid [ ] a police investigation" and, if necessary, be "available for use at a later trial." *Bullcoming*, 564 U.S. at 664.

f. Finally, the State asserts that the information in the autopsy report might have "*exonerated* the accused," if, for example, it concluded that the victim suffered "accidental death" or "suicide." BIO 23 (emphasis added by the State). But if the report had reached such a conclusion, then it would have fallen outside the question presented. We are concerned here solely with reports that (1) are conducted in conjunction with criminal investigations *and* (2) assert the cause of death is homicide. *See* Pet. i. Where a medical examiner makes such a declaration, she plainly offers a "solemn declaration or affirmation made for the purpose of establishing some fact" potentially relevant to a later criminal prosecution. *Melendez-Diaz*, 557 U.S. at 310 (citations omitted).

## CONCLUSION

For the foregoing reasons, the petition for a writ of certiorari should be granted.

Respectfully submitted,

Jeffrey L. Fisher
Stanford Law School
  Supreme Court Litigation Clinic
559 Nathan Abbott Way
Stanford, CA 94305

Robert S. Dean
  *Counsel of Record*
Center for Appellate Litigation
120 Wall Street, 28th Floor
New York, New York 10005
(212) 577-2523, ext. 502
rdean@cfal.org

November 14, 2017



**DEPARTMENT OF HEALTH**
**OFFICE OF CHIEF MEDICAL EXAMINER**
520 FIRST AVENUE, NEW YORK, N.Y. 10016
CHARLES S. HIRSCH, M.D., **Chief Medical Examiner**

RECORDS DEPARTMENT

Fax: 212-323-1960

NAME: **Gabriel Sherwood**          M.E. # **B/11/4597**

SENT TO DISTRICT ATTORNEY FOR COUNTY OF: **BRONX**

BY: Yvelisse Matias          DATE SENT: **December 30, 2011**
(CLERICAL ASSOCIATE III)

| | ITEM: | | ITEM: |
|---|---|---|---|
| ✓ | AUTOPSY REPORT | | SUPPLEMENTAL REPORT (OTHERS) |
| ✓ | TOXICOLOGY REPORT | | WOUND CHART |
| | NEUROPATH. CONSULT REPORT | ✓ | AUTOPSY NOTES/DIAGRAM |
| ✓ | FAMILY IDENTIFICATION | ✓ | CASE WORKSHEET |
| ✓ | ID SURVEY FORM: | ✓ | MICROSCOPIC REPORT |
| | POLICE IDENTIFICATION | | DENTAL CONSULT REPORT |
| | ID BY FINGERPRINTS REPORT | | MICROBIOLOGY REPORT |
| | CONFIRMATION OF ID | | MOLECULAR GENETIC TESTING REPORT |
| ✓ | HOSPITAL REPORT | | X-RAY CONSULT REPORT |
| ✓ | TEL. NOTICE OF DEATH | ✓ | POLICE REPORT ✓ |
| ✓ | SUPPLEMENTAL REPORT (INVESTIGATION) | | IDENTIFICATION TAG |
| | SCENE INVEST. REPORT | ✓ | IDENTIFICATION PHOTO(S) |
| | AUDIO DICTATION | | |

PHOTOGRAPHS, X-RAYS AND AUDIO TAPES ARE NOT AUTOMATICALLY SUPPLIED AND MUST BE SEPERATELY REQUESTED. BACKUP LABORATORY DATA MUST SPECIFICALLY REQUESTED AFTER A CASE CONFERENCE. MICROSCOPIC SLIDES AND RETAINED TISSUES CAN BE REVIEWED AT THE OFFICE OF CHIEF MEDICAL EXAMINERS AS LONG AS APPRORIATE AUTHORIZATION IS OBTAINED.

# OFFICE OF THE CHIEF MEDICAL EXAMINER
## OF THE CITY OF NEW YORK

STATE OF NEW YORK )
                         )    SS.:
COUNTY OF NEW YORK )

### CERTIFICATION AS A BUSINESS RECORD

I have been delegated by Charles S. Hirsch, MD, Chief Medical Examiner, to certify and authenticate records of the Office of the Chief Medical Examiner of the City of New York ("OCME") pursuant to Rule 4518 of the New York Civil Practice Law and Rules.

OCME has been ordered to produce certified copies of documents concerning decedent, **Gabriel Sherwood** **ME #B11-4597.**

OCME is a governmental office organized under the New York City Charter § 557 and the New York City Administrative Code §§17-201 – 17-206. All records contained in its Records Department concerning this matter are maintained in OCME's regular course of business. OCME medical examiner files contain autopsy records generated by OCME staff in the regular course of their business, as well as documents received from other sources which are relevant to the particular case.

The copies provided here represent all the documents contained in the above-cited OCME medical examiner case file.

I have examined the original records maintained by OCME's Records Department and I have compared the copies provided here to the originals from which they were photocopied, and I attest that the records bearing this certification and authentication are a true and correct copy of the original records so described and are accurate and genuine.

I have affixed the official seal of the Office of the Chief Medical Examiner of the City of New York to certify these copies as genuine and as business records of the Records Department of the Office of the Chief Medical Examiner.

Print Name: **Yvelisse Matias**
Title:       **Clerical Associate III**

Date:       **December 30, 2011**



# OFFICE OF CHIEF MEDICAL EXAMINER
### CITY OF NEW YORK

## REPORT OF AUTOPSY



**Name of Decedent:** Gabriel Sherwood     **M.E. #:** B11-4597

**Autopsy Performed by:** Katherine Maloney, M.D.     **Date of Autopsy:** 11/2/2011

---

### FINAL DIAGNOSES

I. **STAB AND INCISED WOUNDS OF TORSO**
    A. **PENETRATION OF HEART**
        1. **HEMOPERICARDIUM AND HEMOTHORAX**
        2. **PNEUMOTHORAX**
    B. **PENETRATION OF DIAPHRAGM**
II. **BLUNT IMPACT INJURIES OF HEAD**
    A. **ABRASIONS AND CONTUSIONS OF FACE**
III. **INCISED WOUND OF RIGHT THIRD DIGIT**
    A. **PERFORATION OF SKIN AND SUBCUTANEOUS TISSUE**

---

**CAUSE OF DEATH:**     STAB WOUND OF TORSO WITH PERFORATION OF HEART

**MANNER OF DEATH:**     HOMICIDE

THIS IS A TRUE COPY
Office of Chief Medical Examiner
This record cannot be released without
prior consent from the Office of Chief
Medical Examiner, New York City, N.Y.

Yvelisse Matias Y.M.
12/30/2011

## OFFICE OF CHIEF MEDICAL EXAMINER
## CITY OF NEW YORK

### REPORT OF AUTOPSY

### CASE NO. B11-4597

*I hereby certify that I, **Katherine Maloney**, M.D., City Medical Examiner - I, have performed an autopsy on the body of **Gabriel Sherwood**, on the 2ⁿᵈ of November, 2011, commencing at 9:00AM in the Bronx Mortuary of the Office of Chief Medical Examiner of the City of New York.*

*This autopsy was performed in the presence of Dr. James Gill.*

### EXTERNAL EXAMINATION:
The body is of a well-developed, well-nourished, average-framed, 5', 7", 159 lb Black man (BMI 24.9) whose appearance is consistent with the given age of 35 years. The curled black hair measures up to approximately ¼". The mustache and beard measure up to 1/8". The nose and facial bones are palpably intact. The eyes have brown irides and the conjunctivae are without hemorrhage, petechiae or jaundice. The oral cavity has natural dentition in good repair with braces (see injuries below). The torso and extremities have the injuries described below. The external genitalia are of a normal adult man.

There is a gray fiber on the back of the head (submitted to evidence). There is a 2-1/2" linear scar of the left side of the head above the ear. There is a curvilinear area of no hair growth of the anterior scalp measuring 3". There are two oval scars of the anterior right leg measuring ½" in greatest dimension.

### POSTMORTEM CHANGES:
There is moderate symmetrical rigor mortis of the upper and lower extremities, neck and jaw. Lividity is purple, fixed, and posterior. The body is cold.

### THERAPEUTIC PROCEDURES:
In place are bandages of the torso and a single lumen intravenous catheter in the left antecubital fossa.

### INJURIES:
There are six sharp injuries of the torso, one sharp injury of the right hand, and blunt injuries of the head. The sharp injuries are labeled "A" through "G" for descriptive purposes only; no sequence is implied.

B11-4597                    **GABRIEL SHERWOOD**                    Page 3

<u>Sharp force injuries of torso and extremity:</u>

**A. Stab Wound of Right Chest**
A stab wound of the right chest is centered 19" below the top of the head, ¼" right of midline, and 3-1/2" medial to the right areola. It is obliquely oriented with the right angle superior; there is no discernable blunt edge. It is 5/8" long on the surface of the skin without natural skin tension. After penetrating the skin and muscle, the knife proceeded through the cartilaginous portion of the right 5th rib and the superior aspect of the diaphragm leaving a ¼" penetration. The direction of penetration is from front to back and slightly downward without discernible right or left deviation. The estimated depth of penetration is 1-1/2 to 2-1/2".

**B. Incised Wound of Right Chest**
A 1" curvilinear, incised wound is of the right chest with vertical orientation, and a depth of approximately 1/8". It is located 20" below the top of the head, midline and 4" medial to the right areola. It did not injure major vessels.

**C. Stab Wound of Left Chest**
A stab wound of the left chest is centered 21" below the top of the head, 5-1/2" left of midline, and 3-1/2" lateral to the left areola. It is horizontally oriented and a 1/32" blunt edge is directed laterally. It is ½" long on the surface of the skin without natural skin tension. After penetrating the skin and muscle, the knife proceeded between left 5th and 6th ribs, the pericardial sac (¾" defect), and the anterior wall of the right ventricle (½" defect). There is approximately 100 ml of sanguineous fluid in the pericardial sac, and approximately 1-1/2 liters of sanguineous fluid and blood clots in the left pleural cavity. The direction of penetration is from front to back and slightly medial without discernible vertical deviation. The estimated depth of penetration is 4-1/2 to 5-1/2". Review of the postmortem chest x-ray shows that the heart is deviated to the right. Upon opening the left pleural cavity, there is the sound of air release. The left lung is atelectatic. There is no intracardiac air embolism.

**D. Incised/Superficial Stab Wound of Left Abdomen**
An incised/superficial stab wound of the left abdomen is centered 21-1/2" below the top of the head, 5-1/2" left of midline, and 3-1/2" below the right areola. It is obliquely oriented with the left angle superior; there is no discernable blunt edge. It is 5/16" long on the surface of the skin with natural skin tension. The wound penetrates the skin and subcutaneous tissue. The estimated depth of penetration is ¼".

**E. Incised/Superficial Stab Wound of Left Abdomen**
An incised/superficial stab wound of the left abdomen is centered 26" below the top of the head, 4" left of midline, and 8" below the right areola. It is horizontally oriented; there is no discernable blunt edge. It is 3/8" long on the surface of the skin with natural skin tension. There are superficial, linear abrasions extending from each edge of the wound,

measuring ½" on the lateral aspect and 1/8" on the medial aspect. The wound penetrates the skin and subcutaneous tissue. The estimated depth of penetration is ¼".

### F. Incised/Superficial Stab Wound of Right Back
An incised/superficial stab wound of the right back is centered 19-1/2" below the top of the head, 6-1/2" right of midline, and 9-1/2" from the top of the shoulder. It is obliquely oriented with the left angle superior; there is no discernable blunt edge. It is 3/8" long on the surface of the skin with natural skin tension. The wound penetrates the skin and subcutaneous tissue. The estimated depth of penetration is ¼".

### G. Incised Wound of Right Third Digit
There is a ¼" superficial, incised wound of the medial right middle finger over the proximal interphalangeal joint. It did not injure major vessels.

### Blunt Impacts to head
There is a ½ x ½" red abrasion of the left lateral forehead, located 2-1/2" above the left ear and 2" posterior to the glabella. There is a 1/8" red abrasion of the left side of the bridge of the nose. There are red abrasions and pink contusions of the upper lip on the left side measuring ¾". There are no scalp contusions and the skull is not fractured. There is no epidural, subdural or subarachnoid hemorrhage. The brain has no contusions.

**The injuries listed above, having been described once, will not be repeated.**

### INTERNAL EXAMINATION:
**BODY CAVITIES:** The organs are in their normal situs. The peritoneal cavity contains normal amounts of serous fluid and is without hemorrhage or adhesion. The abdominal wall pannus is 1/2 inch thick.

**HEAD:** The scalp has no contusion. The brain weighs 1500 gm and is normal size and shape. The cerebral hemispheres are symmetrical with the usual pattern of sulci and gyri. The leptomeninges are thin and clear. The cerebral vessels are without atherosclerosis or aneurysm. The cranial nerves are normally distributed. The white and gray matter, deep nuclei and ventricles are unremarkable. There are no focal lesions. The brainstem and cerebellum are unremarkable.

**NECK:** The cervical vertebrae, hyoid bone, tracheal and laryngeal cartilages, and paratracheal soft tissues are without trauma. The upper airway is patent. The tongue is unremarkable.

**CARDIOVASCULAR SYSTEM:** The heart weighs 350 gm and has a normal distribution of right predominant coronary arteries without atherosclerotic stenosis. There is no

recent thrombus. The myocardium is homogeneous, dark red and firm without pallor, softening or fibrosis (see injuries section above). The left ventricle wall is 1.4 cm and the right is 0.2 cm thick. The foramen ovale is patent. The endocardial surfaces and four cardiac valves are otherwise unremarkable. The aorta is with fatty streaks. The venae cavae and pulmonary arteries are patent.

**RESPIRATORY SYSTEM:** The right lung weighs 460 gm and the left weighs 210 gm. The red parenchyma is without masses, consolidation or obstruction (see injuries section above). The bronchi are unremarkable.

**LIVER, GALLBLADDER, PANCREAS:** The liver weighs 1330 gm and has an intact capsule. The brown parenchyma is without fibrous texture. The gallbladder contains approximately 5 cc of dark green bile without stones. The pancreas is unremarkable in lobulation, color and texture.

**HEMIC AND LYMPHATIC SYSTEMS:** The spleen weighs 90 gm and has an intact capsule. The color, red and white pulp and consistency are unremarkable. There are no enlarged lymph nodes.

**GENITOURINARY SYSTEM:** The right kidney weighs 140 gm and the left weighs 150 gm. Each kidney has a smooth red-brown surface with an unremarkable architecture and vasculature. The ureters maintain uniform caliber into an unremarkable bladder containing 10 ml of urine. The prostate is not enlarged. The testes are unremarkable.

**ENDOCRINE SYSTEM:** The pituitary, thyroid, and adrenal glands are normal color, size and consistency.

**DIGESTIVE SYSTEM:** The esophagus and gastroesophageal junction are unremarkable. The stomach contains approximately 60 cc of tan fluid and food matter. The gastric mucosa and small intestine are unremarkable. There is focal red discoloration of the adventitial aspect of the posterior rectum (Comment: this may be consistent with lividity). The vermiform appendix is present.

**MUSCULOSKELETAL SYSTEM:** The vertebrae, clavicles, sternum, and pelvis are without fracture. The musculature is normally distributed and otherwise unremarkable.

HISTOPATHOLOGY:
Sections are submitted for microscopic examination. A separate report will be issued.

TOXICOLOGY:
Specimens are submitted for toxicologic analysis. A separate report will be issued.

FORENSIC BIOLOGY:

B11-4597       **GABRIEL SHERWOOD**       Page 6

Fingernail, scalp hair and blood specimens are submitted to Forensic Biology.

**POST-MORTEM PHOTOGRAPHY AND RADIOGRAPHY:**
Post mortem photographs and radiographs are taken and retained.

**EVIDENCE:**
The gray fiber identified on the back of the head is submitted to evidence per the usual protocol.

Katherine Maloney, M.D.
City Medical Examiner - I

KFM
DRAFT: 11/2/2011
FINAL: 12/29/2011

**The City of New York**
**Office of Chief Medical Examiner**
**520 First Avenue**
**New York, NY 10016**

# Forensic Toxicology Laboratory

Deceased: **Gabriel Sherwood**     M.E. Case No.: **BX1104597**     Lab. No.: **4659/11**

Autopsy By: **Dr. Maloney**     Autopsy Date: **11/02/11**

Specimens Received:
**Bile, Blood, Brain, Gastric Content, Liver, Urine, Vitreous Humour**

Specimens Received in Laboratory By: **Michelle Dumit**     Date Received: **11/03/11**

Equivalents: 1.0 mcg/mL = 1.0 mg/L = 0.1 mg/dL = 1000 ng/mL     1.0 mcg/g = 1.0 mg/kg = 0.1 mg/100g = 1000 ng/g

## Results

**Blood**
| | | |
|---|---|---|
| Ethanol | 0.12 g% | GC |
| Cannabinoids | Not detected | EI |

**Urine**
| | | |
|---|---|---|
| Ethanol | 0.13 g% | GC |
| Cannabinoids | Detected | EI* |
| Benzodiazepines | Not detected | EI |
| Opiates | Not detected | EI |
| Benzoylecgonine | Not detected | EI |
| Amphetamines | Not detected | EI |
| Barbiturates | Not detected | EI |
| Salicylates | Not detected | CT |
| Acetaminophen | Not detected | CT |
| Basic drugs | Not detected | GC/MS |

**Vitreous Humour**
| | | |
|---|---|---|
| Ethanol | 0.15 g% | GC |

\* Unconfirmed screening result. Confirmation available upon request.

Page 1 of 1

| | |
|---|---|
| EI = Enzyme Immunoassay | CT = Color Test |
| GC = Gas Chromatography | TLC = Thin Layer Chromatography |
| GC/MS = GC/Mass Spectrometry | ISE = Ion Selective Electrode |
| LC = Liquid Chromatography | SP = Spectrophotometry |
| LC/MS = LC/Mass Spectrometry | < = Less than |

Signed: Dr. Marina Stajic
Date: 12/21/11     GA




**The City of New York**
**Office of Chief Medical Examiner**
**New York, N.Y. 10016**

## REPORT OF
## MICROSCOPIC EXAMINATION

Name of Decedent: Gabriel Sherwood

Histology Lab #: 1105379-AR

M.E. Case #: B11-4597

Date of Autopsy: 11/2/2011

MICROSCOPIC DESCRIPTIONS:

Tissue or Organ x # of fragments and/or levels       (#= slide ID number)

HEART x 1 (2): No pathologic diagnosis.

LUNGS x 1 (2): No pathologic diagnosis.

LIVER x 1 (1): No pathologic diagnosis.

KIDNEY x 1 (1): No pathologic diagnosis.

---

Katherine Maloney, M.D.    12/29/2011

*Printed Name/ Date*

*Signature*/December 29, 2011  M.D.



# OFFICE OF CHIEF MEDICAL EXAMINER
## THE CITY OF NEW YORK
## AUTOPSY NOTES



NAME OF DECEDENT: Gabriel Sherwood    M.E.# B - 11 - 4597

♂ ♀ SKIN COLOR: black   WD/WN.: WNL   HEIGHT: 5 FT 7 IN   WEIGHT: 159 LB   AGE: 35

HAIR:TXTR curled CLR black ¼ IN M ⅛ IN B ⅛ IN EYES: IRIDES brown CONJ øh/øj TEETH/ORAL braces

TORSO: ANT see diagram POST _____ GENITALIA: +/- uncirc EXTREMITIES: UPPER _____ LOWER LUL lacs see diagram

RIGOR MORTIS: Marked   LIVOR MORTIS: F/NF post   TEMPERATURE: Warm

Scars: see diagram

Tattoos: R shoulder mono prof "SX"

Clothing: Ø

Therapeutic Procedures: L antecub single, bandages over stab wounds

Injuries: See diagram

| | | |
|---|---|---|
| Head | 1500 | air release c̄ cut above L 3rd rib |
| Brain | gm | |
| Neck | | |
| Cavities | L pleural 1.5L blood + clots | |
| Vessels | | |
| Heart | 350 gm | |
| L.V. | 1.4 cm 0.2 | |
| R-Lung | 460 gm collapsed | |
| L-Lung | 210 gm | |
| Liver | 1330 gm | |
| Bile ≈ | 5 ml | |
| Pancreas | | |
| Spleen | 90 gm | |
| Lymph nodes | | |
| Thymus: Y/N | | |
| R-Kidney | 140 gm | |
| L-Kidney | 150 gm | |
| Urine ≈ | 10 ml | |
| Gonads | ✓✓ | |
| Endocrine | post mortem hem | |
| Digestive Tract | | |
| Gastric = | 60 ml tan + food | |
| App: Ø/N | | |
| Musc-Skel | | |

DIAGNOSES:

6 sharp force injuries

2 deeper stab wounds

Perforation of right ventricle + pericardium

Perforation of right 5th rib cartilage

Penetration of diaphragm

Hemothorax - left

Blunt trauma of head - abrasion ① forehead

Abrasions + Contusion ① upper lip

Examined by: Katherine Maloney    Date: 11/12/2011 Time: 9:00 ☒AM ☐ PM

ME 2073 (6/96)    SA 11



3" kahair

stab
Ⓐ Oblique - Rsp
5/8" long
sharp end blunt lat
5th rib cartilage
1" deep diaphragm
19" TOH
1/4" ROM
3.5" R areola 3:00

1/4" defect - not thrugh

Gray fiber bach of head

1/2" abrasion whorls
2.5" above ear
2" post
1/4" abr L nose
1/2" 1/4" abrasion + cut L upper lip R

skin cut
Ⓑ Vert, curvilinear
1" long
1/8" deep
20" TOH
Midline
4" L areola 4:00

7.5" linear scar

thisml herd 1/4" cyclosl milk alyse PTPH area

Ⓐ Ⓑ   Ⓒ   Ⓓ   Ⓔ

Ⓕ

4.5 - 5.5
deep rib cartilage
diaphram
stab
Ⓒ Horizontal
K bt E blade to lat
14 rib
21" TOH
3" ROM
1/2" long 7.5" L areola 5:00
blunt med lat 1/32
sharp med

1/2" scar

1/2" scar

Cut/stab
Ⓓ Oblique-Rsp
5/16" long
1/4" deep
21.5" TOH
5.5" LOM
3.5" L areola 6:00

Cut
Ⓔ Horizontal
3/8"
1/4" deep
c tails 1/2" lat
1/8" med
26" TOH
4" LOM
8" L areola 6:00

Ⓕ Oblique - Lsup
3/8" long
1/4" deep
19.5" TOH
6.5 LOM
9.5" Top of torso

NAME OF DECEDENT: Gabriel Sherwood    M.E.#: B / 11 / 4597

EXAMINED BY: Katherine Maloney    DATE: 11 / 2 / 2011

ME 2073 (5/98)    SA 12

# CASE WORKSHEET

M.E. CASE #:

M.E. CASE #: B-11-04597

| AGE | RACE | SEX |
|---|---|---|
| 35Y | Black | M |

NAME OF DECEDENT
Gabriel Sherwood

☒ Autopsy
☐ No Autopsy (Exam)
☐ Pursuant To Law

MEDICAL EXAMINER
DR: Katherine Maloney

D Date: November 2, 2011    9:00 AM
am
W
☐ PM

## PART I: DEATH WAS CAUSED BY:   ☐ Pending Further Studies

a. Immediate cause   Stab wound of torso with perforation of heart,

b. Due to or as a consequence of

c. Due to or as a consequence of

## PART II: Other significant conditions contributing to death but not resulting in the underlying cause given in part 1:

d.

### MANNER OF DEATH:

☐ PENDING STUDIES   ☐ NATURAL   ☐ THERAPEUTIC COMPLICATION   ☐ ACCIDENT   ☐ SUICIDE   ☒ HOMICIDE   ☐ UNDETERMINED

PL Place of Death:
(Name of hospital, facility or street address)
**St. Barnabas Hospital**

DATE & TIME OF DEATH: 11/01/11  18:40

DA

'address)

Any Hospice care in last 30 days
☐ Yes
☒ No
☐ Unk.

TYPE OF PLACE:
☐ Hospital in-patient       ☐ Nursing home / long term care
☒ Hospital ED / outpatient  ☐ Hospice facility
☐ Hosp DOA                  ☐ Decedents residence
☐ Other, specify: _____

| INJURY: Date | Time: ☐ AM ☒ PM | AT WORK | TYPE OF PLACE: (Home, Street, etc.) |
|---|---|---|---|
| 11/1/11 | 17:58 | ☐ YES ☒ NO | Building lobby |

LOCATION:   2460 Grand Ave        10468

HOW INJURY OCCURRED:   See above

IF TRANSPORTATION INJURY:   ☐ Driver/operator   ☐ Pedestrian   ☐ Passenger   ☐ Other, specify: _____

### IF FEMALE:
☐ Not pregnant within one year of death
☐ Pregnant at time of death
☐ Not pregnant at time of death, but pregnant within 42 days of death
☐ Not pregnant at time of death, but pregnant 43 days to 1 year before death
☐ Unknown if pregnant within one year of death

If within one year of death, outcome of pregnancy
☐ Live birth
☐ Spontaneous termination
☐ Induced termination
☐ None

Date of outcome
mm /dd / yyyy
/ /

Did tobacco use contribute to death?
☐ Yes   ☒ No   ☐ Probably   ☐ Unk.

For infant under 1 year: Name and address of hospital or other place of birth

ME 2010 (Rev. 3/09)

NAME OF DECEDENT: Gabriel Sherwood

MEDICAL EXAMINER: DR. Katherine Mabney

M
D
T

M.E. CASE #: B-11-04597
DATE OF DEATH: 11/01/2011
TODAY'S DATE: 11/02/2011

☒ HOMICIDE ☐ PRISONER ☐ OTHER RUSH _____

| COMPONENTS OF MEDICOLEGAL CASE RECORD NEEDED | FOR CERTIFICATION | FOR FILE COMPLETION |
|---|---|---|
| TOXICOLOGY REPORT | | X |
| HISTOLOGY SLIDES | | X |
| NEUROPATHOLOGY OR CARDIAC PATHOLOGY | | |
| REPORT(S): ☐ POLICE  ☐ FIRE MARSHAL  ☐ MLI | | |
| CULTURES:  ☐ BLOOD  ☐ TB  ☐ OTHER: | | |
| CONSULTANTS: ☐ ANTHRO  ☐ RADIOLOGY  ☐ OTHER: | | |
| HOSPITAL OR MEDICAL RECORDS | | |
| INFANT DEATH SCENE INVESTIGATION | | |
| OTHER: | | |

For Pediatric Cases: Is there suspicion of abuse at this time?  ☐ YES  ☐ NO
If Yes, Call 1 (800) 635-1522

## AUTOPSY INVENTORY

CONSULT SERVICE:  ☐ BRAIN  ☐ HEART      X-RAYS:  ☒ YES  ☐ NO        PHOTOS:  ☒ YES  ☐ NO

HISTOLOGY:  STOCK JAR(S):  1  2  3  4      BOTTLE(S) REQUESTING SLIDES:  ☐ YES  ☐ NO  1  2  3

MICROBIOLOGY:  ☐ YES  ☒ NO  SPECIMEN SOURCE: _____      OTHER STUDIES:

EVIDENCE:  ☒ YES  ☐ NO  ☐ CLOTHING  ☐ BALLISTICS X _____ (#)  ☐ PERSONAL PROPERTY  ☒ OTHER: Filer from hea

☒ BLOOD  ☒ HAIR: (SCALP) PUBIC  ☐ RAPE-KIT  ☐ SWABS: O-A-V  ☐ RNA LATER  ☐ BONE  ☒ NAILS  ☐ OTHER:

**F.B.**

(BLOOD Heart)  (BILE)  (URINE)  (GASTRIC CONTENTS)  (BRAIN)  (LIVER)  (VITREOUS HUMOR)  SUBDURAL BLOOD  DECOMP  OTHER:

**TOX**

INDICATED
☒ YES  ☐ NO

If death may be a suicide or the result of a motor vehicle accident or a fire indicate below.
If death may be due to chemical agents or if toxicology is needed to exclude other causes of death indicate below.

COMMENTS:

35 yo man stabbed in chest and abdomen, brought to ER.

DURATION OF MEDICAL THERAPY OR RESUSCITATION: 20 minutes

Signature of Medical Examiner



**DEPARTMENT OF HEALTH AND MENTAL HYGIENE**
**OFFICE OF CHIEF MEDICAL EXAMINER**
520 FIRST AVENUE, NEW YORK, NY 10016

**CHARLES S. HIRSCH, M.D.,** *Chief Medical Examiner*

**Rosemary Anzalone**, *Assistant Director of Identifications & Communications*

Telephone (212) 447-2713 Fax: (212) 447-2708 TTY (212) 447-2086

# *Identification Form*

M.E. #: **B-11-04597**

*I* **Claude John** residing at
**2698 8th Avenue, 8E, New York, NY, 10030**
phone number:**212-767-9576   NYS ID# 657-008-550**

### State that:

I am the **Father** of the person whose body was found at
**St. Barnabas Hospital**
on **11/01/2011** and subsequently sent to the Office of Chief
Medical Examiner, that I have seen the **Photo**
of the said deceased, and believe that the body recorded at
said office as:

**Gabriel Sherwood**
of AGE: 35 Years RACE: Black SEX: Male

to be:
✓ **Gabriel Sherwood**
✓ **2763 Webster Avenue, Bronx, NY, 10458**
✓ of AGE: 35 Years RACE: **Black**  SEX: **Male**

Signed: *C. Morris*

Given to me this **5 day of November, 2011.**
Identified to **Kanisha Maloon**  at  **OCME**

OCME REV 052896
ID Form

# OFFICE OF CHIEF MEDICAL EXAMINER
## CITY OF NEW YORK

M.E. # B11 4597

Name of deceased: GABriel Sherwood

Address: 2763 Webster AVE.
Bronx, N.Y. 10458

Date and place of birth: 0025 10-25-76

Closest known family member name:

Address: SAme

Telephone: (____) _____  Cell Phone: (212) 767-9576

Did the deceased live with another person? NO If yes:

Name: _____  Relationship: _____

Address: _____

Telephone: (____) _____  Cell Phone: (____) _____

To your knowledge did the deceased have any of these following conditions:

- ❏ High blood pressure
- ❏ Heart problems
- ❏ Diabetes
- ❏ Seizures
- ❏ Lung problems
- ❏ Tuberculosis
- ❏ Tobacco use
- ❏ Brain infection/disease
- ❏ Radiation Treatment

- ❏ Cancer
- ❏ HIV infection
- ❏ AIDS
- ❏ Hepatitis (liver)
- ☑ Alcohol Abuse
- ☑ Drug Abuse
- ☑ Psychiatric illness
- ❏ Methadone treatment: if yes, where: _____
- ❏ Other: _____

- ❏ Pregnant in the last year
  If yes, the outcome was:
  - ❏ Live birth
  - ❏ Induced termination
  - ❏ Spontaneous termination
  - ❏ None
  Date of outcome: _____

- ❏ Recent hospitalizations or travel: if yes, where and when: _____
- ❏ Dentist (name/address): _____
- ❏ Tattoos or scars (e.g., old surgery), describe: Right arm

If the deceased was treated for any of the above conditions, please describe the conditions and list the **doctor's name/telephone, hospital, clinic, and dates** of treatment:

St. Barnamas Hospital

C. Marced Jr.
Signature

Father
Relationship

_____
Date

D. LEE, MLI                                    11/1/2011          Pg|1



**Office of Chief**
**Medical Examiner**

Charles S. Hirsch, MD
*Chief Medical Examiner*

Damian Lee, MLI, RPA-C, RT (R)
Medico-legal Investigator I
Medico-Legal Investigations
520 First Avenue, New York, NY 10016
Telephone: (212) 447-2734 Fax: (212) 447-6437
E-mail: DLee@ocme.nyc.gov
Official website: http://www.nyc.gov/ocme

## SUPPLEMENTAL CASE INFORMATION

**NAME OF DECEDENT/ DOB:** Sherwood, Gabriel (DOB: 10/25/1976)      **M.E.#:** B-11-04597

**SUPPLEMENT INFORMATION DATE:** 11/1/2011                          **TIME:** 7:30PM

**INFORMATION SOURCE:** Dr. Varughese (ER Resident)- St. Barnabas Hospital

**PLACE OF DEATH:** St. Barnabas Hospital ER – 4422 3rd Avenue,
Bronx NY 10457

**RESIDENCE:** Unknown                                              **TEL:** Unknown

**CONTACT VIA:**    (X) TELEPHONE    ( ) PERSONAL INTERVIEW    ( ) CORRESPONDENCE

**CONTACT INITIATED BY:**    (X) INFORMANT          ( ) UNDERSIGNED

**PER Dr. Varughese** – The decedent is a 35y/o Black man with unknown medical history. The decedent was found by EMS supine on the floor in the lobby of 2460 Grand Avenue, Bronx NY 10458 in cardiac arrest and with multiple (4) stab wounds to the chest and abdomen. It is unclear who called 911 at this time. EMS applied bag mask ventilation, started CPR and transported the decedent to St. Barnabas Hospital ER.

The decedent arrived in the ER at 6:30PM where resuscitation efforts were continued by the Trauma Team under the leadership of Dr. Olsen. The decedent was endotracheally intubated and Chest Compressions continued until echocardiogram confirmed no cardiac activity. Despite resuscitative efforts, the decedent did not maintain a life-sustaining cardiac rhythm. Resuscitation efforts were stopped and the decedent pronounced at 6:40PM by Dr. Olsen.

NOK information is unavailable at this time. The EMS sheet is also unavailable to Dr. Varughese.

A call was placed to the 52nd PCT Detective Squad by the Undersigned (718-220-5811) and conversation was had with Detective Tommy Degrasio who is assigned to the case. Per Detective Degrasio the case is pending further information and no additional information is available.

**EMS ON SCENE OR TRANSPORTED PATIENT:** #1882/ #8848      **ACR#:** 8329149

**DETECTIVE:** Det. Tommy Degrasio/ 718-220-5811      **SQUAD:** 52nd Squad

**HOSPITAL DEATH DISPOSITIONS-** ME Case

Damian Lee, MLI I, RPA-C, RT (R)                                         MLI

Printed Name                          Signature
                                      Date                    11/1/2011

SA 17

 # Notice Of Death



| | | | | | **B-11-04597** |
|---|---|---|---|---|---|
| *Report #:* 1122252 | *Borough:* Bronx | | *Report Date:* 11/01/11 | *Time:* 19:28 | |

**Decedent Information:**

| | | |
|---|---|---|
| *Name:* | Sherwood, Gabriel | **35 Years** |
| *Sex:* | Male | *DOB:* 10/25/1976 |
| *Race:* | Black | *Marital Status:* |
| *Place of Death:* | St. Barnabas Hospital, 4422 Third Avenue 10457 | *Tel Place of Death:* (718)-960-9000 *Cross Street:* |

*Residence:* unk.

**Reporter Information:**

| | | |
|---|---|---|
| *From:* Medical Facility | *Facility:* St. Barnabas Hospital | |
| *Caller Name:* Dr.Varughese-960-6663 | *Shield:* | *Tel:* (718)-960-9000 |
| *Sixty-One #:* | *Aided #:* | *Chart #:* 899981 |

**Circumstances of Death:**

*App. Manner:* Homicide  *History:*

*Other Info:* call.loc. from ? no ems. sheet. stab wound to abdomen & chest n.o.k. unk. at this time.pct#?

**Hospital and Physician Information:**

| | | |
|---|---|---|
| *Facility:* St. Barnabas Hospital | *Date:* 11/01/2011 | *Time:* 18:30 |
| *Pronounced By:* Dr.Dirusso- Olsen | *Date:* 11/01/2011 | *Time:* 18:40 |
| *Physician:* | | *Tel:* |
| *Address:* | | |

**MLI Contact, Scene and Disposition:**

| | | | | |
|---|---|---|---|---|
| 1 *Shield #:* 152 Damian Lee | *Date:* 11/01/11 | *Time:* 19:32 | Investigator On Case: conf. |
| 2 *Shield #:* 152 Damian Lee | *Date:* 11/01/11 | *Time:* 20:20 | ME Case To OCME |

*Scene Investigation:* No

*Case Disposition:* Transport To OCME (Lee)  *Date:* 11/01/11  *Time:* 20:20

**Transportation:**

| | | |
|---|---|---|
| 1 *By:* METT Member Assigned: Reid/SSYKES | *Date:* 11/02/11 | *Time:* 00:28 |
| 2 *By:* METT At Scene, No Custody: Reid/roblopez | *Date:* 11/02/11 | *Time:* 01:11 |
| 3 *By:* METT Takes Custody Of Body: Reid/roblopez | *Date:* 11/02/11 | *Time:* 01:11 |

**Autopsy Objection:**

| | | |
|---|---|---|
| *Date:* | *Time:* | *Who Objected:* |
| *Why:* | | |

**OCME Notes:**

***body readt****

*Initial Call Recorded By:* scanty

*Printed:* 11/02/11-07:16

# OFFICE OF CHIEF MEDICAL EXAMINER
City of New York

### THIS IS A NEW YORK CITY GOVERNMENT RECORD
### AND SHOULD BE ACCURATELY COMPLETED BY HOSPITAL STAFF
NOTE: *Form must accompany body transported to Medical Examiner's Office.*

M.E. #: __B__ / __11__ / __4597__

ST. BARNABAS HOSPITAL (BRONX, NY)                    879981

Name of Hospital                                    Medical Record #

GABRIEL SHERWOOD                  Age: __35__  Race: AFRICAN AMERICAN  Sex: __MALE__

Name of Deceased

Street Address, Apt. No., City, State Zip Code

_____  Phone: (_____) _____

Next of Kin

---

## HOSPITAL COURSE

Date and Time of Admission

DR. OLSEN  &  DR. DIRUSSO                       11/01/11    6:40 P.M.

Pronounced by                                   Date and Time of Death

DR. OLSEN                                        ( 718 ) 960-6663

Attending Physician                             Phone number

*Please summarize: Circumstances and reasons for admission; admission clinical presentation; details of hospital course including diagnostic work-up surgical procedures and findings, including dates, recovery of bullets, alterations of wounds, etc.; and changes in clinical status:*

35 year old male brought in by EMS as trauma code after multiple stab wounds to the chest and abdomen. Patient was found by EMS down on the ground with a thready pulse after the stab wounds. EMS assisted with respirations and transported patient to St. Barnabas. Patient in trauma bay had no vital signs. CPR continued and patient intubated. Ultrasound showed no cardiac activity. Patient pronounced at 6:40 P.M.

DR. JOE VARUGHESE
Reporting Physician

EO014 (291)

COMPLAINT FOLLOW-UP
MEDICAL EXAMINER CASE
PD 313-081-H (Rev. 10-90)-H1

| | | PAGE OF PAGES | | |
|---|---|---|---|---|
| Additional Copies For | 1 Jurisdiction 3 | 9 Pct of Report 052 | Aided/Acc No 2018 | 12 Complaint No 11686 | File No |

| 17 Date of this Report 11-02-11 | Day of Week at this Report WED | 31 Date Only Report Mo Day Yr | Date Assigned | M.P. Case Number | Unit Reporting MISSING PERSONS SQUAD |
|---|---|---|---|---|---|

| DETECTIVE ASSIGNED Degrazia | P.D.S CASE NO | M.E. CASE NO. B11-4597 | BOROUGH NO. 133 | ZONE 9 | ZONE NO 9-47 |
|---|---|---|---|---|---|

Previous Classification   45   48   49   50   51   52   61 Rep. Agency Code 0 0   Case Status ! Open ! Closed

Classification Changed To   HOMICIDE   Invoice No.

NAME OF DECEASED (LAST NAME, FIRST, M.I.)
Sherwood, Gabriel        10-25-76        AGE 35   RACE B   SEX M

ADDRESS
2763 Webster Ave  BX,NY                          APT. NO. 197

| DATE OF OCCURRENCE 11-01-11 | TIME OF OCC. 1758 | DAY OF WEEK Tues | PLACE OF OCCURRENCE I/O 2460 Grand Ave (Lobby) |
|---|---|---|---|

EXPIRED AT   St. barnabas Hospital        DATE 11-01-11   TIME 1840

MOS IDENTIFYING        SHIELD   COMMAND

FAMILY MEMBER IDENTIFYING        REALTIONSHIP

ADDRESS

PHOTO/PRINTS
Det.Kozlowski        COMMAND MPS

DOCTOR PERFORMING AUTOPSY
Dr.Maloney    DATE 11-2-11   LOCATION BXOCME

CAUSE OF DEATH

BULLETS RECOVERED DURING AUTOPSY

DESCRIPTION OF CRIME
Victim was assaulted and stabbed by unknown perp(s) for unknown reason.

MEANS EMPLOYED ☐ PHYSICAL FORCE ☐ SHOTGUN ☐ MACHINE GUN ☒ OTHER    SharpInstrument
☐ KNIFE ☐ BLUNT INSTRUMENT ☐ HANDGUN ☐ RIFLE ☐ STRANGULATION (DESCRIBE)
MOTIVE ☐ ROBBERY ☐ NARCOTICS ☐ DISPUTE ☒ UNK. ☐ OTHER
☐ BURGLARY ☐ SEX CRIME ☐ ORG. CRIME ☐ JUSTIFIABLE (DESCRIBE)

| P E R 1 | ☐ ARRESTED ☐ KNOWN | NAME (LAST, FIRST, M.I.) |
|---|---|---|
| A 2 | ☐ ARRESTED ☐ KNOWN | NAME (LAST, FIRST, M.I.) |
| P S 3 | ☐ ARRESTED ☐ KNOWN | NAME (LAST, FIRST, M.I.) |

RELATIONSHIP
☐ FRIEND ☐ ACQUAINTANCE ☐ HUSBAND/WIFE ☐ COMMON LAW ☐ STRANGER ☐ BOY/GIRL FRIEND ☐ INTRA-FAMILY ☒ UNKNOWN

CRIMINAL RECORD
Victim:        Perp(s).:

DETAILS

        Det. Speranza Bx Homicide present @ autopsy 11-02-11

| REPORTING OFFICERS RANK, SIGNATURE COMMAND | NAME PRINTED KOZLOWSKI | TAX REG. NO 920475 | SUPERVISOR'S SIGNATURE | C.O.'s INITIALS |
|---|---|---|---|---|

DIST.: 1 - ARREST & CRIME CODING UNIT   2 - UNIT REFERRED TO   3 - CRIME ANALYSIS UNIT   4 - CHIEF OF DETECTIVES (CIRD)   5 - FILE

Sherwood, Gabriel
Age:35Y Race:B Sex:M
ME #: B-11-04597
Date of Death: 11/01/2011
POD:St. Barnabas Hospital



X C. Monroe Jah