# 20-1796

## United States Court of Appeals
## for the Second Circuit

---

JAMES GARLICK,

*Petitioner-Appellee,*

*v.*

WILLIAM LEE, SUPERINTENDENT, EASTERN CORRECTIONAL FACILITY,

*Respondent-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT

## BRIEF FOR PETITIONER-APPELLEE

Robert S. Dean
Center for Appellate Litigation
*Counsel for Petitioner-Appellee*
120 Wall Street, 28th Floor
New York, NY 10005
212-577-2523

November 20, 2020

Matthew Bova (5073135)
mbova@cfal.org
212-577-2523 (ext. 543)
*Of Counsel*

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................................... 1

SUMMARY OF ARGUMENT ................................................................ 2

STATEMENT OF FACTS ................................................................. 6

   Trial ........................................................................... 6

     A.   The police identify Mr. Garlick as the lead suspect before the autopsy. .......... 6

     B.   Dr. Maloney's autopsy report declares that the cause of death was a homicidal stabbing .......................................................... 8

     C.   Mr. Garlick confirms that he did not intend to harm Sherwood and that Sherwood brandished a weapon during a struggle. ............................. 9

     D.   Dr. Maloney certifies and signs the autopsy report more than a month after the indictment. ........................................................ 10

     E.   The trial court overrules Mr. Garlick's Confrontation Clause objection. In turn, the prosecutor relies heavily on the autopsy report at trial. .................. 13

   Appellate Division Decision ....................................................... 20

   The District Court Grants the Writ .................................................. 21

ARGUMENT ........................................................................... 26

The Appellate Division's decision was an unreasonable
application of, and contrary to, clearly-established
Supreme Court precedents. ............................................................ 26

     A.   Applicable Standards .......................................................... 26

     B.   The Appellate Division unreasonably applied clearly-established law. .......... 29

       1.   By 2016, it was clearly established that a forensic report created with the primary purpose of proving a fact in a criminal case was testimonial. ....... 29

       2.   The Appellate Division unreasonably applied clearly-established law. ....... 33

   3.    The State unreasonably interprets both the governing AEDPA standards and the clearly-established Confrontation Clause precedents ...................... 36

  C.   The State's new claim that even if the report were testimonial, it was admissible for the non-hearsay purpose of providing a basis for a surrogate expert's conclusions is waived and meritless.. ................................................. 53

  D.   The Appellate Division decision was "contrary to" clearly-established law because *Melendez-Diaz* and *Bullcoming* are "materially indistinguishable." ...... 58

  E.   The Appellate Division decision was "contrary to" clearly-established law because it applied an invalidated legal standard ............................................. 59

  F.   The constitutional violation was not harmless. ................................................ 62

CONCLUSION ........................................................................................................ 65

CERTIFICATE OF COMPLIANCE ......................................................................... 65

## TABLE OF AUTHORITIES

### Cases

*Alvarez v. Ercole*, 763 F.3d 223 (2d Cir. 2014) .................................................... 62

*Bogle-Assegai v. Connecticut*, 470 F.3d 498 (2d Cir. 2006) ..................................... 54

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) .......................................................... 62

*Broun v. Equitable Life Assurance Society of U.S.*, 69 N.Y.2d 675 (1986) ........................... 12

*Bullcoming v. New Mexico*, 564 U.S. 647 (2011) ............................................. passim

*Cone v. Bell*, 556 U.S. 449 (2009) ......................................................................... 56

*Crawford v. Washington*, 541 U.S. 36 (2004) ................................................. passim

*CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987) ............................. 43, 47

*Davis v. Washington*, 547 U.S. 813 (2006) ..................................................... passim

*Greene v. Fisher*, 565 U.S. 34 (2011) .................................................................... 27

*Harrington v. Richter*, 562 U.S. 86 (2011) ................................................. 5, 26, 33

*Hensley v. Roden*, 755 F.3d 724 (1st Cir. 2014) ..................................................... 51, 52

*Jones v. Calloway*, 842 F.3d 454 (7th Cir. 2016) ..................................................... 62

*Kirby v. United States*, 174 U.S. 47 (1899) ........................................................... 31

*Lafler v. Cooper*, 566 U.S. 156 (2012) ...........................................................27, 59, 61, 62

*Marshall v. Rodgers*, 569 U.S. 58 (2013) ............................................................ 5, 40

*McCarley v. Kelly*, 801 F.3d 652 (6th Cir. 2015) .................................................... 29, 33

*McNeiece v. Lattimore*, 501 Fed. Appx. 634 (9th Cir. 2012) ................................... 49

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ...................................passim

*Michigan v. Bryant*, 562 U.S. 344 (2011) ...................................................passim

*Mitchell v. Kelly*, 520 Fed. Appx. 329 (6th Cir. 2013) ........................................... 49

*Nardi v. Pepe*, 662 F.3d 107 (1st Cir. 2011) ........................................................ 49

*Orlando v. Nassau County Dist. Atty. Office*, 915 F.3d 113 (2d Cir. 2019) ......................... 28

*Panetti v. Quarterman*, 551 U.S. 930 (2007) ...............................................passim

*People v Acevedo*, 112 A.D.3d 454 (1st Dept. 2013) ............................................ 20, 55

*People v. Freycinet*, 11 N.Y.3d 38 (2008) ...................................................passim

*People v. Hall*, 84 A.D.3d 79 (1st Dept. 2011) .................................................... 55

*People v. John*, 27 N.Y.3d 294 (2016) ............................................................. 20, 21

*People v. Nisonoff*, 293 N.Y. 597 (1944) ........................................................... 12, 34

*Rompilla v. Beard*, 545 U.S. 374 (2005) ........................................................... 55, 57

*Rosen v. Superintendent Mahanoy SCI*, 972 F.3d 245 (3d Cir. 2020) ............................. 28, 59

*Ryan v. Miller*, 303 F.3d 231 (2d Cir. 2002) ...................................................... 27, 37

*Scrimo v. Lee*, 935 F.3d 103 (2d Cir. 2019) ....................................................... 28

*Sczepanski v. Saul*, 946 F.3d 152 (2d Cir. 2020) ...............................................54, 56, 57

*Sellan v. Kuhlman*, 261 F.3d 303 (2d Cir. 2001) ................................................. 37

*Soler v. United States*, 2015 W.L. 4879170 (S.D.N.Y. Aug. 14, 2015) .............................. 49

*United States v. Duron-Caldera*, 737 F.3d 988 (5th Cir. 2013) ............................... 43

*United States v. James*, 712 F.3d 79 (2d Cir. 2013) ........................................ passim

*Vega v. Walsh*, 669 F.3d 123 (2d Cir. 2012) ................................................. 49, 50

*Walczyk v. Rio*, 496 F.3d 139 (2d Cir. 2007) ............................................... 40

*White v. Woodall*, 572 U.S. 415 (2014) ................................................... passim

*Williams v. Illinois*, 567 U.S. 50 (2012) ................................................. passim

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................. passim

*Wilson v. Sellers*, 138 S. Ct. 1188 (2018) ................................................. 26

*Young v. Conway*, 698 F.3d 69 (2d Cir. 2012) .............................................. 27, 54

## Statutes

28 U.S.C. § 2254 ......................................................................... passim

N.Y. C.P.L.R. § 4518 .............................................................. 12, 34, 47

N.Y. C.P.L.R. § 4520 .............................................................. 12, 34, 47

N.Y. City Charter § 557 ............................................................. 12, 47

N.Y. County Law § 671 .............................................................. 12, 34

N.Y. County Law § 673 .............................................................. 12, 34

N.Y. County Law § 674 .......................................................... 12, 34, 47

N.Y. County Law § 677 .............................................................. 12, 34

N.Y. Penal Law § 120.00 ................................................................ 18

N.Y. Pub. Health Law § 4103 .................................................... 12, 34, 47

## Other Authorities

Means, Federal Habeas Manual (2020 ed.)............................................................ 27

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

JAMES GARLICK,

*Petitioner-Appellee*,

v.

WILLIAM LEE,
Superintendent, Eastern Correctional Facility,

*Respondent-Appellant*.

## BRIEF FOR PETITONER-APPELLEE

Petitioner-Appellee James Garlick, by counsel, submits this brief in opposition to the opening brief of Respondent-Appellant William Lee ("State"). The State's brief seeks reversal of a District Court judgment, which granted Mr. Garlick's petition for a writ of habeas corpus on June 2, 2020 (McMahon, C.J.). Petitioner is currently incarcerated at Eastern Correctional Facility in New York under the 2013 criminal judgment at issue here.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

**1.** At Petitioner's trial, the State introduced a certified autopsy report—created during an active homicide investigation—into evidence without producing the medical examiner who performed the autopsy and wrote the report. The Appellate Division held that under *Crawford v. Washington*[1] and its progeny, the report was not testimonial,

---

[1] 541 U.S. 36 (2004); U.S. Const. amend. VI.

and thus immune from confrontation, because it did not "link the commission of the crime to a particular person."[2] Did the District Court correctly determine, under 28 U.S.C. § 2254(d)(1), that the Appellate Division unreasonably applied clearly-established Supreme Court precedents?

**2.** Alternatively, was the Appellate Division decision "contrary to" clearly-established Supreme Court precedents (28 U.S.C. § 2254(d)(1)), since those precedents were "materially indistinguishable" and/or the state court applied a legal standard that the Supreme Court has rejected?

**3.** Can the State meet its burden of establishing harmless error?

## SUMMARY OF ARGUMENT

The District Court was correct: the Appellate Division unreasonably applied *Crawford v. Washington*[3] and its clearly-established progeny when it held that an autopsy report prepared during an active homicide investigation was non-testimonial.[4]

**\* \* \***

At Petitioner's 2013 homicide trial, the State, over repeated Confrontation Clause objection, introduced a certified autopsy report into evidence without producing the

---

[2] State's Appendix 175 (internal quotation marks omitted) ("A").

[3] 541 U.S. 36 (2004)

[4] A165-68; *Bullcoming v. New Mexico*, 564 U.S. 647 (2011); *Michigan v. Bryant*, 562 U.S. 344 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); *Davis v. Washington*, 547 U.S. 813 (2006).

medical examiner who wrote it. That report's findings were critical evidence that Petitioner James Garlick caused the victim's death and had an intent to cause serious harm.

The autopsy report was created during an active homicide investigation. When the medical examiner performed the autopsy and drafted her report, she knew the cause of the victim's death was homicide and that an active criminal case had ensued. Police officers were even present during the autopsy itself. Further, the police had specifically identified Mr. Garlick as the lead suspect when the medical examiner wrote her report. And later, when the medical examiner finalized the report and transmitted it to the District Attorney—as state law required her to do—Mr. Garlick had already been indicted for murder.

But instead of producing the medical examiner for cross-examination at trial, the State produced a witness who was not involved in the autopsy (Dr. Ely). The State introduced the report into evidence through Dr. Ely, who, in turn, parroted the report's findings to the jury. The jury convicted Mr. Garlick of first-degree manslaughter (intent to cause serious physical injury).

In 2016, on direct appeal, the Appellate Division rejected Mr. Garlick's Confrontation Clause challenge, finding the report non-testimonial because it did not "link the commission of the crime to a particular person."[5] Mr. Garlick exhausted his

---

[5] A175 (quotation marks omitted).

federal claim and petitioned the Southern District for a writ of habeas corpus under 28 U.S.C. § 2254(d)(1) ("AEDPA").

The District Court granted the writ, finding that the Appellate Division unreasonably applied the Supreme Court's clearly-established decisions in *Bullcoming* and *Melendez-Diaz*.[6] This Court should now affirm.

\* \* \*

Under 28 U.S.C. § 2254(d)(1), a habeas petitioner must show that the state court's decision unreasonably applied, or was contrary to, clearly-established Supreme Court precedents. That standard is satisfied. Here, as the District Court held, the Appellate Division unreasonably applied the Supreme Court's clearly-established testimonial standard and the specific holdings of *Bullcoming v. New Mexico*[7] and *Melendez-Diaz v. Massachusetts*.[8] As *Bullcoming* and *Melendez-Diaz* held, "[a]n analyst's certification prepared in connection with a criminal investigation or prosecution . . . is 'testimonial' and therefore within the compass of the Confrontation Clause."[9] The report here unquestionably satisfies that clearly-established rule.

Further, this autopsy report satisfies the clearly-established testimonial standard, which requires the statement have the primary purpose of "establish[ing] or prov[ing]

---

[6] A165-68.

[7] 564 U.S. 647 (2011).

[8] 557 U.S. 305 (2009); *see* A165-68.

[9] *Bullcoming*, 564 U.S. at 658-59 (citing *Melendez-Diaz*, 557 U.S. at 321-24).

past events potentially relevant to later criminal prosecution."[10] As there was no doubt that the purpose of this report was to codify facts and conclusions that would play a central role in a homicide case, the report here was testimonial. Under these compelling facts, no "fair-minded jurist" could find otherwise.[11]

To circumvent this straightforward application of AEDPA and Supreme Court precedents, the State advances a flurry of arguments regarding AEDPA's scope and the relevant Supreme Court holdings.[12] Ultimately, the State misinterprets AEDPA as requiring that (1) a habeas petitioner cite a Supreme Court case involving an identical fact pattern; or (2) lower courts be unanimous on the constitutional question presented. As the District Court correctly held, the Supreme Court has rejected both of these theories.[13]

The State also unreasonably interprets *Crawford* and its progeny, repeating flawed constitutional arguments the Supreme Court has squarely rejected. In the end, the State cannot overcome the basic reality that the Supreme Court has not been silent on the Confrontation Clause in the last two decades. Instead, in *Crawford* and its progeny, the

---

[10] *E.g.*, *Bryant*, 562 U.S. at 356.

[11] *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

[12] State's Brief 20-44.

[13] A165-68 (citing *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) and *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)).

Court has developed clearly-established law. The Appellate Division unreasonably applied that law here.

Alternatively, this Court should affirm because the Appellate Division decision was contrary to clearly-established law.[14] The Appellate Division's decision was "contrary to" clearly-established Supreme Court law because the facts of *Bullcoming* and *Melendez-Diaz*, which both involve certified forensic reports created for criminal prosecution, are "materially indistinguishable."[15] Further, the Appellate Division decision was "contrary to" *Melendez-Diaz*, as it employed a legal standard—a statement is not testimonial unless it links a particular person to the crime—that, as the District Court held below, *Melendez-Diaz* "definitively did away with."[16] As the state court applied an invalidated legal standard, this Court should review this claim without deference under 28 U.S.C. § 2254(d)(1).[17]

## STATEMENT OF FACTS

### Trial

**A. The police identify Mr. Garlick as the lead suspect before the autopsy.**

In the early evening of November 1, 2011, the police responded to a report of an

---

[14] 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

[15] *Williams*, 529 U.S. at 405-06.

[16] A166 (citing *Melendez-Diaz*, 557 U.S. at 313-14).

[17] *E.g.*, *Williams*, 529 U.S. at 405-06.

assault at an apartment building in the Bronx.[18] Inside the building's lobby, the police found Gabriel Sherwood lying on the ground unconscious.[19] The police secured the scene and an officer brought Sherwood to the hospital.[20] Within five minutes of his arrival, Sherwood was pronounced dead.[21]

That evening, the police launched a homicide investigation.[22] They began by reviewing the building lobby's surveillance video.[23] The video indicated that a man struggled with Sherwood inside the lobby. Then, a woman forcefully struck Sherwood in the skull over a dozen times. The two assailants then fled.[24]

Around midnight, the investigation's lead detective concluded that Johanna Rivera, the woman in the video, had repeatedly struck Sherwood in the head, prompting the detective to arrest her.[25] During an interrogation, Rivera informed the detective that Mr. Garlick was the male assailant from the surveillance video.[26]

The next morning (November 2, 2011), the District Attorney's Office authorized

---

[18] Trial Transcript at 156-57, 169 ("T").

[19] T157-58.

[20] T157-59.

[21] T160.

[22] T185-86.

[23] T186; Video: State Trial Ex. 5.

[24] State Trial Ex. 5.

[25] Garlick's Supplemental Appendix 29-33 ("SA"); T188.

[26] SA42-43.

the police to charge Rivera with intentional murder under the theory that her blows to Sherwood's head caused his death.[27] The lead detective then notified the New York City Police Department that Mr. Garlick was the male suspect from the video by issuing a department-wide notification at 4:45 a.m. to arrest him.[28]

## B. Dr. Maloney's autopsy report declares that the cause of death was a homicidal stabbing.

On the day of the homicide, staff at the New York City Office of Chief Medical Examiner ("OCME")—the agency charged with determining the cause of death in homicide cases—discussed this case with Bronx police, including the lead detective.[29] In turn, OCME staff prepared a "Supplemental Case Information" Sheet, which indicated that Sherwood was found with "multiple (4) stab wounds" in the building lobby.[30] Before the autopsy, OCME staff also prepared a "Notice of Death" form, stating: "Circumstances of death: App. Manner: Homicide."[31]

At 9 a.m. on the morning after the incident, Dr. Katherine Maloney of OCME performed the autopsy.[32] Dr. James Gill, another pathologist, was present at the

---

[27] SA44.

[28] SA29.

[29] A289.

[30] A289.

[31] A290.

[32] Autopsy Report (State Trial Ex. 1): A273-80.

autopsy, as were two homicide detectives.[33] Later that day, Dr. Maloney drafted an autopsy report in which she declared that the cause of death was a stabbing to the chest, not blows to the head.[34] That conclusion ruled out Rivera as the person who caused the death.

Dr. Maloney then notified the police of her findings.[35] After receiving this information, the NYPD declined to pursue murder charges against Rivera and instead charged Mr. Garlick with murder because the autopsy "made it clear" that the stab wounds caused the death.[36]

## C. Mr. Garlick confirms that he did not intend to harm Sherwood and that Sherwood brandished a weapon during a struggle.

The police arrested Mr. Garlick about a week after the autopsy. During an interrogation, Mr. Garlick stated that he had arrived at the scene because his girlfriend had frantically told him by phone that Sherwood was sexually harassing and threatening her.[37] When Mr. Garlick arrived, he got into a fist fight with Sherwood outside the apartment building, which then spilled into the lobby.[38] During the fight, Mr. Garlick

---

[33] T243; A292.

[34] A275-80, A285.

[35] T276-77.

[36] T277, T296. Rivera was indicted for first-degree assault and pled guilty to second-degree assault. T75, T276.

[37] T195-200.

[38] T195-200.

explained, Sherwood brandished a weapon and the two struggled for it.[39] Mr. Garlick stated that he never possessed a knife.[40] He declared: "All I was trying to do was defend myself and my girlfriend. It was a tragedy. This wasn't supposed to happen and I'm sorry for my part in this. I wasn't trying to hurt anybody."[41]

On November 17, 2011, the State indicted Mr. Garlick for murder, first-degree manslaughter (intent to cause serious physical injury), and assault with a dangerous weapon (first and second degree).[42]

### D. Dr. Maloney certifies and signs the autopsy report more than a month after the indictment.

On December 29, 2011, more than a month after Mr. Garlick was indicted, Dr. Maloney completed and signed the final version of her certified autopsy report.[43] On the report, Dr. Maloney indicated a "DRAFT" date of "11/2/2011" and a "FINAL" date of "12/29/2011." Her signature is dated "12/29/11."[44]

In her certified report for "CASE NO. B11-4597,"[45] Dr. Maloney asserted that the "manner of death" was "homicide" and that a "stab wound of [the] torso with

---

[39] T195, T199.

[40] T195, T199.

[41] T199.

[42] SA1-4.

[43] A276-80.

[44] A280.

[45] A276.

perforation of heart" was the "cause of death."[46] Her report contained details about each of the seven wounds she observed, including their location and depth.[47] Her report also contained a diagram of a body which summarized the shape, location, and depth of each of these wounds.[48]

The "estimated depth of penetration" of the purportedly fatal wound to the left chest was "4-1/2 to 5-1/2" inches.[49] As for this fatal wound, the report concluded that "[a]fter penetrating the skin and muscle, the knife proceeded between left 5th and 6th ribs, the pericardial sac (3/4 [inch] defect), and the anterior wall of the right ventricle (1/2 [inch] defect)."[50] This fatal wound "perforat[ed] [the] heart," collapsed the lung, and led to the loss of 1.5 liters of blood.[51]

The report detailed another stab wound of the right chest which purportedly resulted from a knife penetrating the diaphragm.[52] The "estimated depth of penetration is 1-1/2 to 2-1/2 [inches]."[53]

Dr. Maloney's report also identified five other "incised wounds," located on the

---

[46] A273-80, A285.

[47] A276-78,

[48] A284.

[49] A277.

[50] A277.

[51] A277.

[52] A277.

[53] A277.

right chest, the left abdomen (two), the back, and a finger. The "estimated depth" of these wounds was .25 inches.[54]

Dr. Maloney's report identified "blunt impact injuries of [the] head," numerous "abrasions" of the head and face, and "contusions of the face."[55] But her "internal examination" of the head indicated no scalp contusions or skull fractures.[56] There were "no epidural, subdural or subarachnoid hemorrhage. The brain has no contusions."[57]

OCME certified the autopsy report as a business record under New York's statutory business-record rule and "affixed the official seal" of OCME to the report.[58] As state and local laws mandate, OCME delivered the inculpatory report to the District Attorney's Office the day after Dr. Maloney signed the final version.[59] Under New York law, an autopsy report is admissible as prima facie evidence of the cause of death.[60]

---

[54] A277-78.

[55] A275, A278.

[56] A278

[57] A278.

[58] A274; N.Y. C.P.L.R. § 4518 (a),(c) (business records and records of a government agency are admissible hearsay and "prima facie evidence of the facts contained").

[59] A273; N.Y. County Law § 677(4) (requiring that an autopsy report be delivered to the District Attorney whenever the medical examiner finds that a "crime was committed"); N.Y. City Charter § 557(g).

[60] N.Y. C.P.L.R. § 4520; N.Y. County Law § 671, 673, 674, 677; N.Y. Pub. Health Law § 4103; C.P.L.R. § 4518(a), (c); *Broun v. Equitable Life Assurance Society of U.S.*, 69 N.Y.2d 675 (1986); *People v. Nisonoff*, 293 N.Y. 597, 604 (1944).

### E. The trial court overrules Mr. Garlick's Confrontation Clause objection. In turn, the prosecutor relies heavily on the autopsy report at trial.

At the 2013 trial, the State proffered Dr. Maloney's autopsy report as its first exhibit. The State refused to produce Dr. Maloney or Dr. Gill (the other medical examiner who was present during the autopsy) for live testimony subject to cross-examination. Instead, the State proffered Dr. Susan Ely, who had no involvement in the autopsy.[61]

The State never claimed Doctors Maloney or Gill were unavailable. Instead, they had simply changed offices; Dr. Maloney was working in upstate New York, while Dr. Gill was working about an hour away in Stamford, Connecticut.[62]

Before opening statements, Mr. Garlick's counsel objected, on Confrontation Clause grounds, to the autopsy report and Dr. Ely's testimony.[63] He argued that the certified autopsy report was testimonial under *Crawford v. Washington*[64] and its progeny because it was prepared under circumstances that would lead an "objective witness" to reasonably believe it "would be available for use later at trial."[65] "The controlling law" from *Melendez-Diaz* and *Bullcoming* dictate that "an autopsy report, under these circumstances, is testimonial" and that "it doesn't matter whether it's a law enforcement

---

[61] SA47.

[62] SA47, SA85-86.

[63] SA47-53.

[64] 541 U.S. 36 (2004).

[65] SA47-53 (quoting *Melendez-Diaz*, 557 U.S. at 310-11).

agency or not."[66] Further, under *Bullcoming*, the State could not satisfy the Confrontation Clause by producing a surrogate witness to testify to "another's testimonial statements."[67]

The trial court overruled the objection, finding the autopsy report non-testimonial and thus admissible.[68] The expert could also use the non-testimonial report to "express an opinion based on its contents," the court held.[69]

The State called Dr. Ely as its first witness and introduced the autopsy report through her.[70] Before the report was entered into evidence, Petitioner renewed his confrontation objection to the report and the "opinions and observations contained therein."[71] Again, the objection was overruled.[72]

Parroting the report, Dr. Ely claimed the "actual cause of death" was a "stab wound of torso with perforation of heart" and that head trauma did not cause the death.[73] The prosecutor asked the expert to detail the "injuries" "observed in the autopsy."[74] Dr. Ely

---

[66] SA49-52.

[67] SA49-50.

[68] SA58-60.

[69] SA69.

[70] SA71-72.

[71] SA68-71.

[72] SA70.

[73] SA83, SA85.

[74] SA73.

cited "multiple, sharp force injuries, meaning he had two stabs wounds [and] four cuts, also called incise wounds, of his torso, as well as a cut to one of his right fingers."[75]

Dr. Ely contrasted "stab wounds" with "incised wounds."[76] A stab wound is a deep wound created by the tip of the knife entering the body, while an incised wound is created by the side of the knife laterally cutting the body.[77] To distinguish between these wounds, a forensic pathologist must assess "certain characteristics" that forensic pathologists "are trained to recognize."[78] Specifically, the pathologist searches for a "very skinny triangle of a wound" that can only be observed upon a "very careful[ ]" examination.[79]

The wounds in the autopsy report were labelled A though G.[80] The prosecutor asked Dr. Ely to "use the designation[s] in the autopsy report to go through each of the injuries sustained."[81] She explained that in "terms of the sharp force trauma of his torso," the "first stab wound, A, is a stab wound of the right chest. It penetrated the skin and the tissues under the skin as well as cartilage of the fifth rib on the right side

---

[75] SA73-74.

[76] SA74-75; Autopsy Report: A275-78 (finding that two of the wounds were "stab wounds" to the chest while five other wounds were "incised" wounds).

[77] SA74-76, SA90-92.

[78] SA91.

[79] SA91.

[80] A276-78.

[81] SA75.

and superficially into the diaphragm[.]"[82] The report, she testified, "described" that wound "as being between [1.5] and [2.5] inches in depth from the tip of the skin to the end point of the stab wound inside the body." That wound "penetrated the diaphragm."[83]

Wound "C" was the "second stab wound," which was located "on the left side of the chest."[84] Dr. Ely repeated the report's conclusion that the "estimated depth of penetration" of this wound was 4.5 to 5.5 inches.[85] This wound "involved penetration and perforation of the skin as well as rib cage. It went between two ribs and then created injury, perforated the heart, the right side of the heart. As a result of that stab wound there was bleeding around the heart and there was also significant bleeding within the left chest cavity."[86] The stab "went through the front part of the heart, which is the anterior wall."[87] Again repeating the report's findings, Dr. Ely testified that the wound caused "significant bleeding" and the loss of 1.5 liters of blood.[88] That wound, standing alone, caused the death.[89]

---

[82] SA75.

[83] SA75-76.

[84] SA77.

[85] SA78.

[86] SA77.

[87] SA77.

[88] SA77.

[89] SA79.

Dr. Ely then testified to the report's findings regarding the five other "incised" wounds, including two to the left abdomen and one to the back.[90]

Finally, the "abrasions on his face" "were not correlated with any major injury or any injury of any kind inside of his head" and thus were not fatal.[91]

Although Dr. Ely couldn't "say for sure," she did not believe Dr. Maloney was even certified in forensic pathology when she performed the autopsy.[92]

Again, at the end of Dr. Ely's testimony, defense counsel renewed his objection to "permitting Dr. Ely to testify as to the autopsy report and the introduction of the autopsy report" under *Bullcoming* and *Melendez-Diaz*.[93]

The State also introduced a surveillance video depicting the incident. But, as the trial court found during the charge conference, "[t]he video itself presents a jury question whether a knife or sharp object is visible on the film."[94] Further, the video fails to foreclose the possibility that Mr. Garlick inadvertently hurt Mr. Sherwood with the knife during a struggle for it.[95] Finally, the footage does not clearly indicate whether or

---

[90] SA81-92.

[91] SA83.

[92] SA93-94.

[93] SA98.

[94] T415.

[95] State Trial Ex. 5.

not Rivera had an object in her hand when striking Sherwood's head.[96]

After the State rested its case, Mr. Garlick requested that the court instruct the jury to consider the lesser-included count of third-degree assault (intentionally causing physical injury) because a reasonable juror could find that the State failed to prove intent to kill or intent to cause serious physical injury.[97] The State resisted such an instruction, stressing that the autopsy report had concluded that "[t]here are seven stab wounds . . . a stab to the heart, collapsed lung, one stab caused the victim to lose [1.5] liters, one-third of the blood in his body. The stab designated as A [in the report], which is also a stab wound, pierced the diaphragm."[98]

Finding that a reasonable juror could conclude that Mr. Garlick's intent was merely to cause physical injury (thus rendering him not guilty of manslaughter and murder), the court agreed to submit a third-degree assault charge to the jury.[99]

In summation, the State relied heavily upon the autopsy report, pressing that Sherwood "had seven knife injuries and also some bruises which didn't contribute to death."[100] The prosecution added that the "most deadly" and "fatal wound" was

---

[96] *Id.*

[97] T380-82; N.Y. Penal Law § 120.00(1).

[98] T394-95.

[99] T415-16.

[100] T452.

"designated" wound "C" on the autopsy report.[101] That wound "perforated [and] went through his heart. There was significant bleeding in his chest cavity. That stab wound alone cost Gabriel Sherwood [1.5] liters of blood. One-third of the blood in his body was lost by that one fatal stab. And that stab also caused him to suffer a collapsed lung. Another stab went through Mr. Sherwood's diaphragm."[102]

The State pressed that, although Rivera was "pounding," "punching," and "kicking" Sherwood, "we know from the medical examiner none of that contributed in any way to [the] death."[103] The prosecutor reminded the jury that the autopsy report caused the police to accuse Mr. Garlick of homicide and to withdraw the homicide charges lodged against co-defendant Rivera.[104] "And remember," the prosecutor stated, "the stab that did the killing, the deepest wound," was 5.5 inches deep.[105]

After summations, defense counsel, yet again, renewed his objection to the autopsy report and Dr. Ely's testimony.[106]

The jury acquitted Mr. Garlick of intentional murder but convicted him of first-

---

[101] T452.

[102] T452-53.

[103] T454.

[104] T460.

[105] T466.

[106] T524-25.

degree manslaughter.[107] Mr. Garlick was sentenced to two decades in prison.

**Appellate Division Decision**

Before the Appellate Division, Mr. Garlick renewed his contention that the autopsy report was testimonial under *Bullcoming* and *Melendez-Diaz*. In response, the State's sole position was that the report was not testimonial.[108] Thus, the State claimed, both the report and Dr. Ely's testimony were admissible.[109] The State did not argue harmless error.

The Appellate Division rejected Petitioner's confrontation claim because the report was "not testimonial":

> "Defendant's right of confrontation was not violated when an autopsy report prepared by a former medical examiner, who did not testify, was introduced through the testimony of another medical examiner" (quoting *People v Acevedo*, 112 A.D.3d 454, 455 (1st Dept. 2013)), since the report, which "did not link the commission of the crime to a particular person," was not testimonial (quoting *People v. John*, 27 N.Y.3d 294, 315 (2016)). Defendant's contention that *People v. Freycinet* (11 N.Y.3d 38 (2008)), has been undermined by subsequent decisions of the United States Supreme Court is unavailing (citing *Acevedo*, 112 A.D.3d at 455).[110]

In *Freycinet*, on which the Appellate Division relied, the New York Court of Appeals

---

[107] T541.

[108] SA100-113.

[109] SA100.

[110] A175.

held that an autopsy report was not testimonial because it "did not directly link defendant to the crime. The report is concerned only with what happened to the victim, not who killed her."[111] The Court of Appeals subsequently ratified that analysis in *John*, which the Appellate Division also cited.[112]

A Judge of the New York Court of Appeals denied leave to appeal. Mr. Garlick then petitioned the Supreme Court for a writ of certiorari, which the Court denied.

### The District Court Grants the Writ

Mr. Garlick petitioned for a writ of habeas corpus in the Southern District. He argued that the Appellate Division's non-testimonial finding was both an unreasonable application of, and contrary to, clearly-established Supreme Court precedents.[113] Specifically, he argued that the Appellate Division decision: (1) unreasonably applied the clearly-established testimonial standard; (2) was contrary-to clearly-established law because its legal standard—the report must "link the commission of the crime to a particular person"[114]—was squarely rejected by *Melendez-Diaz*, thus triggering *de novo* review on federal habeas; and (3) was contrary-to clearly established law because *Melendez-Diaz* and *Bullcoming* were "materially indistinguishable."[115]

---

[111] 11 N.Y.3d at 42.

[112] *John*, 27 N.Y.3d at 315 (citing *Freycinet*, 11 N.Y.3d at 42).

[113] Petitioner's Memorandum of Law (Nov. 27, 2018).

[114] A175

[115] Petitioner's Memo. of Law (Nov. 27, 2018).

The State contended that the Appellate Division's non-testimonial finding was a reasonable application of Supreme Court precedent because (1) no Supreme Court case had found autopsy reports non-testimonial and (2) medical examiners might write autopsy reports for non-prosecutorial reasons, such as ruling out suicide.[116]

In her Report & Recommendation ("R&R"), Magistrate Judge Sarah Cave found the autopsy report testimonial, thus rendering the report and Dr. Ely's surrogate testimony, inadmissible.[117] Additionally, the Appellate Division's link-to-a-particular-person rule, and the state cases the Appellate Division cited in support of that rule (*e.g.*, *Freycinet*), "do not reflect current Supreme Court Confrontation precedent."[118] *Melendez-Diaz* held that "evidence need not identify a specific individual or be 'directly accusatory' to be considered testimonial."[119] Thus, *Freycinet*, is not "good law."[120] And finally, Judge Cave found that the autopsy report's introduction was likely not harmless because "absent the Autopsy Report, the State's case is considerably weaker" and the State relied heavily on Dr. Ely's surrogate testimony and the report.[121] Judge Cave found

---

[116] State's Memo. of Law (March 2019): SA114-41.

[117] A88-98.

[118] A98-106.

[119] A100 (citing *Melendez-Diaz*, 557 U.S. at 313).

[120] A104.

[121] A109-113.

that the surveillance video "did not clearly show a knife," thus rendering the autopsy report's stabbing conclusions important to the State's case.[122]

Nevertheless, Judge Cave recommended denying relief. Judge Cave found there was no "clearly established" law in this area for two principal reasons: (1) no Supreme Court decision has specifically addressed autopsy reports; and (2) lower courts were divided on this constitutional issue.[123] Judge Cave did not address either of Mr. Garlick's contrary-to arguments.

Petitioner objected to the R&R. He first argued that Judge Cave erred in failing to grant relief on contrary-to grounds.[124] Petitioner renewed his contrary-to claims: (1) *Melendez-Diaz* and *Bullcoming* were materially indistinguishable and (2) the Appellate Division's legal standard violated *Melendez-Diaz*.[125]

Petitioner further objected to the unreasonable-application finding, arguing that Judge Cave incorrectly (1) focused on whether autopsy reports are categorically testimonial in all cases (a claim Petitioner never made) and (2) held that "polls of lower-court decisions," not Supreme Court decisions, controlled the AEDPA analysis.[126]

---

[122] A110.

[123] A105-09.

[124] A131-36.

[125] A131-36

[126] A137-41.

The District Court granted the writ.[127] The Court found that the R&R "correctly stated that the certified autopsy report, prepared during the course of an investigation that had already identified Garlick as a suspect, was the sort of 'declaration of facts written down and sworn to by the declarant' that the Supreme Court deemed testimonial in *Melendez-Diaz* and *Bullcoming*."[128] The Court also found that the R&R correctly concluded that "the First Department's decision, as well as the authorities it cited, relied on the 'accusatory witnesses' distinction rejected by the Supreme Court in 2009."[129] "Therefore, the R&R provided a roadmap to conclude that the First Department's [decision] was either contrary to, or an unreasonable application of, Supreme Court precedent."[130]

The District Court then rejected the R&R's no-clearly-established-law finding.[131] The District Court found held that to show clearly-established law, Petitioner did not have to cite a Supreme Court case finding autopsy reports testimonial.[132] AEDPA "does not demand 'an identical factual pattern before a legal rule must be applied.'"[133] Instead,

---

[127] A155-69.

[128] A160.

[129] A160.

[130] A160.

[131] A165-68.

[132] A165.

[133] A165 (quoting *White v. Woodall*, 572 U.S. 415, 427 (2014)).

the controlling inquiry was whether "the First Department unreasonably applied the Supreme Court's precedents to conclude that a certified report (of any kind), prepared in the course of a criminal investigation and tending to prove the victim's cause and manner of death, was testimonial in nature."[134] AEDPA does not require the Supreme Court to specifically address a particular kind of forensic report before "the Supreme Court's recent Confrontation Clause precedents can be applied to [that report]."[135] Further, a habeas court "may not substitute conflicts between lower courts" for "'clearly established law' announced by the Supreme Court."[136] "The habeas statute is clear: it is the word of the Supreme Court, and only the Supreme Court, that matters when determining what is 'clearly established law.'"[137]

"Limiting 'clearly established law' to the statutory definition quickly reveals" the Appellate Division unreasonably applied clearly-established law.[138] "The court ruled that the autopsy report was not testimonial since it did 'not link the commission of the crime to a particular person,' even though *Melendez-Diaz* definitively did away with the accusatory/non-accusatory distinction some seven years earlier."[139] The Appellate

---

[134] A168.

[135] A165.

[136] A166.

[137] A166 (quoting 28 U.S.C. § 2254(d)(1)).

[138] A166.

[139] A166 (citing *Melendez-Diaz*, 557 U.S. at 313-14 and quoting A175).

Division also unreasonably applied *Melendez-Diaz* and *Bullcoming*, which held that "certified reports prepared to aid a criminal investigation . . . are testimonial and that [Supreme Court] precedents 'cannot sensibly be read any other way.'"[140] As the testimonial question was not "subject to 'fairminded disagreement,'" Mr. Garlick satisfied the unreasonable-application standard."[141]

The Court finally found that the autopsy report's introduction was not harmless for the reasons stated by the R&R.[142]

The State then appealed to this Court.

## ARGUMENT

**The Appellate Division's decision was an unreasonable application of, and contrary to, clearly-established Supreme Court precedents.**

### A. Applicable Standards

Under 28 U.S.C. § 2254 (d)(1) ("AEDPA"), a writ of habeas corpus must issue when the state court's "decision" was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." The court must "train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims."[143] "[A]lthough the Supreme Court

---

[140] A166-67 (quoting *Bullcoming*, 564 U.S. at 663).

[141] A167 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

[142] A168-69.

[143] *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (internal quotation marks omitted).

must have acknowledged the right, it need not have considered the exact incarnation of that right or approved the specific theory in order for the underlying right to be clearly established."[144] The relevant date for determining clearly established law is the date of the last state merits decision, here November 29, 2016 (the Appellate Division decision).[145]

When the state court applies a legal rule that violates clearly-established Supreme Court precedent, AEPDA's "contrary to" standard is satisfied and a habeas court reviews the federal claim *de novo*.[146] Further, a state court's decision is "contrary to" clearly-established Supreme Court precedent when it "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Court's]."[147]

On the other hand, a state court unreasonably applies clearly-established law when its decision "'identifies the correct governing legal principle'" from Supreme Court

---

[144] *Ryan v. Miller*, 303 F.3d 231, 248 (2d Cir. 2002) (citations omitted).

[145] *Greene v. Fisher*, 565 U.S. 34, 40 (2011).

[146] *E.g.*, *Lafler v. Cooper*, 566 U.S. 156, 173 (2012) (state court's application of the wrong prejudice standard in an ineffective assistance case triggered *de novo* review); *Young v. Conway*, 698 F.3d 69, 84-85 (2d Cir. 2012); *Williams v. Taylor*, 529 U.S. 362, 405-06, 412-13 (2000); Means, Federal Habeas Manual, *Consequence of "Contrary To" Determination* § 3:50 (2020 ed.) (available on Westlaw).

[147] *Williams*, 529 U.S. at 406.

decisions "'but unreasonably applies that principle to the facts of the prisoner's case.'"[148] The standard requires an "objectively unreasonable" state-court determination that "fairminded jurists" would reject.[149] While difficult, the standard is not "insurmountable."[150] A "decision need not teeter on 'judicial incompetence' to warrant relief under Section 2254."[151]

AEDPA "does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied."[152] Similarly, AEDPA does not "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner."[153]

---

[148] *E.g.*, *Orlando v. Nassau County Dist. Atty. Office*, 915 F.3d 113, 122 (2d Cir. 2019) (quoting *Williams*, 529 U.S. at 413).

[149] *White v. Woodall*, 572 U.S. 415 (2014).

[150] *Rosen v. Superintendent Mahanoy SCI*, 972 F.3d 245, 256 n.83 (3d Cir. 2020).

[151] *Scrimo v. Lee*, 935 F.3d 103, 112 (2d Cir. 2019) (internal quotations omitted).

[152] *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (citation and quotation marks omitted).

[153] *Panetti*, 551 U.S. at 953 (citations and quotation marks omitted).

**B. The Appellate Division unreasonably applied clearly-established law.**

1. **By 2016, it was clearly established that a forensic report created with the primary purpose of proving a fact in a criminal case was testimonial.**

The Confrontation Clause guarantees the accused the right to be "confronted with the witnesses against him."[154] Under clearly-established Supreme Court precedent, the Clause applies to all "testimonial" statements—that is, statements whose "primary purpose" was to "establish or prove past events potentially relevant to later criminal prosecution."[155] If a statement is testimonial, the State cannot introduce the statement against the accused without producing the declarant for confrontation.[156]

Under *Crawford* and its progeny, it is irrelevant whether an out-of-court statement

---

[154] U.S. Const. amend. VI.

[155] *Bryant*, 562 U.S. at 356 ("'[Statements] are testimonial when the circumstances objectively indicate that [they are not made during an] ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'") (quoting *Davis*, 547 U.S. at 822); *see also Melendez-Diaz*, 557 U.S. at 316-17 (the absence of an interrogation is irrelevant); *Melendez-Diaz*, 557 U.S. at 310-11 (forensic report was testimonial because it was "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial") (quoting *Crawford*, 541 U.S. at 51-52 (defining the "core class" of "testimonial statements" to include "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial")); *Melendez-Diaz*, 557 U.S. at 324; *Bullcoming*, 564 U.S. at 663-64; *id.* at 658-59 n. 6; *United States v. James*, 712 F.3d 79, 94-95 (2d Cir. 2013); *McCarley v. Kelly*, 801 F.3d 652, 664-65 (6th Cir. 2015) (the "primary purpose" standard constitutes clearly established Supreme Court law).

[156] *E.g.*, *Crawford*, 541 U.S. 36.

seems "reliable."[157] The Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed" through confrontation.[158] As *Crawford* held, "Dispensing with confrontation because testimony is obviously reliable" is just as unconstitutional as "dispensing with jury trial because a defendant is obviously guilty."[159]

In 2009, the *Melendez-Diaz* Court rejected a "'forensic-evidence' exception" to the Confrontation Clause.[160] Applying *Crawford*'s testimonial standard, the Court found "little doubt" that formalized forensic reports, such as the narcotics report at issue there, fall within the "core class of testimonial statements."[161] Such a report is "inconvertibly a 'solemn declaration or affirmation made for the purpose of proving some fact'" and written "'under circumstances which would lead an objective witness reasonably to believe [it] would be available for use at a later trial.'"[162] The narcotics report there was transmitted to law enforcement personnel and contained "the precise testimony [the witness] would be expected to provide if called at trial."[163]

---

[157] *E.g.*, *Bullcoming*, 564 U.S. at 661.

[158] *Crawford*, 541 U.S. at 61-62.

[159] *Id.* at 61-62.

[160] *Bullcoming*, 564 U.S. at 658-59 (citing *Melendez-Diaz*, 557 U.S. at 317-21).

[161] *Melendez-Diaz*, 557 U.S. at 310 (quoting *Crawford*, 541 U.S. at 51-52).

[162] *Id.* at 310-11 (quoting *Crawford*, 541 U.S. at 51-52).

[163] *Id.*

*Melendez-Diaz* also rejected "a potpourri of analytic arguments" advanced (by the State and dissent) "to avoid this rather straightforward application" of *Crawford*.[164] Specifically, *Melendez-Diaz* rejected the State's contentions that the Confrontation Clause does not apply to: (1) statements that are not the product of interrogation; (2) business or public records; (3) accounts of "contemporaneous" observations; and (4) purportedly "neutral" and "reliable" scientific testing.[165]

*Melendez-Diaz* further rejected the State's attempt to limit the Confrontation Clause to "accusatory" statements that "directly accuse [the defendant] of wrongdoing."[166] That limitation "finds no support in the text of the Sixth Amendment or in our case law" and "would be contrary to longstanding case law" going back to the nineteenth century.[167] The Sixth Amendment, *Melendez-Diaz* held, "guarantees a defendant the right 'to be confronted with the witnesses *against* him.' To the extent the analysts were witnesses [because their statements were testimonial], they certainly provided testimony against petitioner, proving one fact necessary for his conviction—that the substance he possessed was cocaine."[168] The Sixth Amendment's twin guarantees of confrontation and compulsory process "contemplate[ ] two classes of witnesses—those against the

---

[164] *Id.* at 312.

[165] *Id.* at 315-24.

[166] *Id.* at 313-14.

[167] *Id.* at 313-314 (citing *Kirby v. United States*, 174 U.S. 47 (1899)).

[168] *Id.* at 313-14 (emphasis in original).

defendant and those in his favor. The prosecution must produce the former; the defendant may call the latter. Contrary to respondent's assertion, there is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation."[169]

In 2011, the *Bullcoming* Court again found a forensic report (a blood-alcohol-content report) testimonial because "*Melendez-Diaz* left no room for" that "inescapable" conclusion.[170] Relying on *Melendez-Diaz*, the Court reaffirmed a clear rule: "[a]n analyst's certification prepared in connection with a criminal investigation or prosecution . . . is 'testimonial' and therefore within the compass of the Confrontation Clause."[171] The Court then held that just like the report in *Melendez-Diaz*, the blood-alcohol-content report was "'incontrovertibly [an] affirmation[ ] made for the purpose of establishing or proving some fact' in a criminal proceeding."[172]

*Bullcoming* further held that the State cannot comply with the Confrontation Clause by presenting a surrogate expert who was not involved in the forensic analysis. Instead, when the State introduces a testimonial forensic report, it must produce the individual

---

[169] *Id.* at 313-314 (footnote omitted).

[170] *Bullcoming*, 564 U.S. at 663-64.

[171] *Id.* at 658-59 (citing *Melendez-Diaz*, 557 U.S. at 319-24).

[172] *Id.* at 664 (quoting *Melendez-Diaz*, 557 U.S. at 310) (bracket and ellipsis omitted).

who performed the forensic analysis and created the report.[173] "Our precedent cannot sensibly be read any other way."[174]

### 2. The Appellate Division unreasonably applied clearly-established law.

The District Court was right: the Appellate Division unreasonably applied clearly-established law when it found this autopsy report non-testimonial.[175] As *Bullcoming* and *Melendez-Diaz* held, "[a]n analyst's certification prepared in connection with a criminal investigation or prosecution . . . is 'testimonial' and therefore within the compass of the Confrontation Clause."[176] The certified report here, prepared during an active homicide investigation, unquestionably satisfies that clearly-established rule.

Further, this autopsy report satisfies the clearly-established primary-purpose standard, which requires that the statement have the primary purpose of establishing a fact in a criminal case.[177] Under the compelling facts here, no "fair-minded jurist" could find otherwise.[178]

The statements in the autopsy report had the primary purpose of codifying critical

---

[173] *Id.* at 662-63.

[174] *Id.* at 662-63.

[175] A165-68.

[176] *Bullcoming*, 564 U.S. at 658-59 (citing *Melendez-Diaz*, 557 U.S. at 319-24).

[177] *Bullcoming*, 564 U.S. at 658-69 n.6, 663-64; *Bryant*, 562 U.S. at 356; *Melendez-Diaz*, 557 U.S. at 310-11, 324; *Davis*, 547 U.S. at 822; *Crawford*, 541 U.S. at 51-52; *James*, 712 F.3d at 94-95; *McCarley*, 801 F.3d at 664-65.

[178] *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

details for a criminal prosecution. At the time of the autopsy and the report's drafting: (1) the cause of death was unquestionably homicide; (2) an active homicide investigation had ensued; (3) Mr. Garlick had already been identified as the homicide suspect before the autopsy and the police had even circulated a department-wide notice to arrest him; and (4) codefendant Rivera had already been arrested and charged with homicide. Dr. Maloney then performed the autopsy in the presence of police officers. Her formal and certified report concluded that the cause of death was homicide by a stab wound to the chest and ruled out an alternative head-trauma theory—a theory the police had originally adopted. Later, after Mr. Garlick had been indicted for murder, Dr. Maloney finalized and signed her report. Her inculpatory report was then transmitted to prosecutors and was admissible for its truth under New York law.[179]

Given these compelling circumstances, no reasonable jurist could find that this report did not, as in *Melendez-Diaz* and *Bullcoming*, fall within the "core class of testimonial statements."[180] These compelling circumstances support only one conclusion: the report was created for the primary purpose of "establishing or proving some fact" that would be relevant in a criminal case.[181] The "primary, if not indeed the sole," reason Dr. Maloney codified her detailed findings in her formalized report was

---

[179] C.P.L.R. § 4518, 4520; N.Y. County Law § 671, 673, 674, 677; N.Y. Pub. Health Law § 4103; C.P.L.R. § 4518(a),(c).

[180] *Melendez-Diaz*, 557 U.S. at 310-11.

[181] *E.g.*, *Bryant*, 562 U.S. at 356; *Davis*, 547 U.S. at 822.

to prepare a record for a criminal case.[182]

Furthermore, as in *Bullcoming* and *Melendez-Diaz*, "the formalities attending" the autopsy report are "more than adequate to qualify [it] as testimonial."[183] In *Bullcoming* and *Melendez-Diaz*, the analysts "prepared a certificate concerning the result of [their] analysis" and "formalized" the report in a "signed document headed 'a report.'"[184] And in *Bullcoming*, the report "contain[ed] a legend referring to municipal and magistrate courts' rules that provide for the admission of certified blood-alcohol analyses."[185]

So too here, the autopsy report is headed "REPORT OF AUTOPSY," sets forth an official case number, and bears the official seal of OCME.[186] Dr. Maloney certified and signed the report, indicating a "draft" date and a "final" date.[187] In turn, OCME formally certified the report as a business record for purposes of litigation, expressly citing state law authorizing the report's admission into evidence.[188] The "formalities attending" this report are just like those attending the reports in *Bullcoming* and *Melendez-Diaz*.

---

[182] *Davis*, 547 U.S. at 830.

[183] *Bullcoming*, 564 U.S. at 664-65.

[184] *Bullcoming*, 564 U.S. at 664-65; *Melendez-Diaz*, 557 U.S. at 308.

[185] *Id.* at 664-65.

[186] A275.

[187] A276, A280.

[188] A274.

In sum, as the Appellate Division unreasonably ignored the clearly-established command of *Crawford* and its progeny, AEDPA is satisfied.

### 3. The State unreasonably interprets both the governing AEDPA standards and the clearly-established Confrontation Clause precedents.

To circumvent this straightforward application of clearly-established law, the State advances a flurry of arguments regarding AEDPA's scope and *Crawford*'s progeny. As shown below, the State's arguments misconstrue AEDPA and unreasonably interpret clearly-established law. They should be rejected.

\* \* \*

The State insists that to secure relief under AEDPA, Petitioner must cite a Supreme Court case involving an identical fact pattern—that is, autopsies.[189] The District Court correctly rejected this argument because, as the Supreme Court reaffirmed in *White v. Woodall*, AEDPA does not require "an identical factual pattern before a legal rule must be applied."[190] This Court has made the same point: "although the Supreme Court must have acknowledged the right, it need not have considered the exact incarnation of that right or approved the specific theory in order for the underlying right to be clearly

---

[189] State's Brief 20-31.

[190] Dist. Ct. Opinion: A165 (quoting *Woodall*, 572 U.S. at 427); *Panetti*, 551 U.S. at 953.

established."[191] Thus, Petitioner need not cite a confrontation case involving "autopsies" any more than a Petitioner seeking ineffective-assistance relief because his lawyer fell asleep during trial must cite a case involving a "dozing lawyer."[192] The State misreads AEDPA, turning it into an insurmountable exercise of formalism.

Instead of the State's formalistic approach, AEDPA allows a court to find "an application of a *principle* unreasonable when it involves a set of facts different from those of the case in which the principle was announced."[193] "[E]ven a general standard may be applied in an unreasonable manner."[194]

The inquiry, therefore, is not whether the Supreme Court has specifically addressed "autopsy reports" in this context. Instead, the inquiry is the one the State repeatedly evades: did the Appellate Division unreasonably apply the Court's clearly-established constitutional principles to the facts of this case.[195] The answer to that question is yes.

---

[191] *Ryan v. Miller*, 303 F.3d 231, 248 (2d Cir. 2002) (*Bruton* case) (citing *Sellan v. Kuhlman*, 261 F.3d 303, 309 (2d Cir. 2001)).

[192] *See Sellan*, 261 F.3d at 309 ("The *Williams* Court thus clarified that for AEDPA purposes, it matters only that the *Strickland* performance and prejudice test has been 'clearly established'—not that a particular theory of ineffective assistance derived from *Strickland* has been clearly established. Any case-specific concerns 'obviate neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by [the] Court.") (quoting *Williams*, 529 U.S. at 391).

[193] *Panetti*, 551 U.S. at 953 (emphasis added) (internal quotations omitted).

[194] *Panetti*, 551 U.S. at 953 (citing *Williams v. Taylor*, 529 U.S. 362).

[195] *Panetti*, 551 U.S. at 953.

Similar problems doom the State's claim that the District Court violated *White v. Woodall*,[196] which involved the unsettled right to "no-adverse-inference-from-silence" instructions during sentencing.[197] The State claims that as in *Woodall*, the District Court found that the state court unreasonably "failed to extend" clearly-established law, an approach *Woodall* rejected.[198]

But the District Court did not find that the state court unreasonably failed to "extend" Confrontation Clause precedents. Instead, it simply held that the Appellate Division unreasonably *applied Crawford* and its clearly-established forensic-science progeny to a forensic-science fact pattern.[199] That analysis is squarely within 28 U.S.C. § 2254(d)(1)'s wheelhouse,[200] and was expressly ratified by *Woodall*, which quoted from *Williams*:

> "'A state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the particular state prisoner's case.'"[201]

The State thus misreads *Woodall* to hold that whenever a habeas court finds an unreasonable application of a principle to facts different from those in which the

---

[196] 572 U.S. 415 (2014).

[197] State's Brief 25-26.

[198] State's Brief 25-26.

[199] A165-68.

[200] *E.g.*, *Panetti*, 551 U.S. at 953.

[201] *Woodall*, 572 U.S. at 425 (quoting *Williams*, 529 U.S. at 407-08).

"principle was announced,"[202] the habeas court has erroneously engaged in "unreasonable extension" analysis. *Woodall* rejected that precise argument, re-affirming that AEDPA does not require an "identical factual pattern before a legal rule must be applied."[203] Instead, all *Woodall* held was that "*to the extent*" an "unreasonable-refusal-to-extend rule *differs*" from the traditional unreasonable-application standard "embraced in *Williams* and reiterated many times since" (quoted above), *that* new approach was flawed.[204] In turn, the Court denied relief because there was were "reasonable arguments," based on Supreme Court case law, that the defendant's constitutional rights were not violated.[205]

Therefore, *Woodall* ultimately denied relief because the Petitioner could not satisfy AEDPA's objective-reasonableness touchstone, not because the Petitioner could not cite a Supreme Court case with identical facts.[206] Here though, the rule "embraced" in *Williams* and "reiterated many times since" controls: the state court unreasonably applied *Crawford* and its progeny "to the facts" of this case, thus satisfying AEDPA.[207]

---

[202] *Panetti*, 551 U.S. at 953.

[203] *Woodall*, 572 U.S. at 427(quoting *Panetti*, 551 U.S. at 953).

[204] *Woodall*, 572 U.S. at 426 (emphasis added).

[205] *Id.* at 427.

[206] *See also Woodall*, 572 U.S. at 432-33 (Breyer, J., dissenting).

[207] *Id.* at 426 (majority).

Moving on from its identical-fact-pattern claim, the State claims habeas relief is unavailable because lower courts are split on the issue of whether autopsy reports are testimonial.[208] The District Court correctly rejected this approach too, correctly holding that "it is the word of the *Supreme Court*" that drives the AEDPA inquiry.[209] "[T]he Supreme Court has specifically criticized the conflation of an objective reasonableness standard with a requirement of unanimous consensus in the context of a petition for a writ of habeas corpus."[210] While lower-court disagreement may "illustrate the *possibility of fairminded disagreement*,"[211] it is not determinative.[212]

---

[208] State's Brief 28-30, 32-35.

[209] Dist. Ct. Op: A166 (emphasis added) (citing 28 U.S.C. § 2254(d)(1) and *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)); *Williams*, 529 U.S. at 409-10 ("The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case.").

[210] *Walczyk v. Rio*, 496 F.3d 139, 170 (2d Cir. 2007) (Sotomayor, J., concurring) (citing *Williams*, 529 U.S. at 409-10); *Marshall*, 569 U.S. at 64 (a habeas court "may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to this Court, be accepted as correct.").

[211] *Woodall*, 572 U.S. at 422 n.3. (emphasis added).

[212] In any event, the lower-court poll weighs heavily in Mr. Garlick's favor. At least 10 state/federal appellate courts have found autopsy reports to be testimonial, while far less have found to the contrary. *See* R&R: A107 ns. 11 & 12 (collecting authority). The State's subjective approach here thus appears to call for *unanimity* in the lower courts, an insurmountable standard having no basis in AEDPA's text or Supreme Court precedent. *Williams*, 529 U.S. at 409-10

The State next claims there is no clearly-established law in this area at all.[213] The State faults the District Court for "focus[ing] heavily on *Bullcoming* and *Melendez-Diaz*."[214] Instead, the State claims, conflicting lower-court interpretations of *Williams v. Illinois*[215] cancel out the clear principles established in *Bullcoming* and *Melendez-Diaz*.[216] Thus, the theory goes, post-*Williams*, no habeas petitioner can satisfy the clearly-established law requirement in this context.

Besides the fact that purported conflict in lower courts does not control,[217] the State's theory unreasonably construes the non-binding plurality decision in *Williams v. Illinois* as overruling *Melendez-Diaz* and *Bullcoming*. That is wrong. *Williams v. Illinois* failed to produce a majority opinion and thus left those clearly-established decisions intact.

The *Williams* Court analyzed whether a DNA-profile report (summarizing a profile located on the victim's body), which was never introduced into evidence, was subject to the Confrontation Clause. At trial, an analyst who did not prepare that profile testified that defendant's DNA matched it. The Illinois appellate courts held that the profile's contents were admissible because they were not offered for "the truth of the matter asserted" but instead served as the basis for another expert's "match"

---

[213] State's Brief 20-31.

[214] State's Brief 28.

[215] 567 U.S. 50 (2012).

[216] State's Brief 20-31.

[217] Garlick Brief at 40.

conclusions.[218] The Supreme Court issued three decisions (with a split of 4-1-4) and did not produce a majority decision.

Justice Alito's plurality decision found no Sixth Amendment violation because, as the state courts found there, the report was used to explain the basis for another expert's conclusion and not for the truth of the matter asserted.[219] The plurality alternatively found that unlike in *Melendez-Diaz* and *Bullcoming*—which the plurality recognized to be "binding"—the report was not testimonial because it lacked the "primary purpose of accusing a targeted individual" since no suspect had been identified when the report was created.[220]

Justice Kagan's dissenting opinion (joined by three other Justices) and Justice Thomas' concurrence provided five votes for the proposition that the report's contents were presented to the jury for their truth because, if not, they could not serve as a valid

---

[218] *Williams*, 567 U.S. at 60-64.

[219] *Williams*, 567 U.S. at 67-79; *Crawford*, 541 U.S. at 59-60 n.9 (the Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.").

[220] *Williams*, 567 U.S. at 82-86 & 82 n.13.

basis for an expert's opinion.[221] These five justices also rejected the plurality's new targeted-individual standard.[222] As Justice Kagan's opinion put it, "Where that test comes from is anyone's guess. . . . [I]t has no basis in our precedents."[223]

Justice Thomas' decision also articulated a theory that no other Justice adopted: the report was not testimonial because it was not certified or sworn.[224]

As the *Williams* plurality opinion did not garner majority support, the *Williams* decision is, as this Court held in *United States v. James*, "confined to the particular set of facts presented in that case" and leaves prior decisions intact.[225] Only a decision of a majority of the Court can change prior law.[226] The *Williams* plurality expressly

---

[221] *Id.* at 103-09 (Thomas, J., concurring) ("[S]tatements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose. There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth."); *id.* at 126-33 (Kagan, J., dissenting) ("If the statement is true, then the conclusion based on it is probably true; if not, not. So to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies.").

[222] *Id.* at 135-36 (Kagan, J., dissenting); *id.* at 114-17 (Thomas, J., concurring).

[223] *Id.* at 135 (Kagan, J., dissenting) (citations omitted).

[224] 567 U.S. at 112 (Thomas, J., dissenting).

[225] 712 F.3d at 95; *Williams*, 567 U.S. at 121 (Kagan, J., dissenting) (explaining that although there are "five votes to approve the admission of the [DNA] report," the Court "cannot settle on a reason why"); *see also United States v. Duron-Caldera*, 737 F.3d 988, 994 & 994 n.4 (5th Cir. 2013).

[226] *E.g.*, *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 81 (1987) ("As the plurality opinion . . . did not represent the views of a majority of the Court, we are not bound by its reasoning.") (internal footnote omitted).

recognized as much as it confirmed that *Bullcoming* and *Melendez-Diaz* were "binding."[227] Thus, in "focus[ing] heavily on *Bullcoming* and *Melendez-Diaz*,"[228] the District Court correctly focused on those binding *majority* opinions.

The State's search for an objectively-reasonable justification for the Appellate Division's determination fares no better. The State simply rehashes arguments that *Melendez-Diaz* and *Bullcoming* squarely rejected.

Summoning a now-defunct reliability standard,[229] the State claims Mr. Garlick had no right to confront Dr. Maloney because OCME is independent, neutral, and lacks a "'pro-law enforcement bias.'"[230] *Melendez-Diaz* and *Bullcoming* categorically rejected these exact arguments. As *Bullcoming* held, "The State maintains that the affirmations were not 'adversarial' or 'inquisitorial'; instead they were simply observations of an 'independent scientist' made 'according to a non-adversarial public duty.' That argument fares no better here than it did in *Melendez-Diaz*."[231]

---

[227] *Williams*, 567 U.S. at 82 n.13.

[228] State's Brief 28.

[229] *Crawford*, 541 U.S. at 61-62.

[230] State's Brief 38-40.

[231] *Bullcoming*, 564 U.S. at 664; *Melendez-Diaz*, 557 U.S. at 317 (explicitly rejecting the theory that the declarant's apparent neutrality is relevant because, under *Crawford*, "reliability" is irrelevant).

The State's argument that the autopsy report was a "'contemporaneous record of objective facts'" and did not involve "fallible human judgment" fails too.[232] Again, that argument was explicitly rehearsed and rejected in *Melendez-Diaz* and *Bullcoming*.[233]

Finally, relying on the standard employed by the Appellate Division,[234] the State claims the report was neither "inherently inculpatory" nor accusatory.[235] But as the District Court correctly found, "*Melendez-Diaz* definitely did away with the accusatory/non-accusatory distinction some seven years earlier."[236] As *Melendez-Diaz* held, when a testimonial statement is "helpful to the prosecution," the Confrontation Clause applies even if the statement is not "directly accusatory" and does not prove the defendant's identity as the culprit.[237]

---

[232] State's Brief 38 (quoting *Freycinet*, 11 N.Y.3d at 41).

[233] *Bullcoming*, 564 U.S. at 659-61 (it is irrelevant whether the report is an "objective" account of "contemporaneous" observations that did not involve "interpretation or independent judgment"); *id.* at 661 ("This Court settled in *Crawford* that the 'obviou[s] reliab[ility]' of a testimonial statement does not dispense with the Confrontation Clause. Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'") (quoting *Crawford*, 541 U.S. at 62 and *Melendez-Diaz*, 557 U.S. at 319-20 n. 6)

[234] A175.

[235] State's Brief 38-39, 41-42; App. Div. Decision: A175 (finding the report non-testimonial because it did not "link the commission of the crime to a particular person").

[236] A166 (citing *Melendez-Diaz*, 557 U.S. at 313-14).

[237] 557 U.S. at 313-14.

When its effort to relitigate *Melendez-Diaz* and *Bullcoming* collapses, the State invents new and unreasonable standards. The State claims a forensic report can only be testimonial if its "sole" purpose was evidentiary, suggesting (without citing any real alternative purposes) that this report lacked that sole purpose.[238] But the Supreme Court has never limited the Confrontation Clause to "sole purpose" cases. Instead, the statement's "primary purpose" controls.[239] The State's novel effort to rewrite settled law would delete the Confrontation Clause from the Bill of Rights because almost every statement could have mixed purposes.

To be sure, *Melendez-Diaz* used the phrase "sole purpose" when it stated that "not only were the affidavits 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' but under Massachusetts law the *sole purpose* of the affidavits was to provide 'prima facie evidence of the composition, quality and the net weight' of the analyzed substance."[240] But the Court was obviously not creating a new "sole purpose" standard. Instead, by noting that the report's "sole purpose" was evidentiary under Massachusetts law, the Court was simply emphasizing the strength of the testimonial argument in that case.

---

[238] State's Brief 40.

[239] *E.g.*, *Bryant*, 562 U.S. at 356.

[240] 557 U.S. at 311 (emphasis in original).

In any event, the same circumstances that supported *Melendez-Diaz*'s conclusion that the report's "sole purpose" was evidentiary are present here. Just like the Massachusetts law at issue there, New York law mandates the transmission of an autopsy report finding homicide to the District Attorney and then renders it admissible "prima facie" evidence of the cause of death.[241] Thus, just as in *Melendez-Diaz*, the sole purpose of codifying the cause-of-death conclusion, comprehensively justifying that conclusion with factual assertions and diagrams, and then transmitting that report to the prosecution was to create evidence for a criminal case.[242]

Nor could, as the State contends, a reasonable jurist find this report non-testimonial because the medical examiner did not know Mr. Garlick had been specifically identified as the suspect.[243] This formalistic argument, which appears to rest on the *Williams* plurality's "targeted individual" theory, fails.[244] As explained above, a plurality decision is not binding law and does not disturb the Court's prior decisions in this area.[245] And, those prior decisions clearly establish that the Confrontation Clause applies to statements made with the primary purpose of establishing an evidentiary fact—not that

---

[241] C.P.L.R. § 4518, 4520; N.Y. Pub. Health Law § 4103; N.Y. County Law § 674-77; N.Y. City Charter § 577(g) .

[242] 557 U.S. at 311.

[243] State's Brief 41.

[244] *Williams*, 567 U.S. at 82-86

[245] *E.g.*, *CTS Corp.*, 481 U.S. at 81; Garlick Brief at 43.

the statement target someone the declarant knows by name.[246] Indeed, *Melendez-Diaz* rejected an "accusatory" standard[247] and five Justices in *Williams* rejected the plurality's "targeted individual" rule. As Justice Kagan's decision correctly stated, "where [the plurality's new] test comes from is anyone's guess. . . . [I]t has no basis in our precedents."[248]

The State's "targeted individual" theory also fails on its own terms. The *Williams* plurality did not suggest that the analyst must *personally* know the suspect's identity. Instead, it focused on the question of whether a suspect "was identified" by police at the time of the statement.[249] In doing so, the plurality tried to reconcile its new standard with *Melendez-Diaz* and *Bullcoming* on the grounds that, although the analysts there did not know the suspect's identity, the suspects had already been identified by police.[250] Thus, even if a standard from a plurality decision were relevant to the AEDPA analysis—though as shown above it's not—Petitioner satisfies the standard laid out in the plurality's opinion. By the time Dr. Maloney performed the autopsy and drafted her report, Mr. Garlick was already identified a suspect and codefendant Rivera had already

---

[246] *E.g.*, *Davis*, 547 U.S. at 822; *Melendez-Diaz*, 557 U.S. at 310-11.

[247] 557 U.S. at 313-14.

[248] 567 U.S. at 135 (Kagan, J., dissenting) (citations omitted).

[249] *Id.* at 58, 82-86.

[250] *Id.* at 82-84.

been arrested and charged with murder. And by the time Dr. Maloney finalized and signed her report, Mr. Garlick had been indicted for murder.[251]

The State cites several federal-habeas cases, including this Court's in *Vega v. Walsh*, for the proposition that no clearly-established law existed in this arena as of 2016.[252] But these cases analyzed the reasonableness of state decisions handed down *before Melendez-Diaz* and *Bullcoming* clearly established (by 2011) that a forensic report prepared

---

[251] The State claims Petitioner cannot satisfy Justice Thomas' "indicia of solemnity" standard (from *Davis* and *Williams*) because Dr. Maloney only "certified" the report's first paragraph, not the entire report, even though her signature comes at the end of the full report. State's Brief 42-43; *see* A275-80. Besides the fact that a standard from a single Justice's concurring opinion does not control the AEDPA analysis, 28 U.S.C. § 2254(d)(1), this hyper-technical parsing unreasonably interprets the report. The examiner's certification is clearly intended to cover the entire document, not just the first paragraph. The signature—the action that makes the certification official and effective—does not appear until the *end* of the report, after all of the findings/conclusions have been laid out. A280. Obviously, the entire report is certified.

In any event, *Bullcoming* rejected this hyper-technical-drafting theory, holding that "in *Crawford*, this Court rejected as untenable any construction of the Confrontation Clause that would render inadmissible only sworn *ex parte* affidavits while leaving admission of *formal, but unsworn* statements 'perfectly OK.' Reading the Clause in this 'implausible' manner . . . would make the right of confrontation erasable." 564 U.S. at 664 (emphasis added) (quoting *Crawford*, 541 U.S. at 52-53 n.3); *Crawford*, 541 U.S. at 52-53 n.3 ("We find it implausible that a provision which concededly condemned trial by sworn *ex parte* affidavit thought trial by unsworn *ex parte* affidavit perfectly OK.").

[252] State's Brief 22-24 (citing *Vega v. Walsh*, 669 F.3d 123 (2d Cir. 2012) (analyzing a 2005 state-court decision); *Mitchell v. Kelly*, 520 Fed. Appx. 329 (6th Cir. 2013) (2008 decision); *McNeiece v. Lattimore*, 501 Fed. Appx. 634 (9th Cir. 2012) (2006 decision); *Nardi v. Pepe*, 662 F.3d 107 (1st Cir. 2011) (2008 decision)); *see also Soler v. United States*, 2015 W.L. 4879170 (S.D.N.Y. Aug. 14, 2015) (analyzing ineffective assistance during a 2007 trial).

during the course of a criminal investigation is testimonial.[253] *Vega*, for instance, reviewed a state-court decision from 2005.[254]

Nevertheless, the State claims that footnoted dictum from *Vega* (which noted a "fair issue . . . as to whether" *Melendez-Diaz* and *Bullcoming* would justify relief)[255] and Judge Eaton's concurrence in *James* (which claimed that the law is "unsettled")[256] show that post-*Melendez-Diaz* and *Bullcoming*, the law is not "clearly established." Footnoted dictum and a conclusory comment in a concurrence—both non-binding—hardly resolve the legal question before this Court.

Furthermore, the actual holdings in *Vega* and *James* actually support relief here. *Vega* stated that autopsy reports may not be testimonial when "there is no anticipation of use of the autopsy in any kind of court proceeding."[257] Here though, it is uncontested that this "anticipation" existed.

 Similarly, the panel's holding in *James* bolsters Mr. Garlick's petition. There, this Court correctly held that under *Crawford* and its progeny, "we must determine whether, under the circumstances, the autopsy report . . . was prepared with the primary purpose

---

[253] Dist. Ct. Opinion: A167-68.

[254] *Davis,* 547 U.S. at 822.

[255] State's Brief 24-25 (quoting *Vega* 669 F.3d at 128 n.2).

[256] State's Brief 28-29 (citing *James*, 712 F.3d at 108-10) (Eaton, J., concurring)).

[257] *Vega* 669 F.3d at 128.

of creating a record for use at a later criminal trial."[258] And in applying that well-established standard to an autopsy report and a toxicology report, *James* found both non-testimonial because, unlike here, nothing indicated that "a criminal investigation was contemplated during the inquiry into the cause of [the victim's] death."[259] The autopsy report there even indicated that the cause of death was "undetermined."[260] *James* thus confirms what *Melendez-Diaz* and *Bullcoming* command: when, as here, "a criminal investigation was contemplated during the inquiry into the cause of [the victim's] death," the autopsy report is testimonial.[261]

Finally, the First Circuit's non-binding decision in *Hensley v. Roden*[262] is inapposite. *Hensley* considered the reasonableness of a state decision handed down (in 2009) before *Bullcoming* confirmed several critical rules: (1) "[a]n analyst's certification prepared in connection with a criminal investigation or prosecution is 'testimonial,'" the very rule the District Court applied here; (2) there is no requirement that the report be notarized; and (3) the presentation of surrogate testimony does not satisfy the Confrontation Clause.[263]

---

[258] 712 F.3d at 97 (footnote omitted); *id.* at 94-96; *id.* at 101-02.

[259] *Id.* at 101-02.

[260] *Id.* at 99.

[261] *Id.* at 101.

[262] 755 F.3d 724 (1st Cir. 2014); State's Brief 27-29.

[263] 564 U.S. at 658-664.

More fundamentally, the *Hensley* opinion asked the wrong AEDPA questions: (1) whether *Melendez-Diaz* expressly "sa[id]" anything about "autopsies"; (2) whether there is a "disparity of treatment" in lower courts; and (3) whether "one can be *certain* just what the Supreme Court *would say* about [this issue]."[264] We have already shown why the first two inquiries (the demand for an identical-fact pattern and the lower-court-polling approach) violate AEDPA and its case law. As for *Hensley*'s demand for "certainty" in a hypothetical future Supreme Court case, that approach imposes an insurmountable and unprecedented standard that swallows the habeas statute. *No one* can be "certain" how a court will come out on an issue.

Ultimately, as for the controlling question of whether a reasonable jurist could find the autopsy report at issue in *Hensley* non-testimonial, the *Hensley* panel provided no real analysis. That non-binding precedent, which asks the wrong questions and thus reaches the wrong answers, is not persuasive.

* * *

In sum, as the District Court held, just as "it would be unfair to state courts (and a misapplication of § 2254(d)(1)) to second-guess their judgment in light of law that only became 'clearly established' after they delivered a final decision on the merits, it would

---

[264] 755 F.3d at 732-33.

be unfair to Garlick to deny him the benefit of the holdings in *Melendez-Diaz* and *Bullcoming*."[265] The Appellate Division unreasonably applied clearly-established law.

**C. The State's new claim that even if the report were testimonial, it was admissible for the non-hearsay purpose of providing a basis for a surrogate expert's conclusions is waived and meritless.**

Borrowing the theory adopted by the *Williams* plurality but rejected by five Justices there, the State vaguely claims for the first time that even if the report's contents were testimonial, they were not used to establish the truth of the matter asserted but rather to provide a basis for a surrogate expert's conclusions.[266] Thus, the argument seems to go, the report's testimonial contents were immune from the Confrontation Clause.[267] Accordingly, the State asserts: (1) the report was admissible; (2) Dr. Ely could relay its testimonial contents to the jury; and/or (3) Dr. Ely could "rely upon" the report to "form an in-court expert opinion."[268] This waived argument fails on procedural and merits grounds.

First, this new theory is waived. During four years of litigation before five tribunals (the trial court, Appellate Division, Court of Appeals, Supreme Court, and District Court), the State's sole position was that the report's contents were not testimonial. The

---

[265] A168 (internal citation omitted).

[266] State's Brief 32-36, 43-44; *Williams*, 567 U.S. at 56, 70-79 (Alito, J., plurality) (citing *Crawford*, 541 U.S. at 59-60 n.9 (the Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted")).

[267] State's Brief 32-36, 43-44.

[268] State's Brief 32-36, 43-44.

State never claimed that even *if* the report were testimonial, the reports' contents were admissible for the purported non-hearsay purpose of providing a basis for Dr. Ely's testimony. And no court has addressed those questions as they were never raised.[269] Thus, this new and convoluted claim is waived.[270]

Contrary to the State's suggestion, its memorandum of law (filed below) and its response to Petitioner's R&R Objections did not even remotely raise this claim at all.[271] In its memorandum below, the State claimed that the admission of the report through a "live expert medical witness" to "provide a basis for her opinions" indicated that the report's "primary purpose" was not evidentiary—that is, that the report was not "testimonial."[272] The State never claimed that even if the report were testimonial, it could serve as a non-hearsay foundation for Dr. Ely's testimony. Similarly, the State's

---

[269] *See* App. Division Decision: A175 (relying exclusively on the theory that the report was "not testimonial").

[270] *E.g.*, *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006) ("It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.") (quotation marks omitted); *Sczepanski v. Saul*, 946 F.3d 152, 161 (2d Cir. 2020) ("Although we have the discretion to consider forfeited arguments 'where necessary to avoid a manifest injustice, the circumstances normally do not militate in favor of an exercise of discretion to address new arguments on appeal where those arguments were available to the parties below and they proffer no reason for their failure to raise the arguments below.'") (citation omitted); *Young*, 698 F.3d at 85-87 (finding, in a habeas appeal, that argument raised for first time by the State on appeal was waived).

[271] State's Brief 32 n. 10 (citing Memo. of Law: SA131 and Response to Petitioner's R&R Objections: A149-50).

[272] Memo. of Law: SA130-31.

post-R&R papers (including the pages cited for preservation by the State),[273] challenged the testimonial finding and never advanced an alternative not-for-the-truth theory.[274]

Waiver aside, the Appellate Division—adopting the State's only preserved argument before that court—never held (let alone considered) that this "testimonial" report's contents were admissible for the non-hearsay purpose of explaining a surrogate expert's conclusion.[275] Thus, even if this Court were to review this waived claim, *de novo* would apply.[276]

---

[273] *See* State's Brief 32 n.10 (citing A149-50).

[274] A115-120; A142-54.

[275] Puzzlingly, the State claims that even though the only basis for the Appellate Division was that this report was "not testimonial" (A175), the Appellate Division actually reached a not-for-the-truth theory that the State never raised. App. Div. Brief: SA100-113; State's Brief 33 n.11. The State rests its speculative claim on a complex citation trail in the Appellate Division decision. State's Brief 33 n.11. The State notes that the Appellate Division cited *Acevedo*, 112 A.D.3d at 455, which then cited *People v. Hall*, 84 A.D.3d 79 (1st Dept. 2011). State's Brief 33 n.11. From that premise, the State speculates that the Appellate Division adopted a not-for-the-truth argument because *Hall* did. *Id.* This theory not only relies on an unjustifiable reading of the decision, but unreasonably assumes the Appellate Division reached an argument, through coded citations, that was never raised there.

Moreover, *Acevedo* cited *Hall* for its "not testimonial" holding, not for a non-hearsay theory. *Acevedo* 112 A.D.3d at 455. And *Hall* did not even adopt a non-hearsay argument. Instead, after finding the report non-testimonial, *Hall* alternatively held— before *Bullcoming* later rejected the theory—that surrogate testimony satisfies the Clause. 84 A.D.3d at 84. Thus, even if the court employed a citation trail the State imagines it did, that trail just leads back to an argument *Bullcoming* rejected. 564 U.S. at 662-63.

[276] *E.g.*, *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim de novo[.]").

Under deferential or *de novo* review, this unreasonable argument fails. As this Court held in *James*, "The *Williams* plurality's first rationale—that the laboratory report there was offered as basis evidence, and not for its truth—was roundly rejected by five Justices."[277] And as those five Justices held, the theory that expert-basis evidence is not "offered for its truth" is illogical. When a trial expert relies on out-of-court testimonial statements to justify conclusions, those testimonial statements can only serve as a legitimate basis for the expert testimony if they are *true*.[278]

This record conclusively confirms that the State used the report's contents for the truth of the matter asserted:

- the report was introduced into evidence;[279]

---

[277] *James*, 712 F.3d at 95 (citing *Williams*, 567 U.S. at 108-09 (Thomas, J., concurring) and *Williams*, 567 U.S. at 125-28 (Kagan, J., dissenting)).

[278] *Williams*, 567 U.S. at 103-09 (Thomas, J., concurring); *id.* at 126-33 (Kagan, J., dissenting).

[279] SA47-53, SA68-71, SA98; T524-25; *compare Williams*, 567 U.S. at 79 (the report "was not introduced into evidence").

The State's new suggestion that defense counsel somehow "strategically" chose to allow the autopsy report into evidence is baseless. State's Brief 35-36. This appears to be a procedural-default argument that is not properly before this Court because it was never raised in state court, never adopted (let alone considered) by the Appellate Division, and never raised before the District Court. *Cone v. Bell*, 556 U.S. 449, 468-69 (2009); *Saul*, 946 F.3d at 161.

This new suggestion also has no record support. Defense counsel objected to the admission of the autopsy report no less than four times. SA47-53, SA68-71, SA98, T524-25. Indeed, when Petitioner renewed his objection to the autopsy report and Dr. Ely's testimony after her testimony concluded, the trial court responded: "I am sure you covered your record." SA98.

- Dr. Ely read the report's findings to the jury;[280]

- the report's detailed findings served as the express predicate for Dr. Ely's testimony—and those findings had no value to the State's case, or to the reliability of Dr. Ely's testimony, unless they were true;[281]

- the prosecutor's summation explicitly relied on the truth of the report's findings to secure a conviction;[282] and

- no state court ever found, unlike in *Williams*, that the report's contents were admissible for a non-hearsay purpose.[283]

Before this Court, the State does not even try to show how this report was introduced and used for anything other than the truth of the matter asserted.

Finally, the State appears to argue, again for the first time, that even if the report were testimonial and offered for its truth, the mere production of a surrogate witness who had no involvement in the autopsy satisfies the Confrontation Clause.[284] Again, this claim is waived as it was never presented below (or in state court).[285] Further, this claim was never reached by the Appellate Division, thus requiring *de novo* review.[286]

---

[280] SA71-92.

[281] *Id.*

[282] T452-54, T460, T466.

[283] *Compare Williams*, 567 U.S. at 57, 73.

[284] State's Brief 36, 43.

[285] *Saul*, 946 F.3d at 161.

[286] *Rompilla*, 545 U.S. at 390

This surrogate claim fails on the merits. *Bullcoming* clearly establishes that the production of a surrogate witness is insufficient to comply with the Confrontation Clause. Instead, the State must produce the analyst who prepared the report.[287]

### D. The Appellate Division decision was "contrary to" clearly-established law because Melendez-Diaz and Bullcoming are "materially indistinguishable."

Not only did the Appellate Division unreasonably apply clearly-established law, but its decision was "contrary to" that law because the facts of *Bullcoming* and *Melendez-Diaz* are "materially indistinguishable."[288]

*Melendez-Diaz* and *Bullcoming* dictate that, as here, when a medical examiner creates an autopsy report during an active homicide investigation, asserts that the cause of death is homicide, and transmits that report to the prosecution, the report falls within the "core class of testimonial statements."[289] Such reports are, as in *Melendez-Diaz* and *Bullcoming*, indisputably created to codify evidentiary facts for a criminal case.[290]

Like the forensic analysts in *Bullcoming* and *Melendez-Diaz*, medical examiners know that, when the cause of death is obviously homicide and their report finds as much, their report will serve as crucial evidence in a criminal case. That is particularly true when, as here: (1) investigating police officers are present during the autopsy; (2) state

---

[287] 564 U.S. at 662-63.

[288] *Williams*, 529 U.S. at 413; 28 U.S.C. § 2254(d)(1).

[289] *Melendez-Diaz*, 557 U.S. at 310-11; *Bullcoming* 564 U.S. at 658-59, 663-64.

[290] *Melendez-Diaz*, 557 U.S. at 310-11.

law mandates, as in *Bullcoming* and *Melendez-Diaz*, that the analyst "assist in [state criminal] investigations" by immediately forwarding the autopsy report to prosecuting authorities; and (3) state law renders the report "prima facie evidence" of the facts asserted therein.[291] There are no material distinctions between this case and *Melendez-Diaz* and *Bullcoming*.

The District Court found, in conclusory fashion, that Petitioner could not satisfy the "materially indistinguishable" standard because this report was "collected in manner factually distinguishable from the circumstances presented" in *Bullcoming* and *Melendez-Diaz*.[292] This was legal error. Mere "factual distinctions" cannot defeat a contrary-to claim. Instead, the differences must be "material" and legally relevant.[293] And here, no material distinctions exist between this case and *Melendez-Diaz/Bullcoming*. Accordingly, this Court should affirm on this alternative ground.

### E. The Appellate Division decision was "contrary to" clearly-established law because it applied an invalidated legal standard.

Finally, as the Appellate Division applied the "wrong legal standard"—the statement must link a particular defendant to a crime—the decision was contrary to clearly established Supreme Court precedent, thus requiring *de novo* review.[294]

---

[291] *Bullcoming*, 564 U.S. at 665; *Melendez-Diaz*, 557 U.S. at 309, 311.

[292] A164.

[293] *Williams v. Taylor*, 529 U.S. at 413; *Rosen*, 972 F.3d at 256 n. 83.

[294] A175; *e.g.*, *Lafler*, 566 U.S. at 173; *Williams*, 529 U.S. at 405-06, 412-413 (application of a flawed legal standard triggers *de novo* review on "contrary to" grounds).

The Appellate Division did not even consider whether the autopsy report's primary purpose was to "establish or prove past events potentially relevant to later criminal prosecution."[295] Instead, the Appellate Division found the report non-testimonial "since [it] did not link the commission of the crime to a particular person."[296] This rule comes from a pre-*Melendez-Diaz* decision (*Freycinet*), where the New York Court of Appeals held that an autopsy report was not testimonial because it "did not directly link defendant to the crime. The report is concerned only with what happened to the victim, not who killed her."[297]

As the District Court found, *Melendez-Diaz* rejected the Appellate Division's link-to-a-particular-person standard, which requires that the statement accuse an individual by proving his identity as the perpetrator.[298] Instead, *Melendez-Diaz* held, if a testimonial statement is "helpful to the prosecution," confrontation applies regardless of its "non-accusatory" nature or the particular element the statement proves.[299] The vast majority of forensic reports generated in criminal cases don't prove that a "particular" person committed a criminal act; they instead, as in *Bullcoming* and *Melendez-Diaz*, prove blood

---

[295] *E.g.*, *Bryant*, 562 U.S. at 356; *Melendez-Diaz*, 557 U.S. at 310-11, 324.

[296] A175.

[297] *Freycinet*, 11 N.Y.3d at 42.

[298] 557 U.S. at 313-314; A166.

[299] *Melendez-Diaz*, 557 U.S. at 313-14.

content or a substance's nature/weight. Nevertheless, the Supreme Court has "refused to create a 'forensic evidence' exception" to the Confrontation Clause.[300]

As the state court applied a legal standard that was "contrary to" clearly-established Supreme Court precedent, *de novo* review is required.[301] And, as shown above, the report here was unquestionably testimonial, thus precluding its admission absent confrontation of the analyst who prepared it.

The District court erred in rejecting this claim. The court first correctly found that that "*Melendez-Diaz* definitively did away" with the "accusatory/non-accusatory distinction" employed by the Appellate Division.[302] But the court then rejected Petitioner's contrary-to argument because the Appellate Division "located the correct rule, namely out-of-court statements are only subject to confrontation to the extent they are testimonial."[303] That was legal error.

Merely "locating" a general rule is insufficient if, in *defining* that rule, the state court violates clearly-established law. When the state court does so, its decision is "contrary to" clearly-established law because it has "applie[d] a rule that contradicts the governing

---

[300] *Bullcoming*, 564 U.S. at 658-59.

[301] *E.g.*, *Lafler*, 566 U.S. at 173; *Williams*, 529 U.S. at 405-06, 412-13.

[302] A166 (citing *Melendez-Diaz*, 557 U.S. at 313-14).

[303] A166; State's Brief 21 n. 8 (reiterating the same argument).

law set forth in [Supreme Court] cases."[304] That basic logic controls this case.

And for the reasons explained above, under the *de novo* review required by this contrary-to violation, this report was testimonial, thus rendering the report and the surrogate testimony that relied on it inadmissible.[305]

### F. The constitutional violation was not harmless.

The inadmissible autopsy report and Dr. Ely's inadmissible surrogate testimony, which was based on that report, had a "substantial and injurious effect or influence" on the verdict.[306] The State cannot carry its "significant burden" of establishing otherwise.[307]

The autopsy report and Dr. Ely's testimony were crucial to the State's cause-of-death theory. Without that evidence, the State would have been forced to argue cause of death with no medical testimony; a uniquely tough sell in this case. But instead of presenting a case with that critical deficiency, the report allowed the State to persuasively pinpoint the cause and manner of death. In doing so, the State used the

---

[304] *E.g.*, *Williams*, 529 U.S. at 395-98, 405-06, 413; *Lafler*, 566 U.S. at 173; *Jones v. Calloway*, 842 F.3d 454, 464-65 (7th Cir. 2016).

[305] In any event, as the District Court held, the state court's application of the wrong legal standard also constituted an unreasonable application of clearly-established law, thus satisfying AEDPA. Dist. Ct. Op.: A166; 28 U.S.C. § 2254(d)(1).

[306] *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

[307] *Alvarez v. Ercole*, 763 F.3d 223, 233 (2d Cir. 2014) (internal quotation marks omitted).

report's findings to establish that Mr. Garlick inflicted deep stab wounds that led to the loss of significant amounts of blood, thus causing the death.

The report's inadmissible findings also explicitly ruled out Rivera's forceful blows to the head as the cause of the death. The prosecutor's summation relied on that finding, arguing that although Rivera was "pounding," "punching," and "kicking" Sherwood, "we know from the medical examiner none of that contributed in any way to death."[308]

The report's findings were also crucial evidence of intent to cause serious physical injury, an essential element of this manslaughter conviction. In his statement to the police, Mr. Garlick expressly stated that he did not intend to hurt Mr. Sherwood. But the autopsy report demolished that contention as both confirmed that the cause of death was a stab wound with a "depth of penetration" of "4-1/2 to 5-1/2" inches.[309] The report further asserted that the stabbing pierced the heart and caused the loss of 1.5 liters of blood.[310] The prosecutor emphasized these findings in summation, painting the picture of an effort to cause serious harm.[311]

The surveillance video[312] does not prove harmless error because it left important cause-of-death and state-of-mind questions unresolved. The video shows a struggle

---

[308] T454.

[309] Report: A277; Ely: SA78.

[310] Report: A277; Ely: SA77.

[311] T452-53.

[312] State Trial Ex. 5.

between the victim, Mr. Garlick, and the codefendant, but it does not prove how the victim died, let alone that Mr. Garlick caused the death. As the trial court found, the video presents "a jury question whether a knife or sharp object is visible on the film."[313] The video also does not clearly indicate whether or not Rivera had an object in her hand when striking Sherwood's skull.[314] And the video fails to foreclose the meaningful possibility that Mr. Garlick inadvertently hurt Mr. Sherwood with the knife during a struggle for it.[315] Only the autopsy report could answer the critical questions left open by the video.

Indeed, the surveillance video initially led the police to blame codefendant Rivera for the death under the theory that her blows to Sherwood's skull caused his death. It was only *after* they received the autopsy report that they changed positions and accused Mr. Garlick of homicide.[316]

As the autopsy report unquestionably played an important role in the jury's assessment of cause of death and state of mind, its admission was not harmless.

---

[313] T415.

[314] State Trial Ex. 5.

[315] State Trial Ex. 5.

[316] Contrary to the State's odd suggestion, the fact that, after losing a preclusion motion, defense counsel tries to spin the inadmissible evidence in the defense's favor is irrelevant to the question of whether that evidence's initial introduction was harmless. State's Brief 50-51.

## CONCLUSION

The judgment below should be affirmed.

Respectfully submitted,

Robert S. Dean (RD-0772)
Center for Appellate Litigation
*Attorney for Petitioner-Appellee*
120 Wall Street, 28th Floor
New York, New York 10005
(212) 577-2523
rdean@cfal.org

BY:

/s/ Matthew Bova
Matthew Bova (5073135)
*Of Counsel*
(212) 577-2523 (ext. 543)
mbova@cfal.org
November 20, 2020

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Rule 32.1(a)(4), as it contains 13,973 words, excluding the parts of this document exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Garamond font.

/s/ Matthew Bova
Matthew Bova
November 20, 2020