# 20-1796

## United States Court of Appeals
## for the Second Circuit

JAMES GARLICK,

*Petitioner-Appellee,*

*v.*

WILLIAM LEE, SUPERINTENDENT, EASTERN CORRECTIONAL FACILITY,

*Respondent-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT

# SUPPLEMENTAL APPENDIX

Robert S. Dean
Center for Appellate Litigation
*Attorney for Petitioner-Appellee*
120 Wall Street, 28th Floor
New York, NY 10005
212-577-2523
November 20, 2020

Matthew Bova (5073135)
mbova@cfal.org
*Of Counsel*

# SUPPLEMENTAL APPENDIX TABLE OF CONTENTS

Indictment ................................................................................................... SA-1

Excerpts of Pre-trial Hearing (9/11/13) ................................................... SA-5

Excerpts of Oral Argument Transcript (9/23/13) ................................... SA-46

Excerpts of Trial Transcript (9/24/13) .................................................... SA-54

Excerpts of State's Appellate Division Brief ........................................... SA-99

State's Memorandum of Law in Opposition to Petition ........................ SA-114

SA-1

# I N D I C T M E N T

## S U P R E M E   C O U R T   O F   T H E   S T A T E   O F   N E W   Y O R K

### C O U N T Y   O F   B R O N X

---

PEOPLE OF THE STATE OF NEW YORK
                 AGAINST

(J)   GARLICK, JAMES DARNELL
          DEFENDANT: 2011BX061160
(J)   RIVERA, JOHANNA
          DEFENDANT: 2011BX059394

*3681-11*

---

INDICTMENT #:
GRAND JURY #: 44902/2011

COUNTS

MURDER IN THE SECOND DEGREE
MANSLAUGHTER IN THE FIRST DEGREE
ASSAULT IN THE FIRST DEGREE
ASSAULT IN THE SECOND DEGREE

Date 3/20/15
I hereby certify that the foregoing paper is a true
copy of the original thereof, filed in my office.
Luis M. Diaz
County Clerk and Clerk of
the Supreme Court Bronx County
NO FEE-OFFICIAL USE

ORIGINAL

NOV 2 8 2011

E Panel
11th Term
NOVEMBER 17, 2011

A TRUE BILL

FOREPERSON

ROBERT T. JOHNSON
DISTRICT ATTORNEY

FIRST COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANT JAMES DARNELL GARLICK OF THE CRIME OF MURDER IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANT, JAMES DARNELL GARLICK, ON OR ABOUT NOVEMBER 1, 2011, IN THE COUNTY OF THE BRONX, WITH INTENT TO CAUSE THE DEATH OF A PERSON, DID CAUSE THE DEATH OF GABRIEL SHERWOOD, BY STABBING HIM WITH A DANGEROUS INSTRUMENT, TO WIT: A SHARP INSTRUMENT.

SECOND COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANT JAMES DARNELL GARLICK OF THE CRIME OF MANSLAUGHTER IN THE FIRST DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANT, JAMES DARNELL GARLICK, ON OR ABOUT NOVEMBER 1, 2011, IN THE COUNTY OF THE BRONX, DID CAUSE THE DEATH OF GABRIEL SHERWOOD, WHILE ACTING WITH INTENT TO CAUSE SERIOUS PHYSICAL INJURY TO THAT PERSON, BY STABBING HIM WITH A DANGEROUS INSTRUMENT, TO WIT: A SHARP INSTRUMENT.

THIRD COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS OF THE CRIME OF ASSAULT IN THE FIRST DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, ACTING IN CONCERT WITH EACH OTHER, ON OR ABOUT NOVEMBER 1, 2011, IN THE COUNTY OF THE BRONX, WITH INTENT TO CAUSE SERIOUS PHYSICAL INJURY TO ANOTHER PERSON, DID CAUSE SERIOUS PHYSICAL INJURY TO GABRIEL SHERWOOD, BY MEANS OF A DEADLY WEAPON OR A DANGEROUS INSTRUMENT, THAT BEING A SHARP INSTRUMENT.

FOURTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS OF THE CRIME OF ASSAULT IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, ACTING IN CONCERT WITH EACH OTHER, ON OR ABOUT NOVEMBER 1, 2011, IN THE COUNTY OF THE BRONX, WITH INTENT TO CAUSE PHYSICAL INJURY TO GABRIEL SHERWOOD, DID CAUSE SUCH INJURY TO THAT PERSON BY MEANS OF A DEADLY WEAPON OR A DANGEROUS INSTRUMENT, THAT BEING A SHARP OBJECT.

ROBERT T. JOHNSON
DISTRICT ATTORNEY

GRAND JURY REPORT

COUNTY: BRONX

INDICTMENTS#          GRAND JURY # 44902/2011   FINDING: INDICTED

| DEFENDANTS | CORRESPONDING DOCKETS |
|---|---|
| 1. GARLICK, JAMES DARNELL | 2011BX061160 |
| 2. RIVERA, JOHANNA | 2011BX059394 |

INDICTMENT CHARGES

MURDER IN THE SECOND DEGREE
P.L. 125.25(1)
MANSLAUGHTER IN THE FIRST DEGREE
P.L. 125.20(1)
ASSAULT IN THE FIRST DEGREE
P.L. 120.10(1)
ASSAULT IN THE SECOND DEGREE
P.L. 120.05(2)

SCHEDULED ARRAIGNMENT DATE:

ARRAIGNMENT PART:

OTHER ASSOCIATED INDICTMENTS:

DATE COMPLETED: NOVEMBER 17, 2011

ADA: KAREN, ALLEN P

BUREAU: TRIAL BUREAU 30/40

2

1

SUPREME COURT OF THE STATE OF NEW YORK

BRONX COUNTY : CRIMINAL TERM : PART H94

--------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

        -against-          Indictment No.
                               3681-2011

JAMES DARNELL GARLICK,

                Defendant.      Huntley/Rodriguez
                                  Wade Hearing

--------------------------------

                          SEPTEMBER 11, 2013

                          Bronx Supreme Court
                          265 East 161 Street
                          Bronx, New York

B E F O R E:    HONORABLE DENIS J. BOYLE
                  Justice of the Supreme Court

A P P E A R A N C E S:

        ROBERT JOHNSON, ESQ.
        District Attorney, Bronx County
        BY:  ALLEN P. KAREN, ESQ.
            Assistant District Attorney

        MICHAEL BEATRICE, ESQ.
        Attorney for the Defendant
        200 Central Park Avenue
        Hartsdale, NY

        SOLOMON SCHEPPS, ESQ.
        Attorney for the Defendant

                  Laura Rosen
                  Senior Court Reporter


SCANNED

DATE: MAR 31 2015

BY: S. L. Owens

1          (Whereupon, the following took place in open court

2     in the presence of the defendant, defense counsel, and the

3     assistant district attorney.)

4          THE CLERK:  This is an add-on to the calendar,

5     case on trial -- it's not case on trial, 3681 of 2011, James

6     Garlick.

7          MR. BEATRICE:  Michael Beatrice, 18b counsel for

8     Mr. Garlick.

9          MR. KAREN:  Assistant District Attorney Allen

10    Karen for the People.  Good morning.

11         THE COURT:  Counsel, good morning.

12         MR. BEATRICE:  Good morning, Judge.

13         THE COURT:  Mr. Beatrice, have you had enough time

14    to conference with your client regarding the People's offer

15    in this case?

16         MR. BEATRICE:  Judge, I have.  We've discussed it

17    extensively prior to being sent to this part for trial, and

18    also yesterday afternoon I had a lengthy period of time to

19    have a long conversation with my client to discuss the pros

20    and cons of taking the case to trial versus taking a plea.

21         He's had the overnight to think about the

22    parameters of the sentence that the DA's office would

23    recommend, as well as the sentencing guidelines as

24    prescribed by law as to what the Court could sentence Mr.

25    Garlick to, and at this point we're too far apart to enter a

1       plea, so I'd like to proceed to hearings.

2               THE COURT:  Very well.  Is there anything else to

3       discuss before we proceed with the hearing?

4               MR. KAREN:  May we approach, your Honor?

5               THE COURT:  Yes.

6               (Whereupon, a discussion was held at the bench off

7       the record among the Court and counsel.)

8               THE COURT:  We'll second call this case for about

9       10 minutes.

10              (Whereupon, there was a brief recess taken.)

11              (Whereupon, the following took place in open court

12      outside the presence of the defendant.)

13              MR. BEATRICE:  Judge, I just wanted to make an

14      additional application.

15              THE COURT:  Should we wait for your client?

16              MR. BEATRICE:  We can.  It's really not necessary.

17      It slipped my mind.  I'm assigned pursuant to 18b on the

18      case.  I would just ask for daily copy.

19              THE COURT:  I'll grant that.

20              MR. BEATRICE:  Thank you.

21              Judge, also I think it might be better if I

22      introduce Mr. Garlick to Mr. Schepps before he came out.

23              THE COURT:  You want to do that?

24              MR. BEATRICE:  Yes, please.

25              (Pause in proceedings.)

1          THE COURT:  All set?

2          MR. BEATRICE:  Yes.

3          THE COURT:  We can bring him out.

4          (Whereupon, the following took place in open court

5     in the presence of the defendant, defense counsel, and the

6     assistant district attorney.)

7          THE CLERK:  This is a recall to the calendar, 3681

8     of 2011; James Darnell Garlick.

9          THE COURT:  I'm not sure all of your appearances

10    are on the record.

11          MR. BEATRICE:  Michael Beatrice, 18b counsel for

12    Mr. Garlick.

13          THE COURT:  Good morning, Mr. Beatrice.

14          MR. SCHEPPS:  Soloman Schepps assisting Mr.

15    Beatrice.

16          THE COURT:  Good morning, Mr. Schepps.

17          MR. SCHEPPS:  Good morning, Judge.

18          MR. KAREN:  Assistant District Attorney Allen

19    Karen for the People.  Good morning, your Honor.

20          THE COURT:  Mr. Karen, good morning.

21          I believe both sides are ready for the previously

22    directed Huntley/Rodriguez/Wade Hearing.

23          MR. KAREN:  That is correct.  I've also previously

24    called for a video unit to play the defendant's videotape,

25    so at some point they'll be coming in and we'll introduce

1          the tape through Detective DeGrazia, having consulted with

2          defense on that issue.

3                    THE COURT:  Very well.

4                    MR. BEATRICE:  That's correct, Judge.

5                    THE COURT:  Whenever you're ready, Mr. Karen.

6                    MR. KAREN:  At this time the People call Detective

7          Thomas DeGrazia to the stand.

8                    (Whereupon, the witness entered the courtroom and

9          took the witness stand.)

10    DETECTIVE   T H O M A S   D E G R A Z I A,     Shield No.

11         7642, New York City Police Department, 52 Detective

12         Squad, called as a witness on behalf of the People,

13         having been first duly sworn, was examined and testified

14         as follows:

15                   COURT OFFICER:  Have a seat.  In a loud and clear

16         voice, state your name, rank and command for the record.

17                   THE WITNESS:  Detective Thomas DeGrazia, shield

18         number 7642, 52 Precinct Detective Squad.

19                   THE COURT:  Mr. Karen?

20                   MR. KAREN:  Thank you, Judge.

21    DIRECT EXAMINATION

22    BY MR. KAREN:

23         Q     Detective DeGrazia, how long have you been on the

24    force?

25         A     Twenty years.

1      Q     How long have you been a detective?

2      A     Thirteen years.

3      Q     Going back to November 1, 2011, did you go to the

4   location 2460 Grant Avenue in the Bronx?

5      A     Yes, I did.

6      Q     Is that to investigate the death of one Gabriel

7   Sherwood?

8      A     Yes, it was.

9      Q     Who was the assigned detective in the case?

10      A     I was.

11      Q     And can you tell us what you observed when you got to

12   the scene, starting with what type of location is 2460 Grand

13   Avenue?

14      A     That location is a six-story apartment building.

15      Q     What did you observe when you got there?

16      A     When I got there the deceased was already removed by

17   EMS.   There was blood in the lobby.

18                MR. BEATRICE:   Objection.

19                THE COURT:   I'll permit him to testify to his

20          observations.

21                MR. BEATRICE:   Okay.

22      Q     How much blood?

23      A     A pretty good amount.

24      Q     Did you make any other observations in the lobby of

25   2460 Grand?

1      A      There was some clothing, there was a plastic bag with

2      some groceries, and a Walkman.

3      Q      Now, while you were in the lobby did you view or obtain

4      any possible evidence regarding the identification of people

5      involved in the incident?

6      A      Yes, I did.

7      Q      Please tell the Court.

8      A      I viewed surveillance video from 2460 Grand Avenue

9      which showed four people which I identified as the deceased,

10     Gabriel Sherwood, Mr. James Darnell Garlick, Lisa Rivera and

11     Johanna Rivera.

12     Q      Now when you speak of a surveillance video, yesterday a

13     video was played in court as part of this hearing.  Is that the

14     video you're referring to?

15     A      Yes, it is.

16     Q      Now, we showed two camera angles yesterday.  Is that

17     what you're referring to?

18     A      Yes.

19     Q      I'd like you to tell the Court the manner in which each

20     of the people on the video was identified?

21     A      Okay.  The deceased was identified by uniformed

22     officers who responded and found identification.  Lisa Rivera was

23     identified by the super of the building who was showing me the

24     video.  James Darnell Garlick --

25     Q      Let's stop there.  Regarding the super identifying Lisa

1  Rivera, were you given information as to where she might be

2  located?

3      A    Yes.  The super informed me that she lived in the

4  building next door.

5      Q    And did you take any action regarding that information?

6      A    Yes, I did.  I ended up going to that location and I

7  found her in her apartment.

8      Q    And did you interview Lisa Rivera?

9      A    I did.

10     Q    And did you obtain from her her possible relationship

11  to all of the other people seen on the video?

12     A    Yes, I did.

13     Q    Please tell the Court.

14     A    She informed me that James Garlick was her

15  ex-boyfriend, that Johanna Rivera was a girl that lived across

16  the street from the incident location, and she did not know the

17  deceased.

18     Q    Now did you obtain identification of Johanna Rivera?

19     A    Yes, I did.

20     Q    How did you do that?

21     A    She gave me, Lisa Rivera had given me the name Johanna

22  with the building address.  We ran the building, found a Johanna

23  Rivera residing in that building and went to the apartment.

24     Q    And did you actually meet with Johanna Rivera?

25     A    I did.

1    Q    Was she arrested?

2    A    Yes, she was.

3    Q    When did you arrest Johanna Rivera?

4    A    On November the 2nd.

5    Q    Did you interview Miss Rivera?

6    A    Yes, I did.

7    Q    Did you take statements from her?

8    A    Yes, I did.

9    Q    At any point did she become a cooperating witness with

10   the investigation?

11   A    Yes, she did.

12   Q    At what point in the investigation?

13   A    Prior to the grand jury.

14   Q    You met with her and her attorney?

15   A    Yes, I did.

16   Q    And did she give you information regarding this

17   incident?

18   A    Yes, she did.

19   Q    Now, you indicated you arrested Johanna Rivera the

20   evening of November 1st into the morning of November 2nd?

21   A    Yes, it was a little past midnight.

22   Q    Did you, at any point, arrest the defendant James

23   Darnell Garlick?

24   A    Yes, I did.

25   Q    When was he arrested?

1    A    On November 11, 2011.

2    Q    Under what circumstances?

3    A    Warrants violent felony squad apprehended him based on

4    an I-card I had out in Manhattan.

5    Q    And did you actually meet with the defendant?

6    A    Yes, I did.

7    Q    Where did you meet him?

8    A    In the 52 Precinct Detective Squad.

9    Q    Do you see the defendant James Darnell Garlick seated

10   in court?

11   A    Yes, I do.

12   Q    Please indicate.

13   A    He's the gentleman with the beard in the middle.

14   Q    Seated here?

15   A    Yes.

16   Q    Now, did you have a conversation with the defendant,

17   James Darnell Garlick, on November 11, 2011 at about 1 p.m.?

18   A    Yes, I did.

19   Q    And prior to speaking to the defendant, did you inform

20   him of what are commonly known as his Miranda Rights?

21   A    Yes, I did.

22   Q    In what manner did you do that?

23   A    I verbally read them to him as well as he signed, he

24   signed them on a written copy.

25   Q    And do you have a copy of that Miranda Rights

1   statement?

2       A    I do.

3               MR. KAREN:  I'd ask you to take it out.

4       Q    Now, is that the actual rights statement or a copy of

5   it?

6       A    This is the actual Miranda Warnings.

7       Q    And is this the document that the defendant initialed

8   and signed?

9       A    Yes, it is.

10      Q    After you read the defendant his rights and the

11  document was subscribed, have any changes been made to that

12  document?

13      A    No.

14              MR. KAREN:  At this point, your Honor, I would

15      offer for the hearing and ask we deem mark as People's 1 the

16      Miranda Rights statement of the defendant, James Darnell

17      Garlick.

18              THE COURT:  Any voir dire or objection?

19              MR. BEATRICE:  Can I just see it, Judge?

20              THE COURT:  Yes.

21              (Whereupon, the referred to item was handed to

22      defense counsel.)

23              MR. BEATRICE:  Judge, I have no objection to it

24      even being admitted into evidence.

25              THE COURT:  All right, we'll receive it into

1        evidence and I'll deem it People's 1.

2                (Whereupon, People's Exhibit 1 was deemed marked

3        for identification and received in evidence.)

4                (Whereupon, the referred to item was handed to the

5        witness.)

6     Q     Detective, after you read the defendant his Miranda

7  Rights did you have a conversation with him?

8     A     Yes, I did.

9     Q     And was the conversation oral or reduced to writing or

10  in what manner was it done?

11     A     The initial one was oral.

12     Q     Okay.  And can you tell us what the defendant James

13  Darnell Garlick told you after you gave him his Miranda Rights?

14     A     Yes, I can.

15                THE WITNESS:  It is all right if I refer to my

16        spiral notebook?

17                THE COURT:  You may refresh your recollection,

18        yes, but please don't read out loud from it.

19                THE WITNESS:  Yes.

20     A     He stated to me that he received a call from Lisa

21  Rivera, which was his girlfriend.  She was frantic due to the

22  fact that a male was harassing her, that the male had told her,

23  called her a spic and told her to suck his dick.  Originally he

24  said he told her just to go home and she called a second time, at

25  which time he road his bicycle over from his mother's house over

1   to Grand Avenue.  At that time he was trying to take Lisa Rivera

2   home to her apartment, at that point they went to pass the male

3   and the male was shadowboxing and started cursing at Mr. Garlick

4   and to also spit at him.

5         He questioned the male and he said they started

6   fighting and that the fight spilled into the lobby of 2460 Grand

7   Avenue.  At which time he was trying to get the male off him,

8   they fought and the male appeared very strong as if he was on

9   dust, and he ended up getting the better of the male and at no

10  point did he have a weapon on him.

11        Q     Did the defendant reference whether or not he stabbed

12  or anybody stabbed the victim?

13        A     He stated he did not stab the victim.

14        Q     Now, after you had this oral conversation with the

15  defendant was his statement reduced to writing?

16        A     Yes, it was.

17        Q     In what manner was that done?

18        A     It was written on --  he wrote it himself on looseleaf

19  like type paper.

20        Q     And do you have that statement with you?

21        A     Yes, I do.

22        Q     I'd ask you to take it out.

23        A     I have it here.

24        Q     Now, is that a copy of the statement he wrote out or

25  the original statement?

1      A      This is the original.

2      Q      And are there any corrections made on this statement?

3      A      There are several; three, four -- four things are

4    crossed out and initialed JG by the defendant.

5      Q      And he wrote the statement himself?

6      A      Yes, he did.  I wrote the top line with the date, time,

7    location we were and he wrote the rest.

8      Q      After the defendant wrote the statement and subscribed

9    to it, have there been any changes made to that statement?

10     A      No.

11            MR. KAREN:  Your Honor, at this time I would offer

12        into evidence for purposes of the hearing and ask be deemed

13        marked the defendant's written statement.

14            THE COURT:  Have you seen it?

15            MR. BEATRICE:  Not the original, Judge.

16            THE COURT:  We'll show it to you.

17            MR. BEATRICE:  Thank you.

18            (Whereupon, the referred to item was handed to

19        defense counsel.)

20            MR. BEATRICE:  No objection, Judge.

21            THE COURT:  People's 2 is received in evidence.

22            (Whereupon, People's Exhibit 2 was deemed marked

23        for identification and received in evidence.)

24     Q      Detective, with the Court's permission, I would ask you

25    to read for the record the entirety of People's 2 in evidence.

1           THE COURT:  You may do so.

2       A       First line written by myself states 11/11/11, 13:40

3   hours, 52 Precinct Detective Squad, interview room number one.

4   Then the rest is written by James Garlick.

5           It says:  James Darnell Garlick 3278, 2472 Grand

6   Avenue, apartment 3C, Bronx, New York 10468.  On November 1,

7   2011, I was taking a shower at my mother's house on Kingsbridge

8   Road when I received a call from my girlfriend that someone was

9   following her, cursing, threatening and showing her private

10  parts.  I told her to just hurry home.  I got a second call from

11  her a few minutes later and she was in a panic and sounded

12  frantic.  She told me that this same guy was now preventing her

13  from getting to the building, and when she crosses the street he

14  crosses and he's still threatening her.  I tell her I'm coming.

15          I ride my bike back to Grand Avenue and I see her

16  standing on the side of Rite Aid, asked her what happened.  She

17  points to this guy shadowboxing in front of the next building.  I

18  tell her to come on but walk behind me to see if we could pass.

19  As I get close to the guy he is still cursing, making threats and

20  boxing.  I asked the guy what his problem trying to talk to him

21  and he got aggressive with me saying fuck that bitch and fuck

22  you.  I explained to him this is my girl, and as I'm in mid

23  conversation the guy punches me in the face.  We start to fight

24  in front of the building which leads to the courtyard right

25  before you enter the building.  At this point I see him reaching

1    into his right waistband or pocket.  I didn't know what he had so

2    I fought harder and grabbed his hand.  I never seen what it was

3    in the course of the fight, but I wrestled with him for it.

4            At this point the door to the building opens and we

5    fall inside.  He was stronger than or felt stronger me.  As we

6    fought inside the building we wasn't trying to let me go.  I just

7    kept fighting trying to get him off me.  I finally got free and

8    left the building.  When the other girl ran into the building I

9    came back and was trying to stop her.  I pulled her off of him

10   and left.

11           All I was trying to do was defend myself and my

12   girlfriend.  It was a tragedy.  It wasn't supposed to happen and

13   I'm sorry for my part in this.  I wasn't trying to hurt anybody.

14   And then it's signed James Darnell Garlick, and I also signed it

15   and put my shield number.

16       Q    Now Detective, were you present that same day, November

17   11, 2011, around 4 p.m., at the 52 Precinct when the defendant

18   was interviewed by Assistant DA Stephanie Catros, C-A-T-R-O-S?

19       A    Yes, I was.

20       Q    You were present for the entire video?

21       A    Yes, I was.

22       Q    And you -- have you reviewed that video interview?

23       A    Yes, I have.

24       Q    In fact, did you review the video interview as recently

25   as today?

1       A      Yes.

2       Q      And does that recorded video interview reflect the

3    entire conversation between Stephanie Catros and the defendant,

4    James Darnell Garlick?

5       A      Yes, it does.

6                   MR. KAREN:  Your Honor, at this time for purposes

7           of the hearing I would offer into evidence as People's 3 and

8           deem mark the video interview of the defendant, James

9           Darnell Garlick.

10                  THE COURT:  Mr. Beatrice?

11                  MR. BEATRICE:  I've seen it before, Judge.  No

12          objection.

13                  THE COURT:  So moved.

14                  (Whereupon, People's Exhibit 3 was deemed marked

15          for identification and received in evidence.)

16                  MR. KAREN:  With the Court's permission, I ask

17          that the video be played for the Court.

18                  THE COURT:  We'll do that.

19                  (Whereupon, the referred to videotape was played

20          in open court.)

21                  (Continued on the next page...)

22

23

24

25

1    MR. KAREN:  Having concluded the video, People's

2    three, I just have a few more questions.

3    Q    Detective, on the videotape the defendant refers to

4 having injuries.  You spent a fair amount of time with him on

5 November 11, 2011, correct?

6    A    Yes.

7    Q    Did you observe any fresh or apparently current

8 injuries on him at all?

9    A    No.

10   Q    On video the defendant refers to something on the side

11 of his face.  What did you see when that was displayed on the

12 video?

13   A    It appeared to be old scars.

14   Q    Not current?

15   A    Didn't appear current, no.

16   Q    Thank you, nothing further.

17        THE COURT:  Mr. Beatrice.

18        MR. BEATRICE:  Thank you, Judge.

19 CROSS EXAMINATION

20 BY MR. BEATRICE:

21   Q    Detective, when you were testifying on direct you

22 referred to a steno book, right?

23   A    Yes.

24   Q    Can I see the original steno book again?

25   A    Sure.  In regards to that statement?

1    Q    In regards -- right, in regard to your prior

2  testimony.

3    A    Sure (Complies.)

4    Q    Does this steno book contain any references to any

5  cases other than this case?

6    A    No.

7    Q    Does it contain any notations beyond your conversation

8  with Mr. Garlick on the 11th of November?

9    A    Yes.

10            MR. KAREN:  Objection.

11            THE COURT:  Well, I will allow a "yes" or "no".

12  Are you trying to determine if there is other *Rosario*

13  material that you haven't been given?

14            MR. BEATRICE:  Well, I actually wanted to know if

15  it contained other items that have something -- are not

16  relating to the conversation he had with him.

17            THE COURT:  Well, if there is *Rosario* in there --

18            MR. BEATRICE:  Right.

19            THE COURT:  -- you are entitled to it.  If there

20  is *Brady* you are entitled to it.

21            MR. BEATRICE:  Right.

22            THE COURT:  Otherwise I am not seeing a basis for

23  its inquiry.

24            MR. BEATRICE:  The answer to the question is

25  permitted?

1      THE COURT:   I will allow a "yes" or "no."

2      Q    And the answer was "yes"?

3      A    Yes.

4      Q    Detective, when you made notations regarding this

5    statement do you remember where you were located?

6      A    I was in the interview room with Mr. Garlick.

7      Q    The interview room in the five two precinct?

8      A    Detective Squad.

9      Q    Detective Squad?

10      A    That's correct.

11      Q    And did you bring him to that room?

12      A    Yes, I did.

13      Q    Did you arrest him at the location in Manhattan?

14      A    No.

15      Q    Was that arrest effectuated as far as you know by

16    other members of the NYPD?

17      A    He was apprehended by other members of the NYPD.

18      Q    And did you at any time travel to the location of

19    where he was arrested?

20      A    No.

21      Q    Was the first time that you saw Mr. Garlick in person

22    in this squad room was on the date you had the conversation with

23    him?

24      A    Yes.

25      Q    Do you know how much time elapsed from the time he was

1  apprehended in Manhattan from the time you first met him in the

2  squad room on November 11th of 2011?

3      A   I don't recall.

4      Q   When did you become aware that he had been arrested in

5  Manhattan?

6      A   I think pretty immediately.

7      Q   Was it the same day that you had the conversation with

8  him?

9      A   Oh, yes.

10      Q   And did you make any notation regarding that?

11            MR. KAREN:  Objection, as to regarding what?

12            MR. BEATRICE:  Regarding when he became aware

13  that Mr. Garlick had been arrested.

14            THE COURT:  I will allow it.

15      A   I have to look at my book.

16      Q   (Complies.)

17      A   I don't have notations in the book in regard to that.

18      Q   Its fair to assume it was some time prior to your

19  meeting him though, right?

20      A   Yes.

21      Q   And did you become aware via telephone that he had

22  been arrested?

23      A   I don't recall.

24      Q   Do you know the names of the officers that arrested

25  him?

1   A   It may be in a DD5.

2   Q   If you have those documents with you can you check?

3   A   Sure.

4       THE WITNESS:  If that's okay, Judge.

5       THE COURT:  Yes, you may check.

6   A   Detective Ciatto, C-I-A-T-T-O.

7   Q   And his name is referenced in the DD5 that you

8   prepared?

9   A   Yes, it is, DD5 follow-up number 24.  This is talking

10  about contact with him on 11/2.  This particular DD5 refreshes

11  my memory to the fact that he was working the case and he did

12  make the apprehension.

13  Q   On the 11th of November in 2011?

14  A   Yes.

15  Q   Does it also refresh your recollection as to the time

16  that he was arrested in Manhattan?

17  A   No, it doesn't, that one is on the second.  That DD5

18  that I am referring to is November second, but, but that

19  refreshes my memory to the fact that Detective Ciatto picked him

20  up.

21  Q   Did you prepare a DD5 regarding the arrest of

22  Mr. Garlick in Manhattan?

23  A   No.

24  Q   Do you know if the arresting officer prepared a

25  document with regard to the arrest of Mr. Garlick in Manhattan?

1    A    Do you mean the apprehending officer?  I am the

2  arresting officer.

3    Q    Okay.  Well, it's really a question of semantics,

4  right?

5    A    No, I am the arresting officer, I am saying I didn't

6  prepare one.  If you are asking if Detective Ciatto prepared one

7  I don't know, that is something you have to ask him.

8    Q    The individual that took Mr. Garlick into custody in

9  Manhattan?

10    A    Correct.

11    Q    Is Mr. Ciatto?

12    A    Correct.

13    Q    And do you know if he prepared a document regarding

14  his taking Mr. Garlick into custody in Manhattan?

15    A    I don't know, it's not part of my case.  They have

16  their own case folder, if he did I wouldn't know.

17    Q    Do you know if Detective Sheallo (sic.) transported

18  Mr. Garlick from the area where he was taken into custody in

19  Manhattan to the five two squad room in the Bronx?

20    A    Yes.

21    Q    And do you know if there was any conversation between

22  Detective Sheallo and Mr. Garlick on that transport?

23    A    None that was relayed to me.

24    Q    So the answer to my question is no, they had no

25  conversation?

1   A    I don't know if they did or didn't, I am unaware of

2   any.

3   Q    Did Detective Sheallo rather -- withdrawn.

4        Do you know if there were any other officers that were

5   present with this Detective Sheallo when Mr. Garlick was taken

6   into custody?

7   A    I am sure they are, but I don't know.

8        MR. KAREN:  Your Honor, just for the record, on

9   the DD5 I have C-I-A-T-T-O.

10       MR. BEATRICE:  Ciatto?

11       THE WITNESS:  Ciatto.

12       MR. BEATRICE:  Not Sheallo, I stand corrected.

13  Q    Were there any DD5s that you prepared that would

14  refresh your recollection as to how many other officers were

15  present, if any, when Mr. Ciatto -- Garlick was taken into

16  custody?

17  A    No.

18  Q    Did you know Detective Ciatto prior to that date?

19  A    Yes.

20  Q    Did he work with you in the squad?

21  A    No.

22  Q    Did he work with you in the Bronx?

23  A    Yes.

24  Q    Was he also assigned to the five two precinct?

25  A    He was patrol officer probably, I don't know, 15 years

1   ago or so.

2       Q    In the five two?

3       A    Yes.

4       Q    What was his assignment when he took Mr. Garlick into

5   custody?

6       A    He worked for the Warrant Violent Fugitive

7   Apprehension Team.

8       Q    Was there a warrant for Mr. Garlick's arrest prior to

9   him being taken into custody?

10      A    There was an I-card.

11      Q    What's an I-card?

12      A    It's an investigation card, it lets members of the

13  department know if we're looking for someone.

14      Q    And you prepared this?

15      A    Yes, I did.

16      Q    Do you know how Detective Ciatto became aware of the

17  whereabouts of Mr. Garlick on that day?

18      A    When we put out an I-card, especially for something

19  like this, serious case, it gets assigned to someone in this

20  unit.

21      Q    In the unit wherein Detective Ciatto works?

22      A    That's correct.

23      Q    So how did he become aware of the location of

24  Mr. Garlick prior to taking him into custody?

25      A    I don't know.

1   Q   Do you know if Detective Ciatto has the information?

2   A   I am sure he does.

3           MR. KAREN:  Objection, calls for speculation.

4           THE COURT:  Well, I will let the answer stand,

5   but for future purposes if you hear either side make an

6   objection, as I am sure you realize, just let me rule on it

7   before you answer.

8           THE WITNESS:  Okay.

9   Q   So the answer was, I am sure he did?

10  A   Yes.

11  Q   Now, Detective, on the date of the incident, which was

12  the first of November, you testified you responded to the

13  location; is that correct?

14  A   Yes.

15  Q   And when you responded to the location the deceased

16  had already been removed; is that correct?

17  A   That's correct.

18  Q   And then you also testified that you became aware of

19  the identities of the parties that were somewhat involved in

20  this case; is that correct?

21  A   Yes.

22  Q   Now, you became aware of the identities of the

23  individuals at the scene that day?

24  A   I became aware at the scene of the identity of Lisa

25  Rivera at which time I went over to her apartment.

People - DETECTIVE THOMAS DeGRAZIA - cross

1    Q    Right, okay.  And you testified that the super gave

2 you Lisa Rivera's name?

3    A    That's correct.

4    Q    So the super was present with you while you viewed the

5 video surveillance tape?

6    A    Yes, I viewed it in his apartment.

7    Q    And he was the one who told you he knew Lisa Rivera?

8    A    Yes.

9    Q    And what is the super's name?

10    A    Mr. Dass.

11    Q    D-O-S-S?

12    A    I believe it is A.

13         MR. KAREN:  The spelling of the full name is,

14    D-H-A-L-E-E-P, last name D-A-S-S.

15         MR. BEATRICE:  Thank you.

16    Q    Was Mr. Dass on the premises at the time of the

17 incident?

18         MR. KAREN:  Objection.

19         THE COURT:  Again, I will let it stand.

20    A    I don't know.

21    Q    The answer was I don't know?

22    A    I don't know.

23    Q    Did you ask him that question?

24    A    I did not.

25    Q    Now, you also testified that you became aware of the

1  co-defendant, Johanna Rivera; is that correct, the identity of

2  her?

3      A    Yes.

4      Q    And did that also occur at the scene?

5      A    No.

6      Q    At what point and time did you become aware of her

7  identity?

8      A    Lisa Rivera came back to the precinct, she viewed

9  photos in the precinct, she was unable to locate a photo of

10 Ms. Rivera in the -- in the computer system, but she did give me

11 the name Johanna with the address.  Through computer checks we

12 found that she had one prior arrest, which was a desk appearance

13 ticket.  I was able to get a photo of Ms. Rivera from the

14 arresting officer who -- of Johanna Rivera, so, I'm clear of

15 Johanna Rivera who then got positively identified at that time.

16     Q    Identified by whom?

17     A    By -- well by -- I identified her as Johanna residing

18 at 2463 Grand Avenue and was able to find and arrest of a

19 Johanna at 2463 Grand Avenue and I was able to get a photo,

20 which I took with me to 2463 Grand.  I don't believe Lisa Rivera

21 ever saw the photo by the time I gained access to it.

22     Q    Okay.  So you obtained a single photo of Johanna

23 Rivera?

24     A    That's correct.

25     Q    Did you ever show that photo to Lisa Rivera?

1    A    I don't believe I did.

2    Q    Now, you also testified that Johanna Rivera was placed

3  under arrest; is that right?

4    A    Yes.

5    Q    By yourself?

6    A    Yes.

7    Q    And she was originally charged with the murder; is

8  that correct?

9    A    That's correct.

10    Q    And what date did that occur?

11    A    That happened on November the second a few, a few

12  hours -- well, more than a few hours past, but November the

13  second a little after midnight.

14    Q    And she was arrested at her home?

15    A    Yes.

16    Q    Was Lisa Rivera arrested?

17    A    No.

18    Q    When you went to visit Johanna Rivera prior to placing

19  her under arrest did you have a conversation with her?

20    A    I informed her of the fact that she was on videotape

21  for the incident that took place and I told her she was going to

22  come into the precinct with us.

23    Q    So the answer to my question was yes, right, you had a

24  conversation with her?

25    A    Yes.

1     Q    And part of the conversation you were informing her

2 that she had been observed on a videotape?

3     A    That's correct.

4     Q    And then you told her she was coming with you?

5     A    Yes.

6     Q    Did she say anything in response to your statement

7 that she was observed on a videotape?

8     A    No, she was crying and she came with us.

9     Q    Okay.  When you say "us" you mean more than just

10 yourself?

11     A    Yeah, of course.

12     Q    Who else, what other police personnel was present as

13 far as you remember?

14            MR. KAREN:  Objection, irrelevant.

15            THE COURT:  I will allow that question and we'll

16     see where it goes.

17     A    I know for a fact Sergeant Noa, N-O-A.  If I look at

18 my book I may be able --

19            THE WITNESS:  Is it okay, Judge?

20            THE COURT:  You can refresh your recollection.

21     A    Detective Caton was the other person there.

22     Q    I am sorry, can you spell it?

23     A    C-A-T-O-N.

24     Q    Now, just to go back a little bit, were you assigned

25 this case randomly?

1   A   We catch homicides or nonfatal shootings separate from

2   all other cases so I was up in the rotation.

3   Q   Okay.  So it was kind of like a random selection, it

4   was your turn?

5   A   It was my turn.

6   Q   At that particular point and time when you were

7   assigned this investigation were you working with an individual

8   as a partner?

9   A   Just -- I was just on a D team, whoever was on the D

10  team at the time.

11  Q   The D team being a subsection of the Detective

12  Bureau -- the Detective Squad at the five two?

13  A   Correct, there are three teams in the Detective Squad,

14  there is an A, B and a D.

15  Q   And they're just random designation, it has nothing to

16  do with anything other than that?

17  A   Correct, just wherever the boss decides to put you.

18  Q   And you were -- were the other two individuals the

19  officers you mentioned, were they members of the D team?

20  A   Well, Detective Caton was at the time and Sergeant Noa

21  was the supervisor.

22  Q   All right.  So you three went to visit with Johanna

23  Rivera?

24  A   Yes.

25  Q   And was it your intention to place her under arrest?

People - DETECTIVE THOMAS DeGRAZIA - cross

1  MR. KAREN:  Objection.

2  Q    Prior to asking her to come to the precinct --

3  THE COURT:  I am not sure where this is going so

4  let me ask a clarifying question.  Obviously, I didn't have

5  the Omnibus Motion, but I have the judge's decision on

6  them.  Is Johanna Rivera a subject of the *Wade/Rodriguez*

7  hearing?

8  MR. KAREN:  I don't believe so.

9  THE COURT:  Why don't you step up for a moment,

10  please.

11  (Whereupon the following was conducted at

12  sidebar.)

13  THE COURT:  Now, preliminarily in terms of my own

14  perspective as I stand before you to think I don't have a

15  lot of information, but I am aware that the judge directed

16  a *Rodriguez/Wade* hearing and given that we're not

17  withstanding that much knowledge I haven't been sure where

18  you are going with many of your questions, but I have given

19  you some scope for two reasons:  One, being I am thinking

20  that because of your experience you have an objective.

21  Secondly, I am thinking perhaps it could bear ultimately

22  on, at least, background bearing on her familiarity with

23  the defendant if that's an issue.  So maybe you can clarify

24  for me Mr. Karen, did she make an out-of-court

25  identification of the defendant?

1    MR. KAREN:  She knew the defendant and she knew

2    Lisa.  What happened was this:  Lisa Rivera directed the

3    detectives to Johanna Rivera, they are not related, to him,

4    but they all live in the same three or four building area.

5    The detectives went out to see Johanna Rivera and brought

6    her back to the precinct.  They took statements, present

7    her video and arrested her.  The case was going in the

8    Grand Jury, again, by my recollection against Johanna

9    Rivera who had been arrested and the defendant Garlick was

10   identified, but had not yet been arrested as far as I

11   recall.

12          MR. BEATRICE:  Right.

13          MR. KAREN:  The attorney for Johanna Rivera was

14   Scott Turner, I believe.  We met with Johanna Rivera and

15   the attorney before the case was presented to the Grand

16   Jury and she was a cooperating witness from the beginning.

17   She, I think, pled guilty on an SCI, which I don't think

18   she is on the indictment.

19          MR. BEATRICE:  She is.

20          MR. SCHEPP:  She is on the indictment.

21          MR. KAREN:  She is?

22          MR. BEATRICE:  She is on the indictment.

23          MR. KAREN:  We may have indicted her, but

24   basically she had an agreement to cooperate, a signed

25   cooperation agreement prior to the end of the Grand Jury

34

1    presentation.  So she has been a cooperating witness all

2    along.

3            THE COURT:  But in terms of the issues before me

4    at this hearing --

5            MR. BEATRICE:  Right.

6            THE COURT:  -- obviously, we have the *Huntley*

7    hearing.

8            MR. KAREN:  Right.

9            THE COURT:  But insofar as there was a

10   *Rodriguez/Wade* Hearing directed I don't know who the

11   subject of that hearing is, whether it's Johanna Rivera or

12   Lisa Rivera or someone else, but in the meantime I want to

13   give both sides an opportunity to develop the record

14   insofar as *Rodriguez* issues are concerned so that I can

15   give both sides a fair opportunity.

16           MR. KAREN:  This is my speculation because I

17   don't know exactly what the judge intended.  I assumed it

18   had to do with the identification of the defendant, which

19   is why I brought out the entire way this happened.  We had

20   the video, the super led us to Lisa, Lisa led us to Johanna

21   and also said my boyfriend is James Darnell Garlick and an

22   I-card was put out on Garlick and then he gets picked up

23   pursuant to that so basically all -- I made all the

24   connections not knowing exactly what the focus of the

25   decision was.

35

1      THE COURT: Well, as I read *Rodriguez* the

2   question is was a given individual so familiar with the

3   person identified as to moot the potential for

4   subjectivity? Beyond that I don't know was there a

5   out-of-court identification in the first place by any of

6   these people and if so by whom, but I want to give you an

7   opportunity and you an opportunity to inquire as to the

8   prior familiarity of any witness in issue.

9      MR. KAREN: It's clear that Lisa in her statement

10  to detectives refers to the defendant as her boyfriend or

11  ex-boyfriend.

12     MR. BEATRICE: Right.

13     MR. KAREN: The defendant refers to Lisa Rivera

14  as his girlfriend so that connection is made. I don't

15  think the *Rodriguez* would be related to anything other than

16  the connection of Lisa to the defendant, but I am not sure.

17     THE COURT: Do you want to double check that?

18     MR. KAREN: There is no way, we have the

19  decision, but he's not --

20     THE COURT: But insofar as the familiarity with

21  the case goes I don't want to talk fast or rattle off the

22  top of my head, but if there was an out of court

23  identification of the defendant, for example, by Johanna

24  that would potentially be the subject of a *Wade* Hearing

25  then the question becomes does she have such familiarity

1  with the defendant as to moot the need for a *Wade* Hearing

2  and to moot the need for identification notice? So in an

3  effort to be clear, my understanding of the *Rodriguez*

4  portion of this hearing is to determine whether if there

5  was an out of court identification, was the person who made

6  that identification sufficiently familiar with the

7  defendant to, I am using the word "moot" the need for a

8  *Wade* or for a 710.30(1)(b) notice?

9      MR. KAREN: I have no objection to counsel asking

10  any questions about the connection of any of these people

11  to each other so that's -- I don't object to any of that.

12      THE COURT: And if on redirect or if on redirect

13  you want to explore that you can as well.

14      MR. KAREN: The reason I brought out all the

15  connections is I am not clear what the focus of the

16  decision was, which is why I said let's bring it all out so

17  that there is a record as to how all these people know each

18  other.

19      THE COURT: Would it clarify any of our

20  understandings of where we are going with this if you could

21  tell us was there an out-of-court identification of the

22  defendant by, for example, Johanna?

23      MR. KAREN: I believe, she named him and said she

24  knew him from the area.

25      THE COURT: But, for example, does she view him

1  on the video or look at a photo or anything like that?

2          MR. BEATRICE:  That's what I was to going to ask

3  him.

4          MR. KAREN:  Go right ahead, I don't think she

5  did.  Go right ahead.

6          THE COURT:  You can pursue this.

7          MR. KAREN:   Any question on Id. I have no

8  objection to it.

9          MR. BEATRICE:  The focus really, as the Court

10  pointed out, if what, really for me, is really Johanna.

11          MR. KAREN:  Okay.

12          MR. BEATRICE:  I acknowledge that there is a

13  relationship or there was a relationship between Lisa and

14  the defendant so they know each other, but the question for

15  me is the relationship, if any, with Johanna and James.

16          MR. KAREN:  I have no objection --

17          MR. BEATRICE:  How they know each other?

18          MR. KAREN:  -- to any of that.

19          THE COURT:   Okay.  If there is any further need

20  to come up and approach by all means either of you can ask

21  it and we will pursue it --

22          MR. BEATRICE:  Okay.

23          THE COURT:  -- at the bench as well.

24          (Whereupon the following takes place in open

25  court.)

1    BY MR. BEATRICE:

2        Q    Detective, you had testified that you indicated to

3    Johanna Rivera that Johanna Rivera was depicted on a videotape,

4    but at a crime scene or words to that affect; is that correct?

5        A    Yes.

6        Q    And did you show Johanna Rivera that videotape?

7        A    Later on at the precinct, yes, I did.

8        Q    Did she say anything about the other individuals

9    depicted on the videotape?

10       A    She told me that --

11       Q    Well, is it "yes" or "no"?

12       A    It's yes.

13       Q    Okay.  And did she say anything about the individual

14   that was subsequently deceased?

15       A    Yes.

16       Q    And did she say anything about my client, Mr. Garlick?

17       A    Yes.

18       Q    And she say anything about Lisa Rivera?

19       A    Yes.

20       Q    Did she identify herself on the videotape?

21       A    Yes.

22       Q    Did she identify Lisa Rivera on the videotape?

23       A    Yes.

24       Q    And did she identify the deceased individual on the

25   videotape?

1 A Yes.

2 Q And did she identify Mr. Garlick on the videotape?

3 A Yes.

4 Q Now, did she identify Mr. Garlick by name?

5 A No.

6 Q How was it that she identified him?

7 A She referred to him as Lisa's boyfriend.

8 Q Did she indicate to you how she knew that Mr. Garlick

9 was Lisa's boyfriend at the  time?

10 A Not that I recall.

11 Q When she was viewing that videotape was Lisa Rivera

12 also present?

13 A No.

14 Q Did she give you any other form of a pedigree

15 information about Mr. Garlick while she watched the videotape?

16 A No.

17 Q Did she tell you that Lisa would know where

18 Mr. Garlick resided?

19 A If I recall correctly, she said that Mr. Garlick --

20 well, she didn't refer to him as Mr. Garlick, but she said that

21 they resided together, Lisa and Mr. Garlick.

22 Q Okay.  Did she indicate where, did she give an

23 address?

24 A Yes, she didn't give me the address, but she said the

25 building next door to the incident's location across from her

1   house, which is also where we first met Lisa.

2       Q    And during the course of that interview of Johanna

3   Rivera you also took some statements of her; is that correct?

4       A    Yes.

5       Q    And at the conclusion of that interview is that when

6   Ms. Rivera was placed under arrest?

7       A    It wasn't until the District Attorney's office gave me

8   authorization.

9       Q    All right.  So you telephoned the D.A.'s office and

10  indicated to somebody in the DAs office that you wanted to

11  arrest somebody and charge them with murder; is that correct?

12      A    Correct.

13      Q    And you told that individual that you wanted to charge

14  Johanna Rivera?

15      A    Yes.

16      Q    And the basis of your wanting to arrest them was what?

17      A    I am not sure I understand.

18      Q    What was the basis of you wanting to arrest and charge

19  Johanna Rivera with murder at this point and time?

20      A    The fact that I had a dead individual and on the video

21  she's kicking him in the head.

22      Q    Okay.

23              THE COURT:  This is a good place to recess.  We

24          will recess for the afternoon.

25              MR. BEATRICE:  Perfect.

People - DETECTIVE THOMAS DeGRAZIA - cross

40A

1      THE COURT:  Counsel, we will recess for 2:15.

2      MR. BEATRICE:  Thank you, Judge.

3      (Whereupon there is a luncheon recess at this

4  time.)

5      (Continue next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  SUPREME COURT OF THE STATE OF NEW YORK
   BRONX COUNTY : CRIMINAL TERM : PART H94
2  ------------------------------------x
   THE PEOPLE OF THE STATE OF NEW YORK
3
            -against-
4                                        Ind. No.
   JAMES DARNELL GARLICK,                3681/2011
5
                    Defendant.
6  ------------------------------------x
                                    265 East 161 Street
7                                   Bronx, New York 10451
                                    SEPTEMBER 23, 2013
8
   B E F O R E :
9
            THE HONORABLE DENIS J. BOYLE
10           Justice of the Supreme Court

11           (Appearances same as previously noted.)

12                                  LAURA ROSEN
                                    SENIOR COURT REPORTER
13
        *     *     *     *     *     *     *     *
14           (Whereupon, the following took place in open court

15   in the presence of the defendant, defense counsel, and the

16   assistant district attorney.)

17           THE CLERK:  This is number one on the calendar,

18   case on trial, James Darnell Garlick.  All parties are

19   present.  The prospective jurors are not present.

20           MR. BEATRICE:  Michael Beatrice, 18b counsel for

21   Mr. Garlick.  Good morning, Your Honor.

22           THE COURT:  Good morning Mr. Beatrice.

23           MR. SCHEPPS:  Soloman Schepps appearing with Mr.

24   Beatrice for Mr. Garlick.

25           THE COURT:  Mr. Schepps, good morning.

Oral Argument

1    MR. SCHEPPS:  I do, and that regards the medical

2    examiner testimony.  It's come to our attention that the

3    doctor who did the autopsy, Dr. Maloney, is, for whatever

4    reason, I don't know, I believe the People don't know where

5    she is.

6    MR. KAREN:  She's left the medical examiner's

7    office.

8    MR. SCHEPPS:  Well, okay.  So she will not be

9    testifying.  And I believe there was another doctor who was

10   present in the performance of the autopsy who will also not

11   be testifying as well.

12   MR. KAREN:  Dr. Gill as left the ME's office to

13   become the chief medical examiner, I believe in Stamford,

14   Connecticut.  We will be calling Deputy Medical Examiner,

15   Dr. Ely, who, I believe, is the chief in the Bronx.  She's

16   coming in to testify.

17   MR. SCHEPPS:  All right.  I'm going to request

18   that Dr. Ely not be permitted to testify basically under the

19   rule of Crawford and its progeny.  Just hear me out, I know

20   there's been a lot of case law.

21   I think that under the Supreme Courts most recent

22   pronouncements, which are Melendez Diaz versus

23   Massachusetts -- do you want the cites of these or?

24   THE COURT:  I'm familiar with Melendez Diaz.  If

25   you rely on cases I'm not familiar with, I'll ask you for

1    the cite.

2                  MR. SCHEPPS:  Most recently Williams v Illinois.

3                  THE COURT:  I'm not sure I'm familiar with that.

4                  MR. SCHEPPS:  I can give you the cite on that.

5                  THE COURT:  Does it have to do with autopsies?

6                  MR. SCHEPPS:  Not directly, but they have to do

7    with whether anything is testimonial or not.

8                  THE COURT:  Okay.

9                  MR. SCHEPPS:  All right.  I know the Court is

10   familiar with the rules of the Melendez Diaz, but to just

11   summarize briefly, I'll backtrack a little bit to Court of

12   Appeals case that was decided prior to Melendez Diaz and

13   Bullcomings, People versus Freycinet, which I don't know if

14   the Court's familiar with that case.  That cite is 11 NY3d

15   238, a 2008 decision.

16                  In that case a different medical examiner than the

17   one who did the autopsy was permitted to testify,

18   specifically because the autopsy report had been redacted

19   from all opinion information, so that the medical examiner

20   who did testify was testifying basically from what the Court

21   characterized as findings of fact rather than opinion.

22                  THE COURT:  For example, stab wounds as to

23   distinct from homicide?

24                  MR. SCHEPPS:  Well, I don't know exactly how

25   clearly that was laid out in that case in my recollection.

Oral Argument

1    I mean, I think I would argue that there are instances where

2    even the characterization of a wound is, a stab wound would

3    be opinion evidence rather than, you know, a puncture or a

4    laceration or something like that.  The problem is that

5    Melendez Diaz analysis, in that case it was just a

6    certification that was put into evidence that there were,

7    that something that had been taken from a car.  It was

8    cocaine, in fact.  Under the analysis of Melendez Diaz, the

9    analysis by the Court of Appeals, again prior to the

10   Melendez Diaz analysis, I think, is completely called into

11   question, and I think that the decision that the Court of

12   Appeals announced in Freycinet really needs to be revisited.

13        The controlling law from the United States Supreme

14   Court in Melendez Diaz and in Bullcomings, I think, makes

15   it, in my opinion, pretty clear that an autopsy report,

16   under these circumstances, is testimonial.  It's prepared

17   under circumstances that would lead an objective witness

18   reasonably to believe that the statement or the report would

19   be available for use later at trial.  That's quoting from

20   Melendez Diaz at page 2532.  That's probably the Supreme

21   Court cite rather than the official reporter cite.

22        Furthermore, we have in Bullcomings, which was a

23   blood test, blood analysis in a DWI case, and the Court

24   announced there that the confrontation clause does not

25   tolerate dispensing with confrontation simply because the

1   Court believes that questioning one witness about another's

2   testimonial statements provide a fair enough opportunity for

3   cross-examination.

4       Another characterization of what would constitute

5   testimonial evidence is in the more recent case, Williams

6   versus Illinois.  And the cite of that case is -- it's only

7   the unofficial cite, 132 Supreme Court 2221.  I think it's a

8   2012 decision.  And it's a plurality decision, so it was

9   Justice Thomas' concurrence that my reading of the case

10  announces the Court's holding on what constitutes

11  testimoniality(sic).

12      In that case, in fact it was ruled that what was

13  being introduced was not testimonial in nature, but the way

14  Justice Thomas characterized it was that the document or the

15  report had to be sufficiently formalized.  It had to be

16  sworn or certified, and it needed to have the solemnity of

17  an affidavit or deposition.  Clearly, an autopsy report does

18  satisfy that requirement, it's certified, and all of the

19  requirements that the Court would have made in that case was

20  satisfied.

21      Now, I know that there could be an argument made

22  perhaps that it's a business record, but that's really, I

23  think there are two elements that have to be addressed.

24  It's whether it's a business record simply addresses certain

25  hearsay requirements, but not whether it has been prepared

1    in anticipation of litigation would be one way of

2    characterizing it.

3          Now an autopsy report, and certainly the one in

4    this case, was prepared basically at the request of the

5    police.  There's a man found lying on the floor with blood

6    all over the place -- withdrawn, with blood underneath him

7    in the lobby of a building.  The police are the first ones

8    called there and an ambulance comes and he's brought to the

9    hospital and he died.  He dies.  The autopsy is then done at

10    the request of the police and of the hospital.  It isn't

11    necessary that it be a law enforcement agency see in order

12    for the sought document to be characterized as testimonial.

13    In fact, in Melendez Diaz and in Bullcomings that is, that's

14    -- there is language to that effect in both of those cases,

15    interesting language also from Melendez Diaz is the

16    following:  Witnesses are either witnesses for the defendant

17    or against him.  There is no special category for witnesses

18    that are helpful to the prosecution, yet not against the

19    defendant.

20          By mentioning this I'm addressing the argument

21    often made by prosecutors and that I have read in cases as

22    well that because the office of medical examiner has been

23    held by the Court of Appeals as not be a law enforcement

24    agency, it doesn't fall within any of these requirements.

25    And I think that the reasoning and rulings of the court, of

Oral Argument

1    the Supreme Court in Melendez Diaz and Bullcomings, I think

2    makes it clear that it doesn't matter whether it's a law

3    enforcement agency or not.

4         The agency that did the analysis in Melendez Diaz

5    was not a law enforcement agency, and the agency that did

6    the analysis of the blood in Bullcomings was just a

7    hospital, so it clearly is not relevant whether the, whether

8    the agency is considered law enforcement agency or not.

9    It's the purpose for which the report is prepared, number

10   one, and the way in which it's prepared.  Again, to refer to

11   Justice Thomas's analysis in the William versus Illinois

12   case it's certified, the solemnity of an oath and it is

13   available for use at a later time at trial.  An autopsy

14   report clearly fits all of these requirements.

15        Now again, to return to Freycinet finally, the

16   Court of Appeals case, again the ruling in that case was

17   that the report was admissible in that case.  The Court I

18   don't think made an analysis of whether it was testimonial

19   or not in a way that would satisfy Melendez Diaz or

20   Bullcomings, but the court said that it was admissible

21   because it had been redacted of all opinion evidence.  I

22   don't know whether that has been done in this case or not.

23   I don't know whether the proposed doctor has seen it, but

24   this is, this isn't what I'm concerned about.  What I'm

25   concerned about is the Supreme Court's analysis --

1          THE COURT:  And what is your application?

2          MR. SCHEPPS:  My application is that this doctor

3     not be permitted to testify, that the autopsy report not be

4     permitted to be put in through this doctor.

5          THE COURT:  As far as opening statements are

6     concerned, I'm not going to foreclose the People from

7     stating to the jury what it is they intend to prove by way

8     of the content of the autopsy.  If there are specific

9     objections at the time the doctor testifies, I'll take them

10    up with you.  I'm not going to prospectively preclude Dr.

11    Ely's testimony.

12          Do you need a few minutes before openings?

13          MR. KAREN:  Three minutes.  I take it we can put

14    off my argument until.

15          THE COURT:  Yes.  It's ten to four so I don't

16    think we'll get to the autopsy today.

17          MR. KAREN:  No, Dr. Ely's here tomorrow.

18          THE COURT:  Okay.

19          MR. KAREN:  Yes.

20          THE COURT:  Yes, the answer is this, yes, I would

21    like to have openings anyway.

22          MR. KAREN:  Absolutely, I just need three minutes.

23          THE COURT:  Now let's bring the jurors in who are

24    going to be sworn, and then I'll have a brief recess.

25          MR. KAREN:  Very good.  Can I let the officer go

```
1    SUPREME COURT OF THE STATE OF NEW YORK
     BRONX COUNTY : CRIMINAL TERM : PART H94
2    ------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
3
              -against-
4                                          Ind. No.
     JAMES DARNELL GARLICK,                3681-2011
5

6                        Defendant.
     ------------------------------------x
7                                          265 East 161 Street
                                           Bronx, New York 10451
8                                          SEPTEMBER 24, 2013

9    B E F O R E:

10             THE HONORABLE DENIS J. BOYLE
               Justice of the Supreme Court
11
               (Appearances same as previously noted.)
12
                                           LAURA ROSEN
13                                         SENIOR COURT REPORTER

14        *      *      *      *      *      *      *      *

15             (Whereupon, the following took place in open court

16   in the presence of the defendant, defense counsel, and the

17   assistant district attorney.)

18             THE CLERK:  This is case on trial continued.  All

19   parties are present.  The jurors are not present.

20             THE COURT:  Counsel, good morning.

21             MR. SCHEPPS:  Good morning.

22             MR. KAREN:  Good morning, Judge.

23             MR. BEATRICE:  Good morning, Judge.

24             THE COURT:  As of a few minutes ago all of our

25   jurors were here.  My understanding is that the People are
```

1    ready to call their first witness?

2           MR. KAREN:  And their second.  We have Dr. Ely

3    here who should be the first witness.  Johanna Rivera is

4    here and her lawyer is here, she'll be the second witness.

5    There were two other people who were supposed to be here who

6    are not, but I figured with the medical examiner and with

7    Johanna Rivera, an eyewitness, it should be a reasonably

8    full day.

9           THE COURT:  Okay.  Mr. Schepps, Mr. Beatrice, were

10   there additional arguments to be made before the first

11   witness?

12          MR. SCHEPPS:  Do you have any further, anything

13   further to address?  Maybe I misunderstood you.  I thought

14   you were gonna be addressing my application regarding the

15   medical examiner further.

16          MR. KAREN:  Do you want her to step out for the

17   argument?

18          MR. SCHEPPS:  I don't know what we're doing.

19          MR. BEATRICE:  Judge, there are --

20          THE COURT:  I thought you wanted to be heard

21   further.  I had said in substance I'd take up any objections

22   to her testimony when they were made, but I wasn't going to

23   prospectively preclude her.  If you think that you're

24   anticipating an objection that can better be heard before

25   the jury's in the box, I'll take it up with you this way,

1      and I'll ask the witness to step out for that purpose.

2                      MR. SCHEPPS:  It won't take long.

3                      THE COURT:  Okay.  If the witness could please

4      step out.

5                      MR. BEATRICE:  Judge, I would also ask that any

6      other potential witnesses not be in the courtroom for the

7      proceedings also, or the application.

8                      MR. KAREN:  This is Scott Turner who represents

9      Johanna and the other is an intern.

10                     THE COURT:  Mr. Schepps?

11                     MR. SCHEPPS:  One thing that I wanted to add

12     incase the Court has come across it, I am aware of a Second

13     Circuit case, Feliz versus United States, which did hold

14     that autopsy reports are not testimonial; however, that case

15     was also decided prior to Melendez Diaz, Bullcomings and

16     Williams, so I think that that analysis needs to be called

17     into question as well.

18                     As far as the autopsy report is concerned, I mean,

19     it's fine if we deal with it turn by turn and moment by

20     moment.  It's riddled with mentions of stab wounds and

21     knife, and inclusion it was a homicide.  But, you know, the

22     issue of redactions shouldn't be something for me to decide,

23     it should be something for the People to decide.

24                     THE COURT:  And you've reviewed the autopsy

25     report?

1          MR. SCHEPPS:  Yes, of course.

2          THE COURT:  Are there parts of it that you

3     maintain should be redacted that haven't been redacted?

4          MR. SCHEPPS:  Nothing's been redacted.

5          MR. KAREN:  Your Honor?

6          THE COURT:  Yes.

7          MR. KAREN:  I have a suggestion.  Obviously,

8     defense has had this case for a couple of years and has made

9     no application.  What I could do, one option is to introduce

10    the certified copies as a business record and then have the

11    doctor testify.  There is a way to avoid any possible

12    hearsay.  And I think the better practice is to establish

13    that she has the certified record, that it's a business

14    record, but not offer it and simply have her testify.  That

15    way, you don't run the risk of putting a document into

16    evidence where something in there might be objectionable.

17    That's what I would propose.

18          THE COURT:  So if I understand what you're saying,

19    Mr. Karen, you're proposing to introduce testimony from the

20    witness, but not to introduce the document?

21          MR. KAREN:  Right.  And then if anybody wants to

22    put in part of the document later they can, but the risk of

23    putting in, and I think Mr. Schepps is correct, putting in

24    the full document, something could end up in there that

25    could be objectionable.  This is a cleaner way of doing it.

1          MR. SCHEPPS:  Well, that would be fine if we had

2     Dr. Maloney here who could testify as to her actual -- all

3     right, you heard me.

4          THE COURT:  I'm not cutting you off.

5          MR. SCHEPPS:  No, I'm reading you.

6          THE COURT:  Sometimes I'm easier to read than

7     others probably.  Your research was on all fours.  I've read

8     Freycinet, I've read the cases or at least scanned them that

9     you referred me to last night.

10          MR. SCHEPPS:  A one-second approach?

11          THE COURT:  Yes.

12          (Whereupon, a discussion was held at the bench off

13     the record among the Court and counsel.)

14          THE COURT:  I don't draw the same conclusion, Mr.

15     Schepps, as you do from Freycinet.  The principles, at least

16     in broad strokes, I think, are clear to everybody.  There's

17     a very distinct and significant difference between testimony

18     regarding as discussed in Freycinet whether wounds or stab

19     wounds or any kind of wound as compared to whether in the

20     doctor's opinion the wounds were a product of a homicide, so

21     certain conclusions are opinions that are not inadmissible.

22     And arguably, as you point out in Freycinet, certain

23     conclusions and opinions such as the nature of the wounds,

24     the wound's trajectory, opinions based upon observations of

25     the body are not inadmissible conclusions, if you want to

lr-a                    Proceedings

1       describe them as conclusions, and I'm going to be alert to

2       the difference.

3               MR. SCHEPPS:  Okay.

4               THE COURT:  And that's why I said I'll take up

5       your objections as they're made, but I'm not prospectively

6       precluding her testimony.

7               MR. SCHEPPS:  All right, but I would not agree to

8       Mr. Karen's suggestion that the document not be put into

9       evidence.  Dr. Ely is it?

10              MR. KAREN:  Ely, she's the Chief Medical Examiner

11      of the Bronx.

12              MR. SCHEPPS:  Right, but she has no participation

13      in this autopsy at all, and I don't see how it would be

14      possible without Dr. Maloney being here to have an effective

15      cross-examination without the document being placed into

16      evidence, so.

17              MR. KAREN:  And I'll be happy to offer it.

18              THE COURT:  And if either side offers it and if

19      there are redactions to be made, I'll take them up with you.

20              MR. SCHEPPS:  Okay.

21              THE COURT:  But you know, and again, you've read

22      Freycinet, in Freycinet one of the key issues was whether a

23      witness could testify based upon an opinion drawn from

24      reviewing the autopsy --

25              MR. SCHEPPS:  Right.

1           THE COURT:  -- report --

2           MR. SCHEPPS:  Right.

3           THE COURT:  -- where the witness did not themself

4      participate in the autopsy.

5           MR. SCHEPPS:  That's the crux of their analysis,

6      sure.

7           THE COURT:  For whatever it's worth, more recently

8      in People against Hall in the First Department at 84 83rd

9      page 79, similar issues were before the court and it was

10     held that it was proper to allow a witness to testify to the

11     contents of an autopsy report, even though the witness had

12     not participated in the autopsy.

13          MR. SCHEPPS:  I'll have a look at that.

14          THE COURT:  Perhaps significantly, in addition to

15     leave being denied in the Court of Appeals, cert. was denied

16     at 133 Supreme Court page 193.  And anyway, to be continued.

17          MR. SCHEPPS:  Okay.

18          THE COURT:  If both sides are ready, given what

19     we've discussed so far I'll bring the jury in, we'll

20     proceed.

21          MR. KAREN:  We're ready.

22          COURT OFFICER:  Jury entering.

23          (Whereupon, the jury entered the courtroom.)

24          THE CLERK:  This is case on trial continued.  All

25     parties are present.  The jury is also present.

1          THE COURT:  Members of the jury, good morning.

2    Mr. Karen?

3          MR. KAREN:  Thank you, Judge.

4          At this time the People call Dr. Susan Ely to the

5    stand.

6          (Whereupon, the witness entered the courtroom and

7    took the witness stand.)

8    S U S A N     E L Y, a witness called by and on behalf of the

9          People, having been first duly sworn, was examined and

10         testified as follows:

11         COURT OFFICER:  You may have a seat.  In a loud

12    and clear voice, say and spell your first and last name.

13         THE WITNESS:  Dr. Susan Ely, S-U-S-A-N, E-L-Y.

14         COURT OFFICER:  Title and affiliation.

15         THE WITNESS:  Deputy Chief Medical Examiner for

16    the Office of Chief Medical Examiner for the City of New

17    York.

18         THE COURT:  Mr. Karen?

19         MR. KAREN:  Thank you, Judge.

20   DIRECT EXAMINATION

21   BY MR. KAREN:

22    Q    Dr. Ely, what are the duties and functions of the

23   Office of Chief Medical Examiner of the City of New York?

24    A    The primary responsibilities for the medical examiner's

25   office, and there's, you know, a physical office in each borough,

1    but it's one large office that is for the entire city, the main

2    purpose of that office is to investigate very specific kinds of

3    deaths that have occurred in the city.  For instance, deaths that

4    involve drug intoxications; any kind of unnatural death involving

5    injury, suicides, homicides, accidents, deaths in the workplace;

6    natural deaths that are not entirely explained or sudden,

7    unexpected that occur outside of hospitals; deaths that occur in

8    hospitals, in clinics, but have to do with some kind of

9    therapeutic or diagnostic procedure that was given to an

10   individual are also investigated by our office; childhood deaths

11   that are sudden and unexpected.  And for all of these people who

12   die under these circumstances, the medical examiner's office

13   becomes involved.

14        Often times, as a result of that investigation we

15   perform autopsies on these individuals who have died in order to

16   fill out a death certificate that describes the cause and manner

17   of death.  We are sometimes called upon to testify in court when

18   the death involves some kind of criminal matter or a civil

19   matter.

20        Q    Doctor, can you tell us roughly the number of autopsies

21   that the Office of Chief Medical Examiner performs a year?

22        A    How many autopsies?

23        Q    Yes.

24        A    In the thousands.

25        Q    Now, what is your current position?

1      A      I'm Deputy Chief Medical Examiner for the Bronx office

2  of the Chief Medical Examiner.

3      Q      Do you run the Bronx office?

4      A      I do.

5      Q      I'd like you to tell the jury what your educational

6  background and training consists of?

7      A      I received my Bachelor's Degree in science at the

8  University of Maryland.  I then went to medical school at Tulane

9  University to receive my MD and my Masters of Public Health

10  Degree.

11            I then went on to do two years of clinical training in

12  pediatrics, psychiatry and internal medicine.  That was followed

13  by several years training in pathology, and then one year

14  training in the area that I now practice, which is forensic

15  pathology.

16      Q      Doctor, are you a medical doctor licensed to practice

17  in New York?

18      A      Yes, I am.

19      Q      Are there medical specialties in which one can be

20  certified as an expert?

21      A      Yes.

22      Q      And are you certified as an expert or as a diplomate in

23  any specialty dealing with pathology?

24      A      Yes.  I am what is called board certified in the areas

25  of clinical pathology, anatomic pathology, which is also called

1    surgical pathology, the area of pathology where things like

2    cancer or inflammation, diabetes is diagnosed, as well as in

3    forensic pathology.

4         Q     And what is forensic pathology?

5         A     First of all, the general term pathology refers to a

6    specific field of medicine where physicians are involved in the

7    diagnosis of disease and injury.  And specifically, a hospital

8    pathologist or pathologist in private practice might look under a

9    microscope, a tumor might be removed from an individual's body

10   and a pathologist tells the treating doctor whether that tumor is

11   benign or malignant.  There's also laboratory studies that

12   involve diagnoses of anemias, all kinds of blood disorders,

13   diabetes, etc.  That's what pathology is.  Pathology is the study

14   of disease and injury and pathologists are doctors who are

15   experts in that area.

16        Forensic pathology is a further specialized area within

17   the field of pathology where you go on to further training after

18   training in pathology, and that field of forensic pathology

19   involves the investigation of very specific kinds of deaths and

20   recognizing injuries, and the kind of individuals that I

21   previously described.

22        Q     Now doctor, you indicate that you are board certified

23   in clinical, anatomic and forensic pathology.  What did you have

24   to do to get board certified?

25        A     In order for any doctor to become board certified in

1   the field of their study they must complete what's called a

2   residency, which is training after medical school in that area,

3   successfully complete it and then they are in a program that is

4   called accredited.  Then they sit down and they take the exam

5   with other physicians at their level, it's either a written exam

6   or oral exam or both, and the exam is written by experts in that

7   field.  If you're a cardiologist or a pediatrician or a surgeon,

8   you would do the same kind of thing.  And after that test is

9   graded, if you pass that exam you're then called board certified.

10  You have to go through the training first and then take the

11  examination.

12       Q    Now Dr. Ely, can you tell us how long have you been a

13  medical doctor with the Office of the Chief Medical Examiner in

14  New York?

15       A    Since July of 1997.

16       Q    So it's about 16 years?

17       A    That's correct.

18       Q    And can you estimate the number of autopsies that

19  you've personally performed?

20       A    It's somewhere in the range of 2600 autopsies.

21       Q    Now, has any court ever permitted you to testify as an

22  expert in the fields of forensic, clinical or anatomic pathology?

23       A    Yes.

24       Q    How many times have you testified as an expert in those

25  fields?

1      A      I've primarily testified in the field of forensic

2      pathology over a hundred times.

3                      MR. KAREN:  At this time I would offer Dr. Susan

4          Ely as an expert in the fields of clinical, anatomic and

5          forensic pathology.

6                      THE COURT:  Any voir dire?

7                      MR. BEATRICE:  No, she sounds like an expert,

8          Judge.  I'll consent to it.

9                      MR. SCHEPPS:  I think so too.

10                     THE COURT:  Ladies and gentlemen, I will deem the

11         witness qualified to testify in that capacity as an expert.

12     Q      Now Dr. Ely, on November 2nd of 2011, did the Office of

13     Chief Medical Examiner perform an autopsy on the body of Gabriel

14     Sherwood?

15     A      Yes.

16     Q      And was there a --

17                     MR. SCHEPPS:  Objection; foundation.

18                     THE COURT:  I'll permit it.

19     Q      And was there a designation of a case number on that?

20     A      Yes, there was.

21     Q      What is the case number?

22     A      Case number is B as in Bronx 11-4597.

23     Q      Now, did you personally perform the autopsy?

24     A      No.

25     Q      Do you know who did?

1      A      Doctor Catherine Maloney.

2      Q      Is she still working in the Office of Chief Medical

3      Examiner?

4      A      No, she's not.

5      Q      And was there anybody else present for the autopsy who

6      was also a medical doctor?

7      A      Yes.

8      Q      And who was that?

9      A      That was Dr. James Gill.

10     Q      And is he still with the Office of Chief Medical

11     Examiner of New York?

12     A      No.

13     Q      Do you know where he is?

14     A      He's the Chief Medical Examiner of the State of

15     Connecticut.

16     Q      Back in November of 2011 was it the duty and

17     responsibility of the Office of Chief Medical Examiner to do

18     autopsies and issue autopsy reports?

19     A      Yes.

20     Q      And on November 2, 2011, was an autopsy report prepared

21     on that day or shortly thereafter regarding the autopsy of

22     Gabriel Sherwood?

23     A      Yes.

24     Q      And do you have a certified copy as a business record

25     of that autopsy report on the body of Gabriel Sherwood?

1     A    Yes.

2               MR. BEATRICE:  Objection, Judge.

3               THE COURT:  Come up, please, briefly.

4               (Whereupon, a discussion was held at the bench off

5     the record among the Court and counsel.)

6               THE COURT:  Laura, come over, please.

7               (Whereupon, the following took place at the side

8     bar on the record in the presence of the Court and counsel.)

9               THE COURT:  Mr. Beatrice, do you want to put your

10    objection on the record?

11              MR. BEATRICE:  Well Judge, the basis for my

12    objection was that the question was posed of the witness

13    without any, any document in hand that we can all refer to.

14    It was a question that was just asked:  Do you have a copy,

15    a certified copy of the autopsy report?  That's presuming

16    that the document is already certified and getting admitted

17    into evidence.

18              THE COURT:  I'll allow the question.

19              MR. KAREN:  It's a preliminary question to the

20    fact that we're going to introduce it.  She has it

21    physically on her person.  That's the first question.  Then

22    we'll ask her, then it will be introduced.

23              THE COURT:  Mr. Schepps, did you want to add to

24    that?

25              MR. SCHEPPS:  Yes, I'd like to just reiterate the

1       objection that I made earlier.  The difference must be noted

2       between introducing something as a business record and

3       introducing it for the purpose of the opinions and

4       observations contained therein, which make it testimonial in

5       nature, and it would be necessary in that instance for the

6       person who actually did the report to be present under

7       Crawford.  And noting the differences with the Freycinet

8       court, but the United States Supreme Court case law, I

9       believe, makes a different result than the, than the New

10      York Court of Appeals had made.

11              The purpose of introducing something as a business

12      record is merely an identification of that it is what it is,

13      but it doesn't go to the contents of the record and

14      questions of, questions of opinion and expertise.

15              THE COURT:  All right, I think so far the

16      questions come within Freycinet are permissible.

17              MR. SCHEPPS:  Okay.

18              THE COURT:  The Hall case, which I cited earlier,

19      specifically admitted an autopsy report as a business

20      record.  In either event, I'm prepared to allow the People

21      to establish that it's a document that this witness can use

22      to express an opinion based upon its contents.  And I'm not

23      making a broad ruling.  I told you I'd give you an

24      opportunity to be heard as we go along.

25              MR. SCHEPPS:  Right.  And I don't want, you know,

1       and I don't want to crowd the record with this, but I

2       thought this was an appropriate time to renew that.

3                  THE COURT:  I understand.

4                  MR. SCHEPPS:  And again, this is made under the

5       New York State and United States Constitution.

6                  MR. KAREN:  This is a two-stage offer in this

7       sense.  The autopsy report is admissible as a business

8       record.  Once it's admissible, I can call any expert

9       witness, whether they're connected with the medical

10      examiner's office or not, so long as they're an expert to

11      interpret it.  Now we have the deputy medical director of

12      New York, but the document is admissible.  And I could put

13      on an outside doctor if I want.  If the doctor is an expert,

14      they can give their expert opinion based on reviewing the

15      doctor's --

16                 THE COURT:  In any event, I'm permitting the

17      witness on the stand to testify.  I'm anticipating I'll

18      allow her to testify to the contents of the report

19      distinguishing between facts as distinct from what I'll call

20      conclusions, for lack of a better word.

21                 (Whereupon, the following took place in open court

22      in the presence of the defendant, defense counsel, and the

23      assistant district attorney.)

24                 THE COURT:  I'm allowing that question to stand.

25      Do you want it read back?

1          MR. KAREN:  No, I'll ask it again.

2      Q     Doctor, did you have a certified copy of the autopsy

3  that was performed on Gabriel Sherwood on November 2, 2011?

4      A     Yes.

5      Q     Do you have it in front of you?

6      A     Yes.

7      Q     Have you reviewed it?

8      A     Yes.

9      Q     Was it issued in the regular course of medical

10  examiner's business?

11      A     Yes.

12      Q     And was it the business of the Office of Chief Medical

13  Examiner to issue such report back in November of 2011?

14      A     Yes.

15          MR. KAREN:  At this time I would offer into

16      evidence as People's 1 the certified autopsy report on the

17      body of Gabriel Sherwood.

18          MR. SCHEPPS:  I renew my objection.

19          THE COURT:  If you would just step up very

20      briefly, we'll make a record later.

21          (Whereupon, a discussion was held at the bench off

22      the record among the Court and counsel.)

23          THE COURT:  We'll mark the document as People's 1

24      for identification.

25          (Whereupon, People's Exhibit 1 was marked for

1       identification.)

2                   COURT OFFICER:  People's 1 for identification so

3       marked.

4                   THE COURT:  Please show it to defense counsel.

5                   (Whereupon, the referred to item was handed to

6       defense counsel.)

7                   THE COURT:  You've both had an opportunity to

8       review the document?

9                   MR. SCHEPPS:  Yes.

10                   MR. BEATRICE:  We have, Judge.

11                   THE COURT:  Any voir dire?

12                   MR. BEATRICE:  No.

13                   THE COURT:  All right.  I'm going to admit

14       People's 1 in evidence, ladies and gentlemen.  Counsel,

15       subject to the discussion that we've had previously.

16                   (Whereupon, People's Exhibit 1 was received in

17       evidence.)

18                   COURT OFFICER:  People's 1 in evidence so marked.

19                   MR. KAREN:  Thank you.

20                   (Whereupon, the referred to item was handed to the

21       witness.)

22                   MR. KAREN:  May I proceed?

23                   THE COURT:  Yes, you may.

24     Cont'd DIRECT EXAMINATION

25     BY MR. KAREN:

1      Q      Doctor, you stated that you've reviewed People's 1

2   previously, correct?

3      A      Yes.

4      Q      I'd like you to describe the observations in terms of

5   age, size and possible injuries that were observed in the autopsy

6   on Gabriel Sherwood performed on November 2, 2011?

7      A      What was observed was that Mr. Sherwood was an average

8   framed, five-foot seven-inch, 159 pound black man.  The main --

9   he had undergone some therapeutic intervention, some attempts at

10  resuscitation which could be seen on his body in the form of --

11     Q      Doctor, when you say therapeutic interventions, what

12  does that means?

13     A      Sure.  He had been brought to St. Barnabas Hospital by

14  emergency services.  Both emergency services personnel as well as

15  the emergency room doctors attempted to resuscitate him and were

16  unable to, and there was evidence of that had occurred.

17  Intravenous --

18          MR. SCHEPPS:  I'm having a trouble hearing.

19     A      There were intravenous catheters and bandages on his

20  body indicating that he had undergone these resuscitative or

21  attempts at resuscitative measures.  The most notable findings on

22  him from an external standpoint were multiple, sharp force

23  injuries, meaning he had two stab wounds --

24          MR. SCHEPPS:  Objection.

25          THE COURT:  I'll permit that.

1    A    He had two stab wounds as well as four cuts, also

2    called incised wounds, of his torso, as well as a cut to one of

3    his right fingers.

4    Q    Roughly, how old did the deceased appear to be?

5    A    He appeared to be what was ultimately his given age by

6    a family member, he was 35 years old and he did not appear

7    otherwise.

8    Q    Can you tell us what the difference is between a stab

9    wound and an incised wound?

10             MR. SCHEPPS:  Asked and answered.

11             THE COURT:  I'll permit it.

12    A    Stab and incised wounds are two kinds of terms used to

13    describe different wounds that can be sustained by a sharp

14    object.  The most common sharp object that causes sharp wounds,

15    you know, in very general terms are knives.  When a knife causes

16    sharp force injury they can either cause a cut or they can cause

17    a stab.  A stab is caused when the tip of the knife makes contact

18    with the body first and the weapon is thrust into the body.

19             MR. SCHEPPS:  Objection to the use of the term

20       knife and weapon.

21             THE COURT:  I'll permit it.

22    A    A cut is also called an incised wound and that's

23    created by a knife making contact with the body in such a way

24    that the long sharp edge of the knife is making contact just if

25    were you in the kitchen accidentally cut yourself.  It's often by

1    the long edge of the knife as opposed to the sharp tip. And when

2    the long edge of the knife makes contact with the body and

3    creates an injury, it does so typically in the form of a cut or

4    an incised wound.  The incised wounds tend to be not terribly

5    deep relative to what stab wounds can be, which can be deeper as

6    the longest portion of the knife enter into the body.

7        Q    Now, are the various seven stabs or incised wounds

8    designated by numbers or letters in the autopsy report?

9        A    Yes.

10       Q    And is it fair to say that the medical examiner's

11   office can't tell in what order the injuries occurred?

12       A    That's correct.

13       Q    I'd like you to use the designation in the autopsy

14   report to go through each of the injuries sustained by Mr.

15   Sherwood to tell us what exactly was observed?

16       A    As I said, he sustained six sharp force injuries of his

17   torso, two of which were stab wounds, four of which were cuts or

18   incised wounds.  What I failed to mention earlier, he also had

19   some blunt force trauma of his face.  That's a different kind of

20   injury which I can describe in a moment and was not part of his

21   cause of death ultimately.

22            In terms of the sharp force trauma of his torso, they

23   were lettered A through F in arbitrary fashion in terms of their

24   order.  The first stab wound, A, is a stab wound of the right

25   chest.  It penetrated the skin and the tissues under the skin as

1    well as cartilage of fifth rib on the right side and

2    superficially into the diaphragm, which is the muscular sheet

3    that separates the chest cavity from the abdominal cavity and

4    enables you to breathe.  It moves as you breathe, enables

5    respirations.  That wound was described in terms of its depth in

6    the body as being between one-and-a-half and two-and-a-half

7    inches in depth from the tip of the skin to the end point of the

8    stab wound inside the body.

9           The second wound --

10   Q      Let me ask you, did that wound actually perforate the

11   diaphragm?

12   A      It penetrated the diaphragm.  So when a knife makes

13   contact with an organ or tissue and it doesn't go all the way

14   through it's called penetration.  If it goes all the way through,

15   it's called perforation.

16   Q      Continue please with wound number B?

17   A      Wound B was a cut or an incised wound also on the right

18   side of the chest just below the wound that I just described.

19   This was a cut so it was much less deep in terms of its injury in

20   the body, up to about an eighth of an inch in depth which is not

21   unusual for a cut.  Typically, cuts are longer on the body than

22   they are deep in the body.  That did not cause any severe or

23   fatal injury.

24          The third wound described as C was the second stab

25   wound, second meaning the second one I'm describing, not

1    necessarily in order.  That stab wound now is on the left side of

2    the chest.  This wound, this wound involved penetration and

3    perforation of the skin as well as the rib cage.  It went between

4    two ribs and then created injury, perforated the heart, the right

5    side of the heart.  As a result of that stab wound there was

6    bleeding around the heart and there was also significant bleeding

7    within the left chest cavity.

8         If you think of the chest cavity as being divided into

9    left and right, the bleeding was on the left side of the chest

10   cavity which would be consistent with this wound and where it

11   was.  It was significant bleeding.  It was one-and-a-half liters

12   of blood, which would have been a third of Mr. Sherwood's total

13   blood volume in his entire body, and certainly explains going

14   into shock from bleeding internally.  He also had a collapsed

15   lung on the left side which is not unusual when there is this

16   kind of injury and there's bleeding around the lung which causes

17   pressure on the lung and causes it to collapse.

18        Q    Now, did this stab wound go through the heart?

19        A    We say perforation of the heart if it goes through a

20   wall of the heart, and in this case it went through the front

21   part of the heart, which is the anterior wall.

22        Q    The anterior wall of the right ventricle?

23        A    Right ventricle.

24        Q    Did it pierce the pericardial sac?

25        A    It did.

1    Q    What is the pericardial sac?

2    A    The heart sits in a sac in a thin membrane that holds

3    the heart.  There's really nothing between, that normally would

4    be between the heart and the sac.  It's just a thin space.  And

5    often times when there's injury to the heart that penetrates or

6    perforates the heart, there is bleeding into that sac.  There's

7    also bleeding often times outside of that sac, as there was in

8    the case of Mr. Sherwood, depending on what is penetrated.

9         When the heart is penetrated or perforated it's under a

10   tremendous amount of blood pressure as it's the source of blood

11   pressure for your whole body, so there tends to be a lot of

12   bleeding associated with injuries to the heart.

13   Q    Now Doctor, can you estimate the depth of that stab

14   wound through the heart?

15   A    Estimated --

16             MR. SCHEPPS:  Objection.

17             THE COURT:  I'll permit it.

18   A    The estimated depth of penetration was four-and-a-half

19   to five-and-a-half inches in the body.

20   Q    And you indicated that Mr. Sherwood lost roughly one

21   third of the blood in his body?

22   A    Yes.

23   Q    Was that caused by this stab wound that you designate

24   as stab wound C?

25   A    Yes.  When I make an estimation I'm referring to the

1     blood loss described under this wound.

2          Q     Very good.  Let me ask you something, doctor.  Would

3     that wound that you described as stab wound C standing alone be

4     regarded as a fatal injury?

5          A     Yes.

6          Q     Please tell us why?

7          A     The heart is what would be described as a vital organ.

8     All of your organs are important and necessary in your body, some

9     more so than others.  The heart was injured in this case causing

10    significant and ultimately a fatal amount of bleeding.  When an

11    individual rapidly loses as much blood as Mr. Sherwood lost, the

12    outcome is more times than not death.

13         Q     And what is the process in the body that occurs when

14    you have a blood loss of one-and-a-half liters?

15         A     I'm sorry, what is that?

16         Q     What would happen to the body when it sustains a rapid

17    blood loss of one-and-a-half liters?

18         A     When you rapidly lose this much blood pressure, and I

19    mentioned for his weight and size one-and-a-half liters is about

20    a third of his blood volume, if that happens quickly, over a

21    period of minutes I'm talking about, the body goes into shock,

22    the entire system goes into shock, meaning that the body is

23    unable to respond to that rapid blood loss in such a way that it

24    can keep your blood pressure high enough to achieve consciousness

25    and keep your organs functioning.  One of the first things that

1   happens is that you will pass out, and then very shortly

2   thereafter or at the same time your organs stop functioning.

3          The heart is very sensitive to not having enough blood.

4   If you can't keep your pressure up, your blood pressure up, then

5   the blood doesn't get to the organs that vitally need it, and

6   those organs cease to function.  And what happens with the heart

7   is it stops beating.

8          (Continued on the next page...)

1          Q.   Thank you doctor.  Now, can you describe the rest of

2     the wounds?

3               I think the next one wound be designated as D?

4          A.   Wound D is an incised wound of the left abdomen.  So,

5     it is a wound that is lower down on the body relative to the

6     wounds that I just described.

7               This was also a superficial wound consistent with a

8     cut.  It, too, did not cause any major injury to major blood

9     vessels or organs.

10              It was only within -- it stayed within the abdominal

11    wall and did not penetrate into the body cavity.  It was a

12    maximum depth of one quarter inch, which is again, consistent

13    with what we can find in incised wounds.

14         Q.   Now, I would ask you to describe the wound that you

15    designated as wound E?

16         A.   This was another incised wound or cut, also further

17    down on the left abdomen, also superficial, also not causing

18    substantial or fatal injury.

19         Q.   And what about wound F?

20         A.   Wound F is described as an incised wound on the right

21    back.  On the diagram for the autopsy we take -- as Medical

22    Examiner's we take notes in our office when the wounds are being

23    observed at the autopsy table and in the autopsy notes this

24    wound is shown on the left back.

25              As this wound is seen in the photographs that were

1    taken it is also on the left back.  So, it says "right back" on

2    the autopsy report and that is a mistake.

3         This wound was actually on the same side of the body as

4    the abdomen wounds on the body but also on the back side.

5         This was also a superficial wound that did not

6    penetrate any major blood vessel or organ.

7         Q.   These six wounds that you have described so far would

8    have been to the torso, the abdomen or the chest or the back; is

9    that correct?

10        A.   Yes, that's correct.

11        Q.   Can you describe wound G?

12        A.   Wound G was also a cut or an incised wound, but this

13   wound was on the knuckle that was closest to the palm on the

14   back of the third right finger.  (Indicating)

15        Q.   Now, you indicated previously that certain blunt

16   injuries were observed, can you tell us about those?

17        A.   I previously described to you what sharp force trauma

18   is, stabs and cuts.

19        Sharp force trauma is sustained by a sharp instrument.

20   It has a sharp cutting edge or a stabbing point.

21        Blunt force trauma is a different category of injury

22   that the body can sustain.

23        Examples of blunt force trauma are abrasions which are

24   also known as scrapes or cuts not -- some people call them cuts

25   but they are not cuts in the sense that they are sharp force

1    trauma, scrapes are abrasions, bruises are called contusions and

2    tears are called lacerations.

3         Those three types of blunt force trauma go from the

4    first minor to the scrapes to the most severe which are the

5    tearing of tissues called lacerations.

6         A broken fracture is also a form of blunt force trauma.

7    So, if you were to walk by a coffee table and accidentally hit

8    your shin against it and get a bruise that is a form of blunt

9    force trauma.

10        Mr. Sherwood had some abrasions on his face,

11   specifically he had three on his left forehead, the left side of

12   the nose and the left upper lip.

13        These injuries were not correlated with any major

14   injury or any injury of any kind inside of his head, these were

15   not fatal injuries.

16        Q.   So, is it fair to say that the blunt injuries that you

17   described did not contribute to the death of Gabriel Sherwood?

18        A.   That's correct.

19        Q.   Now, would these blunt force injuries be consistent

20   with Mr. Sherwood being punched or kicked?

21        A.   They could be.

22        Q.   Now, as part of the autopsy report, do you do a

23   toxicology screening of the deceased?

24        A.   Yes.   Blood and tissues are collected at autopsy and

25   sent to the toxicology laboratory in our office which is a lab

1   that tests for a large battery of prescription drugs and alcohol

2   drugs and abuse.

3        Q.   Other than alcohol, which we will get to -- other than

4   alcohol -- did Gabriel Sherwood have any drugs in his body?

5        A.   In his urine he did have cannabinoids which is a

6   category of drug that includes marijuana.

7        Q.   Anything else?

8        A.   Besides alcohol, no.

9        Q.   Now, tell us about the result of the toxicology screen

10  for alcohol.

11       A.   He had a blood alcohol level of .12.

12            To give you a frame of reference .08 is the cut off

13  level in most states for driving while under the influence of

14  alcohol.

15            Anything .08 or above is considered driving under the

16  influence.

17            He was .12, so he was above that level.

18            So, when this -- when alcohol or any other drug is in

19  somebody's blood as opposed to in their urine or eye fluid or

20  some other kind of tissue, that indicates that drug or substance

21  was in their system at the time that they died and that they

22  potentially were under the influence of it.

23       Q.   Could you estimate the number of drinks that would

24  cause a blood alcohol level of .12?

25       A.   Depending on the size of the drink, if you have a

1    regular glass of wine or one measured shot of hard liquor or a

2    normal can of beer or a bottle of beer, those are all considered

3    equivalent units of alcohol and each of those would bring your

4    blood alcohol level up depending on a lot of variables; food in

5    your stomach and weight and all kind of things.

6        But, one drink brings up a blood alcohol level by .02.

7    So, this number represents in the range of five to six drinks

8    over some span of time.

9        Q.   Based on the .12 blood alcohol level this would be

10   roughly 50% more than legal intoxication if somebody was driving

11   a car?

12       A.   That's correct.

13       Q.   Thank you.  Now, doctor, can you tell us what the

14   actual cause of death was of Gabriel Sherwood?

15       A.   Yes.  The cause of death is stab wound of torso with

16   perforation of heart.

17            ADA KAREN: Thank you.  Nothing further.

18            MR. SCHEPPS: One minute.

19            THE COURT:  Sure.

20   CROSS-EXAMINATION OF DR. ELY

21   BY MR. SCHEPPS:

22       Q.   Good morning doctor.

23       A.   Good morning.

24       Q.   So, just to be clear you were not present when this

25   autopsy was performed, right?

1      A.    That's correct.

2      Q.    And all of the opinions that you are expressing here

3   today are based on having read the autopsy report; is that

4   correct?

5      A.    Having read the autopsy report and reviewed the

6   photographs that accompanied it.

7            MR. SCHEPPS: I will move to strike the latter part

8       of that.

9            THE COURT:  I will let it stand.

10     Q.    When did you get the autopsy report?

11     A.    Last week.

12     Q.    Who did you get it from?

13     A.    I mean I reviewed the autopsy report last week.

14           The one that I have in front of me is from the DA.

15     Q.    Right.   Where is Dr. Maloney who did this autopsy, do

16   you know?

17     A.    She is practicing in upstate New York, I think it is in

18   the Rochester office, I'm not entirely sure.

19     Q.    To the best of your knowledge was any attempt made to

20   bring her down here to testify?

21           ADA KAREN: Objection.

22     A.    I don't know.

23           THE COURT:  Sustained.

24     Q.    What about Dr. Gill, you said that he is the Chief

25   Medical Examiner in Stamford, Connecticut now?

1       A.   He is the Chief Medical Examiner for the State of

2   Connecticut.

3       Q.   To the best of your knowledge was any effort made to

4   get him down to testify?

5                   ADA KAREN: Objection.  How would she know?

6                   THE COURT:  Sustained.

7                   MR. SCHEPPS: I am just asking her if she knows.

8                   THE COURT:  Sustained.

9       Q.   Do you know how far Stamford, Connecticut is from here?

10                  ADA KAREN: Objection.

11                  THE COURT:  Sustained.

12      Q.   Do you know who inflicted any of these, as you

13  characterized them, stab wounds?

14      A.   No.

15      Q.   Do you know if they were done by one person?

16      A.   No.

17      Q.   Let me ask you this:  Is there anything in the autopsy

18  report that would -- withdrawn.

19           Would your observations in the autopsy report possibly

20  sustain or support the conclusion that the instrument that

21  caused the wounds was being held by two people at the same time?

22                  ADA KAREN: Objection.

23                  THE COURT:  I will permit the question.

24           Please don't speculate, but if your expertise

25      permits an answer, you can give that answer.

1      A.    The autopsy report wouldn't tell me that information.

2      Q.    Right, okay, thank you.  Can you tell from the autopsy

3    report what time Mr. Sherwood died?

4      A.    From the findings on the body or from our paperwork?

5      Q.    From all of your paperwork?

6      A.    Well, the paperwork, we have reports from the hospital

7    of his time of pronouncement, so the pronouncement at

8    St. Barnabas Hospital was reported as 1840 or 6:40 PM on the 1st

9    of November.

10      Q.    Okay.  Can you tell me, doctor, what is a "reading

11    pulse" (sic)?

12      A.    A thready pulse?

13      Q.    That's what it looks like.

14      A.    Thready.

15      Q.    Thready?

16      A.    A thready pulse is a description used by medical

17    professionals when a pulse is very weak and not terribly

18    regular, barely palpable, barely felt.

19      Q.    So, if somebody has a thready pulse are they still

20    alive?

21      A.    They still have a heartbeat.

22      Q.    Right.   And can you tell me whether Mr. Sherwood had

23    a thready pulse when EMS arrived in the lobby of the building?

24      A.    By report of St. Barnabas Emergency Room physicians he

25    did by EMS but not in the Emergency Department.

1        Q.   Right, I understand that.  Now, it is my understanding

2   that -- withdrawn.

3        Did Mr. Sherwood have a single-lumen intravenous

4   catheter in his left antecubital fossa?

5        A.   He did.

6        Q.   What is that?

7        A.   An intravenous catheter is the plastic tubing that is

8   placed inside of a vein.  It is placed by medical professionals

9   so that you can receive -- so a patient can receive medications

10  or intravenous fluids.

11       Q.   Okay.  Now, you had said that according to the

12  toxicology report, Mr. Sherwood had a blood alcohol content I

13  believe that you referred to it as .12%?

14       A.   That's correct.

15       Q.   Now, with --

16       A.   .12 grams percent.

17       Q.   Right.  With the introduction of fluids in the

18  catheter isn't it possible that the concentration of alcohol in

19  his body and his blood would have been higher prior to the

20  introduction of fluids into the body, that they diluted the

21  concentration?

22       A.   It entirely depends on how much fluid they gave him.

23       To really dilute an entire blood volume, a tremendous

24  amount of fluid has to be given and when somebody has no blood

25  pressure the ability of that fluid to circulate is dependent

1    upon blood pressure.

2            So, the likelihood of that level being artifactually

3    lower is -- I don't have enough variables presented to me to

4    even have an opinion about that.

5            But, I would say it is not terribly likely if somebody

6    has no circulation, even if they are working on him, and it

7    would really depend on how much they gave him, liters and liters

8    with somebody with circulation may dilute a blood sample.

9        Q.   So, you don't know?

10       A.   I don't know, but I think it is unlikely given what I

11   do know.

12       Q.   All right.  I want to ask you a few questions about the

13   actual wounds, so we will go to the designations.

14       A.   Yes.

15       Q.   Wound A; was there a discernible blunt edge detected in

16   wound A?

17       A.   No.

18       Q.   Wound B, a discernible blunt edge?

19       A.   None is described.

20       Q.   Wound C, a discernible blunt edge?

21       A.   Yes, there is.

22       Q.   Could you describe that?

23       A.   If I may describe what a blunt edge is to the jury.

24       Q.   Please.

25       A.   When a knife makes contact with a body, particularly in

1    the form of a stab wound, not in the form of a cut, but when the

2    tip goes into the body first and a stab wound is created, the

3    wound that is created tends to have certain characteristics that

4    as forensic pathologists we are trained to recognize and

5    depending upon the shape and the size of the knife what is

6    created most commonly is a very -- what I would describe as a

7    very skinny triangle of a wound.  It looks just like a slit from

8    a distance, but when you look at it very carefully, if it is a

9    single edged knife, meaning one edge of the knife is sharp and

10   the other edge is dull so there is a cutting edge and a

11   non-cutting edge, the non-cutting edge is the blunt edge of the

12   knife.

13        When that knife goes into the body tip first it creates

14   a sharper pointed edge of the wound which is the top of the

15   triangle, the skinny triangle, and the base of the triangle

16   represents that dull or blunt edge of the knife and that skinny

17   triangle tends to have a very thin blunt edge in this case was

18   1/32 of an inch, which is smaller than I can really demonstrate

19   with my fingers, the space between my fingers.

20        Q.   That's what -- do you cook doctor?

21        A.   I do.

22        Q.   Do you know what the back side of a knife blade is

23   referred to in the culinary field?

24        A.   I don't think so.

25        Q.   The spine perhaps?

1    A.    Okay.

2    Q.    So the blunt edge would be that back?

3    A.    The equivalent to the spine, that's correct.

4    Q.    What about the other wounds, is there a blunt edge

5    discernible in any of them?

6    A.    In D, no.

7          In E, no.

8          In F, no.

9          All of which is consistent with incised wounds.

10   Q.    Okay.  Can you tell from the autopsy report how tall a

11   person was who may have caused these injuries?

12   A.    No.

13   Q.    Can you tell whether they were right-handed or

14   left-handed?

15   A.    No.

16   Q.    Can you tell whether they were standing or on the

17   ground?

18   A.    Whether the person with the knife was standing or on

19   the ground?

20   Q.    Right.

21   A.    No.

22   Q.    Can you tell anything about them?

23   A.    No.

24   Q.    Now, you can't tell from the autopsy report in what

25   order any of the wounds were inflicted; is that correct?

1          A.   I cannot.

2          Q.   Correct.  Let's again go to the toxicology report

3     briefly.

4               What is the date of the performance of the toxicology

5     analysis according to the report?

6          A.   The analysis is done prior to the generation of the

7     report.

8               The report -- the date that the report was signed by

9     the toxicologist is after the analysis, is December the 12th of

10    2000 -- I'm sorry, December the 21st of 2011.

11         Q.   So the report was done December the 21st of 2011?

12         A.   That's when it was finalized.

13         Q.   How about the final autopsy report, when was that done?

14         A.   There is a date on the last page of the autopsy report

15    which reads 12/29/11.

16         Q.   And yet there is no mention of the toxicology analysis

17    in the autopsy report, is there?

18         A.   There is not.

19         Q.   And there is no mention of any possible effect that the

20    toxicology, the amount of alcohol in the victim's system --

21    withdrawn -- in Mr. Sherwood's system might have had on the

22    incident, there is no mention of it in the autopsy report; is

23    that correct?

24         A.   There is not.

25         Q.   Was Dr. Maloney board certified when she performed this

1  autopsy?

2      A.   In forensic pathology?

3      Q.   Yes.

4      A.   I can't say for sure, I do not believe she was, but I'm

5  not certain of that.

6      Q.   Okay.  How many times did you say that you had

7  testified?

8      A.   Over 100.

9      Q.   Have you ever testified for the defense in a criminal

10  case?

11      A.   I don't believe so.

12              MR. SCHEPPS: Thank you.

13              THE COURT:  Mr. Karen?

14              ADA KAREN: A couple of points.

15  REDIRECT EXAMINATION OF DR. ELY

16  BY ADA KAREN:

17      Q.   Counsel asked a number of questions about the alcohol

18  intoxication of Mr. Sherwood.

19          Did the ingestion of alcohol by Mr. Sherwood contribute

20  to his death?

21      A.   No.

22      Q.   Last point; counsel asked you whether you ever

23  testified for the defense when you gave expert testimony, are

24  you aware that the People have the burden of proof in a criminal

25  case and and it never shifts?

1           MR. SCHEPPS:  Objection.

2           MR. BEATRICE: Objection.

3           THE COURT:  Sustained.

4      Q.   Are you aware that the People have to establish the

5  cause of death in a homicide?

6           MR. SCHEPPS: Objection.

7           MR. BEATRICE: Objection.

8           THE COURT:  I will permit that.

9      A.   I'm sorry?  Have to establish?

10     Q.   Are you aware that the People have to establish the

11 cause of death in a homicide trial?

12     A.   Yes.

13     Q.   Now, if you were summoned to testify by the defense,

14 would you testify?

15          MR. BEATRICE: Objection.

16          THE COURT:  I will allow it.

17     A.   Yes.

18          ADA KAREN: Thank you.  Nothing further.

19          MR. SCHEPPS: One other question.

20 RECROSS-EXAMINATION OF DR. ELY

21 BY MR. SCHEPPS:

22     Q.   You said that Mr. Sherwood had likely consumed five to

23 six drinks over some span of time, what span of time would that

24 be?

25     A.   Well, the levels of alcohol in his urine and in his eye

1    fluid called the vitreous humor  --

2        Q.   Which were higher than the level of alcohol in his

3    blood?

4        A.   -- indicate and are most consistent with him having

5    completed drinking and he was in what is called a post-arc (ph)

6    phase.  You drink alcohol and it starts to calibrate or equalize

7    through the body and the vitreous, the eye fluid which is called

8    the vitreous, has a high content of water and the alcohol levels

9    once everything evens out, once an individual has stopped

10   drinking and the alcohol distributes throughout the body tends

11   to concentrate higher in the eye fluid.  He has levels that are

12   consistent with him having been in the period of equalizing.

13        So, exactly over what period of time he drank the

14   alcohol that he did, I can't say with any kind of accuracy in

15   terms of was it over an hour, was it over two hours, I don't

16   know.

17        Q.   That's the range though, you think?

18        A.   Hours is a reasonable range, it could be less than

19   that.

20        Q.   Okay.  Thank you.

21             THE COURT:  Mr. Karen?

22             ADA KAREN: Nothing further.

23             THE COURT:  Thank you doctor.

24             THE WITNESS:  Thank you.

25             (Whereupon the witness, Dr. Ely, was excused from

1     the courtroom at this time.)

2                THE COURT:  Would the attorneys step up very

3     briefly?

4                (Whereupon the following is a sidebar discussion

5     at this time between all counsel and the Court on the

6     record.)

7                THE COURT:  I think that I have two questions.

8                Do you need any time before your next witness?

9                ADA KAREN: None.

10               THE COURT:  Will her attorney be up on the witness

11    stand?

12               ADA KAREN: I imagine, he came in.

13               THE COURT:  I am thinking that I should tell the

14    jury who he is.

15               ADA KAREN: Absolutely.

16               THE COURT:  What is his name?

17               ADA KAREN: Scott Turner.

18               MR. SCHEPPS: I never saw him before, did you?

19               ADA KAREN: No, I don't think that he does criminal

20    or knows anything about criminal.

21               THE COURT:  For whatever it is worth I have seen

22    him before.

23               ADA KAREN: I have never seen him.

24               MR. SCHEPPS: It doesn't matter.

25               THE COURT:  I will say that he is representing

1    Ms. --

2              ADA KAREN: Ms. Rivera.

3              THE COURT:  Yes.

4              MR. SCHEPPS: Can I make my final renewal of that

5    objection?

6              THE COURT:  Yes.

7              MR. SCHEPPS: The arguments that I made yesterday

8    and renewed today on my objection to permitting Dr. Ely to

9    testify as to the autopsy report and the introduction of

10   the autopsy report are renewed; the arguments that I made

11   under the US Supreme Court standards announced in

12   Melendez-Diaz, Bullcoming versus New Mexico,

13   B U L L C O M I N G, and Williams versus Illinois.

14             I renew my objection to the introduction of that

15   material and in the way that it was introduced as well.

16             THE COURT:  The record will reflect that in terms

17   of the document itself, People's 1, consistent with our

18   discussion previously it was admitted subject to certain

19   redactions which will be the subject of further discussion

20   between the parties and myself.

21             MR. SCHEPPS: Well, I made the objections.

22             THE COURT:  I am sure you covered your record.

23             MR. SCHEPPS: All right.

24             THE COURT:  So you will call your next witness.

25             ADA KAREN: Yes.

*Argued by*
JORDAN K. HUMMEL

# NEW YORK SUPREME COURT

## Appellate Division - First Department
———

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*-against-*

JAMES GARLICK,

*Defendant-Appellant.*

———

**R E S P O N D E N T ' S   B R I E F**

———

**DARCEL D. CLARK**
*District Attorney*
Bronx County
Attorney for Respondent
Bronx, New York 10451
(718) 838-7322
hummelj@bronxda.nyc.gov

GINA MIGNOLA
JORDAN K. HUMMEL
Assistant District Attorneys
*Of Counsel*

PRINTED ON RECYCLED PAPER

through a jury note or other communication – that any other jurors had viewed the

broadcast or had tried to discuss it. Consequently, the supposed "uh-oh" faces,

under the circumstances here, could not reasonably be interpreted to suggest that

the jurors had engaged in any misconduct. Moreover, defense counsel's subjective

interpretation of a juror's alleged facial expression is simply not enough to require

an individualized inquiry where no sitting juror has confirmed any alleged

misconduct. See Joaquin, 138 AD3d at 422. Put another way, the alleged "uh-oh"

faces alone do not indicate that it was "obvious that a particular juror possesse[d] a

state of mind which would prevent the rendering of an impartial verdict," thus, no

individual inquiry was required. Buford, 69 NY2d at 298 (quoting People v. West,

92 AD2d 620, 622 [2d Dept 1983] [Mahoney, P.J., dissenting]). Instead, the court

properly addressed the entire panel again. See Mejias, 21 NY3d at 77-78.

## POINT THREE

**ADMISSION OF THE AUTOPSY REPORT, AND THE TESTIMONY OF A MEDICAL EXAMINER WHO WAS NOT PRESENT DURING THE AUTOPSY, DID NOT VIOLATE DEFENDANT'S RIGHT TO CONFRONT THE WITNESSES AGAINST HIM (responding to defendant's point II, pp. 39-58).**

Dr. Katherine Maloney, a medical examiner with the Office of the Chief

Medical Examiner (hereinafter, OCME), performed an autopsy on the body of

Gabriel Sherwood. Dr. James Gill was also present. At trial, since both Doctors Maloney and Gill had moved away, the People called another medical examiner, Dr. Susan Ely, to give her opinion about the nature of Sherwood's injuries and the cause of death. Based on Dr. Ely's familiarity with the practices of OCME, she laid a foundation for the admission of Dr. Maloney's report. In addition, on the basis of her own independent review and assessment of the relevant materials, including the autopsy report, Dr. Ely explained that, in her expert medical opinion, the cause of Sherwood's death was a stab wound to his chest that penetrated his heart.

On appeal, defendant contends that his rights under the Sixth Amendment of the United States Constitution and Article I, §6 of the New York Constitution were violated when the court received into evidence the autopsy report and Dr. Ely's testimony based on it. In fact, the autopsy report was not testimonial and its admission into evidence, and Dr. Ely's corresponding testimony, did not violate defendant's right to confront the witnesses against him.

**A. Facts**

On November 2, 2011, Dr. Katherine Maloney, with Dr. James Gill present, conducted an autopsy on Sherwood's body and issued a report (T. 28-29; People's exhibit 1 at trial, Autopsy Report). In September 2013, when trial began, Dr.

37

Maloney and Dr. Gill were no longer employed at the OCME.[12] Thus, the People called Dr. Susan Ely, Deputy Chief Medical Examiner for the New York City branch of the OCME, to testify at trial (T. 23).

During voir dire, defense counsel argued that the autopsy report was testimonial and that, therefore, allowing a medical examiner who did not conduct the autopsy to testify at trial about the contents of the report would violate defendant's confrontation right. Accordingly, defense counsel requested that Dr. Ely be precluded from testifying about the autopsy, the nature and extent of Sherwood's injuries, and the cause of death (T. 637-43). The court denied the application and stated that it would address specific objections when the expert testified (T. 643).[13] Then, immediately before Dr. Ely testified, defendant renewed his application. Relying on People v. Freycinet, 11 NY3d 38 (2008), and People v. Hall, 84 AD3d 79 (1st Dept 2011), lv den, 18 NY3d 924 (2012), cert den, 133 S Ct 193 (2012), the court, again, denied the application and stated it would address any further objections during the witness's testimony (T. 17-22).

Dr. Ely's brief direct testimony (Ely: T. 23-44) began with a description of her training and experience in determining the cause and manner of death (Ely: T.

---

[12] Dr. Gill became the Chief Medical Examiner of Connecticut (Ely: T. 29). Dr. Ely believed that Dr. Maloney was practicing upstate in Rochester (Ely: T. 47).

[13] The court, however, precluded the People, during their opening statement, from mentioning what they intended to prove through the autopsy report (T. 643).

25-28). Next, she explained the procedures that OCME used for documenting autopsies, testified that she had reviewed Sherwood's autopsy report, and laid the foundation necessary to have the report admitted into evidence as a business record (Ely: T. 28-34).

Then, based on her review of the autopsy report, Dr. Ely described Sherwood's wounds including the location, nature, and depth of the wounds. Further, Dr. Ely stated that, in her professional opinion, wounds of this nature were most commonly caused by a knife. In addition, Dr. Ely gave her independent opinions and conclusions about Sherwood's injuries. In particular, Dr. Ely opined that the fatal injury was a stab wound to the left side of Sherwood's chest that penetrated and perforated his skin, rib cage, and heart, and caused internal bleeding and a collapsed lung (Ely: T. 35-44).

On cross-examination, Dr. Ely admitted that she was not present during the autopsy and that her expert opinions were based on the data contained in the autopsy report and corresponding photographs (Ely: T. 46-47). She further admitted that, based on the autopsy report, she did not know who had inflicted the stab wounds, if the wounds had been inflicted by multiple people, the height of the assailant, whether the assailant was right or left handed, standing or sitting. She

also did not know when or the order in which the wounds had been inflicted (Ely: T. 48, 53-54).

Notably, a police report that was completed on the day that Dr. Maloney performed the autopsy was included as part of the medical examiner's file. That report stated that, "Victim [had been] assaulted and stabbed by unknown perp(s) for unknown reason" (People's exhibit 1 at trial, Autopsy Report, Medical Examiner Complaint Follow-Up).

## B. The Autopsy Report Was Not a Testimonial Statement

It is well established that a defendant has the right to confront the witnesses "who bear testimony against him." People v. John, 27 NY3d 294, 303 (2016); US Const Amend VI; NY Const, Art I, § 6. This means that, with certain limited exceptions not applicable in this case, testimonial statements may not be introduced against a defendant at trial to establish the truth of the matter asserted. Id. (see Crawford v. Washington, 541 US 36, 42 [2004]; Davis v. Washington, 547 US 813 [2006]; Freycinet, 11 NY3d at 41). Equally clear, however, is that this rule does not bar the use of out-of-court statements by declarants who are not "witnesses"—that is, those who do not "bear testimony." Freycinet, 11 NY3d at 41.

40

New York's highest federal and state courts agree that the factual portions of an autopsy report are not testimonial and that, therefore, admitting an autopsy report into evidence as the basis for medical testimony by an expert witness who had no role in the autopsy is permissible under the confrontation clause. United States v. James, 712 F.3d 79, 99 (2d Cir 2013), cert den, 134 S Ct 2660 (2014); United States v. Feliz, 467 F.3d 227, 238 (2d. Cir. 2006); Freycinet, 11 NY3d at 41.

In fact, recently, in People v. John, 27 NY3d 294 (2016), while considering whether DNA reports had been admitted in violation of a defendant's constitutional rights, the New York Court of Appeals reiterated its position on the admissibility of autopsy reports. In particular, the Court confirmed:

> We are not retreating from our prior decisions holding that, given the primary purpose of a medical examiner in conducting autopsies, such redacted [autopsy] reports— "a contemporaneous, objective account of observable facts that [do] not link the commission of the crime to a particular person"—are not testimonial.

Id. at 315 (quoting People v. Pealer, 20 NY3d 447, 454 [2013]; citing Freycinet, 11 NY3d at 42; James, 712 F.3d at 99).

In United States v. James, 712 F.3d 79 (2013), cert den, 134 S Ct 2660 (2014), the Second Circuit, Court of Appeals, addressed this exact issue and held

41

that neither an autopsy report nor a toxicology report were testimonial.  Id. at 99, 102.[14]  The Circuit Court explained that:

> a laboratory analysis is testimonial if the circumstances under which the analysis was prepared, viewed objectively, establish that the primary purpose of a reasonable analyst in the declarant's position would have been to create a record for use at a later criminal trial.

Id. at 94-95 (citing Melendez-Diaz v. Massachusetts, 557 US 305, 324 [2009]; Bullcoming v. New Mexico, 564 US 647, 669 [2011] [Sotomayor, J., concurring]).

And, of course, this Court has similarly held that autopsy reports are not testimonial. People v. Acevedo, 112 AD3d 454, 455 (1st Dept 2013), lv den, 23 NY3d 1017 (2014); People v. Hall, 84 AD3d 79, 81-83 (1st Dept 2011), lv den, 18 NY3d 924 (2012), cert den, 133 S Ct 193 (2012).

Defendant nevertheless contends that the reasoning articulated by the Supreme Court in Melendez-Diaz v. Massachusetts, 557 US 305 (2009), Bullcoming v. New Mexico, 564 US 647 (2011), and Williams v. Illinois, 132 S Ct 2221 (2012), "squarely undermines" Freycinet and, therefore, defendant argues,

---

[14] In James, the defendant objected to two related Confrontation Clause issues: (1) a medical examiner's testimony about an autopsy she did not perform or participate in and a toxicology report, admitted into evidence at trial, which supported her conclusion about the victim's cause of death (poisoning); and (2) a medical examiner's testimony about the victim's cause of death (poisoning) based on observations during the victim's autopsy, which the testifying medical examiner performed, and the results of the related toxicology test, which he did not perform. James, 712 F.3d at 96, 100.

*Freycinet* is "no longer good Sixth Amendment law" (defendant's brief, p. 43).

Defendant is wrong.

First, as noted, a number of cases decided after *Williams*, including *James*, *John*, *Acevedo*, and *Hall*, have all rejected similar attacks. In *Hall*, for example, this Court noted that *Melendez- Diaz* "neither explicitly overruled *Freycinet* nor made its holding untenable." *Hall*, 84 AD3d at 82-83. Similarly, in *Acevedo*, 112 AD3d at 455, this Court held:

> Defendant's right of confrontation was not violated when an autopsy report prepared by a former medical examiner, who did not testify, was introduced through the testimony of another medical examiner. The report was not testimonial and neither *Bullcoming v. New Mexico* nor any other decision of the Supreme Court of the United States is to the contrary.

(internal citations omitted). Other federal district courts agree. See *e.g.*, *Spells v. Lee*, 2016 WL 1337283, at *9–10 (EDNY, Apr 4, 2016, No 11-CV-1680[KAM]); *Madrid v. Ercole*, 2015 WL 7779207, at *9 (EDNY Dec 2, 2015, No 08-CV-4397 [ENV]) ("After *Melendez-Diaz*, it has been more than well-established that autopsy reports remain non-testimonial"); *Soler v. United States*, 2015 WL 4879170, at *14–17 (SDNY Aug 14, 2015, No 05 CR. 165 (LAP]) ("even after *Melendez-Diaz* the courts have failed to evolve a clear set of rules that would

43

demonstrate the applicability of the Confrontation Clause to preclude the use of []

autopsy report[s]").

Notably, the Supreme Court's most recent case, <u>Williams v. Illinois</u>, 132 S

Ct 2221 (2012), sheds light on the test to determine whether an out-of-court

statement is testimonial. In <u>Williams</u>, a forensic expert gave his opinion that two

DNA profiles matched. The opinion was based on facts about which the expert had

no first-hand knowledge. The Court ruled that it was proper—and not a

Confrontation Clause violation—for the DNA expert, who had not performed the

tests and who could not vouch for the accuracy of the DNA profiles, to testify that

the profiles matched. <u>See</u> <u>Williams</u> 132 S Ct at 2224-25. Five justices agreed on

the outcome, but there was no majority consensus on the appropriate standard or

test to apply. Rather, four justices who concurred with the result utilized the

primary purpose test.

In <u>John</u>, 27 NY3d at 307, the Court of Appeals explained that it too had

"deemed the primary purpose test essential to determining whether particular

evidence is testimonial." In that regard, a statement will be considered testimonial,

"only if it was 'procured with a primary purpose of creating an out-of-court

substitute for trial testimony.'" <u>Id</u>. (quoting, <u>People v Pealer</u>, 20 NY3d 447, 453

[2013], and <u>Michigan v Bryant</u>, 562 US 344, 358 [2011]). As the Court

acknowledged, there is no "iron clad" definition of testimonial evidence. Indeed, the question of testimoniality requires consideration of multiple factors. People v. Rawlins, 10 NY3d 136, 156 (2008), cert denied sub nom. Meekins v New York, 557 US 934 (2009) ("various indicia of testimoniality").

Two factors are of particular importance. John, 27 NY3d at 307. First, "whether the statement was prepared in a manner resembling ex parte examination and second, whether the statement accuses defendant of criminal wrongdoing." Id. Furthermore, these two "interrelated touchtone" considerations are informed by the "purpose of making or generating the statement, and the declarant's motive for doing so." Id. (quoting Pealer, 20 NY3d at 453, and Rawlins, 10 NY3d at 156). In short, a report that was prepared for the primary purpose of accusing a targeted individual will be testimonial.

Here, contrary to defendant's view, the autopsy report was not prepared in a manner that resembled an ex parte examination. It certainly was not "a solemn declaration or affirmation made for the purpose of establishing or proving some fact" (defendant's brief, p. 44, quoting Melendez-Diaz).

By law, OCME is independent of, and not subject to the control of, the prosecuting authorities or the police. It is not a law enforcement agency. People v. Washington, 86 NY2d 189, 192 (1995). Moreover, the deceased's body, and the

45

evidence that it contained, were not examined for the primary purpose of furthering a particular prosecution or to accuse a targeted individual of wrongdoing. Rather, the primary purpose of the medical examination was to determine the nature and extent of any injuries, "to provide an impartial determination of the cause of death" (Id. at 193), and to contemporaneously document the wounds and injuries that the medical examiner observed.

Notably, before the medical examination on November 2, 2011, it was not clear what, if any, crime had been committed, much less who was responsible. In that regard, there might have been no criminal prosecution against anyone if, for example, the medical examination revealed that Sherwood had died of a heart attack during an unarmed struggle, rather than a stab wound to the heart. If the fatal wound had been a blow consistent with a kick to the head, and not a stab wound to the heart, the charging decision and ultimate outcome might have been very different. And, there would have been no prosecution if the autopsy had led the authorities to conclude that the fatal wound had been self-inflicted or accidental. Thus, since at the time of the autopsy it was unclear what, if any, crime had been committed, it would have been impossible for the report to accuse defendant, or anyone for that matter, of a crime. Therefore, the report was not testimonial.

46

Furthermore, the autopsy report would have been created no matter what the medical examiner found. Indeed, as this Court has noted,

> [a]lthough OCME performs autopsies where the cause of death is suspected to be criminal, its powers and duties also extend to deaths arising, inter alia, "by accident, by suicide, suddenly when in apparent health, [or] when unattended by a physician." (New York City charter §557[f][1]). While it is true that some autopsy reports may later be used in litigation, that does not mean that such reports are "prepared specifically for use at … trial," as were the affidavits in <u>Melendez-Diaz</u>, 557 U.S. at 324.

<u>Hall</u>, 84 AD3d at 83.

Critically, too, when Dr. Maloney was conducting the autopsy, defendant had not yet been arrested. Indeed, he was not arrested until nine days later. More important, Dr. Maloney had no way of knowing that defendant or anyone else was even considered a suspect. The one police report that was included in the medical examiner's file, dated the same day as the autopsy, stated that the "Victim [had been] assaulted and stabbed by unknown perp(s) for unknown reasons" (People's exhibit 1 at trial, Autopsy Report, Medical Examiner's Complaint Follow-Up). Thus, Dr. Maloney could not have known if defendant, or anyone else, was a suspect in the investigation. Moreover, on cross-examination, Dr. Ely stated candidly that the autopsy report, and the information it contained, could not assist her in identifying the assailant (Ely: T. 48, 53-54), thus, it certainly did not link

47

defendant to any crime. Accordingly, when Dr. Maloney performed the autopsy, she was not aware that any suspect or suspects were targets of the criminal investigation and, therefore, she did not document her observations in the report for the purpose of accusing a targeted individual. Thus, under the principles espoused in <u>Williams</u>, <u>James</u>, and <u>John</u>, Dr. Maloney's autopsy report, which contained her contemporaneous observations about the nature and extent of Sherwood's wounds, was not testimonial.

Furthermore, Dr. Ely made her own independent conclusions about the cause of Sherwood's injuries and the cause of death based on her own independent analysis of the factual portions of the autopsy report and corresponding photos. Dr. Ely independently concluded that Sherwood's injuries were likely caused by a knife and that the stab wound that penetrated Sherwood's heart was the fatal injury (Ely: T. 35-44, 46-47). And, of course, Dr. Ely was cross-examined; her knowledge, methods, and opinions were amply scrutinized and defense counsel highlighted that she had not been present during the autopsy and that the information in the autopsy report could not help her identify an assailant (Ely: T. 46-47). For these reasons, the admission of the autopsy report and Dr. Ely's testimony did not violate defendant's confrontation rights.

Defendant is equally wrong to suggest that the admission of the autopsy report violated his right to confront the witnesses against him under the New York State Constitution (defendant's brief, pp. 56-58). Under the New York State Constitution, Article I, §6, "In any trial in any court whatever the party accused shall . . . be confronted with the witnesses against him or her." Likewise, under the Sixth Amendment to the United States Constitution, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." As the Court of Appeals noted in People v. Bradley, 8 NY3d 124, 126 (2006), both clauses articulate the right to confrontation "in virtually identical language." More important, the Court of Appeals has not drawn a distinction between the confrontation right under the New York State and the United States Constitutions and certainly has not interpreted the right under New York law to be more expansive than that under its federal counterpart. See e.g., People v. Montes, 16 NY3d 250, 253 (2011) (citing both the NYS and US Constitution for the Confrontation Clause).[15] For these reasons, defendant's claim that his rights were violated under New York's Constitution should be rejected.

---

[15] Last term, in People v. John, 27 NY3d 294, 297 (2016), although the defense had raised his complaint under both the New York State and federal constitutions, the Court found there had been a Confrontation Clause violation under the federal constitution and did not mention the state constitutional provision.

49

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
JAMES GARLICK,

                      Petitioner,

                                          18 Civ. 11038 (CM)

          -against-

CHRISTOPHER MILLER, Superintendent,
Great Meadow Correctional Facility,
                           Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


## <u>MEMORANDUM OF LAW</u>


                                                DARCEL D. CLARK
                                                District Attorney
                                                Bronx County
                                                198 East 161st Street
                                                  Bronx, New York 10451
                                                (718) 838-7322


NANCY D. KILLIAN
JORDAN K. HUMMEL
Assistant District Attorneys
        Of Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
JAMES GARLICK,

                             Petitioner,

                                              18 Civ. 11038 (CM)

                -against-

CHRISTOPHER MILLER, Superintendent,
Great Meadow Correctional Facility,
                                 Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


## RESPONDENT'S MEMORANDUM OF LAW

## STATEMENT

This memorandum of law is submitted in opposition to the instant petition for

a writ of <u>habeas</u> <u>corpus</u>.

## **THE FACTS**

The facts relied upon in this memorandum of law are contained in the accompanying declaration of Assistant District Attorney Jordan K. Hummel, the exhibits attached hereto, and the minutes of the trial provided under separate cover to this Court. For a full exposition of the facts in the case, the Court is respectfully referred to respondent's brief to the Appellate Division, First Department (see Exhibit 2, pp. 2-10).

Briefly, on November 1, 2011, after she and Johanna Rivera were verbally assailed by an intoxicated Gabriel Sherwood on a Bronx street, Lisa Rivera felt unsafe so she called her then-boyfriend, petitioner, who arrived on the scene about ten minutes later (T 65-68, 300-01). Petitioner and Sherwood spoke, physically fought, and entered the lobby of an apartment building, where their actions were recorded by the building's surveillance video (T 67-68, 302-03). Petitioner struck Sherwood repeatedly about his chest with an object. After Sherwood fell to the ground, petitioner got on top of him and continued to strike him in the chest. Johanna also punched and kicked Sherwood while petitioner stood nearby. Petitioner pulled Johanna off of Sherwood and she, petitioner, and Lisa left (T 68-70, 303-05). As the video surveillance showed, no one else touched Sherwood.

Police arrived on the scene and saw Sherwood lying on the ground, exhibiting no signs of life, surrounded by blood (T 155-58). EMS arrived and took Sherwood to

a hospital where medical staff unsuccessfully tried to revive him and pronounced him dead at 6:40 P.M. (T 49, 159-60; Exhibit 7, pp. 17-19).

Meanwhile, at the scene, the police searched for weapons, but found none. Det. DeGrazia met with the building's superintendent and reviewed security footage depicting that evening's events (T 185-86, 218-19). Later, Det. DeGrazia met with Lisa at her apartment (T 187). After midnight on November 2, 2011, Johanna gave a statement to the police at a local precinct and was subsequently arrested and charged with murder on the theory that she had acted in concert with an unapprehended individual to intentionally cause Sherwood's death (T 70-71, 188, 271).

On November 11, 2011, petitioner was arrested (T 189). Petitioner gave oral and written statements admitting that he had fought Sherwood on the date in question, but that he "was trying to defend [himself] and [his] girlfriend" and that he "wasn't trying to hurt anybody." Petitioner also stated that while he and Sherwood were fighting outside, he saw Sherwood reach into his waistband and, although petitioner did not see what Sherwood was reaching for,[1] he was able to wrestle it away from Sherwood. Petitioner said the fight continued inside and that Sherwood was "stronger than" petitioner and "wasn't trying to let [petitioner] go" so he "kept fighting trying to get

---

[1] Contrary to petitioner's current claim that "Sherwood brandished a weapon" (Petition: 5), petitioner stated he "didn't know what [Sherwood] had" and that he "never s[aw] what it was in the course of the fight" (Exhibit 4 at trial, petitioner's written statement to police).

[Sherwood] off of [him]."  Petitioner said that he eventually left the building, returned to pull Johanna off of Sherwood, and left again (T 195-97).

Autopsy and Autopsy Report

On November 1, 2011, the Office of the Chief Medical Examiner (hereinafter "OCME") received Sherwood's body.  Damien Lee, a Medico-Legal Investigator, completed a "Supplemental Case Information" form that indicated that, according to a doctor at the hospital, Sherwood was "found by EMS supine on the floor . . . in cardiac arrest and with multiple (4) stab wounds to the chest and abdomen."  The form further indicated that Lee called the precinct and "Per Detective Degrasio the case is pending further information and no additional information is available." (Exhibit 7, p. 17).  Also, the "Notice of Death" form, completed at the same time, indicated under "Circumstances of Death," "App. Manner: Homicide," and "Other Info: call.loc[ation] ? no ems.sheet. stab wound to abdomen & chest n[ext].o[f].k[in]. unk[nown]. at this time.pct#?" (Exhibit 7, p. 18).

On November 2, 2011, Dr. Katherine Maloney, with Dr. James Gill present, conducted an autopsy on Sherwood's body at OCME and issued a report (T 28-29; Exhibit 7, p. 21).  Based on Dr. Maloney's "Case Worksheet," completed the same day and included in the report, Sherwood's "Immediate cause" of death was a "stab wound of torso with perforation of heart," the same cause of death articulated in the final report on December 29, 2011 (Exhibit 7, pp. 3, 13).

Detectives Speranza and Farmer were also present during the autopsy (T 243; Exhibit 7, p. 20), though the record is silent as to their participation, if any. Notably, a police report completed on the same day as the autopsy and included as part of the autopsy report stated "Victim was assaulted and stabbed by unknown perp(s) for unknown reason" (Exhibit 7, p. 20).

In September 2013, when trial began, Dr. Maloney and Dr. Gill were no longer employed at OCME.[2] Accordingly, the People called Dr. Susan Ely, Deputy Chief Medical Examiner of OCME, to testify (T 23).

Prior to testimony, defense counsel argued that the autopsy report was testimonial, therefore, allowing a medical examiner who did not conduct the autopsy to testify about the contents of the report would violate petitioner's confrontation rights. Counsel requested that Dr. Ely be precluded from testifying about the autopsy, the nature and extent of Sherwood's injuries, and the cause of death (T 637-43). The court denied the general application, but encouraged specific objections when the expert testified (T 643). Immediately before Dr. Ely testified, counsel renewed his application that her testimony should be precluded. Relying on People v. Freycinet, 11 N.Y.3d 38 (2008), and People v. Hall, 84 A.D.3d 79 (1st Dept. 2011), lv den 18 N.Y.3d 924 (2012), cert denied 133 S. Ct. 193 (2012), the court, again, denied the general application and

---

[2] Dr. Gill became the Chief Medical Examiner of Connecticut (T 29). Dr. Ely believed that Dr. Maloney was practicing upstate in Rochester (T 47). The reason for these relocations and promotions was not developed on this record.

invited further objections during the witness's testimony (T 17-22). With respect to redacting the autopsy report, the People suggested that it be certified as a business record and that the witness be permitted to testify, but that the report not be moved into evidence (T 19). Defense counsel "would not agree to [the prosecutor's] suggestion" because he did not see how he could have "an effective cross-examination without the document being placed into evidence" (T 21).

Dr. Ely's brief direct testimony (T 23-44) began with a description of her training and experience in determining the cause and manner of death (T 25-28). Next, she explained OCME procedures used for documenting autopsies, testified that she had reviewed Sherwood's autopsy report, and laid the foundation necessary to have the report admitted into evidence as a business record (T 28-34). When the report was introduced, defense counsel acknowledged he had reviewed the document, did not object, and declined to voir dire the witness (T 34).

Based on her review of the autopsy report and related photographs, Dr. Ely described Sherwood's wounds including their location, nature, and depth. She testified that Sherwood had suffered two stab wounds and four incised wounds to his torso and blunt force trauma to his face (T 35-36). In addition, Dr. Ely gave her independent opinions and conclusions about Sherwood's injuries. In particular, she opined that the fatal injury was a 4 ½-5 ½ inch stab wound to his chest that penetrated and perforated his skin and rib cage, continued between two ribs, and perforated his heart. This injury caused internal bleeding around his heart and within his left chest cavity, totaling 1 ½

liters of blood (1/3 of his total blood volume), which, in her opinion, caused shock and the collapse of his left lung (T 37-41a; Exhibit 7, p. 5). Further, Dr. Ely stated that, in her professional opinion, wounds of this nature were most commonly caused by a knife (T 36-37).

On cross-examination, Dr. Ely admitted that she was not present during the autopsy and that her expert opinions were based on the data contained in the autopsy report and corresponding photographs (T 46-47). She further admitted that, based on the autopsy report and photographs, she did not know who had inflicted the stab wounds, if the wounds had been inflicted by multiple people, the height of the assailant, whether the assailant was right or left handed, standing or sitting. She also did not know when or the order in which the wounds had been inflicted (T 48-49, 53-54).

At the conclusion of Dr. Ely's testimony, the court explained that the autopsy report "was admitted subject to certain redactions" the parties would discuss later (T 59). After summations, the court reminded counsel that redactions needed to be addressed and took a brief recess for counsel to retrieve his annotated copy of the report to propose redactions (T 504-09). Ultimately, counsel reiterated his position that Dr. Ely's testimony was inadmissible and stated he had no "further application" with respect to redactions (T 524-26).

During summation, defense counsel focused on the surveillance video of the crime, but argued that the relative depth of Sherwood's wounds, only one of which was lethal, showed that petitioner lacked the intent to kill (T 424-25, 439). He further argued

that Dr. Ely could not tell the jury "the time the fatal stab wound was inflicted," "the sequence of the cuts," "the gender," "position," or "size of the stabber," or whether they were "lefthanded or righthanded" (T 440). During the People's summation, which argued "in this case you got the crime on videotape and that's really all you need" (T 450), the prosecutor briefly responded to counsel's claims by describing the seriousness of Sherwood's injuries (T 452-53). The jurors acquitted petitioner of murder, but found him guilty of First-Degree Manslaughter.

## ARGUMENT

### POINT

**THE STATE COURT'S REJECTION OF PETITIONER'S CLAIM THAT THE TRIAL COURT ERRED IN ADMITTING THE AUTOPSY REPORT WAS NEITHER CONTRARY TO NOR AN UNREASONABLE APPLICATION OF SUPREME COURT PRECEDENT.**

In his appellate brief and in his petition for a writ of <u>certiorari</u>, petitioner claimed that the trial court violated his confrontation rights by admitting a non-testifying medical examiner's autopsy report, as well as the testifying medical examiner's independent conclusion about Sherwood's cause of death (see Exhibits 1, pp. 39-58, 3, 4, and 6). The Appellate Division, First Department, unanimously rejected petitioner's claim, the New York Court of Appeals subsequently denied petitioner's leave application, and the Supreme Court of the United States denied his petition for a writ of <u>certiorari</u>. Petitioner now raises this exhausted claim before this Court. He cannot

prevail on federal habeas review, however, because the determination of the state court was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent because the Supreme Court has not ruled on the testimonial nature of autopsy reports and fair minded jurists could disagree upon the correctness of the state court's ruling. Indeed, if the Supreme Court of the United States thought New York's analysis of this important issue was contrary to or an unreasonable application of its precedent, it likely would have granted <u>certiorari</u> to correct this alleged error.

"The Antiterrorism and Effective Death Penalty Act of 1996 ["AEDPA"] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under law." <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002); <u>see</u> <u>also</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 100 (2011) (noting that AEDPA imposes, with limited exceptions, a "relitigation bar"); <u>Parker v. Matthews</u>, 567 U.S. 37, 38 (2012) (per curiam) (AEDPA proscribes "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts" [internal quotation marks omitted]). To advance these objectives, 28 U.S.C. § 2254 (d) provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

The Supreme Court has explained that under § 2254(d)'s "contrary to" clause, a habeas court may only issue the writ if the state court applied a different rule from the governing precedent established by the Court, or if, on a materially indistinguishable set of facts, the state court reached a different result than the Supreme Court has reached. <u>Bell</u>, 535 U.S. at 694. A habeas court may grant relief pursuant to AEDPA's "unreasonable application" clause "if the state court correctly identified the governing legal principle but unreasonably applie[d] it to the facts of a particular case." <u>Id</u>. But "an <u>unreasonable</u> application of federal law is different from an incorrect application of federal law." <u>Eze v. Senkowski</u>, 321 F.3d 110, 124–25 (2d Cir. 2003) (emphasis in original), quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000). Indeed, a habeas court is not permitted to grant the writ "simply because [it] concludes in its independent judgment that the state-court decision applied [the law] incorrectly. . . . Relief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable." <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 665 (2004) (internal citation and quotation marks omitted).

Importantly to the instant matter, a state court's application of federal law is objectively unreasonable "only if it is so erroneous that 'there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" <u>Nevada v. Jackson</u>, 569 U.S. 505, 508 (2013) (per curiam). "If this standard [sounds] difficult to meet, that is because it was meant to be," since "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,'

not a substitute for ordinary error correction through appeal." Richter, 1562 U.S. at 102–103.

Petitioner now asserts—as he did in his direct appeal and his petition for a writ of certiorari—that the trial court admitted a non-testifying medical examiner's autopsy report in contravention to the Confrontation Clause. However, the New York State Supreme Court Appellate Division, First Department, rejected petitioner's claim, finding that the autopsy report at issue was not testimonial, since it did "not link the commission of the crime to a particular person" People v. Garlick, 144 A.D.3d 605, 606 (1st Dept. 2016). The court also held that petitioner's "contention that People v. Freycinet[] has been undermined by subsequent decisions of the United States Supreme Court is unavailing." Id.[3] The New York Court of Appeals and Supreme Court of the United States declined to review this decision. Garlick, 29 N.Y.3d 948; Garlick, 138 S. Ct. 502.

To date, the Supreme Court has not addressed the question of whether an autopsy report is testimonial. Petitioner does not – and cannot – dispute this, as it was the center-piece of his petition for a writ of certiorari (Exhibit 4, p. 12 "This Court has never considered how Crawford applies to autopsy reports"]). Indeed, in urging the Supreme Court to grant certiorari, petitioner argued that "[l]acking clear guidance on

---

[3] Since the New York Court of Appeals subsequently denied petitioner's leave application (Garlick, 29 N.Y.3d 948 [2017]), petitioner has satisfied the exhaustion requirement for raising the instant claim in this Court.

this issue, state and federal courts have become intractably split over whether an autopsy report is testimonial hearsay" and explains the details of the split for four pages. Exhibit 4, pp. 12-16 (internal quotations and citations omitted). Describing the split as "deeply entrenched," petitioner stated that "[o]nly [the Supreme Court] can resolve the conflict over how the Confrontation Clause applies" to autopsy reports, evincing a clear lack of Supreme Court authority on this issue. Exhibit 4, p. 16. The lack of Supreme Court authority on this issue, and the fact that fair minded jurists disagree about the testimonial nature of autopsy reports, including the Second Circuit, requires denial of petitioner's writ of <u>habeas</u> <u>corpus</u>.

The Supreme Court has been explicit that federal habeas relief is available "only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and that federal habeas relief is "precluded where 'fair minded jurists could disagree' on the correctness of the state court's decision." <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (quoting 28 U.S.C. § 2254[d][1] and <u>Richter</u>, 562 U.S. at 101). Further, to grant habeas relief, the "state court decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." <u>Id</u>. (quoting <u>White v. Woodall</u>, 572 U.S. 415, 419-20 [2014]). Since "[n]o precedent of [the Supreme Court] clearly forecloses th[e] view" that autopsy reports are not testimonial, and "[i]t is also not

beyond the realm of possibility that fair minded jurists could conclude" the same, federal habeas relief must be denied. Etherton, 136 at 1152.

With a plethora of fair minded jurists disagreeing with petitioner's claim, he has clearly failed under the deferential standards of AEDPA. Moreover, as will be demonstrated, petitioner has not even established that the state court was incorrect, much less that it erred unreasonably.

A defendant has the right to confront witnesses "who bear testimony against him." See Crawford v. Washington, 541 U.S. 36, 51 (2004); U.S. Const. Amend. VI. This essentially means that out-of-court testimonial statements may not be introduced against a defendant at trial to establish the truth of the matter asserted. See Crawford, 541 U.S. at 42; Davis v. Washington, 547 U.S. 813 (2006). Equally clear, however, is that this rule does not bar the use of out-of-court statements by declarants who are not "witnesses"-that is, those who do not "bear testimony." See e.g., Davis, 547 U.S. 813; Michigan v. Bryant, 562 U.S. 344 (2011); Ohio v. Clark, 135 S. Ct. 2173 (2015).

In recent years, the Supreme Court has weighed in on the testimonial nature of various out-of-court statements. See Davis, 547 U.S. 813 (victims' statements to 911 operator and affidavit given to police officer); Giles v. California, 554 U.S. 353 (2008)(deceased victim's statements to police officer); Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009)(laboratory analyses certifying that police-seized material was a certain quantity of cocaine); Bryant, 562 U.S. 344 (victim's identification and description—during an ongoing emergency—of the shooter and the location of the

shooting); Bullcoming v. New Mexico, 564 U.S. 647 (2011)(forensic laboratory analysis certifying that defendant's blood-alcohol level was above the legally permissible limit for driving); Williams v. Illinois, 567 U.S. 50 (2012) (expert's testimony that DNA profile found on rape victim matched defendant's DNA profile); Clark, 135 S. Ct. 2173 (victim's statements to preschool teacher). In Clark, the Court reiterated the following test to determine if a statement is testimonial: "whether in light of all the circumstances, viewed objectively, the 'primary purpose' of the [statement] was to 'create an out-of-court substitute for trial testimony.'" Clark, 135 S. Ct. at 2180 (quoting Bryant, 562 U.S. at 358).[4]

Applying this standard, New York's jurisprudence holds that autopsy reports are not testimonial. In Freycinet, the New York Court of Appeals held that a redacted autopsy report was non-testimonial. Like the Supreme Court of the United States, New York refused to adopt an absolute rule that business records were non-testimonial and, instead, evaluated the totality of the circumstances—"various indicia of

---

[4] The Court's analyses in Melendez-Diaz, Bullcoming, and Williams, utilized the above-mentioned "primary purpose test." Melendez-Diaz held that certificates identifying a substance as cocaine were testimonial because "under Massachusetts law the sole purpose of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substances"; thus, the certificates were "functionally identical to live, in court testimony, doing 'precisely what a witness does on direct examination.'" See 557 U.S. at 310-311 (internal citations omitted). Bullcoming rejected the results of a blood-alcohol-content test as "surrogate testimony" because it was "made for the purpose of proving a particular fact" and admitted through a witness who did not perform the test. See 564 U.S. at 652. Williams held that a DNA profile created by a non-testifying witness was non-testimonial, since it was relayed by an expert witness—who was subject to cross-examination—solely for the purpose of explaining his opinion, and was, therefore not offered for its truth. See 567 U.S. at 57-58.

testimonality"—to distill the document's primary purpose. Freycinet, 11 N.Y.3d at 41.

In particular, the court noted "the extent to which the entity conducting the procedure

is an arm of law enforcement," "whether the contents of the report are a

contemporaneous record of objective facts, or reflect the exercise of fallible human

judgment," "whether a pro-law-enforcement bias is likely to influence the contents of

the report," and "whether the report's contents are directly accusatory in the sense that

they explicitly link the defendant to the crime" were important factors to consider. Id.

(internal citations and quotation marks omitted). The court explained that an autopsy

report was non-testimonial given the independent nature of OCME, that the report

contained contemporaneous, objective observations (as compared to the opinions

communicated during testimony at trial), and that the report did not directly link the

defendant to the crime. Id. at 846. Put another way, based on the totality of the

circumstances, the court found that the primary and sole purpose of the report was to

ascertain "what happened to the victim," not to be used as an out-of-court substitute

for live testimony to prove "who killed her." Id.

Based on Freycinet's clear precedent, in People v. Acevedo, 112 A.D.3d 454, 455

(1st Dept. 2013), lv den 23 N.Y.3d 1017 (2014), the First Department held that autopsy

reports were non-testimonial and rejected the notion that Bullcoming or Melendez-

Diaz or "any other decision of the Supreme Court of the United States is to the

contrary." In People v. John, 27 N.Y.3d 294, 307, 315 (2016), the New York Court of

Appeals held that a defendant's DNA profile was testimonial in part because it directly

linked the defendant to the charged crimes, but explicitly stated that it was "not retreating" from its position that autopsy reports are non-testimonial. Most recently, in People v. Austin, 30 N.Y.3d 98 (2017), the court reaffirmed its conclusion with respect to a defendant's DNA profile, but, as John made clear, this does not alter the court's analysis with respect to autopsy reports.

The Second Circuit has taken a similar position to the state court. In United States v. James, 712 F.3d 79, 98-99 (2d Cir. 2013), the court held that an autopsy report was non-testimonial because OCME's independence from law enforcement demonstrated that the report "was not prepared primarily to create a record for use at a criminal trial." The Circuit Court explained that "a laboratory analysis is testimonial if the circumstances under which the analysis was prepared, viewed objectively, establish that the primary purpose of a reasonable analyst in the declarant's position would have been to create a record for use at a later criminal trial." Id. at 94-95 (citing Melendez-Diaz, 557 U.S. at 324; Bullcoming, 564 U.S. at 669 [Sotomayor, J., concurring]).

Contrary to petitioner's contentions (Petition: 24-27), New York's jurisprudence, including the decision in this case, squarely aligns with Supreme Court precedent, including Melendez-Diaz and Bullcoming. The main concern in those cases was that substituted testimony at issue—i.e, the certifications stating that seized material was cocaine and that defendant's blood alcohol content was above the legal limit, respectively—were per se evidence of the defendants' culpability. Put differently, the

contents of those reports could be "nothing but testimonial" since they "directly linked the accused to the charged crimes." See People v. Pealer, 20 N.Y.3d 447, 454 (2013). Taking into account that factor and all of the circumstances below, viewed objectively, the primary purpose of the autopsy report at issue was not to "create an out-of-court substitute for trial testimony" (Clark, 135 S. Ct. at 2180 [quoting Bryant, 562 U.S. at 358] [alteration omitted]), thus it aligns with the Melendez-Diaz and Bullcoming holdings.

As an initial matter, the fact that the autopsy report at issue was admitted through a live expert medical witness to provide a basis for her opinions about the cause and manner of death, who was, of course, subject to cross-examination, demonstrates that it was not created for the primary purpose of being a substitute for trial testimony. Indeed, after reviewing the factual portions of the autopsy report and the nearly 50 photographs that carefully documented Sherwood's injuries, Dr. Ely made her own independent conclusions about the cause of death (the stab wound that penetrated Sherwood's heart) (T 35-44, 46-47). On cross-examination, Dr. Ely's knowledge and opinions were amply scrutinized, highlighting that she had not been present during the autopsy and that the information in the autopsy report neither identified an assailant, nor ruled out the possibility that the fatal wound was inflicted accidentally during a struggle (T 46-47). This is a far cry from the offending reports admitted without live testimony in Melendez-Diaz.

Rather, the autopsy report was created pursuant to the OCME's statutory duties as a public health official, including its duty to "determin[e] the cause or manner of injuries and/or death" (NYC Charter 557[f][3]) in a variety of circumstances, not merely death due to "criminal violence" (NYC Charter 557[f][1]).[5] OCME is "by law, independent of and not subject to the control of the prosecutor's office. People v. Washington, 86 N.Y.2d 189, 193 (1995). Since "[t]he People have no power to dictate the contents or practices within OCME [and] Medical Examiners have no authority to gather evidence with an eye toward prosecuting a perpetrator" (id.), the resulting report plainly was not created as part of a criminal investigation (Petition: 25-28). Indeed, the

---

[5] In New York City, the authority, duties, and responsibilities of OCME are dictated by provisions set out in New York's Public Health Law, the New York City Charter, and the Administrative Code of the City of New York. See NY Public Health Law §§4209 and 4210; NYC Charter § 557; NYC Admin Code § 17-203. OCME "is not a law enforcement agency." People v. Washington, 86 N.Y.2d 189, 192 (1995).

Instead, in New York City, OCME's predominant function is to serve public health concerns. By statute, OCME has a duty to "determin[e] the cause or manner of injuries and/or death" (NYC Charter § 557[f][3]) under various circumstances, only one of which is a violent death. Indeed, medical examiners also perform autopsies when the death is "by accident, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility, or in any suspicious or unusual manner." NYC Charter § 557(f)(1). Only "ten percent of deaths investigated by the OCME lead to criminal investigations." James, 712 F.3d at 99 n. 10) (explaining on average OCME performs 5,500 autopsies each year and, in 2010, 533 New York City residents' causes of death were listed as homicides). Indeed, while a determination of a manner of death as homicide may be used in a criminal trial, it may also be used for a multitude of other purposes such as civil litigation (wrongful death, medical malpractice, product liability, etc.), medical and public health research to investigate and catalogue causes of death implicating public health concerns (i.e., identifying a rise in certain diseases or unusual causes of illness and/or death, "satisfy[ing] the public's interest in knowing the cause of death," particularly in cases that receive media attention, or "provid[ing] answers to grieving family members" (People v. Dungo, 55 Cal.4th 608, 619-620 [Cal. 2012]).

Furthermore, under NYC Admin Code § 17-203, OCME determines whether to conduct an autopsy based on whether "it may be concluded with reasonable certainty that death occurred from natural causes or obvious traumatic injury."

fact that New York City Charter §557(f)(1) authorizes OCME to perform autopsies not only where the cause of death is suspected to be criminal, but also in deaths arising, inter alia, "by accident, by suicide, suddenly when in apparent health, [or] when unattended by a physician, in a correctional facility or in any suspicious or unusual manner," means that while some autopsy reports may later be used in a criminal prosecution, the reports are not prepared specifically for use in a criminal trial, in contrast to the affidavits that were created in Melendez-Diaz, 557 U.S. at 324.

The totality of the circumstances, viewed objectively, support this conclusion. First, the medical examiner had access only to limited information when she conducted the autopsy and knew nothing about the detectives' suspicions or the status of their investigation. She had received a report from a doctor at St. Barnabas Hospital which stated that Sherwood had been found by EMS in cardiac arrest with multiple stab wounds to his chest and abdomen (Exhibit 7, p. 17). Additionally, according to the "Supplemental Case Information" form, which had been completed prior to the autopsy, Det. DeGrazia informed an OCME representative by phone only that, "the case is pending further information and no additional information is available" (Exhibit 7, p. 17). Similarly, the "Notice of Death" form offered no additional information with respect to a police investigation (Exhibit 7, p. 18) and a police report, which had been completed on the same day as the autopsy, explicitly stated "Victim was assaulted and

stabbed by unknown perp(s) for unknown reason" (Exhibit 7, p. 20).[6] Critically, the

medical examiner was not aware of any targeted suspect: no suspect was identified in

the autopsy report or in the medical examiner's files.

Second, there was no reason for the medical examiner to conclude that her

autopsy report would be used as evidence in lieu of testimony at a criminal trial or that

it would "serve as crucial evidence in a criminal case," as petitioner suggests (Petition:

20, 25-26). An autopsy report is not "inherently inculpatory." See Williams, 567 U.S. at

57-58, 84-85. Like the DNA profile in Williams, the autopsy report here was created at

a point when the medical examiner had no way to know whether her observations and

conclusions would ultimately prove relevant at a criminal trial. She could not have

known whether her observations and conclusions would turn out to be incriminating,

exonerating, or both. See Williams, 567 U.S. at 85. Before the autopsy on November 2,

2011, and throughout the period until the final report was sent to the District Attorney,

the medical examiner could not have known what, if any, crime had been committed,

much less who was responsible, or whether a prosecution would ensue. There might

have been no criminal prosecution against anyone if, for example, the medical

examination revealed that Sherwood had died of a heart attack during an unarmed

---

[6] The report also shows that OCME conferred with multiple other sources to gather information about the circumstances of Sherwood's death with an eye towards accurately determining his manner and cause of death. Specifically, OCME contacted EMS personnel who responded to the scene, doctors at the hospital who treated Sherwood, and Sherwood's family to learn about where the body was found, what medical treatment was provided (if any), and his medical history.

struggle or a drug overdose. Similarly, no prosecution would have ensued if the authorities concluded that the fatal wound to the heart had been self-inflicted, accidental, or was legally justified in self-defense or if they had been unable to identify or locate the perpetrator(s). Had the fatal wound been a blow consistent with a kick to the head, and not a stab wound to the heart, the charging decision and the course of a criminal prosecution would have been very different. Even assuming that the authorities pursued a prosecution against a particular individual, the case could have been resolved in any number of ways without using the autopsy report in court, such as a plea bargain or a trial in which the parties stipulated to the cause of death (see Melendez-Diaz, 557 U.S. at 328 [positing defense counsel will stipulate to forensic evidence rather than insist on live testimony that will highlight its importance]; Bullcoming, 564 U.S. at 667 [Ginsburg, J.] [same]).

Furthermore, even if there were a trial, the information in the autopsy report might have exonerated the accused, or supported his theory of the defense such as justification, third-person responsibility, mitigation, a psychiatric defense, accidental death, or suicide. Notably, in this case, the observations and conclusions contained in the medical examiner's report did partially exonerate Johanna Rivera – the medical examiner's findings that the cause of death was a stab wound to the heart, and not a head injury, convinced the authorities ultimately not to pursue homicide charges against her.

Accordingly, it matters little that petitioner had been indicted by the time the autopsy report was certified (as a business record), signed, and delivered to the prosecution (Petition: 23-24). On the contrary, the critical fact is that Dr. Maloney completed the autopsy and documented her findings—including the fact that the "[i]mmediate cause" of death was a "stab wound of torso with preformation of heart" (Exhibit 7, p. 13)—on November 2, 2011, nine days before petitioner was arrested and weeks before the grand jury voted an indictment. When the report was finalized, on December 29, 2011, after several other tests were completed (e.g. toxicology), the cause of death remained the same (Exhibit 7, p. 3). Ultimately, because the medical examiner operated independently of the police and conducted her examination unaware that the police had identified a suspect, it did not matter that by the time she signed and sent the report, the police had arrested petitioner. See Williams, 567 U.S. at 135-36 (Kagan, J. dissenting) ("the typical problem with laboratory analyses—and the typical focus of cross-examination—has to do with careless or incompetent work, rather than with personal vendettas[, therefore,] . . . it makes not a whit of difference whether, at the time of the laboratory test, the police already have a suspect").

Third, the medical examiner did not certify the findings or the results of the autopsy (Petition: 26-27). The report contains two certifications. The first was a classic business record certification: a clerk "attest[ed] that the records bearing this certification and authentication are a true and correct copy of the original records so described and are accurate and genuine" (Exhibit 7, p. 2). The second certification was a signed

23

statement by Dr. Maloney that she had performed Gabriel Sherwood's autopsy on November 2, 2011, with Dr. Gill present (Exhibit 7, p. 4). Critically, the medical examiner did not certify, attest, or swear that the statements, findings, or conclusions contained in the autopsy report were true or accurate. This certification is very different than those found to be of testimonial character in <u>Melendez-Diaz</u> and <u>Bullcoming</u>. <u>See Hall</u>, 84 A.D.3d at 83-84.[7]

Fourth, the factual portions of the report—descriptions of the wounds and the injuries—are statements that were made contemporaneously with the medical examiner's observations. <u>See</u> <u>Williams</u>, 567 U.S. at 84-85 (noting the reliability of the scientific process). In this regard, the salient portions of the report are akin to a 911 emergency call in which the speaker recounts current circumstances, rather than someone recalling a story about the past. Additionally, such observations are also comparable to medical records, observing objective facts about an individual to diagnose, which are not considered testimonial. <u>See</u> <u>Dungo</u>, 55 Cal.4th at 619-620.

Furthermore, the fact that the medical examiner is required by law to send the autopsy report to the prosecutor's office does not transform the report into testimonial evidence (Petition: 26 n. 122, 28). Pursuant to New York City Charter § 557 (g) "[t]he

---

[7] Moreover, this is not the kind of formalized statement—like an affidavit, deposition, prior testimony, or confession to police—that would be considered testimonial under Justice Thomas' analysis. <u>See</u> <u>Williams</u>, 567 U.S. at 110 (Thomas, J., concurring); <u>Bryant</u>, 562 U.S. at 378-79 (Thomas, J., concurring); <u>Melendez-Diaz</u>, 557 U.S. at 329-330 (Thomas, J., concurring); <u>Davis</u>, 547 U.S. at 836 (Thomas, J., concurring in part and dissenting in part).

chief medical examiner shall promptly deliver to the appropriate district attorney copies of all records relating to every death as to which there is, in the judgment of the medical examiner in charge, any indication of criminality." Thus, where a medical examiner suspects criminality, that information must be reported to the District Attorney. This is no different from the reporting requirement in <u>Clark</u>, where the Supreme Court noted that "mandatory reporting statutes alone cannot convert a [statement] into a law enforcement mission aimed primarily at gathering evidence for a prosecution." <u>Clark</u>, 135 S. Ct. at 2183. Like the teacher in <u>Clark</u>, a medical examiner who suspected a crime had been committed "would have acted with the same purpose whether or not they had a state-law duty to report" <u>Id</u>.

Given all of the circumstances outlined above, it is clear that the First Department's holding that the autopsy report in this case was not testimonial was sound and is neither contrary to nor an unreasonable application of the Supreme Court's precedent.

Further, the autopsy report did not play a "critical role" in the prosecution (Petition: 28-29), thus, any error in its admission was harmless. Under <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), constitutional errors are harmless for purposes of habeas review unless the error had a "substantial and injurious effect" on the verdict. <u>Fry v Pliler</u>, 551 U.S. 112, 116–117 (2007). The Brecht analysis considers: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted

testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." Grigg v Phillips, 401 Fed.Appx. 590, 593–95 (2d Cir. 2010) (citing Zappulla v New York, 391 F.3d 462, 468 [2d Cir. 2004]) (references to defendant's silence were error, but harmless because they were "a small part of the record and were largely cumulative of properly admitted evidence" and the prosecution's evidence "was certainly weighty").

Given this "more forgiving" harmlessness standard, petitioner cannot prevail. Fry, 551 U.S. at 116. The People's evidence against petitioner was strong. As the prosecutor put it during his summation, "in this case you got the crime on videotape and that's really all you need" (T 450). Johanna, who testified as a cooperating witness, outlined the day's events leading up to the stabbing, which was clearly captured on surveillance video. Medical testimony from the EMT who arrived on the scene demonstrated the extent of Sherwood's injuries that could only be explained by a stabbing, not mere punches and kicks, and, when apprehended by police, petitioner confessed he had fought Sherwood (though he attempted to mitigate by saying he was protecting himself and his girlfriend). This was strong evidence of petitioner's guilt that, even absent the autopsy report and medical examiner's testimony, would not have led to petitioner's acquittal. Accordingly, the medical examiner's testimony at trial was brief, as were the prosecutor's comments on summation about describing the seriousness of Sherwood's injuries (T 452-53), largely responding to defense counsel's summation argument that the depth of the wounds indicated a lack of homicidal intent

(T 424-25, 439), which the jury accepted and, ultimately, acquitted petitioner of Second-Degree Murder, and convicted him only of First-Degree Manslaughter.

Moreover, at trial, the extent of Sherwood's injuries and his cause of death were undisputed. Thus, far from playing "a critical role in this prosecution" (Petition: 28-29), the autopsy report, and Dr. Ely's expert opinion about what had caused Sherwood's death, were hardly consequential. Petitioner nevertheless argues that the report was critical because it allowed the prosecution "to rule out Rivera's forceful blows to the head as the cause of death" and to demonstrate petitioner's intent to cause serious physical injury (Petition: 28-29). Setting aside the medical evidence, including Dr. Ely's opinion about injuries and cause of death, the circumstances of the dispute on the street and the surveillance video that depicted petitioner repeatedly stabbing at Sherwood, in combination with the fact that petitioner fled the scene and, when finally apprehended, admitted to fighting Sherwood, left no doubt that petitioner intended to seriously injure Sherwood and did not simply cut him "unintentionally" or accidently during a struggle (Petition: 29). The video also would allow the jury to draw the reasonable conclusion that petitioner, who was repeatedly stabbing Sherwood, was the cause of his death, rather than Johanna's quick punches and kicks. Indeed, the video shows that no one else touched Sherwood before he was discovered by police, lying on the ground, exhibiting no signs of life, surrounded by blood. This fact, combined with the EMS testimony that Sherwood could not be revived, permitted the reasonable conclusion that the stab wounds caused Sherwood's death, not punches and kicks.

The autopsy report, therefore, did not have a "substantial and injurious effect" on the verdict, thus, any error in its admission was harmless. Brecht, 507 U.S. 619.

\* \* \*

Finally since none of petitioner's claims raises issues of constitutional law about which reasonable jurists could disagree (see Slack v. McDaniel, 529 U.S. 473, 484 [2000]), or which are fairly debatable (see Miller-El v. Cockrell, 537 U.S. 322, 342-43, 347 [2003]), this Court should refuse to issue a Certificate of Appealability.

## CONCLUSION

**PETITIONER'S APPLICATION FOR A WRIT OF HABEAS CORPUS SHOULD BE DENIED IN ITS ENTIRETY AND NO CERTIFICATE OF APPEALABILITY SHOULD ISSUE.**

Respectfully submitted,

By:
/s/_____
NANCY D. KILLIAN (NK 0771)
Chief Appellate Attorney

/s/_____
JORDAN K. HUMMEL (JH 1188)
Assistant District Attorney

DARCEL D. CLARK
District Attorney
Bronx County
198 East 161st Street
Bronx, New York 10451
(718) 838-7322

NANCY D. KILLIAN
JORDAN K. HUMMEL
Assistant District Attorneys
*Of Counsel*
MARCH 2019